**Form 1.945 – Damages, LLC**
**Steven M. Collard, M. ED.**
Vocational Economic Consulting
Telephone (813) 417-9168
P.O. Box 893   Valrico, FL   33595-0893

February 15, 2019

**EXHIBIT C**

Mr. Ryan Bresler
Attorney at Law
Criterion Center
29605 U.S. 19 North
Building 200, Suite 210
Clearwater, FL  33761

RE:  Ms. Jennifer M. Farley

Dear Mr. Bresler:

You have asked me to do an analysis to calculate the loss of future earning capacity and the past loss of wages, if any, sustained by Ms. Jennifer M. Farley as a result of injuries she sustained from vehicular collisions that occurred on May 4, 2016.  In conducting the analysis, I interviewed Ms. Farley on January 12, 2019, and I reviewed Ms. Farley's deposition transcript and the earnings and medical information forwarded by your office.

The interview reveals Ms. Farley to be a 38-year-old female who was graduated from Trumbull high school in Trumbull, Connecticut.  Ms. Farley said that prior to injury she had acquired her high school transcript and was contemplating taking college coursework toward a degree in Project Management.

Over her worklife, Ms. Farley has functioned as a Quality Analyst, a Case Coordinator and a Senior Case Coordinator.  She audits the Processors' work and corrects errors, and she writes procedures for operations and subsidiaries, and takes questions and gives answers.  She was building a Quality System, and states she had a knack for Information Technology and enjoyed the technical side.  She was the Subject Matter Expert for her team, and she had completed a two-year project in April, prior to the motor vehicle collisions in May of 2016.

The work she's performed has been semiskilled to skilled in nature and sedentary to light in terms of physical demands.

Mr. Bresler
February 15, 2019
Page 2

Physical demands are defined as the physical requirements made on the worker by the specific job-worker situation. For example, *Sedentary Work* requires of a worker exerting up to 10 pounds of force occasionally (Activity exists up to 1/3 of the time) or a negligible amount of force frequently to lift, carry, push, pull or otherwise move objects, including the human body. *Sedentary Work* involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are Sedentary if walking or standing is required only occasionally and all other sedentary criteria are met.

*Light Work* requires of a worker exerting up to 20 pounds of force occasionally, or up to 10 pounds of force frequently (Activity exists from 1/3 to 2/3 of the time) or a negligible amount of force constantly to move objects. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work:

- When it requires walking or standing to a significant degree; or
- When it requires sitting most of the time but entails pushing or pulling of arm or leg controls; or,
- When the job requires working a production rate pace entailing the constant pushing or pulling of materials even though the weight of those materials is negligible.

Physical Demands of *Reaching* (Extending her arms), *Handling* (Seizing, holding, grasping, turning or otherwise working with her hand or hands. Fingers are involved only to the extent that they are an extension of her hand, such as to turn on a switch or shift gears), and *Fingering* (Picking, pinching or otherwise working primarily with fingers rather than with the whole hand or arm, as with *Handling*) are required on a frequent basis (up to 2/3rd of the time) in Ms. Farley's work.

On the morning of May 4, 2016, Ms. Farley sustained injuries when the vehicle she was operating was stopped in traffic and the vehicle behind hers did not stop, colliding into the rear-end of Ms. Farley's vehicle and thrusting it forward into the vehicle in front of hers. Ms. Farley immediately experienced pain in her left upper extremity and left arm, and in her neck and low back. Ms. Farley's left mid-arm impacted the steering wheel, and her right knee impacted the dash.

Ms. Farley initially sought treatment at Mease Countryside Hospital, where she was examined under back and neck pain protocol for sprain/strain injury. Although no acute injury was identified, Ms. Farley was advised to follow-up with a spine specialist.

Ms. Farley contacted Orthopedic Specialists and was examined by Dr. Alan J. Graves. Dr. Graves noted that Ms. Farley complained of pain in her left arm and left shoulder and chest/breast area and that she reported positive for headaches, numbness and radiculopathy in her left upper extremity and in her low back/right hip when weightbearing.

Ms. Farley was prescribed a regimen of palliative care and magnetic resonance imagery scans were ordered. On June 25, 2016, Dr. Graves administered facet joint injections at

Mr. Bresler
February 15, 2019
Page 3

C-3/4 and C4/5. Next, Dr. Graves performed a MR Arthrogram procedure on Ms. Farley's left shoulder on June 27, 2016 that showed injuries, and subsequently Dr. Graves performed left shoulder arthroscopy surgery on September 27, 2017.

