

**Forensic Research + Analysis**         **EXHIBIT D**

April 22, 2019

Ryan Bresler
Tanney, Griffith & Bresler, P.A.
29605 US 19 North, Suite 210
Clearwater, FL 33761
Tel: (727)781-8817
Fax: (727)781-8606

RE: *Jennifer Farley v. State Farm Mutual*

Date of Crash: May 4, 2016
Date of Birth: April 6, 1980 [36 years old at time of crash]

Dear Mr. Bresler,

I am in receipt of your correspondence regarding the above-named action. I have reviewed the documentation accompanying your correspondence including medical records, photos, police report, and other materials.

The purpose of this report is to provide an analysis of the causal relationship between the subject collision sequence and Ms. Farley's subsequent shoulder, spine and other injuries and associated treatment.

*My qualifications to provide opinions concerning the matters herein, particularly on issues of the causal relationship between trauma and injury, are as follows:*

I am a consultant in forensic medicine and forensic epidemiology. For crash related causation assessments I have additional qualifications in the fields of crash reconstruction and injury biomechanics. I hold the following academic degrees: doctor of medicine (Umeå University), doctor of philosophy in public health/epidemiology (Oregon State University), doctor of chiropractic (University of Western States), master of public health/ epidemiology and biostatistics (Oregon State University), and bachelor of science in general science (University of Oregon). In addition to my degreed education, I have completed a 2-year post-doctoral fellowship in forensic pathology at Umeå University in Sweden, and am a fellow of the pathology section of the American Academy of Forensic Sciences. I am a Fulbright Fellow, and hold a 3-year appointment (2017-20) with the United States Department of State as a Fulbright Specialist in the field of forensic medicine.

Ryan Bresler
Attorney at Law

Re: *Jennifer Farley v. State Farm Mutual*

April 22, 2019

Page 2 of 19

I serve as tenured Associate Professor of Forensic Medicine at Maastricht University, and an Affiliate Professor of Psychiatry at Oregon Health and Science University School of Medicine, where I have taught courses for the past 20 years in forensic medicine, forensic epidemiology, and injury epidemiology. From 2005-2017 I held an appointment as an Adjunct Professor of Forensic Medicine and Epidemiology at the Institute of Forensic Medicine, Faculty of Health Sciences, Aarhus University, Aarhus, Denmark.

I have been a crash reconstructionist since 1996, and have had ACTAR accreditation (the Accreditation Commission on Traffic Accident Reconstruction) since 2005. Over the past >20 years I have participated in the reconstruction of more than 2,000 crashes, including more than 300 fatalities. Since 1999 I have served as a vehicular homicide investigator for law enforcement (consultant to the state medical examiner and special deputy sheriff), and I am currently an affiliate medical examiner with the Allegheny County Medical Examiner's office.

I have more than 60 scientific publications pertaining to injury biomechanics, including a book for the Society of Automotive Engineering, and taught injury biomechanics in a faculty peer-reviewed course at OHSU for 15 years. I have served as a consultant on injury biomechanics to state and federal government.

I serve or have served as an associate editor or editorial board member of 14 scientific peer-reviewed journals, and was the co-founder and co-editor in chief of the Journal of Whiplash and Related Disorders. I have published approximately 200 scientific papers, abstracts, book chapters and books on topics that include traffic crash injuries, crash reconstruction, injury causation and injury biomechanics, including the recent text for Elsevier, <u>Forensic Epidemiology: Principles and Practice</u> (2016). My publications have been cited by other authors of peer-reviewed papers more than 2,000 times.

I have provided testimony in more than 350 civil and criminal trials in state and Federal courts throughout the United States, Canada, and Australia. Please see my CV for further details.

Ryan Bresler
Attorney at Law

Re: *Jennifer Farley v. State Farm Mutual*

April 22, 2019

Page 3 of 19

## Background Facts

On May 4, 2016 at approximately 9:17 am Jennifer Farley was the restrained driver of a 2004 Hyundai XG350 4D sedan that was traveling southbound N. McMullen Booth Blvd. (CR-611) near Abby Crescent Ln., Clearwater, Florida when it was struck in the rear by a 2004 Ford F-550 truck, driven by Michael Henderson. The impact caused her stopped vehicle to strike the rear of a 2004 Chevrolet Colorado, driven by Joshua, Choate, that had suddenly stopped in front of her. A fourth vehicle, a 2012 Volkswagen Jetta was subsequently struck in the rear by the Chevrolet Colorado. At the time of the crash it was raining, and the speed limit in the area was 45 mph.

