Exhibit "A"

1

```
            IN THE UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA


--------------------------x
JENNIFER FARLEY,

        Plaintiff,
vs.                         CASE NO.:  8:18-cv-00171-JSM-MAP


STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, a foreign
corporation.

        Defendant.
--------------------------x

VIDEOTAPED
DEPOSITION OF:       STEVEN M. COLLARD

DATE:                April 4, 2019

TIME:                12:30 p.m. to 2:15 p.m.

PLACE:               Riesdorph Reporting Group
                     1073 East Brandon Boulevard
                     Brandon, Florida

PURSUANT TO:         Notice by counsel for Defendant for
                     purposes of discovery, use at
                     trial or such other purposes as
                     are permitted under the Florida
                     Rules of Civil Procedure

REPORTER:            J. Gay Smith, RPR, RMR, FPR
                     Notary Public, State of Florida
```

Pages 1 - 72

2

```
 1   APPEARANCES:

 2        RYAN BRESLER, ESQUIRE
          Tanney, Griffith & Bresler, P.A.
 3        29605 US 19 North, Suite 210
          Clearwater, Florida  33761
 4            Attorney for Plaintiff

 5
          ROBERT N. BELLE JR., ESQUIRE
 6        deBeaubien, Simmons, Knight, Mantzaris & Neal, LLP
          332 North Magnolia Avenue
 7        Orlando, Florida  32801
              Attorney for Defendant
 8
     VIDEOGRAPHER:
 9        Robert N. Belle Jr.

10

11

12

13                     I N D E X

14   DIRECT EXAMINATION BY MR. BELLE          Page   3

15   CROSS-EXAMINATION BY MR. BESLER          Page  67

16   REDIRECT EXAMINATION BY MR. BELLE        Page  67

17   CERTIFICATE OF OATH                      Page  70

18   REPORTER'S CERTIFICATE                   Page  71

19   ERRATA SHEET                             Page  72

20

21                   E X H I B I T S

22   Defendant        Description                 Marked

23      1         Mr. Collard's file                5
     NOTE:  CD provided by the deponent was blank.
24

25
```

1        STEVEN M. COLLARD,

2   the witness herein, being first duly sworn on oath, was

3   examined and testified as follows:

4        DIRECT EXAMINATION

5   BY MR. BELLE:

6        Q    Hi, sir.  My name is Robert Belle.  I'm here on

7   behalf of State Farm.  We're here to do your deposition,

8   your discovery deposition today.

9        Could you state your name for the record and

10  spell your last name, please?

11       A    Steven Michael Collard, C-O-L-L-A-R-D.

12       Q    Okay, sir.  And just so that we're operating from

13  the same baseline, I sent you a -- I sent your -- or I sent

14  the lawyer who retained you a subpoena asking you to bring

15  your file today.  I'm looking over.  Do you have a file

16  with you today?

17       A    I do.

18       Q    Okay.  Could you tell me what that file consists

19  of?

20       A    I have a CD that has all of the records that were

21  sent by the plaintiff's attorney.

22       Q    Okay.

23       A    Digitally.

24       I have a copy of my resume.  A copy of my Elkins

25  list.  I have a copy of my report.  I have a copy of the

1  correspondence.  Have a copy of my file notes.  I have my

2  interview notes.  And some of the select reports that I've

3  printed out.

4      Q    Okay.  I don't think I have a copy of your

5  interview notes.  Did you just -- are those typed or

6  handwritten?

7      A    They're handwritten.

8      Q    Okay.  And are those notes -- been incorporated

9  in the report that you generated?

10     A    Yes, sir.

11     Q    Okay.  And is this report the only report that

12  you've done?

13     A    Yes.

14     Q    Okay.  Let's start with your fee schedule.  How

15  much -- do you have any communications with the -- with

16  Mr. Bresler's office?

17     A    I do.

18     Q    That -- what do you have in your file for

19  communication?

20     A    E-mails.

21     Q    Okay.  I don't think we were provided a copy of

22  those either.

23          I'd like to mark -- you can use it for purposes

24  of the deposition, but I'd like to mark his file as Defense

25  Composite Exhibit 1, and then we'll just get a copy of

 1   whatever you've got there after the deposition, okay?

 2        A    Yes, sir.

 3             (Mr. Collard's file marked Defendant's Exhibit 1.)

 4   BY MR. BELLE:

 5        Q    Sir, what is your hourly rate?

 6        A    Two fifty.  $250 per hour.

 7        Q    Okay.

 8        A    Deposition and trial time is $400 per hour for

 9   testifying.

10        Q    Okay.  And what is your -- what is your fee for a

11   deposition?

12        A    $400.

13        Q    It's $400 per hour?

14        A    (Nodding head.)

15        Q    Okay.  And were you paid anything for today's

16   deposition?

17        A    $400.

18        Q    Okay.  When did -- when were you first contacted

19   by Mr. Bresler's office?

20        A    Sometime in 2018.

21        Q    Okay.  And how many e-mails do you have from

22   Mr. Bresler in your file?

23        A    I don't know.

24        Q    Okay.  Do you have those e-mails printed out?

25        A    Yes.

1      Q    Could I take a look at them?

2      A    Of course.

3      Q    And how did they first come into contact with you

4  in terms of for purposes of this case?

5      A    I believe his assistant called me.

6      Q    Okay.  That was the first time -- that's how you

7  were initially retained?

8      A    I believe so.

9      Q    Okay.  Have you talked to Mr. Bresler at any

10 point since you issued this report on February 15th, 2019?

11     A    Yes.

12     Q    Okay.  And do you take notes on the conversations

13 that you have with your clients?

14     A    I don't.

15     Q    Okay.  Do you recall the substance of any of

16 those conversations, prior conversations with Mr. Bresler

17 about this file?

18     A    The conversations, as I recall, was explaining

19 the methodology that I use, how I use it and what I do with

20 it, all that stuff, just to help him understand what it is

21 that I do.

22     Q    Okay.  Okay.  All right, sir.  What -- what were

23 you retained to do in this case?

24     A    I was retained to do an earning capacity

25 assessment.

1    Q    Okay.  And let's just focus a little bit on your

2    background.  Where are you currently employed?

3    A    I'm self-employed.

4    Q    Okay.  And self-employed as what?

5    A    As a -- as a consultant.

6    Q    Okay.  What kind of consultant?

7    A    As a forensic -- forensic vocational economist.

8    Q    Okay.  And where did you -- let's go through a

9    little bit of your background.  Where did you go to

10   college?

11   A    I went to University of Louisville, Louisville,

12   Kentucky.

13   Q    Okay.  And what did you major in?

14   A    At the beginning I majored in electrical

15   engineering.  And then I switched to arts and sciences, and

16   finished a couple of degrees.

17   Q    Okay.  So did you get a degree in engineering and

18   arts and sciences?

19   A    I did not get a degree in engineering.  When I

20   got into the Department of Electrical Engineering, I did a

21   co-op and worked with electrical engineers, and at that

22   point in time, I thought "I don't want to do this work."

23   Q    Okay.  So what did you actually get your degree

24   in?

25   A    My degree is a Bachelor in Psychology with an

1   emphasis in natural sciences.  And I have a Master's degree

2   in Educational and Counseling Psychology with the emphasis

3   in vocational counseling.

4        Q    Okay.  What training do you have in economics or

5   in finance?

6        A    In economics and finance, I have -- I've taken

7   five -- five classes at the University of Nevada, Las

8   Vegas.  Four of those were for two credit hours each.  And

9   I've pretty much had all the math and sciences, so --

10       Q    Okay.  But you didn't graduate as a -- as an

11  engineer; is that correct?  You graduated with a Bachelor's

12  of Arts; is that correct?

13       A    That's true.  But basic training for engineering

14  is two and a half years of math.

15       Q    Okay.  But what specific business and economic

16  training do you have beyond this course that you took at

17  the University of Nevada at Las Vegas?

18       A    I interned at -- for two and a half years with a

19  firm, Vocational Economics, Incorporated.  And I have

20  on-the-job training through them.

21       Q    Okay.  Do you have any type of specific

22  vocational license or anything of that nature?

23       A    No, sir.

24       Q    And you don't have any type of -- do you have any

25  specific business training to perform economic studies?

1      A      Do I --

2      Q      Do you have any specific business training?

3      A      I think I had business training for two and a

4   half years working full-time for Vocational Economics.

5      Q      What did you do at Vocational Economics?

6      A      I began off as a vocational economic evaluator.

7   And as the evaluator, I worked on over a thousand cases.  I

8   was the point of contact for 27 offices.  And I eventually

9   began training consultants.

10     Q      Do you have any experience in forensic

11  accounting?

12     A      I'm not an accountant.

13     Q      Okay.  Besides these eight credit hours that you

14  took at the university -- did you graduate from the

15  University of Nevada Las Vegas with any type of degree or

16  credential?

17     A      What was your question?

18     Q      Did you graduate the University of Nevada at Las

19  Vegas with any type of degree or credential?

20     A      No, sir.

21     Q      Okay.  Did you receive any type of certificate

22  for completing this eight credit hours of coursework

23  addressing the economic and financial issues associated

24  with disability?