As a result of injury in the May 4, 2016 collision, Ms. Farley reports the following:

- Frequent occipital headaches and occasional painful migraine headaches;
- She reports a painful "flashing" pain in her brain behind her eyes, worse on the right;
- Occasional tinnitus;
- Decreased range of motion in her neck and upper extremities;
- Looking down causes her neck pain to increase;
- She will avoid lifting a gallon of milk or heavier items with her left upper extremity;
- She reports radicular symptoms and loss of grip strength in her left hand;
- Holding posture at her steering wheel and at her computer causes her neck and arm pain to increase;
- She has clicking in her left shoulder;
- She reports her short-term memory is diminished;
- She reports occasional word-finding difficulty;
- She has difficulty with problem-solving;
- She has difficulty with organization;
- She has difficulty concentrating and has to work in a quiet and distraction-free environment;
- She is afraid of driving and feels distress with having to leave her home;
- She feels like she is using all her life's energy to sustain working;
- She has frequent "cut-down" days which she doesn't accomplish as much as she used to and she feels she doesn't do the work as carefully as she used to because of her decreased physical and emotional/psychological health;
- She repeatedly looks over and over her work;
- She is depressed due to her loss of ability to fully function without limits and pain;
- She has anxiety due to her loss of ability to fully function without limits and pain;
- She has limits with performing her activities of daily living and with performing her instrumental activities of daily living;
- She is limited a lot with performing moderate activities such as moving a table or scrubbing on her hands and knees;
- She has difficulty performing her work;
- She has a decreased social life;
- Using her left upper extremity causes her pain to increase;
- She is functionally limited from performing a full range of her usual and customary household chores and tasks; and,
- She has a loss of quality of life.

Prior to May 4, 2016, Ms. Farley reports her overall health was "Very Good" on a scale of "Excellent", to "Very Good", to "Good", to "Fair", to "Poor". She had no limits with

Mr. Bresler
February 15, 2019
Page 4

either the amount or kind of work she could perform. She enjoyed taking road trips with her family, and her favorite hobbies were baking and gardening. Prior to injury, Ms. Farley was exploring going to college, and had attained her high school transcripts.

As a result of injury with limitations and severe and distracting pain, Ms. Farley reports her overall heath is "fair" to "poor" on the overall health scale, and she is limited a lot with performing her major activity (work) and has significant limits with performing her activities of daily living and instrumental activities of daily living.

Ms. Farley's date of birth is April 6, 1980. She will be 39 years old. Mortality Tables have long been established which measure the number of expected years of life at a given age. Ms. Farley's statistical Life Expectancy at age 39 is 43.5 years.

The National Health Interview Survey (NHIS) defines Chronic Health Condition as a "condition that a respondent describes as having persisted for three or more months, or one that is on the NHIS list of conditions always classified as chronic, no matter how long the person has had the condition". An Activity Limitation is defined as "being limited in an activity that a person would otherwise be expected to perform". Activity Restrictions are defined in terms of "bed-days", "school-loss days", "work-loss days", and "cut-down days". Ms. Farley's condition is chronic as a result of the injuries she sustained in the motor-vehicle collision.

The U.S. Department of Commerce defines occupational disability as existing when a person is limited in terms of the amount of work performed or the kind of work performed on a job as a result of a physical or mental impairment. Ms. Farley meets the definition of occupational disability.

Two empirically derived facts exist for persons who meet the definition of occupational disability. The first is that, on average, when persons with occupational disability do work, on average they earn less than their nondisabled counterparts. The second is that, on average, persons with occupational disability have a worklife expectancy that is shorter than their nondisabled counterparts.

Earning capacity represents an individual's ability or power to earn money. It may or may not be synonymous with actual earnings. In most instances, workers in their mid-to-late 40's experience actual earnings that are congruent with earning capacity.

Earning capacity is more commonly reduced, rather than destroyed, as a function of occupational disability. The occupationally disabled person's age, education, previous work history, skill level, and severity of impairment combine to produce either a destruction or reduction of earning capacity.

Ms. Farley's pre-injury earning capacity is reasonably represented by an average of her actual earnings for the two years prior to injury, or $40,843 stated in terms of 2018 dollars. Ms. Farley's post-injury earning capacity is reasonably represented by an average

of her actual earnings for the two years post-injury, or $36,904 stated in terms of 2018 dollars.

Another issue that must be considered when defining total loss of lifetime capacity to work and to earn money, however, is worklife expectancy. Worklife expectancy addresses the issues of being alive in the future, being a labor force participant in the future and being employed in the future. These probabilities are measurable today for cohorts of Ms. Farley, and are used in the analysis of loss of future earning capacity to determine the probability of her receipt of her future earning capacity.