After the crash Mr. Henderson stated that he was traveling about 45 mph when he applied the brakes while crossing railroad tracks, at which time his vehicle began to slide and rotate somewhat. The figures below depict the police report diagram, a satellite image of the crash site (and distance between the railroad tracks and the point of impact) and 2 of the involved vehicles post-collision:

 

**Police scene diagram (left), satellite image of crash area (right)**

Ryan Bresler
Attorney at Law

Re: *Jennifer Farley v. State Farm Mutual*

April 22, 2019

Page 4 of 19




**Ms. Farley's Hyundai XG350 post-collision**




**Ford F-550 post-impact**

The damage estimate for the Hyundai XG350 came to approximately $8000, indicating replacement of the rear bumper, trunk lid, right and left quarter panels, rear glass, hood, left front fender, left front lamps, front fender and grille. I have not reviewed any documentation of the damage to the Ford but from the photos it there is damage to the front bumper, grill, hood, front fenders and possibly the frame. No airbag deployments were reported (a driver side airbag in the Ford is optional and it is unknown at the present time if it had one).

Ryan Bresler
Attorney at Law

Re: *Jennifer Farley v. State Farm Mutual*

April 22, 2019

Page 5 of 19

At the time of the collision Ms. Farley was wearing her seatbelt, and she was stopped in traffic. Both hands were positioned on the steering wheel, at 3 and 9, and her foot was resting on the brake. The initial rear impact was hard (she rated it at 9/10) and Ms. Farley felt like her vehicle was catapulted into the vehicle in front.

Upon the frontal impact her right knee struck the bottom of the dashboard, her left arm impacted the steering wheel. Ms. Farley also recalled striking her head on the head restraint during the crash sequence. Ms. Farley felt immediate pain in her right knee, neck and shoulders, and mid to lower back. Her entire left shoulder area felt hot and swollen straight away. Ms. Farley called her mother right after the crash, who arrived about 20 minutes later.

EMS also arrived on scene and checked Ms. Farley but she declined ambulance transportation to the ED; instead, her mother drove her to the Mease Countryside Hospital ED where she was evaluated for complaints of left upper arm pain, left sided neck pain, and pain in the lower back. An area of ecchymosis was noted on the left mid arm. Ms. Farley completed radiographs of the cervical and lumbar spine and left humerus which were interpreted as normal without evidence for fracture. Ms. Farley was diagnosed with left arm contusion, acute neck and back pain and released home. She declined pain medication in the ED.

Ms. Farley was recommended to take Motrin as needed and to seek follow up with a spine specialist.

On May 9, 2016, 5 days after the crash, Ms. Farley presented to Dr. Alan Graves (orthopedic surgery, joint specialist) reporting pain in the neck, upper and lower back and left shoulder; and bruising on the left arm, left chest wall and breast (present 2 days after the crash). She additionally reported numbness and pain radiating into the left upper extremity and pain radiating into the right hip. She completed further radiographs of the cervical spine which showed laxity in flexion on C2-3, C3-4 and C5-6, correcting on extension. Dr. Graves also noted post-traumatic headaches. He prescribed Mobic 7.5 mg and Flexeril and scheduled MRIs of the cervical and lumbar spine.

On May 10, 2016 Ms. Farley completed the MRI studies. The cervical images showed Chiari 1 malformation, and loss of lordosis in the mid cervical segments. The lumbar spine revealed mild lower facet arthrosis; and both spinal studies were without evidence for fracture.

On May 18, 2016 Ms. Farley began physical therapy.

Ryan Bresler
Attorney at Law

Re: *Jennifer Farley v. State Farm Mutual*

April 22, 2019

Page 6 of 19

On June 22, 2016 Ms. Farley revisited Dr. Grave. She reported persisting symptomatology in the left neck, left shoulder/elbow (with intermittent paresthesias) and upper back. Physical examination revealed limited motion and crepitus in the left shoulder. Dr. Grave recommended MRI of the thoracic spine and MR/arthrogram of the left shoulder.

On June 27, 2017 Dr. Graves performed the left shoulder arthrogram which showed inferior labral maceration with edematous labral glenoid scarring and minor central cuff tendinopathy. The thoracic MRI, completed the same day, revealed mild disk narrowing in the upper thoracic segments with facet arthrosis in the mid to lower thoracic segments.

On June 30, and July 28, 2016 Ms. Farley returned to Dr. Graves for follow up. Pain persisted in the neck, back and left shoulder. Ms. Farley requested additional physical therapy.

On August 25, 2016 Dr. Graves discussed progressing with an arthroscopy for the left shoulder. Ms. Farley agreed to the surgery.

On September 8, 2016 Ms. Farley was released from therapy.

On March 13, 2017 Ms. Farley revisited Dr. Grave. Pain persisted in the left shoulder, neck and she had headaches. Physical examination revealed diminished range of motion throughout the cervical spine and elicited pain in the left shoulder with forward elevation and abduction. Dr. Grave recommended restarting Mobic and physical therapy. He discussed possible injections for the cervical and lumbar spine; and arthroscopic surgical repair of the left shoulder tear.