25     A      No, sir.

1    Q    And in this course, did you only study the impact

2    that a disability has on somebody's earning capacity, as

3    opposed to the job market as a whole?

4    A    I don't understand your question.

5    Q    Okay.  I guess what I'm saying is, was this

6    course only focused on the impact a person's disability has

7    on their future earning capacity?

8    A    Which course?

9    Q    The eight credit hours of coursework addressing

10   the economic and financial issues associated with

11   disability.

12   A    Well, the time value of money doesn't involve

13   disability.  The relationship between wages, medical costs

14   and interest rates, that doesn't involve disability.  Labor

15   economics doesn't involve disability.  Worklife expectancy

16   statistics can or cannot involve disability.  Personal

17   consumption doesn't involve disability.  Business valuation

18   doesn't involve disability.  And household services

19   replacement costs may or may not.

20   Q    And this class was only eight hours?

21   A    There were four two-hour credit hour classes that

22   lasted 40 hours.

23   Q    So the class was -- so it was eight credit hours

24   but -- so you only -- you earned eight credits towards

25   this -- towards vocational -- making -- doing vocational

1   economic analysis, but it was over -- how long did it take

2   you to complete the course?  Was it a semester?

3       A    It was -- it was a 40-hour class.  We went to

4   class for eight hours a day for five days and had a final.

5       Q    And are there master's degrees available in what

6   you are claiming to be an expert in?

7       A    I couldn't tell you.  I don't know.

8       Q    What ongoing continuing training are you doing

9   for your -- for your field?

10      A    I did a study in health economics.  I did a study

11  in health economics, and did a book chapter in a book

12  called Carbon Monoxide Poisoning.  Carbon Monoxide

13  Poisoning.  That was in 2007.

14          In 2006 and '07, I did an intensive study in

15  health economics, and the global burden of disease studies,

16  burden of disease studies for -- for probably ten different

17  countries.  I looked into -- I looked into disability

18  weights.  It was a lot of health economic studies that I

19  did.  And there's a book chapter out there with my name on

20  it.

21      Q    Okay.  Now, you have a fairly extensive list of

22  previous cases that you have testified in in the past.

23  Could we go to your list for a minute, please?

24      A    Sure.  I thought I had it.

25      Q    I'm not going to ask you about a specific case,

1   I'm just -- I'm just referring to it.

2        A    Uh-huh.

3        Q    So in looking over most of the times that you've

4   testified in the past, basically the past few years, most

5   of those cases have been depositions; is that correct?

6   I'll let you look at it if you need to.  I don't need to

7   mark it, but --

8        A    Deposition, deposition, deposition.  Trial in May

9   of last year.  Trial May the year before.  Deposition and

10  trial.  Deposition and trial.  I see a lot of depositions,

11  but -- and trials.

12       Q    Okay.  And has there ever been any instance where

13  a court has prevented you from testifying?

14       A    No.

15       Q    Okay.  I'm looking over your list.  I guess I

16  can't tell by looking at it, were all of these cases, did

17  you testify on behalf of the plaintiff, or were there ever

18  instances where you testified on behalf of a defendant?

19       A    Can I see it again?

20       Q    Sure, sir.

21       A    And most of them are plaintiff.  I have trial

22  testimony, that was Brelow (Phonetic) and Spirit Airlines,

23  trial testimony.  That was a defense case.

24       Q    Okay.  So I'm looking at a trial list that has --

25  I'm looking at your trial -- at a trial list that you

1    provided that has approximately anywhere from 47 to 50

2    cases on it that you were involved in in some capacity.

3    And out of this list, that you can recall, only one of

4    those was -- you testified on behalf of a defendant?

5          A    Yes.

6          Q    Okay.  And do you derive the majority of your

7    primary income from consulting work?

8          A    I do.

9          Q    Okay.  And what percentage of that consulting

10   work is for plaintiffs?

11         A    Pretty much 95 to 99 percent.

12         Q    And in those 99 percent of cases that you worked

13   on, has there ever been a time where you found that a

14   person didn't suffer some sort of economic loss?

15              MR. BRESLER:  Form.

16         A    Repeat your question, please.

17         Q    Okay.

18              MR. BELLE:  And your objection is noted as I

19         repeat the question.

20              MR. BRESLER:  Okay.  Thank you.

21   BY MR. BELLE:

22         Q    You said that 99 percent of the work that you do

23   you -- is for plaintiffs.  And in all those cases, did you

24   reach the conclusion that the person had suffered some sort

25   of economic loss?

```
 1          A     Yes.

 2          Q     Okay.

 3               MR. BELLE:  And the objection is noted for the

 4      record.

 5               MR. BRESLER:  Thank you.

 6   BY MR. BELLE:

 7          Q     Okay.  Let's -- let's focus a little bit on

 8      what -- what it is that you did here.  What is it in this

 9      case that you -- explain your methodology to me, how you

10      arrived at some of your conclusions, please.

11          A     If an individual meets the definition of

12      occupational disability, and that is, limited in terms of

13      either the amount or kind of work he or she can perform

14      because of a physical or mental impairment, two facts

15      exist:  On average those individuals have a shortened

16      worklife probability.  On average the average annual

17      earnings are less.

18          Q     Okay.  And -- okay.  So that's -- that's the --

19      that's the methodology at which you arrive at your

20      conclusions, that just in general people who meet the

21      definition of a workplace disability -- what was the second

22      part that you said?  You said it fast, so could you repeat

23      it again?

24          A     If an individual is limited in terms of either

25      the amount or kind of work he or she can perform because of
```

15

1    a physical or mental impairment.  It's in my report too.

2          Q    Okay.  I just want to --

3          A    If you want to reference it.

4          Q    I got it.  I just want you to --

5          A    That individual -- two facts exist for that

6    individual.  On average, the individual has annual earnings

7    that are less than a nondisabled individual doing the same

8    work.  On average, the individual has a shortened worklife

9    probability.

10         Q    Okay.  What did you review in this case as it

11   relates to Mrs. Farley's claims of wage loss and loss of

12   future earning capacity?

13         A    I reviewed her earnings records.

14         Q    Okay.

15         A    Reviewed medical reports.  I reviewed her

16   deposition transcript.  And I think that's about it.

17         Q    Okay.  When you say you reviewed her earning

18   records, did you review her pay stubs?

19         A    I had some.

20         Q    Okay.  You had pay -- you had actual pay stubs?

21   Because --

22         A    Copies of pay stubs.

23              MR. BELLE:  That wasn't produced either.

24         A    It's in that list that you have.

25         Q    This one?

1      A     I believe so.

2           MR. BELLE:  I've been provided tax records.  I

3      haven't been provided any pay stubs.

4      A     There's a -- in the e-mails, there was a list of

5  pay -- paycheck stubs in the e-mails.

6           MR. BRESLER:  Let me see.

7           MR. BELLE:  Can I just go off the record for a

8      second?

9           MR. BRESLER:  Sure.

10          (There was a discussion off the record.)

11          MR. BELLE:  I'm ready to go back on.

12  BY MR. BELLE:

13     Q     Okay, sir.  So I'll ask that question again.  Did

14  you have an opportunity to review some pay stubs in this

15  case?

16     A     I did.

17     Q     Okay.  And are those pay stubs contained within

18  screenshots of e-mails that you were provided by defense

19  counsel?

20     A     Yes, sir.

21     Q     I mean, excuse me, plaintiff's counsel?

22     A     Yes, sir.

23     Q     And could you take a look at those screenshots so

24  that you're just -- so that you're familiar with the ones

25  that I'm talking about?

1      A     Okay.

2      Q     Do those -- do any of those screenshots reflect

3  Mrs. Farley's hourly rate of pay?

4      A     I don't believe so.

5      Q     Okay.  And when you interviewed Mrs. Farley, did

6  you ask her if she was paid via commission, wage or salary?

7      A     Yes.

8      Q     Okay.  And how was she paid?

9      A     She was paid hourly.

10     Q     She's paid hourly?  Is there a limitation on how

11 many hours a week she can work?

12     A     Not from my understanding.

13     Q     Did you ask her specifically if she was

14 working -- working a 40-hour week, or was it as much as she

15 could do?

16     A     She was working -- well, prior to the injury, she

17 said she worked overtime, and after the injury she said she

18 didn't.

19     Q     Okay.  And when you interviewed Mrs. Farley --

20 let's take a look at this.  You said you reviewed her

21 deposition transcript; is that correct?

22     A     I did.

23     Q     Okay.  Let's first start with your claim that --

24 there's a section in your report where it says she

25 sustained a wage loss; is that correct?

1      A    Yes, sir.

2      Q    Okay.  And you indicated that she sustained a

3   wage loss of 7,353; is that correct?

4      A    That is.

5      Q    Okay.  And you said you had an opportunity to

6   review her deposition transcript?

7      A    I did.

8      Q    How did you conclude that she had lost that

9   amount?

10      A    I did the math.

11      Q    Okay.  What did you do the math with?  It doesn't

12   say in your report how you came to that conclusion.

13      A    I'll show you.

14      Q    Okay.  I don't -- I don't understand what I'm

15   looking at.  So could you -- could you walk me through how

16   you came to the conclusion that she lost 7,000 some -- some

17   7,000, I believe, let me -- I don't want to misquote the

18   number -- $7,353?