Disability status is the factor most often overlooked in defining worklife expectancy. When quantifying loss of earning capacity, it is erroneous to assume that a permanently injured person successfully returned to work will enjoy the same worklife expectancy he or she would have, absent the permanent impairment. This assumption flatly ignores compelling government data to the contrary.

The government has annually collected data on the employment potential of disabled versus nondisabled persons, all other factors held constant, since 1981 through the Current Population Survey, the American Community Surveys and the Decennial Census. The data reveal the disabled are less-frequent participants and are less likely to find employment than the nondisabled. Since these data constitute the building blocks for calculating worklife expectancy, one quickly concludes that, on average, disabled workers experience a shorter worklife than their nondisabled counterparts (persons of the same sex, age, and education). Thus, an individual who meets the definition of occupational disability will, on average, have a reduced lifetime earning capacity resulting from shortened worklife expectancy.

Prior to injury, and based on her age, education, and nondisabled status, Ms. Farley's pre-injury worklife expectancy is like that of an average nondisabled female with 13-15 years of education/training time, reduced from age 39 through 74 by the joint probabilities of Life, Participation and Employment, or 21.42 years.

As a result of injury, and based on her age, education, and anticipated best-case scenario of recovery, Ms. Farley's post-injury worklife expectancy would be like that of an average moderately disabled female with 13-15 years of education/training time, reduced from age 39 through 74 by the joint probabilities of Life, Participation and Employment, or 16.34 years.

As a result of injury, and based on her age, education, and anticipated worst-case scenario of recovery, Ms. Farley's post-injury worklife expectancy would be like that of an average disabled female with 13-15 years of education/training time, reduced from age 39 through 74 by the joint probabilities of Life, Participation and Employment, or 7.56 years.

For the "best-case" scenario, when Ms. Farley's earning capacity is combined with her pre-injury and post-injury worklife expectancies, her lifetime loss of capacity amounts to

Mr. Bresler
February 15, 2019
Page 6

$326,247, stated in terms of present value and including fringe benefits calculated at a rate of 20%.

For the "worst-case" scenario, when Ms. Farley's earning capacity is combined with her pre-injury and post-injury worklife expectancies, her lifetime loss of capacity amounts to $714,849, stated in terms of present value and including fringe benefits calculated at a rate of 20%.

From the date of injury to Ms. Farley's 39rd birthday is a period of 2.92 years. During this period, she has a past loss of wages of $7,353, stated in terms of 2018 dollars.

When Ms. Farley's loss of future earning capacity in the two scenarios are combined with her past loss of wages, her combined losses are in a range of $333,600 to $722,202 stated in terms of present value.

Please advise if you have any questions.

Sincerely,

*[signature]*

Steven M. Collard, M.Ed.
Vocational Economic Analyst

Sources:

1. U.S. Department of Health and Human Services, National Center for Health Statistics, Vital Statistics of the United States, Volume 66, no. 3, 2013 data, published April 2017.

2. U. S. Department of Commerce, Bureau of the Census, Current Population Reports, 1995-2009. (Http://www.census.gov/hhes/www/disable/disabcps.html)

3. The Occupational Outlook Handbook, United States Department of Labor, Bureau of Labor Statistics, US Government Printing Office.

4. Consumer Price Index, All Urban Consumers (CPI-U), US city average, All items; US Department of Labor, Bureau of Labor Statistics.

5. Methodological Issues in Measuring Health Status and Health-related Quality of Life for Population Measures: A Brief Overview of the "HALY" Family of Measures", Fryback, D.G., Ph.D., Appendix C, Summarizing Population Health – Directions for the Development and Application of Population Metrics, Washington DC: National Academy Press, 1998.

6. Department of Commerce, Bureau of the Census report "Labor Force Status and Other Characteristics of Persons With a Work Disability", Current Population Reports, Series P-23, Number 160.

7. Department of Commerce, Bureau of the Census, Current Population Report "Mean Earnings of Individuals by Age, Sex, Level of Educational attainment and Disability Status".

8. Murray, C.J. and Lopez, A.D.,Global Burden of Disease and Injury, Copyright 1996, World Health Organization.

9. Pennifer Erickson, Ronald Wilson, and Ildy Shannon. "Years of Healthy Life", U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention, National Center for Health Statistics, www.health.gov/healthypeople, April, 1995.

10. Expectancy data, Economic Demographers, Shawnee Mission, Kansas, "Difference between expected life and full function healthy life at single years of age..."

11. International Classification of Functioning,World Health Organization, 2001.

12. United States Department of Labor Office of Administrative Law Judges Law Library,http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTPARTS.HTML