On May 11, 2017 Ms. Farley completed a single therapeutic treatment secondary to complaints of aches and kinks in her neck and increasing shoulder pain.

**On September 22, 2017 Dr. Graves performed the left shoulder arthroscopy, debridement of the labral tear and subacromial decompression.**

On October 19, 2017 Ms. Farley began post-surgical rehabilitative therapy, progressing to home exercises by December 14, 2017. She recommenced therapeutic treatments for persisting neck pain and headaches on January 8, 2018.

Ryan Bresler
Attorney at Law

Re: *Jennifer Farley v. State Farm Mutual*

April 22, 2019

Page 7 of 19


On February 19, 2018 Ms. Farley returned to Dr. Graves with persisting cervical symptomatology and residual shoulder pain. He believed she had reached maximum medical improvement but considered her a good candidate for future care including pain medications, physical therapy, injections and possible further surgery on the left shoulder. Dr. Graves opined that Ms. Farley's quality of life had diminished as a result of the subject crash.

Ms. Farley continued therapy through April 2, 2018 at which time she received a trigger point injection in the left trapezius and requested cervical injections due to persisting symptoms.

On June 25, 2018 Dr. Graves performed left sided cervical facet injections at C3-4 and C4-5.

On August 2, 2018 Ms. Farley reported headaches, persisting pain in the neck, and residual discomfort in the left shoulder with clicking. Dr. Graves discussed proceeding with a second cervical spine injection.

<u>Pre-crash medical history</u>
Ms. Farley was involved in a couple of minor vehicle crashes under the age of 11 years. There were no injuries sustained.

<u>Medical and other records reviewed for history</u>
Jennifer Farley, deposition June 22, 2018.
Complaint.
Florida Traffic Crash Report.
Mease Countryside Hospital ED records.
Dr. Graves, all records.
BayCare Surgery Center, arthroscopy left shoulder.
Orthopedic Specialists, Physical Therapy records.
Orthopedic Specialists, MRI studies (all).
Orthopedic Specialists, MR arthrogram.
Dr. Torke, compulsory medical examination report (for defendant).

Ryan Bresler
Attorney at Law

Re: *Jennifer Farley v. State Farm Mutual*

April 22, 2019

Page 8 of 19

### *Injury Causation Analysis*

A crash-related injury causation analysis for a specific individual is performed by assessing the risk of injury from the collision and comparing it to the probability that the injuries or conditions would have been present at the same point in time if the collision had not occurred. The process is referred to as a "3-step" injury causation method in which improbable alternative causes are ruled out and the single most likely cause is identified. The analysis is accomplished via the application of crash reconstruction, biomechanical, medical, and epidemiologic (risk assessment) principles.[1-4] This 3-step methodology has been extensively described in the peer-reviewed literature, been deemed generally accepted by Courts in the United States, and has been adopted as part of case law in the U.S. (see the Appendix at the end of this report for more further information)[5-10]

The three fundamental elements or steps of an injury causation analysis are as follows:
1) Whether the injury mechanism had the potential to cause the injury in question (*aka* general causation);
2) The degree of temporal proximity between the injury mechanism and the onset of the symptoms reasonably indicating the presence of the injury; and
3) Whether there is a more likely alternative explanation for the occurrence of the symptoms at the same point in time (*aka* differential etiology).

As applied to the facts in the subject case, these 3 steps are as follows:

---

[1] Freeman MD, Zeegers M. Principles and applications of forensic epidemiology in the medicolegal setting. *Law, Probability, & Risk* 2015; doi:10.1093/lpr/mgv010.
[2] Koehler S, Freeman MD. Forensic epidemiology; a methodology for investigating and quantifying specific causation. *Forens Sci Med Path* 2014 Jun;10(2):217-22
[3] Freeman MD. Medicolegal causation analysis of a lumbar spine fracture following a low speed rear impact traffic crash. *J Case Rep Prac* 2015; 3(2): 23-29.
[4] Freeman MD, Kohles SS. An Evaluation of Applied Biomechanics as an adjunct to systematic specific causation in forensic medicine. *Wien Med Wochenschr* 2011;161:1-11.
[5] Freeman MD, Centeno CJ, Kohles SS. A systematic approach to clinical determinations of causation in symptomatic spinal disc injury following motor vehicle crash trauma. *PM R* 2009;1(10):951-6.
[6] Freeman MD. A practicable and systematic approach to medicolegal causation. *Orthopedics* 2018;41(2):70-2.
[7] Hashish R, Badday H. Frequency of acute cervical and lumbar pathology in common types of motor vehicle collisions: a retrospective record review. *BMC Musculoskeletal Disorders* 2017;18:437
[8] Bunketorp O (2017) WAD – Criteria for Evaluation of Causality. Open J Trauma 1(3):054-063.
[9] 35 F.Supp.3d 1360 United States District Court, D. Colorado. Donald L. Etherton, Plaintiff, v. Owners Insurance Company, a Michigan Insurance Company, Defendant. Civil Action No. 10–cv–00892– PAB–KLM
[10] Etherton v. Owner Insurance Company. U.S. District Court of Appeals, 10th Circuit. Case No. 14-1164.