19      A    In the two point -- I have her -- I have her

20   preinjury earning capacity at $40,843.08.

21      Q    Okay.

22      A    And that's the average of the two years prior to

23   injury.  Okay?  And then -- that's the baseline.  And then

24   the average of her earnings after injury are less than

25   that.

1    Q    Okay.  Let's make sure we're using the same

2 definition of wage loss.  What does wage loss mean to you?

3 Could you explain it to the jury?

4    A    What wage loss means to me?

5    Q    Yes, sir.

6    A    It means the difference in what somebody would

7 have earned had they not been injured, compared with what

8 they actually earned.

9    Q    Okay.  And what is loss of future earning

10 capacity?

11    A    It's looking into the future.

12    Q    So let me ask you this, then:  What is it -- say

13 I get into an accident and I'm hurt, and I injure a part of

14 my body and I can't work for a week.  And as a result of

15 not being able to work for that week, I don't get paid that

16 week.  So let's just say I made $500 a week.  I've lost

17 $500 because I couldn't work that week.  Would that be --

18 would that be a fair baseline?

19    A    I think so.

20    Q    Okay.  And would that be defined as a wage loss?

21    A    I think it would be.

22    Q    Okay.  So how many days of work did Ms. Farley

23 tell you that she missed as a result of the accident?

24    A    I couldn't tell you off the top of my head.

25    Q    Okay.  So you don't know how many days of work

1    that she missed, but you've calculated what her loss is?

2         A    Yes.

3         Q    Okay.

4         A    Yes.  And here is why:  Because the average

5    annual earnings at the end of the year show how much she

6    made, the economic production of the individual.  And

7    postinjury, the economic production has been less.

8         Q    Okay.  Let me ask you --

9         A    And so when you compare preinjury to postinjury,

10   I calculate a loss there.

11        Q    Okay.  Now, let me ask you this:  Did Mrs. Farley

12   ever -- have you ever had -- you said you reviewed her

13   transcript.  Did Mrs. Farley ever tell you that the company

14   that she was working for prior to the accident -- and let

15   me just make sure I have the right job here.  Mrs. Farley

16   works for Tata Consultancy Services; is that correct?  Is

17   that what you were told?

18        A    It's changed.  It was Transamerica; right?

19        Q    It was Transamerica first.

20        A    Transamerica first.  Okay.

21        Q    And what did she tell you happened between

22   those two -- what did -- did she -- what did she tell you

23   about -- what position did she tell you that she had at

24   Transamerica?

25        A    What position did she tell me --

1    Q    Yeah.  What job position did she have, sir?

2    A    Let me look at my notes.  It's maybe in my

3 report.  Well, she was functioning as a quality analyst,

4 case coordinator, and senior case coordinator.  She audits

5 the processors' work and corrects errors.  That's what she

6 does.  She was the subject matter expert for her team.

7         And I've got notes on her job title here.  Tata

8 Consulting and Services, a quality analyst, and she works

9 from home.

10   Q    Okay.  So the -- so the two years before the

11 accident, she worked for Transamerica Life, okay,

12 Insurance?

13   A    Well, she worked for Transamerica until April of

14 2018.

15   Q    And then was Transamerica -- I don't know if it

16 was that -- up to that -- she said she worked there until

17 2018?

18   A    Yes, sir.

19   Q    Okay.  And where are you getting that from?

20   A    From my notes.

21   Q    And -- let's see.  When did she tell you her

22 start dates were with Transamerica?

23   A    I don't know that she told me her start date.

24   Q    And did she tell you that in April of 2018, April

25 of 2018, Transamerica transitioned into Tata?

1    A    Yes, she did.

2    Q    Okay.  And did her position change when she

3 switched over to Tata?

4    A    I believe it did.

5    Q    Okay.  And did she start working as a contract

6 employee at that point?

7    A    I don't believe so.  She was a senior case

8 coordinator prior to the accident.  And afterwards, she did

9 the quality -- quality analyst job because she could do

10 that from home, whereas the other job she couldn't.

11    Q    And did you calculate what the pay was for a

12 person who was a senior case coordinator?

13    A    I calculated her pay.

14    Q    Okay.  And what was her pay as a senior case

15 coordinator?

16    A    What year?  Senior case coordinator?

17    Q    Let's start for 2017.

18    A    2017, she earned $35,405.

19    Q    What was her pay in 2016 when she was a senior

20 case coordinator?

21    A    Let's see.  I had an hourly figure here

22 somewhere.  I thought I saw she had -- $19 an hour was her

23 most recent pay.

24    Q    So if you think her hourly pay is $19 an hour,

25 40 hours a week, it comes out around $40,000.  And that you

23

1    said was her current pay?

2         A    I thought I saw that number.  I don't see it now,

3    but I think I saw $19 an hour.

4         Q    Okay.  And at that rate of pay -- did you analyze

5    any of her 2018 pay stubs?

6         A    I didn't.

7         Q    Okay.  Do you -- so I guess I had asked you what

8    was her salary in 2016?

9         A    In 2016, she earned $37,776.

10        Q    And what was her pay in 2015, sir?

11        A    In 2015, she earned $37,830.

12        Q    And would you admit that there could be other

13   reasons that a person's pay goes down besides their

14   injuries?

15        A    Yes.  They work less overtime.

16        Q    Okay.  And did she tell you that overtime was

17   still available to her in 2017?

18        A    Yes.

19        Q    And how many hours a week did she tell you that

20   she was averaging prior to the accident?

21        A    She didn't.

22        Q    Now, I want to get back to the wage loss, okay?

23   I'm confused about your methodology.  My understanding of

24   wage loss is to account for days or hours of work that you

25   missed.  Not overtime, but regular hours within your

1    40-hour week.

2        A    Well, this caused a loss of earnings.

3            MR. BRESLER:  Form.

4        Q    Well, no, no.  There's two different things here.

5    I understand what loss of earnings is.  Loss of earnings is

6    saying that if I wasn't injured, I could have worked "X"

7    amount of hours, but I could only do "X" hours because I'm

8    hurt.

9            But loss of earning -- loss of future earning

10   capacity and loss of wages are different, aren't they?  I'm

11   asking.

12           MR. BRESLER:  Form.

13       A    Wages and earnings are used interchangeably,

14   okay?  Wages and earnings are used interchangeably.  I use

15   earnings as an annual basis, not as a weekly basis.  And I

16   look at the average annual earnings that accrues to the

17   individual.

18           And in my spreadsheet, I have a loss of average

19   annual earnings from the date of injury, based on her

20   capacity of 40,800 -- $40,843.  Had she continued earning

21   at the rate that she was earning prior to injury, 2016 and

22   '17 -- 2015, '16.  Sorry.  Wait, wait.  2014 to '15.  2016

23   is the injury year, so we threw that out.  In 2014 and '15,

24   her average annual earnings -- let me show you the

25   spreadsheet and you'll understand a little better.  If you

1    look on the spreadsheet, she earned 32,000 here in 2011.

2        Q    Okay.

3        A    The value of that in today's dollars is 36,432.

4        Q    Okay.  So you're accounting for -- how did you

5    come -- how did you come to the conclusion of what today's

6    dollars were, compared to what it was worth --

7        A    Used the CPI table, conversion to 2018 dollars.

8        Q    Okay.  And that's where you came up with this

9    40,843, you're saying that's --

10       A    The two years prior to injury.

11       Q    I think I've got it.

12            My question here is, is that you're using the

13   terms interchangeably, but legally they have two different

14   distinctions.  Loss of future earning capacity reflects the

15   money that a person lost going into the future.  And, to

16   me, lost wage, depending on how you're arguing it, reflects

17   the money that she lost from -- lost or time missed as a

18   result of the accident.  And that's -- I'm having trouble

19   understanding why those two things are interchangeable.

20            MR. BRESLER:  Form.

21       A    The -- the loss of future earning capacity is

22   different than the past loss of wages.

23       Q    Okay.

24       A    Okay?  So past loss of wages, we're looking at

25   what she could have earned had she never been injured.

1    Q    Right.

2    A    Okay?  So we've gathered her earning capacity

3  from that time.

4    Q    Okay.

5    A    And said this is her baseline.

6    Q    Okay.

7    A    And using her baseline, moving forward in the

8  days after injury, on the annual basis she didn't earn as

9  much as she did for the baseline years.

10   Q    Okay.

11   A    Even though her salary went up.  So she worked

12 fewer hours.  And that's the loss that I captured.

13   Q    Okay.  But her salary increased over time?  Her

14 salary in -- her salary in 20 -- 2016 --

15   A    You're helping me argue my point.

16   Q    No.  I'm asking you.  I'm not arguing anything.

17   A    Yeah.  I think her salary went up.

18   Q    And when you reviewed her deposition,

19 Ms. Farley's deposition, did she tell you she had missed

20 any days of work due to the accident?

21   A    When I reviewed her deposition transcript, she

22 said she had no past loss of -- of wages or whatever it

23 was.  I know it's stated right in there, she didn't think

24 she had a loss.