Ryan Bresler
Attorney at Law

Re: *Jennifer Farley v. State Farm Mutual*

April 22, 2019

Page 9 of 19

### Injury mechanism

Based on the photos and damage reports, it appears that the Ford F-550 impacted the rear of the Hyundai from an approximately 7 o'clock direction. This is consistent Mr. Henderson's statement that his vehicle began to rotate as it lost traction, and also with his statement that he was attempting to avoid hitting another vehicle prior to rear impact with the Hyundai, which the police report indicates occurred at an impact speed of 45 mph.

Based on the distance from the railroad tracks to the area of impact (approximately 450 feet, based on the police report diagram above), it is doubtful that the collision occurred near the tracks, and thus it is difficult to make sense from Mr. Henderson's statement that he lost control of his vehicle over the tracks. Mr. Henderson stated that he was going approximately 40 mph prior to losing control of his truck. Considering the likely effect of pre-impact braking, the degree of damage to the rear of the Hyundai and front of the Ford, and the fact that the airbags did not deploy in the Hyundai during the secondary frontal collision, a reasonable estimated impact speed is approximately 33 mph.

Using this value as the closing speed for the Ford into the Hyundai, the crash-related speed change (also known as delta V) to the Hyundai can be estimated via application of a momentum, energy and restitution (MER) analysis. Using a crash reconstruction and simulation program to perform the analysis,[11] the delta V to the Hyundai would have been 33.7 mph with a range of peak vehicle acceleration of approximately 15.4 g. The impact speed of the Hyundai into the Chevrolet Colorado during the secondary frontal collision would have been approximately 32 mph, which would have resulted in a delta V of 21.6 mph in the Hyundai, and peak acceleration of 13.1 g. This frontal crash delta V serves as an upper bound at which a functioning airbag may not have deployed.

### Injury risk associated with a 34 mph delta V rear impact collision

In order to provide an estimate of the injury risk associated with *just* the first (rear impact) collision that Ms. Farley sustained in the subject collision sequence I accessed and analyzed data from the US national crash injury database (the National Automotive Sampling System-Crashworthiness Data System [NASS-CDS] of the National Highway Traffic Safety Administration [NHTSA]).

The NASS-CDS investigates approximately 5,000 crashes every year in 24 geographic Primary Sampling Units (PSU) at a cost of approximately $10,000 per investigation. A record of over 800 variables including weather conditions, road conditions, injury to occupants or pedestrians and

---

[11] Virtual Crash 3, vCrash America, Inc.

vehicle damage is gathered for each crash by trained NASS crash investigators. In order for a collision to be recorded in the NASS-CDS it must meet several criteria: a police report was generated; it was located within a primary sampling unit; it involved at least one passenger car, van or light truck; and at least one vehicle was towed from the crash scene. In turn, these data are weighted to provide a national estimate of all police-reported crashes occurring in the US and involving passenger cars, light trucks, and minivans that were towed due to damage.

The parameters of the search performed for the present case were as follows: All passenger vehicles exposed to a single rear impact crash, for which the delta V imparted to the vehicle had been reconstructed, were pulled for the 21-year period of 1995-2015 (inclusive). Then, all crashes at more than 30 mph delta V were selectively examined for the injury status of a restrained driver.

The results of the analysis were as follows:
Across the 21 years there were an estimated 5,059,491 vehicles in the US exposed to rear impact collisions for which there was a reconstructed delta V. The average delta V across all crashes was 12 mph, and 90% of the crashes were below 24 mph. A 34 mph delta was in the top 2% of all rear impact crashes, with regard to severity. See the chart below for the distribution of the crashes:



Ryan Bresler
Attorney at Law

Re: *Jennifer Farley v. State Farm Mutual*

April 22, 2019

Page 11 of 19

There were a total of 15,718 crashes in which the injury status and severity of a restrained driver was known for a more than 30 mph delta V. Among the injured drivers there were 23.2% (1 in 4) who sustained an injury that was deemed "moderate" or greater in severity. Moderate severity injuries include intervertebral disk injuries, vertebral body compression fractures, long bone and rib fractures, concussions and mild brain bleeds, and injuries to organs (liver lacerations, etc.). There were 4.3% (1 in 23) who sustained serious and greater injuries, which include skull fractures and significant brain injuries, multiple rib fractures and injuries to the lungs and heart, and a substantial (~10%) risk of death. There were 3.2% (1 in 32) of the injured drivers who sustained injuries deemed severe or critical, and who were at a very high risk of death. There were 83 deaths among the drivers with the most severe injuries, for a fatality rate of 1 in 189 drivers exposed to a rear impact crash like the first crash in the subject case.