25   Q    Okay.  But I'm just talking strictly in terms of

1 days missed.  Did she tell you that she missed any days?

2     A   I don't think she did.  Maybe right after the

3 accident she missed some time --

4     Q   And would that be --

5     A   Just reading her deposition transcript, I don't

6 think she did.

7     Q   Okay.  And would that be something that would

8 factor into whatever analysis you performed?

9     A   That she didn't miss days?

10     Q   If -- what I'm saying is, is that if she came in

11 your office and told you that she had missed 60 days, let's

12 just say hypothetically, how would that factor into your

13 analysis?

14     A   I would see it in the average annual -- I would

15 see it in her earnings report at the end of the year.

16     Q   And is there anything in the earnings report that

17 reflect that she missed actual days of work?

18     A   There wouldn't.  Just the number on the 1040, or

19 the W-2.

20     Q   Did you perform -- did you review any of her

21 performance evaluations?

22     A   I believe I did.

23     Q   You did?

24     A   I don't know.  Let's see.

25     I don't see any notes to that effect in my file.

1    I'm sorry.

2         Q    Okay.  And you don't have any paperwork that

3    reflects that you have any performance evaluations?

4         A    I don't think so either.

5         Q    Okay.  Did you talk to any of her supervisors or

6    managers?

7         A    I did not.

8         Q    Okay.  And most of what -- did you -- did you

9    review her medical records?

10        A    I did.

11        Q    Okay.  Was she given any type of work

12   restrictions?  I can help you out with her deposition

13   transcript if that would refresh your recollection.

14        A    Okay.

15             MR. BRESLER:  Form.

16             MR. BELLE:  Form of what?  I'm not asking a

17        question.

18             MR. BRESLER:  I mean, you're asking about what

19        the medical records say, versus what the deposition

20        testimony is.

21   BY MR. BELLE:

22        Q    Okay.  Did you review her deposition testimony?

23        A    Yes, sir.

24        Q    Is there anywhere in the deposition testimony

25   where you -- where it indicated that she had any type of

1    work restriction?

2        A    Not that I recall.

3        Q    Okay.  In any of the medical records that you

4    reviewed, was there anything that reflected that she had

5    any type of work restriction?

6        A    Let me check.  I don't see restrictions.

7        Q    Okay.  Are restrictions something that would --

8    if you did see a restriction, is that something that you

9    would have noted in your report?

10       A    Preexisting conditions?

11       Q    No.  If you had -- if the doctor -- if you had

12   reviewed one of the medical reports and it said that she

13   had a work restriction, is that something that you would

14   have listed in your report?

15       A    I may have.

16       Q    You may have?

17       A    Yes.

18       Q    Let's go through some of this report, if you

19   don't mind.  Let's get over to page 3.

20       A    Okay.

21       Q    You -- you conducted an interview with

22   Mrs. Farley, I presume?

23       A    Yes, sir.

24       Q    How long was your interview?

25       A    Probably an hour and a half.

1    Q    Okay.  And could you tell me a little bit about

2    what your interview process consists of?

3    A    I have a standard vocational interview.  I try to

4    get to know the individual and her world before the injury

5    and after the injury, on four domains:  Work, emotional,

6    psychological functioning, social functioning and household

7    chores and tasks.

8    Q    Okay.  Did you perform any type of cognitive

9    testing on Mrs. Farley?

10   A    No, sir.

11   Q    Okay.  Did you perform any type of testing on

12   her?

13   A    No, sir.

14   Q    Okay.  And do you -- when you generate this list

15   of issues that a person may be suffering from, is it

16   exclusively from what the patient tells you, or do you

17   review the medical records and then list based upon that?

18   A    Both.

19   Q    Okay.  And I'm looking at your report.  I can't

20   tell what is from what the patient told you and what --

21   what -- what you saw in the records.  So let me go through

22   some of them.

23        "The patient" -- let's start with the first

24   one -- "said that she had frequent occipital headaches and

25   occasional painful migraine headaches."  Was that something

1   that she told you, or was that something that you saw in a

2   medical record?

3        A    It may have been both.  I'm pretty sure she told

4   me.

5        Q    But you can't confirm whether you actually got it

6   from an actual medical record?

7        A    If I looked through everything.  I don't have it

8   memorized --

9        Q    Okay.  So --

10       A    -- that I found it in medical records.

11       Q    So for purposes of your methodology, is it

12  important what things in the report are objective, as

13  opposed to the subjective things that the patient -- or the

14  client or whoever you're interviewing tells you?

15       A    Both are important.

16       Q    Okay.  But is it important to note where you got

17  it from?

18       A    I don't know.

19       Q    Okay.  So -- and I see that you used the

20  designation "Often she reports," so I'm assuming those are

21  the times that she told you, and the other times that you

22  write stuff is from the medical records; is that correct?

23       A    It may be.

24       Q    Okay.  You don't know what you did?

25            MR. BRESLER:  Form.

1      A    It's not that I don't know what I did.  It's

2   you're asking me about a voluminous amount of medical

3   records and different comments that may or may not have

4   come from the medical records and/or both from her and the

5   medical records.

6      Q    Okay.  Let's keep going through it.

7           She indicated to you that she suffered from some

8   type of short-term memory -- her short-term memory is

9   diminished.  Do you recall whether you got that from a

10  medical record or she told you that?

11     A    I got that from her.

12     Q    And had she told you that she had any type of

13  clinical correlation with regard to the short-term memory

14  being diminished?

15     A    She didn't.

16     Q    And she indicated that she reports occasional

17  word finding difficulty?

18     A    Yes.

19     Q    And did she -- did she tell you that there was

20  any clinical correlation for that?

21     A    She didn't.

22     Q    Did you ask?

23     A    No.

24     Q    Okay.  She indicated that she had difficulty with

25  problem solving; is that correct?

33

1    A    Yes.

2    Q    Okay.  Did you seek any type of -- did she tell

3    you whether she had any type of clinical correlation for

4    that?

5    A    She didn't.

6    Q    She has difficulty with organization; is that

7    correct?

8    A    That's what she reported.

9    Q    Okay.  And did she give you any type of -- was

10   there any type of clinical correlation that she told you

11   about in relation to that?

12   A    As far as being tested and found out that

13   she was, no.

14   Q    Okay.  Now, did she at any point tell you that

15   she had reported to her employer that she was having these

16   difficulties?

17   A    I don't believe so.  The cognitive difficulties?

18   Q    Yes.

19   A    I don't believe so.

20   Q    She indicated that she has difficulty

21   concentrating and has to work in a quiet and

22   distraction-free environment; is that correct?

23   A    That is correct.

24   Q    Was there -- in your interview of her, was the

25   indication that she worked from home?

1    A    Yes.

2    Q    I know that you're trained as a psychologist.  Do

3    you actually treat patients in a psychiatric capacity?

4    A    No, sir.

5    Q    Have you ever treated patients in a psychiatric

6    capacity?

7    A    I'm not trained as a psychologist.

8    Q    I thought you said you were, you had a --

9    A    Counseling psychology, but not in clinical

10   psychology.

11   Q    Okay.  Do you have any type of medical training,

12   sir?  Like, do you have any training where you diagnose

13   patients for any type of psychiatric or --

14   A    I do not.

15   Q    -- mental illness?

16   A    I do not.

17   Q    And just for purposes of this, you have -- kind

18   of confusing from this, but you have a B.A. in psychology.

19   Was there some sort of -- did you have a minor or some sort

20   of subspecialty?  Do you not understand my question?

21   A    I don't understand your question.

22   Q    Okay.  So you're trained in psychology, but

23   you're not trained in clinical psychology?

24   A    Well, clinical psychology is one of the portions

25   that you learn in basic psychology.

35

```
 1        Q     Okay.  But you've never actively treated
 2   patients?
 3        A     Correct.
 4        Q     Okay.  And have you actively ever diagnosed
 5   patients?
 6        A     I'm not qualified to diagnose patients.  From
 7   a -- from a counseling psychologist perspective, the
 8   counseling psychologist is the guidance counselor in high
 9   school that you may have had.
10        Q     Okay.  She indicated to you that she has
11   difficulty performing her work?
12        A     Yes.
13        Q     And was there any -- was there any indication
14   that she had told her employer about this?
15        A     Not to my knowledge.
16        Q     Is there -- did you ask her if there was anything
17   that would assist her in completing her job better?
18        A     No, but what would -- what would help her would
19   be not to have the 5:00 deadline every day.
20        Q     What -- explain that to me.  What deadline --
21   what do you mean a 5:00 deadline?
22        A     She has to have all of her work finished at a
23   certain point in time, and that's her deadline.  And if she
24   had a looser deadline, she would be under less distress, I
25   think, at the end of the day.
```

 1     Q    Okay.  And has she requested that accommodation

 2   from her employer?

 3     A    Not to my knowledge.

 4     Q    Did you suggest to her that she should request an

 5   accommodation?

 6     A    I didn't.

 7     Q    And do you think that accommodation would assist

 8   her in completing her job tasks if she had more time?

 9     A    I think it would assist her in completing her job

10   tasks with less stress, or distress.

11     Q    And what type of tasks did she tell you that

12   she was performing?