The preceding analysis demonstrates that just the initial rear impact collision that Ms. Farley was exposed to was a competent cause of all of her injuries, including her left shoulder internal derangement and ongoing chronic neck pain.

*Cervical spine loads and injuries*
The forces on Ms. Farley's spine would have included axial (up and down) compression as well as forward and lateral flexion, extension, and shear forces during the first collision, and primarily forward and lateral flexion forces, along with compression, during the later collisions and vehicular movement. The loads on Ms. Farley's cervical disks and joints from just the rear impact collision would have exceeded 300 lbs.

*Left shoulder loads and injury*
Ms. Farley was gripping the steering wheel at the time of the initial rear and secondary frontal impact, and thus the load from her accelerating torso would have been transferred into her shoulder in the form of shear, rotation, and compression. Additionally, there was a mechanism during the collision to produce an impact between Ms. Farley's left arm and shoulder and the driver's side door or steering wheel, evidenced by the bruising described in the medical records and visible in contemporaneous photographs. These loads would have easily exceeded 500 lbs., more than sufficient to cause injury to the rotator cuff or glenoid labrum.

> [*NB* I note that Dr. Torke, the defendant's orthopedic expert who performed a compulsory medical examination on Ms. Farley, concluded that her left shoulder labral tear was

> degenerative rather than traumatic in origin. Dr. Torke claimed that traffic crashes were an unusual cause of labral tears, which was apparently the basis for his claim that Ms. Farley's left shoulder internal derangement was degenerative rather than traumatic. Given the unusual nature of the collision, as well as the direct trauma to Ms. Farley's left upper extremity and the resultant biomechanical loads on her left shoulder, Dr. Torke's opinions regarding what kind of injury mechanisms are most common in traffic crashes and as a cause of labral tears is unrelated to the propensity of the subject collisions to cause the type of injuries observed in Ms. Farley. More importantly, Ms. Farley's age (36) is not associated with a high risk of degenerative changes in the shoulder. Most importantly, regardless of the pre-crash of her shoulder, Ms. Farley had no symptoms or need for treatment in any part of her body. If she did have a degenerative tear in her labrum (a proposition for which there is no evidence), it was asymptomatic, and only converted to a symptomatic state by the subject collision.[6]]

Based on the preceding discussion there was more than ample force exerted on Ms. Farley's neck and left shoulder (as well as the remainder of her spine, extremities, and head) in either of the individual impacts in the subject multi-vehicle collision to cause her medically documented left shoulder and spinal injuries, *i.a.*, as well as the associated need for treatment.

### *Temporal relationship between the crash and symptoms indicative of injury*

The second step of the injury causation analysis is the assessment of the timing between the trauma and the onset of symptoms indicative of injury. The hallmark of injury is that "you know it when it happens;" *i.e.* the causal relationship between the trauma and onset of the symptoms indicative of the injury is usually close enough in time that it is easy to recognize when the injury was incurred. There are some injuries that exhibit a delayed onset of symptoms, including injuries to intervertebral disks, which can first manifest with identical symptoms to a simple spinal strain. Other injuries are always immediately apparent, such as bony fractures. Some injuries are considered "distracting" from others, because the pain they generate distracts attention from other, less painful injuries. There are still other injuries that can "mask" pain from nearby parts of the body through complicated pain accommodation mechanisms that are mediated at the spinal cord and in the brain. The assessment of the timing of the onset of symptoms reasonably attributed to an injury can sometimes be nuanced and complicated, and sometimes requires expert assessment.

Ryan Bresler
Attorney at Law

Re: *Jennifer Farley v. State Farm Mutual*

April 22, 2019

Page 13 of 19

Ms. Farley had an immediate onset of pain after the crash sequence (within minutes), and was diagnosed with sprain/ strain type injuries within a couple of hours of the crash. After less than 2 months of persisting and contiguous left shoulder and neck symptoms Ms. Farley was diagnosed with left shoulder internal derangement via MR arthrography. Ms. Farley had persisting left shoulder symptoms indicated throughout the medical records, which overlapped with complaints of left upper extremity radiculopathy as well as neck pain and headaches. There was a clear and contiguous history (chain of causation) between the onset of the symptoms and ultimate diagnoses and treatments, including the left shoulder surgery and ongoing cervical spine complaints.

An additional factor to consider in Ms. Farley's history is the presence of the pre-existing and previously asymptomatic Chiari malformation I (*i.e.* CMI, a condition in which the base of the brain protrudes through the opening at the base of the skull and into the spinal canal), which was discovered in her post-crash cervical MRI study.