13     A    She was auditing the -- the agents' work, making

14   sure that they did all of their work right.

15     Q    And did she tell you that she didn't experience

16   any stress completing her job tasks prior to the accident?

17     A    She didn't.  She didn't tell me that she had

18   stress prior.  She worked in the office.  She worked in the

19   office with other people, and she loved her job.

20     Q    Did she also indicate that she is afraid of

21   driving, and feels distressed with having to leave her

22   home?

23     A    Yes.

24     Q    Did she -- in reviewing her deposition, did she

25   indicate whether -- or let me ask it another way.  Did she

1  tell you that she stopped driving in total, or she still
2  drives?
3      A    She still drives.
4      Q    Okay.  Let's go over to page 4 of your report.
5      A    Okay.
6      Q    Okay.  So one of the things that you do when you
7  look at a person is you look at their mortality table and
8  you look at their statistical life expectancy; is that
9  correct?
10     A    Yes, sir.
11     Q    Okay.  And even though a person may have a
12 statistical life expectancy, do -- there is a retirement
13 age for people; is that correct?  Or let me rephrase.
14          Do a lot of people retire and exit the job force?
15     A    They do.
16     Q    Okay.  What is the average age that people exit
17 the job force?
18     A    What year were they born?
19     Q    What was -- what is the year that you calculated
20 that Ms. Farley should be exiting the job force, based on
21 the fact that she's 39 and has a life expectancy of 43.5
22 years?
23     A    What year would I expect her to leave the labor
24 force?
25     Q    Presuming that she didn't have an injury, as

1    outlined in your report, and everything was fine, what

2    year --

3         A    Her retirement age would be 67 and some months, I

4    think.

5         Q    Okay.  And what is the National Health Interview

6    Survey?

7         A    It's a survey.

8         Q    What is it a survey of, sir?

9         A    It's a survey of the national health.  It's the

10   National Health Interview.  It's a survey of health.

11        Q    And it lists -- does it classify certain chronic

12   conditions?

13        A    It does.

14        Q    Okay.  And are you saying that Mrs. Farley has a

15   chronic condition?

16        A    It's persisted for three or more months.

17        Q    Okay.  But let me ask it another way.  Is the

18   National Health Interview Survey have a list of -- list of

19   conditions that when a person has them they're

20   automatically considered chronic if you have this

21   particular thing?

22        A    Yes.  I think if you had a seizure disorder or

23   something like that, that would always be chronic.

24        Q    Okay.  And what is the condition that you say

25   that Ms. Farley has that's chronic in terms of persisting

1  for three or four months?

2      A    Severe and distracting pain; the emotional

3  distress that she has as a result of it.

4      Q    And you're --

5      A    And the physical limitations in her life.

6      Q    And did Ms. Farley tell you that she had any --

7  has sought any type of psychiatric treatment?

8      A    She didn't.

9      Q    Okay.  So your analysis of -- are you considering

10 emotional pain a chronic health condition?

11     A    I think so.

12     Q    And is that on the list?

13     A    I'm not sure.

14     Q    Okay.  And what is an activity limitation?

15     A    Activity -- activities you do in a day.  You

16 cook.  You clean.  You take the garbage out.  You make your

17 beds.  You dress.  You groom.  You take care of yourself.

18 You work.  You do housework.  And you sleep.  Those are

19 activities.

20     Q    Okay.  And what are activity limitations -- what

21 is the importance of them as they relate to a person

22 performing their normal job tasks?

23     A    Because if she's limited because of physical and

24 mental impairments, she meets the definition of

25 occupational disability.

1    Q    And is the standard for occupational disability
2    different from what somebody would have to be -- would be
3    if they were just disabled and couldn't work at all?
4    A    Social Security disability?
5    Q    Yes.
6    A    Social Security disability definition is unable
7    to perform significant -- what is the definition?
8    Inability to perform substantial gainful activity is the
9    definition for Social Security disability.
10   Q    But she is able to work in some capacity based
11   upon your interview of her?
12   A    Certainly.  She doesn't meet the Social Security
13   definition at present.
14   Q    And an occupational disability is defined as a
15   person is limited in terms of the amount of work performed
16   or the kind of work performed on a job; is that correct?
17   A    As a result of a physical and mental impairment.
18   Q    Okay.  And you're claiming her physical
19   impairment is just ongoing pain; is that correct?
20   A    And limitations.  Range of motion limitations.
21   Q    Now, Mrs. Farley said that she has a deadline for
22   completing her job tasks by -- did you say it was
23   5:00 every day?
24   A    I believe so.
25   Q    Okay.  Did she indicate to you that she was not

1  completing her work?

2      A    She indicated that she was distressed to get her

3  work completed on time --

4      Q    Okay.  But did she --

5      A    -- every day.

6      Q    But did she tell you that she was not -- that

7  she was failing to meet the requirements of her job?

8      A    She told me she was doing everything in her power

9  to meet the requirements of her job.

10     Q    So if she is meeting all the requirements of her

11 job, the amount of work performed is the same, or the

12 amount -- there's no reduction in the amount of work

13 performed?

14     A    She's not working overtime.

15     Q    And how do you calculate -- I guess what I'm

16 having trouble with is how do you calculate how much

17 overtime a person is going to be -- did she tell you that

18 overtime was always approved, that she could work as many

19 hours as she wanted?

20     A    I believe so.

21     Q    Is that reflected anywhere in your notes?

22     A    It could be.  I know it's in my notes that she

23 worked overtime before, and she took this job because she

24 wouldn't have to work overtime.

25     Q    Okay.  So let me get this straight.  So she took

1    a position so that she would not have to work overtime?

2    She changed positions because -- why did she say she

3    changed positions?

4         A    So she could work at home.

5         Q    Okay.  And is the quality control -- I mean --

6    sorry.  And what position did she change from?

7         A    We talked about it earlier.

8         Q    I understand, but this report is all over, so I'm

9    trying to -- I'm trying to work with you here.

10             Let me ask it another way.  Was the position that

11   she switched to, was it a demotion or promotion?  Did you

12   ask her that?

13        A    I didn't ask her that.

14        Q    Okay.  And did she tell you when she took the new

15   position?

16        A    I don't have that.  When she started to work at

17   home?

18        Q    Yes, sir.

19        A    Let's see.  On the date of the injury she was a

20   case coordinator, a senior case coordinator.  That was her

21   job before the accident.  And she left the senior case

22   coordinator job for the auditing processor, for the

23   auditing job.  And she reviews the auditing processors'

24   work.  And she corrects their errors, and it has to be done

25   by the end of the day.  And that job allows her to work

43

1   from home.

2        Q    Right.  And did she -- did she -- and did she

3   leave the senior case coordinator position due to injury,

4   or because she didn't want to work overtime anymore?

5        A    She left it due to injuries so she could work

6   from home.

7        Q    And did the other position require overtime?  Is

8   that your understanding from interviewing her?

9        A    The other position did require overtime.

10       Q    And you determined that Mrs. Farley had a

11  physical and mental -- or mental impairment based upon what

12  she subjectively told you in terms of -- you didn't -- you

13  didn't do any clinical correlation to determine whether she

14  had a physical or mental impairment?  Did you do any type

15  of clinical correlation to determine whether she had a

16  physical or mental impairment?

17       A    No, sir.

18       Q    In any of the records that you reviewed so far

19  regarding Mrs. Farley's health, was there anything in the

20  records that indicated that she had a mental impairment?

21       A    As far as headaches, migraines, things like that?

22  I didn't see anything.

23       Q    Let's go on to the next -- your next, I guess,

24  your next opinion.  Or you say it's a fact.  But it says,

25  "Two empirically derived facts exist for a person who meets

44

1  the definition of occupational disability.  The first is

2  that, on average, when a person with occupational

3  disability do work, on average they earn less than their

4  nondisabled counterparts."

5          Okay.  Did you pull any statistical records or

6  review any records for how much someone who is a, I guess,

7  a -- she was a senior -- coordinator -- senior case

8  coordinator, and I guess she said she moved to a --

9      A    Quality analyst.

10     Q    Quality analyst.

11         Now -- I lost my train of thought on that now.

12         Okay.  So how did you determine in this

13  particular instance that she earned less than her

14  nondisabled counterparts to do the same job?

15     A    Her actual earnings have dropped.

16     Q    Okay.  But how do you know what her earnings were

17  compared to her nondisabled counterpart?  Or you're just

18  comparing her to herself?

19     A    I'm comparing her to herself.  As far as the

20  average goes, this is the earning capacity.  She earns --

21  she's earning less than she would have had she not been

22  injured.

23     Q    Okay.  Now, you are -- and then the next thing

24  that you look at is worklife expectancy that is shorter

25  than their nondisabled counterparts.  But when you're

45

1    talking about their nondisabled counterparts, you're just

2    comparing the person to themselves, it's not against a

3    larger group or sample size; is that correct?

4         A    Well, the nondisabled person that she used to be

5    is different than the person with disability that she is

6    today.

7         Q    Okay.  I'm just --

8         A    And the group of persons that are nondisabled,

9    I'm using the group of persons in her category to represent

10   the nondisabled and the disabled group.