From a biomechanical perspective, the sort of trauma associated with the violent rearward-frontal head movement associated with the subject collision sequence induces substantial movement into the cervicocranial junction (between the neck and the skull), and this trauma has the potential to symptomatically activate a previously asymptomatic CMI.

Symptoms that are most often associated with CMI are occipital headache, neck pain, upper extremity numbness and paresthesias and weakness.[12] The criterion for diagnosis of a CMI is typically MRI evidence of low cerebellar tonsils relative to the foramen magnum, but the threshold for diagnosis of CMI is variable. A CMI is typically diagnosed when the cerebellar tonsils are 5 mm or more below the foramen magnum.[13]

It is well established that previously asymptomatic CMI can become symptomatic as a result of exposure to traumatic injury. In a study of 364 cases of symptomatic CMI one group of authors found that 24% of their subjects described a traumatic event that precipitated their symptoms; often it was

---

[12] Milhorat et al. Chiari 1 malformation redefined: Clinical and radiographic findings for 364 symptomatic patients. Neurosurgery 1999;44:1005–17.
[13] Barkovich et al. Significance of cerebellar tonsillar position on MR. AJNR: American Journal of Neuroradiology 1986;7:795–9,

Ryan Bresler
Attorney at Law

Re: *Jennifer Farley v. State Farm Mutual*

April 22, 2019

Page 14 of 19

a traffic crash.[14] Syringomyelia (syrinx), a dilation of the central canal of the spinal cord, is closely associated with CMI,[15] and in particular with worsening of CMI secondary to trauma.[16]

In a more recent publication my colleagues and I described MRI findings in 600 cases of head and neck trauma, and we found that approximately 1 in 4 had cerebellar tonsillar ectopia/ Chiari when imaged in an upright position.[17]

Although I have not found any medical providers who have yet linked Ms. Farley's persisting symptoms with a symptomatically activated CMI (her headaches, in particular), should symptoms persist the potential contribution of the condition to Ms. Farley's clinical presentation should be further investigated.

Based on the documented history, there is a strong temporal relationship between the subject collisions and Ms. Farley's first development of symptoms indicative of injury to both her cervical spine and left shoulder, as well as other parts of her body.

*Alternative explanations*
This last step of the injury causation analysis specific to the individual involves the assessment of the probability of the same symptoms, injuries, diagnoses, and need for treatment occurring at the same point in time, but in the absence of the investigated crash.

This part of the analysis is accomplished in 2 ways; first and most obviously, any competing contemporaneous traumatic cause of injury must be ruled out. There is, however, no such history for Ms. Farley, and the only source of trauma apparent in my review of materials that is temporally proximate to Ms. Farley's injuries is the May 2016 collision.

The second part of the analysis requires an assessment of the probability that Ms. Farley would have developed her symptoms of a chronic, and ultimately surgical shoulder injury at the same point in

---

[14] Milhorat et al. Chiari 1 malformation redefined: Clinical and radiographic findings for 364 symptomatic patients. Neurosurgery 1999;44:1005–17.
[15] Speer MC et al. Review Article: Chiari Type I Malformation with or Without Syringomyelia: Prevalence and Genetics. J Genet Couns 2003;12(4):297-311.
[16] Milhorat TH. Classification of syringomyelia. Neurosurg Focus 2000;8(3):E1.
[17] Freeman et al. A case-control study of cerebellar tonsillar ectopia and head/neck (whiplash) trauma. *Brain Injury* 2010;24(7-8):988-94.

Ryan Bresler
Attorney at Law

Re: *Jennifer Farley v. State Farm Mutual*

April 22, 2019

Page 15 of 19

time had she not been involved in the May 4, 2016 high speed rear-front collision. As a previously healthy 36 year-old woman Ms. Farley was at a negligible annual risk of spontaneously developing chronic shoulder, spine, or head pain, much less the need for shoulder surgery, in the absence of trauma. Less than 1 in 2,000 is indicated by the literature on the topic and national hospital data.[6,18]

The chance that Ms. Farley was going to develop the onset of chronic (and ultimately surgical) shoulder, spine, and head pain on the *same day as the crash by pure coincidence* is obviously much smaller; less than 1 in 730,000 (the annual risk divided by 365 days). In comparison, the risk of moderate injury in *just the first rear impact collision* was nearly 200,000 times greater (1 in 4).

Based on the preceding analysis I conclude that the most probable, and *near certain* cause of Ms. Farley's left shoulder and spinal injuries and need for treatment described in this report is the subject May 4, 2016 rear impact collision.

I have not examined Ms. Farley and I therefore have no opinions about her diagnoses, treatment, or prognoses outside of what is reflected in the medical record. This is not to say that I am not qualified, licensed, and extensively experienced in performing such evaluations, but that I have not done so in this case.