11        Q    Okay.  So when you say "Her category," what do

12   you mean by that?  I don't understand that.  I don't

13   understand.

14        A    Well, she's -- she used to be a nondisabled

15   female with 13 to 15 years of education, okay?  And now she

16   has a disability status with the same amount of education.

17   So the data for earnings for persons with disability and

18   without are different.  That's one of the two facts.

19        Q    Okay.  Now, you indicated that her salary is

20   expected to go down over the life of her -- over her

21   worklife.  And you indicated that you did review her

22   deposition --

23        A    Yes.

24        Q    -- transcript?

25             When you reviewed her deposition transcript, did

1    you --

2         Did Mrs. Farley tell you that she makes more

3    money at Tata Consultancy Services than she made at

4    Transamerica Life Insurance?

5         A    I think the rate of pay is more.  But without

6    overtime, the average hourly return on her investment in

7    time is less because she's not working as many hours.

8         Q    Okay.  So she told you that she was making $3,000

9    a year more working at Tata Consultancy Services; is that

10   correct?  I'll let you --

11        A    I saw it in the deposition transcript, but I

12   don't think the numbers came out that way.  When I look at

13   the actual earnings -- when I look at the actual earnings,

14   they don't come out that way, 3,000 more a year.

15        Q    And the pay stubs that you did review, what year

16   were these?

17        A    I don't think I reviewed them.  I don't think I

18   looked at pay stubs.  I mean, I saw a couple, but I really

19   didn't study the pay stubs for any reason, other than to

20   see that she was working.

21        Q    Okay.  So, but I guess what we're trying to

22   measure is we're trying to measure where she is going

23   forward.  And she changed jobs in 2018, in April of 2018.

24   So we really don't have an accurate -- or do we have an

25   accurate snapshot of what she's losing going forward, given

1  that she changed jobs?

2     A    She changed jobs because she couldn't sustain the

3  job she had before.

4     Q    All right.  Well, let's talk about worklife

5  expectancy.  Would you -- that's -- would you admit that

6  worklife expectancy is just an estimate?  A person could

7  have a work -- could a person out -- work longer -- work

8  more years than their worklife expectancy?  Is that

9  possible?

10    A    Yes.  If you assume that.

11    Q    No, I'm not --

12    A    We can assume that she would have worked

13 uninterruptedly to age 67.

14    Q    Okay.  What I'm asking you is, is this -- right.

15 That's what I'm saying.  So let's say that she's been

16 involved in this accident, would it be fair to say that you

17 have no knowledge, assuming that she -- you know, lives

18 that long, that she -- when she's going to retire?

19    A    When I look in the crystal ball, all I see is the

20 steam off my big nose.

21    Q    Okay.  Fair enough.

22         Okay.  And in this particular case, you said,

23 "Based upon the severity of the impairment, based upon the

24 person -- the disabled person's age, education, previous

25 work history, skill level and severity of the impairment,

1    and combine that to produce either a destruction or

2    reduction of earning capacity."  Which one does Ms. Farley

3    have, a destruction or a reduction?

4        A    She has reduction.

5        Q    Okay.  And in your report you indicated that

6    Mrs. Farley -- the two years prior to the accident she

7    earned in present, in terms of 2018 dollars, 40,843; is

8    that correct?

9        A    Yes, sir.

10       Q    And what was her 20 -- so for the two years after

11   the accident, you would need to evaluate 2017 and 2018; is

12   that correct?

13       A    Yes, sir.

14       Q    Okay.  What analysis did you perform on 2018?

15   Because I don't have a -- I don't have any -- I don't have

16   a tax return for that year, for 2018.

17       A    I didn't do any analysis for it.  I used the

18   numbers in the spreadsheet to -- to reduce the past loss of

19   wages.

20       Q    So how did you come up with what her post -- her

21   post -- her postinjury salary was?  How did you -- how did

22   you compute that figure?

23       A    I'll show you.  Took her actual earnings from

24   2017 and '18, and multiplied 2017 by the CPI adjustment to

25   turn it all into a 2018 dollar.  Averaged them together for

49

1    36,909.

2         Q    Okay.  I guess what I'm asking is where did you

3    get that 2018 salary figure from?  Because I wasn't

4    provided that.

5         A    Her 2018 -- you've got it on this -- on CD.

6    You'll have it on the CD, 2018 taxes.

7         Q    Okay.  I've got '13, 2012, 2017, 2016, and a

8    second copy of 2014 and '13.  I don't have 2018.  I believe

9    you if that's what you say.

10        A    Uh-huh.

11        Q    Could I look at that sheet that you had again,

12   sir?  No, the --

13        A    CPI?

14        Q    Yeah.  I do see pay stubs in there that you just

15   looked at.

16        A    Yeah, I did have one, uh-huh.

17        Q    I just want to write this out or down, if you

18   don't mind.

19             Okay.  Let's continue going through your report,

20   if you don't mind, sir.  I think we're almost to the end of

21   it.

22             And so you calculated Ms. Farley's worklife

23   expectancy; is that correct?

24        A    Yes.

25        Q    How did you do that?

1    A    I summed up the years between age 37, age 39 and

2  age 74, looking at the likelihood of being alive, in the

3  labor force, and working as a nondisabled person, and as a

4  person with a moderate level of occupational disability,

5  and an average level of occupational disability.

6    Q    Okay.  And do -- you said that you would expect

7  Mrs. Farley's retirement age to be 67; correct?  Or

8  worklife expectancy to be up to -- or retirement date to be

9  67?

10    A    You asked me what a retirement age would be for a

11  person like that, yes.

12    Q    Okay.  So why did you start your calculation from

13  74, as opposed to 67?

14    A    Because I could assume that she would work

15  full-time and uninterruptedly to age 67.  And that's 27

16  some odd years, I think, beginning at age 39.  Might be 28

17  years; right?  Okay?

18    Q    Okay.

19    A    But each one of those years I'm assuming that

20  she'll be alive.  Each one of those years I'm assuming

21  she'll be in the labor force working a hundred percent, and

22  a hundred percent work.

23    Q    Right.

24    A    Okay?  But when I look at occupational data where

25  people are actually in the labor force, they don't live

1  every year to age 67.

2      Q    Right.

3      A    There's a chance they'll die every year.  Every

4  year there's a chance they'll be out of the labor force for

5  any reason.  And every year there's a chance that they

6  could be not employed.

7      Q    Okay.

8      A    And so I looked at those probabilities in the

9  future, because they're calculated all the way to age 75, I

10 look at them through age 74.  And through age 74, there's

11 only 21.42 years that a person like her would be expected

12 to working [sic] at age 39.

13     Q    No.  But what I'm saying is, is this:  We know

14 that she's 39 today or --

15     A    Yeah.

16     Q    Just approximately, give or take?

17     A    She just turned 39.

18     Q    Okay.  So she's 39 years old.  And we're going to

19 assume that she's going to be alive, and assume that she's

20 working.  Let's just assume everything was normal and she's

21 going to live to age 74.  You estimate that she would be

22 out of the work force at age 67.  So I don't understand --

23 or could you explain to me why you're calculating work

24 expectancy at a year that's -- that's further -- further

25 out than when she would be expected to work?

1    A    Because that's what the data go to.  Data go to

2   age 75.  There's a study called Labor Force Datas and other

3   characteristics of individuals by age, sex, level of

4   educational attainment, and disability status.

5    Q    But if I look at your final numbers here, you've

6   included in your calculation seven years when she would

7   just be expected to be out of the labor force due to her

8   age.

9    A    How?

10    Q    Because you're telling me that --

11    A    Just wait, wait, wait.  If you assume she works

12   to age 67.

13    Q    Right.

14    A    How many years is that from age 39?

15    Q    I don't know.  You do the math.

16    A    It's 28.

17    Q    Okay.  So it's 28 years.

18    A    Okay.

19    Q    So you've got 28 years?

20    A    Okay.

21    Q    But if you -- but if you do it from 74, you add

22   another seven years to it, and so when you take your

23   numbers, you're giving her seven years of employment that

24   she wouldn't otherwise be working.

25    A    I'm not, though.  I'm not, though.  I'm only

1   saying she's only going to work 21.4 years, not 28 years.

2   I'm not assuming that she'll work uninterruptedly.  I'm

3   assuming that every year there's a probability she'll be

4   out of the labor force for one reason or the other.  And

5   postinjury, that those probabilities are less that she will

6   be successful in the labor force.

7        Q    Okay.  But your numbers are including if you --

8   if you started at 67, there would be a shorter -- that the

9   number -- wouldn't the number be bigger?  I mean, I don't

10  understand why you're using 74, if she retires at 67.

11       A    Because it's the terminal age that the data are

12  collected from -- to.  The data are collected to age 75.

13  And so through age 74, I have a statistical model that

14  looks at the likelihood of this individual, with 13 to 15

15  years of education, being in the labor force.

16            And every year -- there's not a probability in

17  here that's greater than 84 percent.  And in her most

18  productive years, from 45 to 54, the likelihood is -- is

19  15.7 percent that she will not be in the labor force at any

20  given time working.

21       Q    Okay.  You are -- in looking at Mrs. Farley, did

22  you get -- did you assign a degree of her disability level?