The preceding opinions were given as reasonable medical and scientific probabilities. I reserve the right to amend any of my opinions should new information come to light.

Very truly yours,

*[signature]*

Michael D. Freeman, MedDr PhD MPH FAAFS
Associate Professor of Forensic Medicine
University of Maastricht Medical Center
Faculty of Health, Medicine, and Life Sciences
Maastricht University, Maastricht, Netherlands

---

[18] Nationwide Inpatient Sample, Healthcare Utilization Project, Agency for Health Research and Quality, US Department of Health and Human Resources

Ryan Bresler
Attorney at Law

Re: *Jennifer Farley v. State Farm Mutual*

April 22, 2019

Page 16 of 19

## Appendix

The 3-step causation methodology that I have used in this case is set forth in a number of my peer-reviewed publications, including a paper entitled *A Systematic Approach to Clinical Determinations of Causation in Symptomatic Spinal Disk Injury Following Motor Vehicle Crash Trauma,* published in the Journal of Physical Medicine & Rehabilitation in 2009. I first described this 3-step methodology in a paper published in 2008, and have since published more than a dozen papers describing some of the manifold applications of the causation methodology. As I describe below, the 3-step causal methodology has recently become part of United States Appellate Court case law on injury causation.

The methodology set forth in my 2009 paper consists of 3 steps or elements that need to be satisfied in an injury causation analysis in order to conclude that an injury resulted from a particular event to a reasonable degree of medical/ scientific probability, which are as follows:

1. Plausibility: This first step addresses whether it is biologically *possible* for the injury event to have caused the condition (a.k.a general causation). A finding of plausibility is unrelated to the *frequency* of the injury, because even if the injury occurs in only 1 in 100 or fewer cases of exposure to the event (*e.g.* a spinal disk injury following a car crash), it is still *plausibly* caused by the event. Plausibility is a relatively low hurdle to clear in a causal analysis, and is largely satisfied by the lack of evidence of *implausibility* of the relationship. Although it is common in crash injury litigation for the defendant to assert minimal vehicle damage as a basis for disputing injury causation, the approach is unhelpful for evaluating plausibility, as such an analysis does not have a sufficiently low error rate to establish impossibility, and at best can only be used to suggest a low frequency of injury in the general population. An example of an *impossible* causal relationship is the discovery of leukemia the day after a crash, as it is well established that it is not biologically plausible for trauma to cause leukemia. Plausibility is often, but not necessarily, established with epidemiologic data or information.

2. Temporality: This second step examines the clinical and other evidence of the timing between the onset of the symptoms of injury and the injury event, and must be satisfied to assess specific causation. First, it must be established that the sequence of the injury and the event is appropriate; the symptoms cannot be identically present prior to the event. Further, the onset of the symptoms of injury cannot be implausibly latent, relative to the injury event. For example,

Ryan Bresler
Attorney at Law

Re: *Jennifer Farley v. State Farm Mutual*

April 22, 2019

Page 17 of 19

while the symptoms of a spinal disk injury in the neck may not immediately include upper extremity radiculopathy (most such injuries are initially diagnosed as a simple sprain or strain), a complete absence of symptoms in the neck for 3 months after a traffic crash, followed by the sudden insidious onset of symptoms of a cervical disk injury with radiculopathy, could not be plausibly related to the crash in most cases.

3. <u>Lack of a more probable alternative explanation:</u> This final step examines the probability of the injury condition occurring at the same point in time in the plaintiff, given what is known about the plaintiff from the review of medical records and other evidence, but in the absence of the injury event (a.k.a. differential etiology). First, evidence of competing injury events must be evaluated, and compared for injury risk. Then, the likelihood of the condition occurring spontaneously must be assessed. For example, the plaintiff may have evidence of degenerative changes in the spinal disks pre-existing a traffic crash, but no symptoms. The question of interest (after the first 2 steps are satisfied) is what the probability was that the condition would have "converted" from asymptomatic to symptomatic in the absence of ("but-for") the crash. Since there is no information that can be gleaned from an examination of the plaintiff regarding him or his condition in the hypothetical absence of the crash, epidemiologic data often serves as the basis for the evaluation of the probability of alternative explanations. More probable alternative explanations are often intervening traumatic events that alter the clinical history in a substantive way. As an example, for a plaintiff with neck strain symptoms that lasted for 1 week after a crash, who is then involved in second collision a month later that results in neck and arm pain and is ultimately diagnosed with a cervical disk herniation, the second collision is easily identified as a more probable cause of the disk derangement than the antecedent crash. This is in part due to the abrupt change in the distribution of the symptoms more consistent with a disk derangement, but also the epidemiologically based conclusion that it is rare for a cervical strain that improves rapidly to evolve into a cervical disk herniation, and thus but-for the second crash, the condition would not have manifested.