23       A    No.

24       Q    Okay.  Is that something that you -- that you

25  normally do or you don't do?

1    A    I don't assign anybody a degree of a disability

2    rating or things like that.  There's no disability rating.

3    Q    Okay.  Let's go down -- let's go on page 5 down

4    to, one, two, three, four -- paragraph five.

5    A    "Prior to injury"?

6    Q    Yes.

7    A    Okay.

8    Q    How did you come up with this -- she's expected

9    to participate in the labor force another 21.42 years?

10    A    I just explained it to you.

11    Q    Well, I guess I don't understand, so please

12    explain it to me again.

13    A    Well, let me use a visual display to help you.

14    Age 39.

15    Q    Uh-huh.

16    A    Is 97,762 live survivors.  Age 40 is 97,640.  So

17    what's happening between there and there?  There's fewer.

18    So some people have died.

19    So in this probability of 99.88, that's a

20    probability that she will live from age 39 to age 40.

21    Q    Okay.

22    A    Okay?  Doesn't add up to a year.

23    Q    I got you.

24    A    Just a little less.

25    All right.  Here is the probability of a

55

1  nondisabled female with 13 to 15 years of education of

2  being in the labor force working, 81 -- 81.7 percent.

3       Q    Okay.

4       A    Okay?  With occupational disability, mildly

5  occupational disabled would be .7.  Average is .343.  And

6  severe is .108.

7       Q    Okay.  And I guess what I'm asking is --

8       A    I'm looking at the combined probability in each

9  year that a person like her would be alive, in the labor

10 force and working, and I'm reducing her 40,000 a year by

11 that probability.

12      Q    Okay.

13      A    Postinjury the probability is more dramatic than

14 preinjury, because the effects of disability shorten the

15 participation and the employment rates.

16      Q    Okay.  And -- but you don't know which one of

17 these three categories she falls in under the model; is

18 that correct?

19      A    I do.  I do.  I've assigned her a nondisabled

20 preinjury.  She had no limits in the amount of kind of work

21 she could do.  And postinjury, I've assigned her either

22 average disabled or average moderately disabled.

23      Q    Okay.  But you didn't do -- you didn't calculate

24 severe; is that correct?

25      A    Severe is part of the average.  Severe is in the

1    average data.  It's just not removed from the average data

2    there.  I have a separate category for severe.  And I don't

3    consider her as severe today.

4         Q    Okay.  And do you have some place where you

5    actually worked out the math of how you came to your

6    conclusions?  Just -- you just looked at the chart?

7         A    I mean, I -- I have the steps on one of my papers

8    here.  I have the --

9         Q    I'll get -- I'll get a copy of your notes after,

10   when she does the --

11        A    I have my five steps.

12        Q    Okay.  What are the five steps in your

13   methodology for coming up with --

14        A    Step one is the preinjury earning capacity.

15   Step two is the preinjury worklife probability.

16        Q    Okay.

17        A    Step three is the postinjury earning capacity.

18   Step four is the postinjury worklife probability.  Step

19   five is the present value calculation.  How much money do

20   we need today in a safe, prudent investment to replace the

21   growing amount of earnings over time.

22        Q    And this is all based upon -- based upon the

23   assumption that the person is going to do the same job for

24   the rest of their life?

25        A    No.

1    Q    So what she -- would Ms. Farley be losing money

2    or losing future earning capacity if she found a new job

3    tomorrow where she was making more money on a salary?

4    A    She really hasn't -- in my opinion, she hasn't

5    reached earning capacity yet, because typically we reach it

6    in our mid to late forties.  And so technically her actual

7    earnings could -- could go up.  We don't know that, but the

8    fact that she was earning more before injury than after

9    injury, I captured that.

10    Q    Okay.  But you -- but you admit that there's a

11    probability that she could be making more money in the

12    future than what she's making today?

13    A    Had she never been injured, there's a greater

14    probability, though.

15    Q    Okay.  But that's not what I asked you.  I asked

16    you, the possibility exists that tomorrow she could go out

17    and get a job that pays her more money than what she makes

18    today?

19    A    I have difficulty answering that affirmatively,

20    because it's just not as likely as it would have been had

21    she never been hurt.

22    Q    Okay.  Then the next paragraph is that -- what

23    is -- what did you do in the next paragraph in terms of

24    your -- in terms of -- is that a different category?  You

25    have the worklife expectancy as 16.34 years.

58

```
 1        A     Okay.  Let me get with you.

 2        Q     Okay.

 3        A     "As a result of injury," that paragraph?

 4        Q     Uh-huh.

 5        A     Yeah.  So it's looking at the -- at the

 6   moderately disabled, saying that the impairments that she

 7   has today she'll be able to work at home in a relaxed

 8   atmosphere where she's not distressed with the job

 9   situation, driving, things like that.  She would be like

10   the moderately disabled counterpart.

11        Q     Okay.  And she's expected to be able to work

12   another 16.34 years?

13        A     Yes.

14        Q     Okay.

15        A     And, again, that is calculated to age 74, just

16   the probabilities are less each year that she'll be in the

17   labor force and working.

18        Q     What is the next one?

19        A     The next one is the -- the worst-case scenario,

20   where she would be more like the average disabled female.

21   And the worklife probability for that individual is 7.56

22   years.

23        Q     Now, 2016 was one of the years that you performed

24   an analysis on, is that correct, when you were calculating

25   her yearly earnings?
```

```
 1        A    2016?  Yes.
 2        Q    Okay.  And that was the year that she had the
 3   accident; is that correct?
 4        A    Right.
 5        Q    So how -- does that -- does that -- does that
 6   interfere with your analysis in any way that half the year
 7   she was nondisabled?
 8        A    I didn't consider the injury year.
 9        Q    You didn't consider it?
10        A    I don't think I considered the injury year on the
11   data.
12             MR. BRESLER:  I think you testified -- I don't
13        know that you relied on 2014, 2015 because that was
14        the last two full years prior to the injury year.
15   BY MR. BELLE:
16        Q    Yeah, I'm just clarifying.  So you relied on
17   2014, 2015; is that correct?
18        A    Yes.
19        Q    Okay.  And you didn't perform any analysis on
20   2016?
21        A    Well, I've got the number --
22        Q    You have the number but you didn't --
23        A    -- but it wasn't included in the -- in the
24   factoring.
25        Q    Okay.  I'm just trying -- and I'm just trying to
```

1    understand what you did here.  But 2017 and then 2018,

2    based upon what you received?

3        A    Correct.

4        Q    Okay.  Now, did you look for 2018 at a tax

5    return, or what did you -- how were you provided her salary

6    for 2018?  As a tax return or in some other way?

7        A    I had a tax return and a -- an end-of-the-year

8    statement, but I think I used the tax return.

9        Q    Okay.  And you used her -- you used her pretax

10   income; is that correct?

11       A    Yes.

12       Q    Okay.  And it's your -- it's your opinion that

13   her lifetime loss of -- I guess your next paragraph in

14   your -- in your report is what is your best-case scenario

15   opinion as to Mrs. Farley's present -- or loss of future

16   earning capacity --

17       A    $326,247.

18       Q    Okay.  And in the worst-case scenario, what was

19   your opinion, sir?

20       A    The worst-case scenario, $714,849.

21       Q    Okay.  And when you say worst-case scenario, that

22   means she -- you used the shortest worklife expectancy that

23   the model provided; is that correct?

24       A    No.

25       Q    How did you get -- how did you get the first

1    number, the 326,000?

2         A    I used her preinjury earning capacity, times her

3    preinjury worklife probability, and summed up the

4    observations.

5         Q    Okay.  And the worst case scenario, how did you

6    come up with that one?

7         A    That one is using the postinjury worklife --

8    postinjury earning capacity, times the average disabled

9    worklife probability.

10             Remember, we had two categories on the

11   spreadsheet with postinjury?  And it's the worst-case

12   scenario is average disabled.

13        Q    Okay.  And I don't -- and what is -- and so can

14   you -- I'm still having trouble with what -- how you're

15   calculating your past loss of wages.

16        A    I looked at the preinjury capacity times the 2.92

17   years, multiplied it out.  Postinjury capacity times the

18   same period, which she actually earned over the same

19   period, subtracted it and added fringe to it.

20        Q    And I guess -- I guess where -- I'm having

21   trouble from a terminology standpoint, because I don't -- I

22   don't understand -- one, I don't under -- so you're -- I

23   don't -- you're saying that she's lost $7,353 in wages due

24   to a loss of basically ability to do overtime?

25        A    Regardless of what it's at, the bottom line

1   number for what she actually earned --

2       Q    Okay.

3       A    -- compared to her base, there's $7,353

4   difference.

5       Q    Okay.  And are all of these items at the

6   beginning of your report that you've listed when you

7   interviewed her in terms of her complaints about memory or

8   headaches, or whatever complaints she told you when you

9   were interviewing her, are these the, I guess, the physical

10  or mental impairments that you're saying that Ms. Farley

11  has been suffering from for more than -- for more than

12  three to four months?

13      A    Yes.

14      Q    Would it be important for you to review a

15  person's performance evaluations to determine whether they

16  can -- whether their disability is actually affecting them,

17  or is it all just an economic analysis?