The methodology described above was used to evaluate the cause of the Plaintiff's injury in *Etherton v Owners Insurance Company*, entered on March 3, 2014 in United States District Court for the District of Colorado. In Etherton, the Plaintiff's medical expert relied on the above referenced article to support her methodology (see footnote 3 on page 8 of the decision). The expert specified the same 3-step approach to assessing causation outlined above, described by the Court on page 8 of the order as follows:

Ryan Bresler
Attorney at Law

Re: *Jennifer Farley v. State Farm Mutual*

April 22, 2019

Page 18 of 19

> "...his first step was to determine general causation... whether or not the type of injury that the plaintiff sustained could have been caused by the type of collision that the plaintiff was in... her second step was to consider whether there was a temporal relationship between plaintiff's injury and the collision... her third step was to... rule out alternative causes of plaintiff's injury."

The defense challenged, among other things, the reliability and fit of the methods described by the expert. After an extensive examination and discussion of the 3-step process used by the expert, the Court found that the methodology appropriately fit the specific facts of the case, and that a population-based (epidemiologic) approach was an appropriate part of the causal methodology. The Court denied the Defendant's motion to strike the expert's testimony.

The Defendant appealed the ruling from the District Court, and in July of 2016, the Tenth Circuit U.S. Court of Appeals unanimously affirmed the 3-step causal methodology described in my 2009 publication cited above as generally accepted and well established for assessing injury causation (see *Etherton v. Owners Insurance Company*, No. 14-1164, 10th Cir, entered on July 19, 2016). Using the 3-step methodology the Court determined the expert's methodology fit the specific facts in the case, and that the District Court properly applied Rule 702/Daubert standard to the expert's testimony in finding his methodology reliable. The judicial panel included Supreme Court Justice Neil Gorsuch.

Below is a partial list of publications in scientific journals in which my descriptions of the 3-step methodology described in the *Etherton* decision and its various applications have been subjected to peer review. The foundation for the specific causation methodology described in all of these papers is the "Hill criteria," a guideline for the assessment of general causation that has been universally relied on in medicine and science for more than 50 years.

- Freeman MD. *A practicable and systematic approach to medicolegal causation. Orthopedics* 2018;41(2):70-2.

- Freeman MD, Zeegers M. *Principles and applications of forensic epidemiology in the medicolegal setting. Law, Probability, & Risk* 2015; doi:10.1093/lpr/mgv010.

- Freeman MD. *Medicolegal causation analysis of a lumbar spine fracture following a low speed rear impact traffic crash. J Case Rep Prac* 2015; 3(2): 23-29.

Ryan Bresler
Attorney at Law

Re: *Jennifer Farley v. State Farm Mutual*

April 22, 2019

Page 19 of 19

- Freeman MD, Cahn PJ, Franklin FA. Applied forensic epidemiology. Part 1: medical negligence. *OA Epidemiology* 2014;2(1):2.

- Koehler S, Freeman MD. Forensic epidemiology; a methodology for investigating and quantifying specific causation. *Forens Sci Med Path* 2014 Jun;10(2):217-22.

- Freeman MD, Kohles SS. An examination of the threshold criteria for the evaluation of specific causation of mesothelioma following a history of significant exposure to chrysotile asbestos-containing brake dust, *Int J Occ Env Hlth* 2012;18(4):329-36.

- Freeman MD, Everson T, Kohles SS. Forensic epidemiologic and biomechanical analysis of a pelvic cavity blowout injury associated with ejection from a personal watercraft (jet-ski). *J Forens Sci* 2012 doi: 10.1111/j.1556-4029.2012.02250.x

- Freeman MD, Kohles SS. Plasma levels of polychlorinated biphenyls, non-Hodgkin lymphoma, and causation. *J Environ Public Health* 2012;2012:258981. doi: 10.1155/2012/258981. Review.

- Freeman MD, Kohles SS. Application of the Hill Criteria to the Causal Association of Post-Traumatic Headache and Assault. *Egypt J Forensic Sci* 2011;1:35-40.

- Freeman MD, Kohles SS. Application of the Bradford-Hill Criteria for Assessing Specific Causation in Post-Traumatic Headache. *Brain Inj Prof* 2011;8(1):26-8.

- Freeman MD, Kohles SS. An Evaluation of Applied Biomechanics as an adjunct to systematic specific causation in forensic medicine. *Wien Med Wochenschr* 2011;161:1-11.

- Freeman MD, Centeno CJ, Kohles SS. A systematic approach to clinical determinations of causation in symptomatic spinal disc injury following motor vehicle crash trauma. *PM R* 2009;1(10):951-6.

- Freeman MD, Rossignol AC, Hand M. Forensic Epidemiology: A systematic approach to probabilistic determinations in disputed matters. *J Forensic Legal Med* 2008;15(5):281-90.