18      A    The -- the -- the personnel evaluation would be

19  based only on work, and the employee's dedication to her

20  job and things like that.

21           And from that perspective, she would hide any

22  limits that she really had in doing her job.  She wouldn't

23  want to tell the employer that, I'm suffering with terrible

24  headaches all day long trying to get this job done, and

25  I've got to keep the birds out of my room, I've got to keep

1   it quiet, and by the time I'm finished I'm totally

2   distressed.  She doesn't want to tell the employer that.

3   She wants to tell the employer that, I love my job and I'm

4   happy working for you.

5       Q    Are all the opinions that you plan to present at

6   trial contained within this report that I have been

7   provided, this six-page report that we've discussed --

8       A    Yes, sir.

9       Q    -- today?

10      A    Yes, sir.

11      Q    Has anything else been sent to you to perform any

12  additional work since you were initially retained by

13  Mr. Bresler's law firm?

14      A    I haven't done additional work.

15      Q    No, I'm saying are you scheduled to do any

16  additional work?

17      A    No.

18      Q    Besides the losses listed in your report, are you

19  claiming that there are any other additional economic

20  losses suffered by Mrs. Farley?

21      A    I'm not claiming that, no.

22      Q    Do you plan to render any type of medical

23  opinions at trial as it relates to Mrs. Farley?

24      A    Absolutely not.

25      Q    You have provided a range of where you think her

64

1  loss might fall.  But can you provide -- you can't provide

2  a specific number as to what you think her loss is going to

3  be, just the range?

4       A    Just the range.

5       Q    Now, you've indicated that some of these

6  conditions that Mrs. Farley has suffered from have

7  persisted for three or four -- three to four -- three to

8  four months or more; is that correct?

9       A    Yes, sir.

10      Q    Okay.  And how does your model account for the

11 fact that some of these conditions may go away at some

12 point?  Meaning, she has some of this stuff, but you're not

13 a doctor.  But let's just say for the sake of argument some

14 of these things go away.  Would she still fall in -- I

15 mean, so does your model account for that?

16      A    I think the best-case scenario looks at the

17 best-case recovery.  And the worst-case scenario looks at

18 those items that may or may not improve, that's not

19 improving, and sustain and get worse over time.

20      Q    Just to -- you indicated that you took a -- you

21 took this eight credit hour course.  Are there any degrees

22 available in any type of the -- in any of the vocational

23 sciences?

24      A    In what I do?

25      Q    Yes.

65

1     A     Not that I know of.

2     Q     And at some point did she tell you that she has

3   frequent -- what's a cut-down day?

4     A     Days you don't accomplish as much as you would

5   have had you not been injured.

6     Q     And did she indicate to you that she feels that

7   she doesn't do the work as carefully as she used to?

8     A     She does.  She checks and rechecks and checks and

9   rechecks because she makes mistakes, finds --

10    Q     And all of these findings of -- that you've made

11  that she falls into a disability category due to

12  psychological health, you didn't receive any psychological

13  records for this person; is that correct?

14    A     That's correct.

15    Q     So a lot of what you do in terms of determining

16  somebody's loss of earning capacity, or determining whether

17  they have a qualified disability, is based on the

18  subjective stuff that they tell you?

19    A     It's a self-report, yes.  It's a self-report.

20    Q     And what do you do when you find things in the

21  medical records that don't -- are not consistent with what

22  the person self-reports?

23    A     I assume that they hadn't been asked the question

24  that I asked.

25    Q     Have you ever had situations where the medical

1    records are inconsistent with what the patient is telling

2    you?

3          A    Like this, where there's no cognitive complaints

4    in the medical records, and yet she has cognitive

5    complaints?  Yes.

6          Q    Is your -- is your question -- is the

7    questionnaire that you use, is that part of your file?

8          A    Part of the questionnaire is.

9          Q    No, I mean, but do you have a physical copy of

10   your questionnaire that you use to ask her questions?

11         A    I don't follow the same format as far as the

12   questions go.

13         Q    Okay.  But did you -- prior to interviewing

14   Mrs. Farley, did you write down the questions somewhere?

15         A    No, sir.

16         Q    Okay.  So all the questions came directly from

17   you as you just interviewed her?

18         A    Yes.  I have the Ranford short form that is a

19   guide on a lot of the answers, for a lot of the answers.

20   And then I have -- a friend of mine developed a 60-page

21   questionnaire that I've got pages in my head from.

22         Q    Okay.

23         A    And cognitive questionnaires kind of in my head

24   too.

25         Q    I guess what I'm asking you is, is that this

1    patient has given you a lot -- not patient, but client or

2    person that you -- this interviewee has given you a

3    significant amount of information.  Where did you record

4    that information?

5         A    In my notes.

6         Q    Okay.  So you wrote it down.  What I'm trying to

7    ask is that as she told you these things, you wrote them

8    down somewhere?

9         A    Yes.

10        Q    Okay.  And can I have a copy of that when we're

11   done here today?

12        A    It will be in my file.

13        Q    Okay.

14             MR. BELLE:  I don't think I have any other

15        questions.

16                  CROSS-EXAMINATION

17   BY MR. BRESLER:

18        Q    Just one.  You and I spoke about, in addition to

19   your report, doctor -- Gerri Pennachio's report?

20        A    Yes, sir.

21        Q    Okay.

22             MR. BRESLER:  No further questions.

23                  REDIRECT EXAMINATION

24   BY MR. BELLE:

25        Q    Okay.  And what was the substance of your

1    conversation regarding her report?

2         A    At one point in time, I had -- I had looked at

3    future medical care costs.  And then I was asked to drop

4    that.  I looked at what Ms. Pennachio had done, and then

5    had reviewed that.  And I was asked just to take it all out

6    and not consider it anymore.

7         Q    Okay.  So you're not making -- you're not

8    rendering any opinions on reasonableness of medical bills

9    or care?

10        A    Not at all.

11        Q    Okay.

12             MR. BELLE:  All right.  I don't think I have any

13        other questions.  You have an opportunity with regard

14        to any deposition to read or waive.  What do you want

15        to do?

16             THE DEPONENT:  I'll read.

17             MR. BELLE:  And I would like a copy of his file.

18        I don't know if your file has the 2018 tax returns.

19             THE DEPONENT:  The CD.

20             MR. BELLE:  The CD does?

21             THE DEPONENT:  Yes, sir.

22             THE REPORTER:  Do you need a transcript?

23             MR. BELLE:  I do.  I'll have a mini and a regular

24        .pdf.  E-mail is fine.

25             THE REPORTER:  Do you need a copy, sir?

69

1          MR. BRESLER:  Yes, please.

2          (Deposition concluded at 2:15 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

70

```
 1                    CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA

 4   COUNTY OF HILLSBOROUGH

 5           I, the undersigned authority, certify that the

 6   witness named herein personally appeared before me and was

 7   duly sworn.

 8           Witness my hand and official seal this 11th day

 9   of April, 2019.

10

11

12

13

14                 _____

15                 J. Gay Smith, RPR, RMR, FPR
                   Notary Public - State of Florida
16                 My Commission Expires: 2/18/2021
                   Commission No.: GG 041811
17

18

19

20

21

22

23

24

25
```

71

```
 1              REPORTER'S CERTIFICATE

 2    STATE OF FLORIDA        :

 3    COUNTY OF HILLSBOROUGH  :

 4            I, Jolyn Gay Smith, RPR, RMR, FPR, certify that I

 5    was authorized to and did stenographically report the

 6    deposition of STEVEN M. COLLARD; that a review of the

 7    transcript was requested and that the transcript is a true

 8    and complete record of my stenographic notes.

 9            I further certify that I am not a relative,

10    employee, attorney, or counsel of any of the parties, nor

11    am I a relative or employee of any of the parties'

12    attorneys or counsel connected with the action, nor am I

13    financially interested in the outcome of the foregoing

14    action.

15            Dated this 11TH day of APRIL, 2019, IN THE CITY

16    OF TAMPA, COUNTY OF HILLSBOROUGH, STATE OF FLORIDA.

17

18

19

20

21

22            _____

23            JOLYN GAY SMITH, RPR, RMR, FPR
              Registered Merit Reporter
24            Florida Professional Reporter

25
```

72

1    PLEASE ATTACH TO THE DEPOSITION OF STEVEN M. COLLARD, TAKEN

2    ON APRIL 4, 2019, IN THE CASE OF JENNIFER FARLEY VS. STATE

3    FARM MUTUAL AUTOMOBILE INSURANCE COMPANY.

4    PAGE:     LINE:          CORRECTION AND REASON THEREFOR:

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   I HAVE READ THE FOREGOING PAGES AND, EXCEPT FOR ANY
     CORRECTIONS OR AMENDMENTS INDICATED ABOVE, I HEREBY
21   SUBSCRIBE TO THE ACCURACY OF THIS TRANSCRIPT.

22

23   _____     _____
     STEVEN M. COLLARD                    DATE
24
     _____     _____
25   WITNESS TO SIGNATURE                 DATE

**Riesdorph Reporting Group, Inc.  (813) 222-8963**
**www.rrgtampa.com**