Exhibit "B"

**In the Matter of:**

JENNIFER FARLEY

vs.

STATE FARM

---

**MICHAEL FREEMAN, MEDDR, PH.D., MPH**

*April 30, 2019*

---



www.OrangeLegal.com

800-275-7991

JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 MIDDLE DISTRICT OF FLORIDA

 3

 4   JENNIFER FARLEY,          )
                               )
 5         Plaintiff,          ) Case No. 8:18-cv-00171-JSM-MAP
                               )
 6   vs.                       )
                               )
 7   STATE FARM MUTUAL         )
     AUTOMOTIVE INSURANCE      )
 8   COMPANY, a foreign        )
     corporation,              )
 9                             )
           Defendant.          )
10   _____)

11

12

13               VIDEOTAPED DEPOSITION

14                        OF

15      MICHAEL D. FREEMAN, MedDr, PhD, MPH

16          Taken in behalf of the Defendant

17

18

19                  (Pages 1 - 96)

20

21                  Salem, Oregon

22                  April 30, 2019

23

24

25
```



**Orange Legal**
**800-275-7991**

```
 1              BE IT REMEMBERED THAT, pursuant to the rules

 2    of civil procedure, the deposition of MICHAEL D.

 3    FREEMAN, MedDr, PhD, MPH, was taken before Maureen

 4    Kelly, a Certified Shorthand Reporter for Oregon and

 5    Washington, and a Registered Professional Reporter, on

 6    April 30, 2019, commencing at the hour of 1:43 p.m., at

 7    C&L Court Reporters, 4103 Sylvia Street SE, Salem,

 8    Oregon, the attorneys appearing via video conference

 9    from Florida.

10

11

12                         APPEARANCES

13
      For the Plaintiff (Via Videoconference):
14        TANNY, GRIFFITH & BRESLER, P.A.
          By: Ryan D. Bresler
15        29605 US Highway 19 N, Suite 210
          Clearwater, FL 33761-1545
16        727-781-8817
          ryan@tanneygriffithlaw.com
17

18    For the Defendant (Via Videoconference):
          DSK LAW
19        By: Robert N. Belle, Jr.
          332 North Magnolia Avenue
20        Orlando, FL 32801-1609
          407-422-2454
21        rbelle@dsklawgroup.com

22
      Also Present:   David McGinnis - Videographer
23                    Bill Nelson - PacifiComm

24                         --oOo--

25
```



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                    3

```
 1                   EXAMINATION INDEX

 2

 3   DEPOSITION OF:  Michael D. Freeman, MedDr, PhD, MPH

 4                                                   PAGE

 5   Examination by Mr. Belle......................    5

 6   Examination by Mr. Bresler...................   93

 7                      --oOo--

 8

 9                    EXHIBIT INDEX

10   NUMBER        DESCRIPTION                      PAGE

11              (No Exhibits Marked.)

12                      --oOo--

13

14   INSTRUCTION not to Answer:            (None.)

15                      --oOo--

16

17   REQUEST for Production:               (None.)

18                      --oOo--

19

20

21

22

23

24

25
```



```
 1        SALEM, OREGON, TUESDAY, APRIL 30, 2019, 1:43 P.M.

 2   /////

 3              THE VIDEOGRAPHER:  We are on the record.

 4   Today's date is April 30th, 2019.  The time is 1:43 p.m.

 5   Our location is 4103 Sylvia Street Southeast, Salem,

 6   Oregon 97317.  This is the time and place set for the

 7   video deposition of Dr. Michael Freeman in the matter of

 8   Jennifer Farley vs. State Farm Mutual Automotoble --

 9   Automotoble -- Automobile Insurance Company, case No.

10   8:18-cv-00171-JSM-MAP, in the United States District

11   Court, Middle District of Florida.

12              Counsel, would you please identify yourself

13   and your affiliates?

14              MR. BRESLER:  This is Ryan Bresler on

15   behalf of Jennifer Farley.

16              MR. BELLE:  Robert Belle on behalf of State

17   Farm.

18              THE VIDEOGRAPHER:  And will the court

19   reporter please swear in the witness.

20   /////

21              MICHAEL D. FREEMAN, MedDr, PhD, MPH

22   having been first duly sworn, was examined and testified

23   as follows:

24   /////

25              THE VIDEOGRAPHER:  And counsel may proceed.
```

JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                         5

```
 1    /////

 2                    EXAMINATION

 3    BY MR. BELLE:

 4         Q.   Sir, could you state your name for the

 5    record and spell your last name?

 6         A.   It's Michael Freeman.  Middle initial D.

 7    F-R-E-E-M-A-N.

 8         Q.   And, sir, are you currently employed?

 9         A.   I am.

10         Q.   Where are you employed at?

11         A.   I'm employed at two places.  One is a

12    consulting company called Forensic Research & Analysis,

13    and the other one is Maastricht University.  That's

14    M-A-A-S-T-R-I-C-H-T.

15         Q.   And what do you do at Maastricht

16    University?

17         A.   I'm a tenured professor of forensic

18    medicine, and I run a Ph.D. program for physicians who

19    are studying the field of forensic medicine.

20         Q.   And what is forensic medicine?

21         A.   Well, broadly it's just the intersection of

22    medicine and law.  My area of interest most specifically

23    is how epidemiologic information and data are used in

24    evaluating various disputed issues within forensic

25    medicine or that come under the -- the purview of
```



**Orange Legal**
**800-275-7991**

```
 1   forensic medicine.
 2          Q.    Okay.  And what do you do with Forensic
 3   Research & Analysis?
 4          A.    That is a consulting company with a total
 5   of 12 employees.  Eight employees with expert knowledge
 6   or in expert areas.  And we deal with primarily
 7   litigation issues.  The -- the -- the company takes in
 8   about -- of all of the work that it consults on, about
 9   80 percent is in the criminal arena and -- excuse me.
10   20 percent is in the criminal arena, and 80 percent is
11   in the civil arena.
12          Q.    And, sir, did you receive a subpoena for
13   today's deposition?
14          A.    I --
15          Q.    Did you receive a list of items to bring
16   with you to the deposition?
17          A.    I'm looking for that right now.  Give me
18   just a minute.
19                Yes -- yes, I did get one.
20          Q.    Okay.  Did you just bring your laptop with
21   you today or did you bring a physical file for this
22   case?
23          A.    No.  Just my laptop because everything I
24   have is electronic.
25          Q.    Okay.  Do you think I would be able to get
```



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH
7

```
 1    a copy of your digital file?

 2         A.    Of course.  If -- as long as we have

 3    something that I can use to get it off of my laptop, I

 4    can get it for you today.  Otherwise, I -- I'll get it

 5    for you at another time.  No problem.

 6         Q.    Okay.  Okay.

 7               What does your digital file consist of?

 8         A.    Would -- would you like a -- a detailed

 9    list or just a general?

10         Q.    Let me -- let me ask you areas that I guess

11    I'm interested in, and then I'll just get a copy of

12    whatever it is that you have.  Okay?

13         A.    You bet.

14         Q.    All right.  Do you have any type of written

15    correspondence or engagement letter from Mr. Bresler's

16    law firm?

17         A.    I -- I do.  There is a cover letter dated

18    December 19th of 2018, and it just says:  Please find

19    your signed fee schedule and our retainer check for

20    $5,000 along with a CD of file materials.  And then --

21         Q.    What is your -- what is your standard fee

22    schedule, sir?

23         A.    You mean like hourly and that kind of

24    thing?

25         Q.    Yes, sir.
```



```
 1          A.   Sure.  I charge 625 per hour and -- for

 2   pretty much all work with the exception of testimony,

 3   which I charge at $800 per hour.

 4          Q.   And how much are you charging for this

 5   deposition today?

 6          A.   I would assume $800 per hour for the two

 7   hours that we have scheduled.

 8          Q.   And do you have any other written

 9   communication be that electronic or written with

10   Mr. Bresler's office?

11          A.   And I'm -- I'm just looking through my --

12   my subfolders to see if I can answer that question.

13               Yes, I -- so I have a February 20th, 2019,

14   correspondence from Mr. Bresler that has a -- a list of

15   primarily medical records.

16          Q.   Okay.  And besides that do you have any

17   other communications with his office?

18          A.   Give me just a second, and I will

19   double-check to see what I've got.

20               No, it does not -- it does not look like --

21   like I do.

22          Q.   Have you had any -- have you had any

23   conversations with Mr. Bresler prior to this deposition?

24          A.   I'm sorry.  I -- I -- I misstated.  I do

25   have one other cover letter which was April 23rd, 2019.
```



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                    9

```
 1          Q.   And what does that letter say?

 2          A.   It says:  Dear, Dr. Freeman, enclosed

 3     please -- well, it looks like it's missing a word --

 4     please a copy of the USB drive that we received from

 5     defense expert Dr. Rawson Wood, R-A-W-S-O-N, for your

 6     file --

 7          Q.   Okay.  And you're cutting -- you're cutting

 8     out a little bit.

 9          A.   Okay.  I know our court reporter got it.

10     What did --

11          Q.   No.  I heard you -- you got a -- you got a

12     digital -- you got a file from a Dr. Wood; is that

13     correct?

14          A.   Yeah.  The defendant's expert, correct.

15          Q.   After reviewing that -- that report, did

16     you -- did that change any of the opinions that you were

17     going to provide today?

18          A.   It did not.

19          Q.   Okay.  How much in total has Mr. Bresler's

20     firm paid you for your work on this case?

21          A.   Hold on just a minute.

22               I have been paid in total $14,375.

23          Q.   How much?

24          A.   14,375.

25          Q.   Okay.  All right, Doctor.  Let's -- let's
```

10



```
 1    go to your -- your report and let's start with page 1

 2    where you're discussing what your credentials are.

 3    Okay?

 4         A.   Yes.  And I -- I apologize.  I missed one

 5    bill.  There is an additional 2500 on top of the 14,000

 6    figure I gave you.

 7         Q.   Okay.  That -- that bill is outstanding?

 8         A.   No.

 9              Well, good question.  It is -- it is

10    outstanding.

11         Q.   Have you ever worked with Mr. Bresler's

12    firm before?

13         A.   I have to look at Mr. Bresler's -- who is

14    in Mr. Bresler's firm.

15         Q.   And the -- the name of the firm is Tanney,

16    Griffith & Bresler, P.A., and it's located in

17    Clearwater, Florida.

18         A.   Not that I'm aware of.

19         Q.   Okay.  And what percentage of your income

20    would you say is derived from doing forensic expert

21    work?

22         A.   Over the past five years it's averaged

23    about 80 percent.

24         Q.   Okay.  And then the remainder of your

25    income comes from teaching your clinical program?
```



```
 1            A.   In part.  Some of it is from teaching.

 2   That's not very much.  Other like non-related

 3   business --

 4            Q.   Okay.

 5            A.   -- interests, yeah.

 6            Q.   Got it.

 7            But 80 percent of your income is generally

 8   derived from forensic work; is that fair?

 9            A.   Yes.

10            Q.   Okay.  What percentage of work do you

11   typically do for plaintiffs and what percentage of work

12   do you typically do for defendants?

13            A.   In the civil work that I do it's broken

14   down about 83/15 plaintiff to defendant.

15            Q.   Okay.  All right.  Let's go through -- can

16   we go through your report?  Can you pull that up, sir?

17            A.   Of course.

18            Q.   Okay.  In your report it says that -- could

19   you tell me a little bit about your educational

20   background?

21            A.   Sure.  So I -- I have an -- an odd

22   educational background given what I do.  I started out

23   life as a chiropractor.  I did four years training at

24   the University of Oregon and did my degree there in

25   general science, which is chemistry, physics and
```



 1   biology.  Sort of a spattering of each.  And then I went

 2   to chiropractic school because my dad is a chiropractor

 3   and that's what I started out to do.  And that was in

 4   Oregon as well at what's now the University of Western

 5   States.

 6                After I practiced for about four to five

 7   years, I went back to school and did a master's in

 8   public health in epidemiology and biostatistics and then

 9   a Ph.D. also in epidemiology.  And my focus in that

10   program was on traffic crash related injuries.  After

11   that I did some M.D. training.  I didn't finish the

12   medical program because I didn't want to do clinical

13   work after having spent enough time around it and went

14   to a program in Sweden for a Doctor of Medicine, which

15   is like a scientific medical degree, and took my Doctor

16   of Medicine in Sweden.  So it's a -- a nonclinical

17   medical degree.

18                And then did two more years in forensic

19   pathology postdoctoral fellowship.  So that was two

20   years of what was basically autopsy training and --

21        **Q.   Where did you attend medical -- where did**

22   **you attend some medical school but did not complete it?**

23        A.   University of Health Services at Antigua.

24   So a Caribbean school that was -- had clinical rotations

25   set up in the United States.



1          Q.    Okay.  So how many years did you go to that

2     school?

3          A.    Three years.

4          Q.    Okay.  And how many years of medical

5     school?

6          A.    Four years.

7          Q.    Okay.  So do you have a medical license to

8     practice medicine in any place in the continental United

9     States?

10         A.    Outside of a license to practice

11    chiropractic medicine, which I have never given up, I am

12    not licensed as an allopath.  And I have never applied

13    for it nor have I ever done all of the examinations --

14    the US medical license exams that would be required for

15    it.  I'm a medical scientist, not a medical clinician.

16         Q.    Okay.  So would it be fair to say you're

17    not an M.D.?

18         A.    Well, my -- my degree is MedDr.  It is

19    correct to say I am a Doctor of Medicine but I'm not a

20    clinical medical doctor.

21         Q.    Okay.  So you -- can you -- do you have any

22    privileges at any hospitals?

23         A.    No.  I've never applied for any.

24         Q.    Can you perform any surgeries?

25         A.    I am licensed to do so in the State of



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                    14

```
 1    Oregon, yes.
 2           Q.   Okay.  Are you licensed in the State of
 3    Florida to perform surgery?
 4           A.   Absolutely not.
 5           Q.   So are you -- are you -- are you -- are you
 6    trained to make medical diagnosises [sic] regarding a
 7    patient?
 8           A.   Oh, certainly.
 9           Q.   From a chiropractic standpoint only?
10           A.   A medical diag -- no.  I am -- I have M.D.
11    training.  I have a total of eight years of medical
12    training including my training in Sweden, my training in
13    Antigua and other training.
14           Q.   Is --
15           A.   However -- however, that's not part of what
16    I typically do.
17           Q.   Okay.  And with regard to the training that
18    you underwent in Sweden -- in Sweden, that would not
19    authorize you to practice medicine in the United States?
20           A.   That was -- was not what it was intended
21    for, no.
22           Q.   Do you have any training or background in
23    engineering?
24           A.   I have an extensive amount of background in
25    engineering with regard to crash reconstruction and
```



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                          15

```
 1   injury biomechanics but not in a formal engineering

 2   cost.

 3          Q.   Okay.  Let's focus a little bit on your

 4   injury biomechanics.  Where did you undergo injury

 5   biomechanics training?

 6          A.   Well, my first injury biomechanics credit

 7   was in my Ph.D. program in the 1990s at Oregon State

 8   University.  I think I had three or four courses that

 9   were included as credit for a minor in -- that included

10   injury biomechanics.  Then when I started as a professor

11   at Oregon Health & Science University medical school in

12   1997, I began -- I was requested to develop a curriculum

13   on injury and trauma epidemiology.  Part of that

14   curriculum, probably about a third of it, was devoted to

15   injury biomechanics.  And so I -- I wrote a curriculum

16   that included injury biomechanics and taught it for 14

17   years at the medical school.  During that --

18          Q.   How many -- oh, sorry.  You're cutting out,

19   sir.  You're cutting out.  Can you move your -- you

20   might need to move your microphone just a little bit up.

21          A.   Well, I don't -- the microphone I think

22   just goes to the video.

23          Q.   Okay.  Are you near a phone then?  You may

24   need to be closer.

25          A.   Yeah, I don't know -- actually, I'm not
```



1    sure what you're hearing me through.

2              THE WITNESS:  Is it through that thing over

3    there?

4              MR. NELSON:  Yeah, it's always been through

5    -- though that.  So it's standard --

6              THE WITNESS:  So -- so the -- the thing I'm

7    looking at -- I know this might look weird on the video

8    or to you.  But the thing I'm looking at is I'm looking

9    at a screen where you are teeny --

10             MR. BELLE:  Yeah.

11             THE WITNESS:  -- you are teeny tiny on the

12   screen.  And then above that and behind it is a camera

13   that you're looking at me through, and that's where the

14   microphone is.  I don't know how I can get closer to

15   that.

16             MR. BELLE:  Okay.  It's fine.  We'll do the

17   best we can.

18             THE WITNESS:  Okay.  Yeah.

19             So I think you were asking me about the

20   biomechanics.  Anyway during the late 1990s and 2000s I

21   developed curriculum in biomechanics.  I attended

22   multiple conferences and training in biomechanics and

23   began publishing in the area of biomechanics.  And at

24   the present time I have more than 60 publications in the

25   peer-reviewed literature pertaining to injury

JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                    17

```
 1   biomechanics.
 2   BY MR. BELLE:  (Continuing)
 3        Q.   Okay.  Now, you indicated that you're a
 4   biostatistician; is that correct?
 5        A.   I don't think I did, but that is correct,
 6   yes.
 7        Q.   Well, it says on here that the University
 8   of Western States that you got a master's of public
 9   health/epidemiology and biostatistics?
10        A.   It probably says Oregon State University.
11        Q.   Okay.  It says University -- yes, it says
12   Oregon State.  I'm sorry.
13        A.   Yeah.  So -- so I do have a degree that is
14   divided between epidemiology and biostatistics.  That's
15   correct.
16        Q.   Okay.  But do you have any specific degree
17   in biomechanics or injury causation?
18        A.   There's no such thing as a degree in injury
19   causation.  That doesn't exist.
20        Q.   That about --
21        A.   That doesn't exist.
22        Q.   What about biomechanics?
23        A.   Biomechanics certainly is a degreed
24   program.  I don't have a degree in biomechanics.  I just
25   have extensive experience and --
```



1      Q.   Okay.

2      A.   -- publications and training in it.

3      Q.   **And where else did you get your -- your**

4   **training and experience in biomechanics?**

5      A.   Well, training in -- with the Association

6   for the Advancement of Automotive Medicine, the Society

7   of Automotive Engineers, the National Transportation

8   Safety Board.  So my training has come from

9   conference-type training, and I've got hundreds of hours

10  of training in biomechanics and injury biomechanics.

11     Q.   **Have you ever been told in any county in**

12  **the State of Florida that you were not allowed -- that**

13  **you would not be allowed to testify regarding your**

14  **opinions on biomechanics and epidemiology?**

15     A.   Oh, I'm sure I have.  There's -- I've -- I

16  am -- I understand that my testimony had been challenged

17  over 750 times and that 17 of those challenges have been

18  granted in one form or another, so --

19     Q.   **Okay.**

20     A.   And I know that a large percentage of them

21  occur in Florida.

22     Q.   **Has the -- has your testimony ever been**

23  **stricken or told that you can't testify in any federal**

24  **district court?**

25     A.   I -- I think there's one case that I've

 1    heard of; otherwise, no.  Certainly not in Florida, and

 2    certainly not for anything that I was present for.  I

 3    think there was one case where I was told my testimony

 4    was -- that -- that the issue didn't require the -- the

 5    expertise of an expert because it was apparent to the

 6    jury.  That's my understanding --

 7         **Q.   Okay.**

 8              A.   -- from a case from -- I think it's

 9    California.

10         **Q.   Okay.  And do you have any recollection --**

11    **recollection of testifying -- having your testimony**

12    **restricted or limited in the northern district of -- the**

13    **Northern Federal District of Florida?**

14              A.   No.

15              MR. BELLE:  I'd just like to read into the

16    record the name of the case is Dewitt v. UPS Ground and

17    Freight.  It's got a citation number of 2017 WL 3597515.

18              THE WITNESS:  Are you telling me that's a

19    federal case court -- federal --

20              MR. BELLE:  Yes --

21              THE WITNESS:  -- court case?

22              MR. BELLE:  Yes, sir.

23              THE WITNESS:  I -- I have no recollection

24    or understanding or knowledge of that.

25    BY MR. BELLE:  (Continuing)



**Orange Legal**
**800-275-7991**

```
 1          Q.   Okay.  Then that's -- that's the answer.  I
 2   can't ask you to talk about something that you don't
 3   recall or remember.
 4          A.   Yep.
 5          Q.   Let's keep going here.
 6               MR. BRESLER:  Hey, Robert, what was that --
 7               MR. BELLE:  Yes.
 8               MR. BRESLER:  -- what was that cite again?
 9   I got the -- I got the WL.  I apologize.
10               MR. BELLE:  Let me go back and find it.
11               MR. BRESLER:  Sorry about that.
12               MR. BELLE:  It's 20 -- can you hear me?
13               MR. BRESLER:  Yes.
14               MR. BELLE:  17 WL 3597515.
15               MR. BRESLER:  Thanks.
16               MR. BELLE:  Yep.
17   BY MR. BELLE:  (Continuing)
18          Q.   Sir, have you ever been issued a cease and
19   desist order for referring to yourself as a doctor in
20   the State of Texas?
21          A.   You mean the one that was rescinded after
22   it turned out that it was based on a fraudulent
23   complaint from an expert from Biodynamic Research
24   Corporation, the people who you've hired in this case?
25   Yes, I'm familiar with that.  The notice has been
```

1    rescinded, and the complaint was dismissed because it

2    was fraudulent.

3              The complaint was brought by a Dr. Ted Bain

4    of Biodynamic Research Corporation.  Dr. Bain has

5    been -- has had his testimony stricken more than 20

6    times based on my testimony.  Fortunately Dr. Bain's

7    competency at filing a false complaint with the Board of

8    Medical Examiners is at the same level of his testimony

9    that's been stricken so often.

10         **Q.   Okay.  So the answer to the question is**

11   **yes?**

12        A.   That answer to my question is that there is

13   no such order because the order was rescinded because it

14   was issued in error and now the complaint has been

15   dismissed because it was fraudulent.

16         **Q.   Now, you write also in your report that you**

17   **are an affiliate of the medical examiner with the**

18   **Allegheny County Medical Examiner's Office.  What does**

19   **that mean?**

20        A.   It means that -- it's an unpaid position.

21   It's associated with my fellowship in forensic pathology

22   that I did with that organization in 2014 and '15, and

23   that I am periodically consulted on cases.

24         **Q.   Okay.  Do you at any time issue causes of**

25   **death or manner of death reports?**



**Orange Legal**
**800-275-7991**

JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                    22

```
 1            A.    Sure.
 2            Q.    Okay.  So you are diagnose -- or you are
 3      making determinations of cause of death.  And where is
 4      Allegheny -- is this Allegheny County in Pennsylvania or
 5      in Oregon?
 6            A.    I'm -- I'm sorry.  What was the question
 7      again?
 8            Q.    Is this Allegheny County in Oregon or is it
 9      in Pennsylvania?
10            A.    This is -- there is no Allegheny County in
11      Oregon.  This is Allegheny County -- that I'm aware of
12      anyway.  That is Allegheny County in Pennsylvania.
13            Q.    Okay.  So how frequently are you working in
14      this medical examiner's office?
15            A.    Oh, I only get a -- I only get a request
16      perhaps once or twice a year now.
17            Q.    Okay.  And what kind of request do you
18      receive?
19            A.    Typically it's consultation in a pediatric
20      death case or it might be a traffic crash related
21      homicide.
22            Q.    Okay.  So typically when -- you know, maybe
23      it's a child that's been shaken, you're -- you're giving
24      biodiag -- bio -- biomechanic testimony about the
25      mechanism of injury?
```



 1          A.    I might.  That might be included in my

 2    testimony.

 3          **Q.    Okay.  And are you actually signing**

 4    **anybody's death certificates and saying what their cause**

 5    **of death is in the certificates?**

 6          A.    No.  There are full time employed forensic

 7    pathologists who do all of that stuff.

 8          **Q.    Okay.  And you're not a forensic**

 9    **pathologist; is that correct?**

10          A.    No.  I'm trained in forensic pathology, but

11    I'm not a forensic pathologist, no.

12          **Q.    What type of training and experience do you**

13    **have in accident reconstruction?**

14          A.    It goes back to 1995, I think, '96.  When I

15    was doing my Ph.D. I was required to -- I was required

16    to do 150 hours about of contact training with

17    Northwestern University at their traffic crash

18    reconstruction and investigation school.  And then after

19    that time -- in 1999 I began working with a medical

20    examiner in the State of Oregon and with law enforcement

21    and began doing monthly training and taking other

22    training in crash reconstruction.  Until about 2005 when

23    I took my ACTAR accreditation examination.

24                ACTAR is A-C-T-A-R and that stands for the

25    Accreditation Commission on Traffic Accident



**Orange Legal**
**800-275-7991**

 1    Reconstruction.  And since that time have analyzed over

 2    3,000 crashes and more than 300 fatalities.

 3          Q.   Okay.  And it says on here that you have

 4    over 60 scientific publications; is that correct?

 5          A.   No.  That is incorrect.  I have nearly 200

 6    scientific publications.  I over -- have over 60

 7    publications just in the field of injury biomechanics.

 8          Q.   Okay.  And how many of those -- of those 60

 9    biomechanical publications that you have, how many of

10    them have been peer reviewed?

11          A.   All of them have been peer reviewed.

12          Q.   And what about the other 200 scientific

13    papers?

14          A.   They are in other areas.  I only have about

15    10 or so non peer reviewed publications.

16          Q.   Okay.  Let's move on.  Can we move to the

17    section of your report page 3 where you -- where you --

18    where it says background facts?

19          A.   You bet.

20          Q.   Okay.  What did you do to gather your facts

21    about the nature of the loss in this case?

22          A.   I reviewed the materials that were sent to

23    me.

24          Q.   Okay.  Did you ever investigate -- did you

25    ever visit the scene?



```
 1              A.   I did not.

 2              Q.   Did you ever perform any type of testing on

 3   any of the vehicles that were involved in the accident?

 4              A.   I did not.

 5              Q.   Were you able to perform any type of

 6   testing on any vehicles that were similar make, model

 7   and year of the vehicles that were involved in the

 8   accident?

 9              A.   What do you -- was I able to?  I mean I --

10   I didn't attempt to because it was unnecessary for my

11   reconstruction.  So --

12              Q.   Okay.

13              A.   So -- unable to makes it sound like I tried

14   to but then couldn't do it.

15              Q.   Okay, sir.  And I understand that

16   there's -- that there's subject to interpretation, but

17   please just try to answer my question.  It's -- if -- if

18   you -- if you don't understand my question, tell me you

19   don't understand; but otherwise, just provide me with an

20   answer.  When we're in court, you'll have an opportunity

21   to explain things as you would like.  But I'm trying to

22   just -- we have a little bit of time.  I'm trying to get

23   through this before I run out of time.

24              A.   Yeah.  I'm not --

25              Q.   So --
```



```
 1         A.   And I'm not trying to -- I promise you I'm

 2   not trying to slow you down.  I just want to make sure

 3   I'm -- I'm answering your questions as they're asked.

 4   That's all.

 5         Q.   Okay.  Well, did you perform any type of

 6   independent investigation in this case beyond looking at

 7   the records that were sent to you by Mr. Bresler's

 8   office --

 9         A.   Yes.

10         Q.   -- the record -- the records, pictures?

11         Okay.  Walk me through what you did from

12   an -- from an investigatory point.

13         A.   It is covered starting on page 9 of my

14   report and going through page -- to page 11.

15         Q.   Okay.  So let's work through a couple of

16   things here.  What -- what did you determine the speed

17   was of Mr. -- what -- do you recall what type of vehicle

18   Mr. Henderson was driving?

19         A.   He was driving a Ford F-550 truck.

20         Q.   Okay.  And did you review any exemplars

21   regarding the weight and braking capacity of this

22   vehicle?

23         A.   Well, the braking capacity is dictated by

24   the friction on the roadway.  So I mean I didn't inspect

25   this vehicle.  But the braking capacity would be that of
```



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                      27

```
 1    an ordinary pickup truck -- a heavy duty pickup truck at

 2    that.  But it's not like a semi-tractor trailer where

 3    there's issues of braking efficacy.  This would be a

 4    passenger vehicle, a vehicle that would have normal

 5    passenger vehicle braking.  As far as the weights go,

 6    that's from the standard information on the weights of

 7    such vehicles.

 8          Q.   Are you still talking?  I can't hear

 9    anything you're saying.

10          A.   Not now, no.

11          Q.   Okay.  Let's go to your injury causation

12    analysis.  Can you explain your methodology to me?

13          A.   Sure.  Injury causation is based on

14    assessing the probability of an injury from a particular

15    event given the -- the nature of the event and occurring

16    at the point in time that it did versus the probability

17    of the same injury occurring at the same point in time

18    in the absence of the event.

19               So in this case we would ask is Ms. -- if

20    Ms. Farley was sitting at home on her sofa at the time

21    of the crash, what's the chance that she would have

22    ended up going to the hospital by ambulance, having left

23    shoulder and arm symptoms essentially immediately after

24    the crash, and having that problem persist until she

25    ended up having left shoulder surgery.
```



**Orange Legal**
**800-275-7991**

```
 1            Q.   Okay.  So I'm looking at your -- your

 2   methodology, and I see that you have it broken down with

 3   multiple footnotes saying where you came up with the

 4   principles that you're using; is that correct?

 5            A.   Well, not precisely.  I'm just citing to

 6   where the -- the method has been published in the

 7   literature.

 8            Q.   Okay.  And these instances where the

 9   methods have been published, you're the person who

10   published the material.  Correct?

11            A.   The ones that I have cited to with the

12   exception of citation No. 7 and 8.  Those are -- those

13   publications were not written by me.

14            Q.   Okay.  And were you -- so all of these

15   publications that you're citing to as in support of your

16   methodology are items that you've written yourself?

17            A.   No.  I just stated that that's not the

18   case; that two of the items are written by other people

19   that don't involve me.

20            Q.   Okay.  And besides -- besides those two

21   items, the remainder of the items were written by you;

22   is that correct?

23            A.   That's correct.

24            Q.   Okay.

25            A.   Citations 1 through 6 are my publications.
```



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                              29

```
 1            Q.    Okay.  And -- now, when you -- when you

 2     talk about whether the mechanism of injury has the

 3     potential to injure a person, that is you -- you're

 4     making an epi -- an epidemiological finding?  You're

 5     saying that in a -- in a group a particular injury could

 6     be caused by say this accident?

 7            A.    I would say it's a general causation

 8     conclusion which can be supported by epidemiological

 9     findings or applying the Hill Criteria for example.

10            Q.    And what is the Hill Criteria?

11            A.    Well, it's a set of nine or so viewpoints

12     set forth in 1965 that are the generally followed

13     guidelines or principles, I should say, by which a -- an

14     association between an exposure in the environment and a

15     disease or injury can be determined whether or not it's

16     causal.

17            Q.    Hello?

18            A.    Yeah.

19            Q.    You're cutting out.  You're cutting out.

20            A.    Would you -- would you prefer if we go

21     to -- like a phone?  Would that help?

22            Q.    No.  Let's just -- let's try to --

23            A.    Okay.

24            Q.    I'm sure we can power through.  I just --

25     if you cut out, I will just let you know.
```



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                    30

```
 1          A.   Fair enough.
 2          Q.   So you were saying -- you were -- you were
 3    telling me something about nine recognized points, but I
 4    couldn't hear what you were saying at the end.
 5          A.   Oh, I -- I -- what I said was that the --
 6    there are nine viewpoints or so that are kind of used as
 7    a criteria to assess when a -- a relationship that is
 8    observed is likely to be one that is causal or whether
 9    it's a spurious relationship.
10          Q.   Okay.  And is it possible for -- from an --
11    say you've -- you've examined an -- an automobile
12    accident and it's an automobile accident where 50 out of
13    a thousand people in the population that are involved
14    with the same accident would sustain an injury, you
15    can't make a determine as to whether that -- whether an
16    individual falls within that category of people who
17    would be injured; is that fair?
18          A.   Well, you could take that information --
19    that's -- that's not quite correct actually, no.  You
20    would take that information and say there's a 1 in 20
21    risk of someone being injured in this crash, which would
22    be 50 out of a thousand.  And then say, well, what was
23    the chance that this individual was going to have these
24    injuries if they hadn't been in the crash.  Let's say
25    the injury is a -- a broken leg.
```



```
 1              Well, the chance that someone is going to

 2    have a broken leg if they're not exposed to a trauma is

 3    virtually zero.  So 1 in 20 versus nearly zero is -- is

 4    -- is close to infinity.  Basically it's a hundred

 5    percent.

 6         Q.    How -- sorry.

 7              How do you reconcile that statistic with

 8    the 19 other people who would be in that same accident

 9    and not sustain an injury?

10         A.    Well, that -- that is -- that frequency,

11    the -- the 1 out of 20 is in a ratio to the whatever --

12    1 out of whatever number of people who would

13    spontaneously get a broken leg.  Let's say 1 in a

14    million.  As long as you exceed the 1 in 20, you've

15    exceeded the 50 percent probability of causation

16    attributable to the crash.

17         Q.    Okay.  Well, you're using -- you're using

18    a -- a trauma that pretty much everyone could observe.

19    If there's a broken leg, there's a broken leg.  But what

20    about traumas where there is diverse opinion about

21    whether the person sustained the injury?

22         A.    Well, I would be surprised if there was

23    diverse opinion in this case as to whether or not

24    Ms. Farley sustained injury in this crash.  The only

25    person we have is Dr. Wood who has come up with a pretty
```



 1   wild opinion that somehow someone who is exposed to a

 2   high speed crash shouldn't get a shoulder injury.  It

 3   doesn't make any sense at all.

 4            But outside of that, I think there's a

 5   general recognition in medicine -- orthopedic medicine,

 6   chiropractic medicine, every kind of medical discipline

 7   that a -- a high speed rear impact/front impact

 8   collision has the potential to cause musculoskeletal

 9   injury.  That's not some sort of mysterious

10   relationship.

11            The question is then for Ms. Farley is, was

12   she going to have this injury at the same point in time

13   if she hadn't been in this crash.  Well, she was a

14   pretty healthy 36-year-old woman without any kind of

15   shoulder problems.  And the chance that she was going to

16   need shoulder surgery had she not sustained the trauma

17   of this crash was very, very small.  So that's what's

18   called a relative risk analysis, which is essentially

19   the mainstay of -- of causation, comparing the -- the -

20   it's the but/for question which is assessed by comparing

21   two risks.

22       Q.   Okay.  So you're saying -- you're making

23   a -- you're making a statistical conclusion as opposed

24   to an actual medical diagnosis; is that fair?

25       A.   The diagnosis would be what is wrong with



1    this lady?  Does she have a torn rotator cuff?  Does she

2    have a subscapularis inflammation?  That's something

3    that's diagnosed by the clinician who has examined her

4    and treated her.

5                The -- the question I'm looking at is:

6    Given that diagnosis and the temporal proximity to the

7    subject crash from which Ms. Farley was taken away by

8    ambulance and then immediately diagnosed with trauma to

9    her upper extremity -- the question is what's the chance

10   she was going to have that condition at the same point

11   in time.  So it's a comparison of risk.  And risk is

12   always based on what's happened before to other people.

13   That's -- that's how you get there.  But it is the basis

14   of the causation question.

15        Q.   Okay.  So I guess my question is is that --

16   what -- what I'm trying to say is that you gave me an

17   example a minute ago with a person with a broken leg.  A

18   broken leg is an injury that is not subject to

19   interpretation.  We all can look at it and see that

20   somebody's leg is broken.  There's -- there's generally

21   no medical debate about that.

22                But if some -- whether somebody has a torn

23   tendon or sustained some sort of slap tear of whether

24   that injury was degenerative in nature, how do you

25   decipher that with the people who are in the same



```
 1    accident that are not hurt from a statistical

 2    standpoint?

 3         A.   Well, what we do is we look at that person

 4    as they were and the population they represent if the

 5    crash had never happened.  So in my report if you go to

 6    page -- page 14 of my analysis -- actually page 15, what

 7    I said was as a previously healthy --

 8         Q.   Hold -- hold on.  Got it.

 9         A.   Sorry.  What I said was --

10         Q.   Go ahead.

11         A.   -- as a previously healthy 36-year-old

12    woman, Ms. Farley was at a negligible annual risk of

13    spontaneously developing chronic shoulder, spine or head

14    pain, much less the need for shoulder surgery in the

15    absence of trauma.  Less than 1 in 2,000 is indicated by

16    the literature on the topic and national hospital data.

17    And you'll see I -- I reference the -- the nationwide

18    inpatient sample, which is National Hospital Database,

19    and I also referenced one of my papers which is on

20    shoulder injuries occurring in traffic crashes.  And

21    that was citation No. 6 that was a paper published in

22    the Journal of Orthopedics.

23              So the -- the only way we can ever assess a

24    cause is to make a comparison of risk.  And whatever you

25    call it, you -- cause is not a diagnosis.  As you noted,
```



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                    35

```
 1    a diagnosis is observed.  Now, whether somebody --
 2            Q.   (Inaudible.)
 3            A.   I'm sorry.
 4            Q.   Go ahead.
 5            A.   I'm going on, and I don't mean to do that.
 6            Q.   Okay.  So what I'm asking you is is that --
 7    statistically you're saying that a healthy person
 8    doesn't require the type of intervention that
 9    Mrs. Farley had, but you're also acknowledging that
10    there is a statistical probability; is that correct?
11            A.   Well, what I'm -- what I'm saying is that
12    Ms. Farley in the absence of the crash given the
13    population she belongs to had a 1 -- a less than 1 in
14    2,000 risk of spontaneously developing a shoulder
15    problem in a given year.
16            Q.   Okay.
17            A.   Whether it was due to trauma --
18            Q.   Besides -- sorry.  Go ahead.
19            A.   Whether it was --
20            Q.   I didn't mean to cut you off.  Go ahead.
21            A.   That's okay.
22                 Whether it was due to trauma or any other
23    cause.  Just --
24            Q.   Okay.
25            A.   The day before the crash, projecting
```

Orange Legal
800-275-7991

1   forward in the next year, we would say Ms. Farley has

2   got a less than 1 in 2,000 chance she's going to need a

3   shoulder surgery.

4          Whatever degree of degeneration she has is

5   -- that's present in her shoulder is not causing her to

6   seek treatment, and she has no prior recommendation of

7   surgery.  There's lots of people walking around with

8   degeneration in their body -- in their neck, in their

9   shoulders who will never need surgery.  In fact, most

10  people don't.

11         So the question is what's the chance

12  they're going to convert on the same day of the crash

13  but if the crash doesn't happen.  And that -- and that

14  risk is extremely miniscule.

15         Q.   Okay.  So I don't see anywhere in your

16  report where you cited what size the cohort is that

17  Mrs. Farley belongs to.  It just says 1 in 2,000.  But

18  how many people are actually in that group from a

19  population standpoint on -- on the planet?

20         A.   Well, I don't talk in the planet.  But in

21  the United States there's around 20 million women in her

22  age group of 30 to 39.

23         Q.   Okay.  So in her age group of 30 to 39, one

24  out of every 2,000 of those women could develop a

25  chronic shoulder condition; is that correct?



1          A.    No.  Will develop a condition that requires

2     surgery to their shoulder.

3          Q.    Okay.  Okay.  So could develop a condition.

4     So out of 20 million that's -- I don't want to make -- I

5     can do the math here.  That's -- that's quite a large

6     population of people in the United States.

7                MR. BRESLER:  Form.

8                THE WITNESS:  Well, your -- your -- I think

9     your question is how many is 2,000 out of 20 million.

10    Am I correct?

11    BY MR. BELLE:  (Continuing)

12         Q.    Yes, sir.

13         A.    So that's what?  1 in -- 1 in a thousand.

14    Is that right?

15         Q.    I'm doing the math.

16         A.    1 in 10,000.  Sorry.

17         Q.    Wait.  How do you go from 1 in 2,000 to 1

18    in 10,000?

19         A.    I'm sorry.  It's 10,000 people, not -- not

20    a probability.  It's 10,000 out of 20 million is what I

21    meant to say.

22         Q.    And could you say within a reasonable

23    degree of medical certainty or probability or

24    biomechanical certainty that Mrs. Farley isn't one --

25    isn't one of those 10,000 people that prior to this --



1    this accident -- this event would have required some

2    sort of surgical intervention?

3         A.   Well, there's a 1 in 2,000 chance that she

4    is.

5         Q.   Okay.

6         A.   Or less.  But there's a much higher

7    probability that her injury is due to the crash of

8    course.

9         Q.   Okay.  And in explaining your methodology

10   to a jury, is your methodology to once a person -- by

11   showing a person what the probability of injury is, for

12   that person to then just make the next connection that

13   it must have been from the accident?

14        A.   Oh, most definitely --

15             MR. BRESLER:  Form.

16             THE WITNESS:  -- most definitely not.  I

17   mean the -- the method that -- that I applies is

18   described on page 8 of 19, which says first we have to

19   see can the injury result from the event in question.

20   This was a huge crash with an enormous risk of injury,

21   and it would be weird for someone not to be

22   substantially injured from it.

23             Then look at how close the onset of the

24   symptoms are to the crash, which were immediate in this

25   case.  And we even know we had direct trauma because

JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                    39

```
 1   there was interaction as Ms. Farley's body moved away
 2   from her belt and back into it.  She had some
 3   interaction with the belt.  And then asking the question
 4   at the same point in time would she have had all of
 5   these problems.
 6              Well, I said there was a 1 in 2,000 chance
 7   that she would have these problems in a -- in a given
 8   year.  There's a less than 1 therefore chance -- 1
 9   chance in 730,000 she would have had the same problem on
10   the same day.  So it's just a very diminishing competing
11   risk compared to the very high risk she was going to
12   have an injury in the crash.  So you're talking about
13   very, very desperate probabilities.
14   BY MR. BELLE:  (Continuing)
15        Q.  So just so that I can understand your
16   opinion on this, you're basically of the opinion from a
17   statistical standpoint based on the type of crash that
18   occurred here Ms. -- you're -- you're saying from a
19   statistical standpoint it's likely that Mrs. Farley
20   suffered an injury in the crash?
21        A.   No.  I'm saying from an injury causation
22   perspective the most probable cause of Ms. Farley's
23   injuries, particularly her injury to her shoulder, was
24   by far the crash.  I can state what the statistical risk
25   or statistically derived risk of injury from the crash
```



**Orange Legal**
**800-275-7991**

 1   was.  And I can say what the statistically derived risk

 2   in Ms. Farley's population in the absence of the crash

 3   at -- at a maximum was in the event that the crash never

 4   happened.  And I can compare those two and then reach a

 5   conclusion, which is the conclusion I gave.

 6          **Q.   And then let me -- let's go to the third**

 7   **leg of your injury causation analysis, where there is a**

 8   **more likely alternative explanation for the occurrence**

 9   **of symptoms at the same point in time.**

10          **Do you -- are you -- are you on the same**

11   **page as to where I am?**

12          A.   I am, yes.

13          **Q.   Okay.  And how are you excluding at this**

14   **point that -- if the patient -- if a person were to have**

15   **a degenerative condition, how are you excluding that**

16   **that is what's causing them pain on that particular day?**

17          A.   Well, you can't exclude it.  You can only

18   examine the probability it would occur.  I mean all of

19   us have degeneration in our bodies at some point in our

20   life.  The -- the number of women who are 36 who have

21   some degree of degeneration in their spine or their

22   shoulder joints is -- is quite high.  It's going to

23   exceed 20, 25 percent.  But only a teeny tiny fraction

24   of those people go on to end up having surgery.

25          So you have to say, well, given the fact



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                    41

```
 1   that she has degeneration with no symptoms, what's the

 2   chance in the absence of a trauma it's going to become

 3   surgical.  And the answer is is extremely low.  And then

 4   of course if you're going to say that she had

 5   degeneration before the crash which made her more

 6   susceptible to developing symptoms spontaneously,

 7   wouldn't she also be more susceptible to developing

 8   symptoms as a result of the crash.  And the answer is,

 9   yes, of course.

10          So those two factors actually cancel each

11   other out, because if she's more likely to get symptoms

12   in the absence of the crash, she is also more likely to

13   get them in the presence of the crash.

14          Q.   Okay.  Let's -- let's keep moving because I

15   know we -- we only have a limited amount of time.  Let's

16   go to the injury mechanism.  Talk to me about your

17   methodology here, please, sir.

18          A.   Oh, sure.

19          So the -- the first thing I did was I

20   quantified the severity of the crash using a crash

21   reconstruction approach which I described on page 9.  I

22   then took the severity of only the first crash, which

23   was I think reconstructed to have been around 33 -- no.

24   Let's see.  Sorry -- around 34 miles per hour delta V.

25          Q.   All right.  Well, let's go -- let's go into
```



Orange Legal
800-275-7991

1   that first.  Where did you gather your information for

2   purposes of the crash reconstruction?  Meaning how did

3   you reach these conclusions about speed?

4        A.   That was based on the application of the

5   virtual crash simulator program, which I described.

6        Q.   Well, before you could get to the virtual

7   crash simulator program, don't you have to input a speed

8   at what you think the vehicles were traveling?

9        A.   Yes, you do.  You have to input the -- you

10  have to input the various types of vehicles and then you

11  have to start with some sort of assumed impact speed

12  based --

13       Q.   Okay.  So that's -- that's what I'm trying

14  to get to.

15       A.   Sure.

16       Q.   So what was the impact speed that you put

17  into the computer?

18       A.   Well, I looked at the police reported

19  impact speed of 45 miles per hour, and then I took

20  Mr. Henderson's statement that he was going 40 miles per

21  hour prior to losing control of his vehicle.  So I added

22  in pre-impact braking, and that brought the impact speed

23  down to around 33 miles per hour, so in -- in part --

24       Q.   Okay.  So what was the coefficient of

25  friction that you used?



```
 1          A.   I would imagine that I used .65.
 2          Q.   Okay.  And isn't the coefficient of
 3   friction for these types of vehicle closer to .05 to
 4   .08?
 5          A.   No.  So -- so the -- you're referring -- so
 6   the -- the -- the coefficient of friction is point --
 7   is -- typically for a wet roadway is going to be between
 8   .55 and .7 or .75.  You're referring to the degree of
 9   drag, which is the amount of -- of drag as a function of
10   1G.  So that -- that's --
11          Q.   Okay.  And where -- and where -- and where
12   in here do you cite your coefficient of friction values?
13          A.   I don't cite it.  It's in my virtual crash
14   analysis that I did, which I'm happy to give you all of
15   the inputs for.  I think we gave those to you.  Did we
16   not?
17          Q.   I don't have them.
18          A.   Well, I -- maybe I wasn't.  I might be
19   thinking of a different case.  I'm certainly happy to
20   supply them.
21          Q.   Okay.
22          MR. BELLE:  And based upon receiving some
23   of his inputs, we -- we're going to go ahead and reserve
24   the right to -- to redepose him if we need to because
25   we're -- we're -- certain things were not turned over
```



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                44

```
 1    for purposes of this deposition.  And I'm not -- I know
 2    that both the plaintiff and I have been working against
 3    a deadline that we thought was going to expire on May
 4    2nd, so we both have been doing the best that we can.
 5              But absent having a complete look at some
 6    of the stuff on your file, me being able to ask the
 7    right questions is a little bit premature without being
 8    able to see the input; is that fair?
 9              THE WITNESS:  Are you -- are you asking me
10    or Ryan?
11              MR. BELLE:  No.  No.  No.  I'm asking Ryan
12    if he has an objection to my reservation.
13              MR. BRESLER:  No.  I don't have an
14    objection.
15    BY MR. BELLE:  (Continuing)
16         Q.   Okay.  So let's go -- let's go back to what
17    you were doing again.  So you -- when did -- when did
18    Mr. Henderson say that he -- how far away did
19    Mr. Henderson say he was from Mrs. Farley's vehicle when
20    he applied the brakes?
21         A.   I would have to go back and look at his
22    testimony.
23         Q.   Okay.  What does it say in your report --
24         A.   Let me look.
25         Q.   -- page 9?
```



Orange Legal
800-275-7991

JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                45

```
 1          A.   I don't -- I don't -- let's see.  I don't
 2     think I have anything from him that says when he applied
 3     the brakes.
 4          Q.   Okay.  When you said -- well, you said that
 5     he lost control of his vehicle.
 6          A.   Well, he claims he lost control of his
 7     vehicle going over the railroad tracks, but he also
 8     stated that that was 450 miles -- 450, excuse me, feet
 9     away from the impact point, which wouldn't make any
10     sense with regard to this crash because he would have
11     been able to bring his vehicle to a stop long before
12     then.
13          Q.   What about if the vehicle -- what if -- did
14     you recall reading anything about the brakes being
15     locked or sliding across the pavement?
16          A.   Well, he said he lost control of his
17     vehicle but --
18          Q.   And what did you understand that to mean?
19          A.   It didn't make any sense with regard to
20     where the crash happened.  I didn't -- I couldn't make
21     really heads or tails of it because it wasn't consistent
22     with what the physical evidence showed.  So...
23          Q.   Okay.  So with him -- without having
24     accurate information from Mr. Henderson about the speed
25     that he was traveling at and without having -- and with
```



```
 1     the police officer being -- is there any indication that

 2     you saw that the police officer observed the accident

 3     himself?

 4          A.   No.  I'm quite sure the police officer did

 5     not.

 6          Q.   So was it your understanding that you were

 7     entering into -- entering into the program an estimate

 8     of what the police officer said the speed was?

 9          A.   Well, I didn't use the 45 miles per hour

10     from the police officer.  I actually --

11          Q.   Okay.

12          A.   -- relied on Mr. Henderson's statement of

13     his speed to --

14          Q.   Okay.

15          A.   -- as a starting point.

16          Q.   Okay.  But you just said that based upon

17     Mr. Henderson's explanation of where he started to lose

18     control of the vehicle, his recollection of events

19     didn't make any sense.

20          A.   Correct.

21          Q.   Okay.  So without Mr. Henderson being able

22     to provide accurate information about what his vehicle

23     was doing and without the police officer observing what

24     speed the vehicle was going at, what information did you

25     use to come up with the speed analysis or the speed that
```



1    you used to put into your computer system?

2            A.   Oh, well, we have this -- so the way a

3    simulator works is that you input a certain speed and

4    certain assumptions and then you see what result you

5    get.  So the enormous amount of damage to this Hyundai

6    is representative in the program.  So I'm getting -- I'm

7    getting damage that roughly matches with what I see in

8    the Hyundai using a impact speed of approximately 33

9    miles per hour.

10           Q.   Okay.  Now, most of the crashes that

11   your -- the simulators do, are they designed to simulate

12   bumper-to-bumper collisions?

13           A.   The -- the virtual crash will simulate an

14   override or an underride or bumper to bumper.

15           Q.   Okay.  And was this -- was the impact in

16   this case an override or an underride impact?

17           A.   It was -- it was a bumper-to-bumper impact

18   with an override component to it.

19           Q.   Okay.  So there was no distance between the

20   bumper of the F-150 and the bumper of the -- of the car

21   being driven by Mrs. Farley?

22               MR. BRESLER:  Form.

23               THE WITNESS:  I -- I think you're --

24   you're -- when you said there was no distance between

25   them, I'm -- I'm going to interpret that as -- as you



```
 1   saying there was no distance -- difference in height --

 2   BY MR. BELLE:  (Continuing)

 3        Q.   Yes.

 4        A.   -- between the bumpers.  Am I correct?

 5        Q.   Yes, sir.

 6        A.   Okay.  And the answer is, well, the bumper

 7   goes up higher on the F-550, but the lower part of the

 8   bumper definitely would cover and impact the bumper on

 9   the Hyundai.  And we have -- we have absolute definite

10   evidence that it in fact did engage the bumper.

11        Q.   Are you still talking?

12        A.   No.

13        Q.   Okay.

14        A.   I said -- I said we have definite evidence

15   that the bumper did engage between the front of the

16   bumper and the rear of the -- of the Hyundai.

17        Q.   And did you perform any type of crush

18   damage analysis?

19        A.   Yes.  That's an integral part of the

20   simulation.

21        Q.   And how much of the simulation -- does the

22   simulation just allow you to put in the speed of the

23   vehicle -- what the vehicles are and the speed that they

24   travel and it just figures out crash or how does that

25   work?
```



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                           49

```
 1            A.   Did -- did you have Hot Wheels when you
 2      were a kid?
 3            Q.   I did.
 4            A.   So it's basically like a Hot Wheels.  So
 5      you've got your -- you put your vehicle in and you've
 6      got your Hot Wheels other vehicle and you've got your
 7      ramp, and you just let it go and then the physics take
 8      over.
 9            Q.   Okay.
10            A.   And that's the same thing that happens
11      within the simulator.  But the simulator has the ability
12      to tell you how much crush would also be produced.  So
13      the output of the simulation is typically -- well, in
14      the program that I use, I can get an animation as an
15      output.  But I also get an output that tells me how much
16      crush would I have expected to see.
17                 So like if I saw that the rear of this
18      vehicle was crushed in 5 inches, of the Hyundai, by a
19      crash, I would say, wait, my -- my numbers are way too
20      low, I've got to -- I've got to have my impact speed up
21      to match what the photograph shows.
22            Q.   So how do you make a determination as to
23      how many inches the vehicle's rear should be crushed in?
24            A.   Well, we -- the -- it's a balance because
25      we've got a rear impact and a front impact.  So we have
```



1   to have enough impact from the rear to produce all of

2   that crush in the front.  So we know that there is a

3   sizable frontal impact.

4              You can't have a little 8-mile-an-hour

5   front impact and smash the heck out of the front of this

6   vehicle.  So you -- you've got to -- you have to balance

7   all of these factors and figure out how the evidence

8   fits together.  It's not like -- it's not like you --

9   you do a calculation and you come up with a number and

10  that's exactly the number.  You have to figure out how

11  all of the evidence of -- of each crash fits with the

12  other crash.

13        **Q.   Okay.  But -- but what I'm -- what I'm**

14  **asking you is is that how many -- how many variables did**

15  **you have to input that you didn't -- that you weren't**

16  **able to actually confirm?  So you don't -- so would it**

17  **be fair to say that you don't know -- you have no -- you**

18  **have no actual evidence of what vehicle -- speed of the**

19  **vehicle that went into the -- the rear of**

20  **Mrs. Farley's -- Mrs. Farley's vehicle was traveling at?**

21        A.   Well, I have --

22             MR. BRESLER:  Form.

23             THE WITNESS:  -- I have evidence of what

24  it's not.

25  BY MR. BELLE:  (Continuing)



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH

51

1    Q.   Okay.  But would it be fair to say that the

2    number that you put into the computer system is an

3    estimate?

4    A.   You all --

5         MR. BRESLER:  Form.

6         THE WITNESS:  Exactly.  Yes.  You have to

7    start with an impact -- a closing speed based on an

8    appropriate reconstruction of the crash based on the

9    evidence.

10   BY MR. BELLE:  (Continuing)

11   Q.   Okay.  And what evidence did you have

12   besides what was in the police report and

13   Mr. Henderson's testimony which you said based upon his

14   explanation of the event was not reliable as to the

15   speed -- as to the speed that his vehicle was traveling?

16   A.   Well, I have the damage to Ms. Farley's

17   vehicle.  I -- this vehicle was struck at a relatively

18   high speed with a great deal of force and it produced a

19   tremendous amount of damage to the vehicle both in the

20   rear and the front.

21   Q.   So it's -- so the initial -- your initial

22   estimates that you entered into the computer system

23   based upon the evidence have when -- and when I say "the

24   evidence," I mean actual physical evidence that we have

25   is you looked at the pictures and made a determination



1    of speed based upon those?

2              MR. BRESLER:  Form.

3              THE WITNESS:  No.  That would be incorrect.

4    I -- I looked at the -- I looked at the pictures, and I

5    was able to tell that a starting speed of 5 miles an

6    hour was too low.  A starting speed of 10 miles per hour

7    was too low.

8              You probably would have been able to figure

9    that out as well even though you're not a crash

10   reconstructionist.  Then taking what I know about the

11   characteristics of these vehicles, I'm able to dial in

12   closer and say:  All right.  How do I now match what I

13   see in the damage?  And what I see in the front of the

14   damage to this vehicle is more than 2 feet of crush

15   across the front end of the vehicle, which tells me

16   something about the force of the crash that -- excuse

17   me -- across the rear of the vehicle, and I also see

18   that the entire rear frame of the vehicle has been

19   collapsed, so that I know that the rear bumper had been

20   engaged.

21             Because if you look at the right rear

22   quarter of this vehicle -- of the Hyundai, it is -- it

23   is almost touching the ground because it has been bent

24   downwards.  So there's tremendous damage through the

25   body of this vehicle, which indicates that there must

JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                    53

```
 1   have been engagement of the bumper.

 2   BY MR. BELLE:  (Continuing)

 3        Q.   Okay.  So let me ask you this:  If you have

 4   an override impact of a vehicle where the portion of the

 5   bumper that hold -- that is held onto the vehicle --

 6   because I'm looking at this bumper, and your -- and your

 7   testimony is that the bumper sustained damage.  I'm

 8   looking at this vehicle -- I'm looking at this picture,

 9   and I see override damage over the top of the bumper and

10   the -- then the bumper is hanging on the ground because

11   it no longer has a component to which to latch onto to

12   hang onto the vehicle.

13             MR. BRESLER:  Form.

14             THE WITNESS:  Right.  So --

15   BY MR. BELLE:  (Continuing)

16        Q.   So could -- so could you -- I'm -- when I'm

17   looking at the bumper you're saying that there was a

18   significant impact on the bumper in terms of their being

19   significant damage.  I'm looking at the bumper and what

20   I see is -- and this is hard -- more difficult because I

21   cannot pass you pictures.

22             Do you have a picture on your system of the

23   rear of the -- of Ms. Farley's vehicle?

24        A.   Yeah.  Let me -- I -- I don't -- I can

25   email it to you.  Well, I don't know if you can actually
```



```
 1   get it.  I don't know where in all of the documents I

 2   have looked at, but what you're looking for is a

 3   photograph of this vehicle from the side and --

 4        Q.   I see it.

 5        A.   And if you look at that photograph of the

 6   vehicle, you'll see it -- it's complete -- the entirety

 7   of the vehicle is -- can be seen from the side.

 8        Q.   Okay.

 9        A.   And you -- what you can see is that the

10   bumper cover has -- is off of the vehicle, but you can

11   also see that there is crumpling of the rear quarter

12   panel.  The crumpling of the rear quarter panel could

13   not have occurred without the body being crushed.

14        Q.   And what is -- what is your explanation for

15   the significant crumpling of the rear of the -- of the

16   trunk area?

17        A.   That tells me that this thing was

18   essentially accordioned, and it was accordioned not as a

19   complete override.  It was accordioned because there was

20   engagement of the bumper which obviously destroyed the

21   bumper and tore it off.  That's why it fell off, was

22   because it got hit.  Bumpers don't fall off in pure

23   override crashes.

24             And then it crushed the area behind the

25   bumper.  We can't examine the bumper and look at all of
```



**Orange Legal**
**800-275-7991**

```
 1    the damage inside the bumper, but clearly there's damage

 2    beyond the bumper that could only have occurred because

 3    of full engagement of the bumper.  It is absolutely just

 4    wrong to call this crash an over -- a pure override.

 5           Q.   Okay.  So let me ask you this:  When you're

 6    doing -- what is -- what is your margin for error with

 7    regard to your speed inputs or what -- I should re --

 8    rephrase it.

 9                What is your range that you use for speed

10    inputs?  What is the high end and what is the possible

11    low end for this crash?

12           A.   Impact speed I think I gave in my report as

13    reasonably -- so -- so the -- the -- the simulation that

14    I did utilized an impact speed of 33 miles per hour for

15    the Ford.  I would say that the impact speed could not

16    have been much less than 30 miles an hour or maybe no

17    lower than 27 miles per hour to have caused this damage

18    and to have produced the chain reaction crash that we

19    see.  But all of the damage in the front of the Hyundai

20    and the rear of the Hyundai.

21           Q.   Okay.  Did you perform any -- did you put

22    anything in your report with regard to the low end

23    number?

24           A.   No, I did not.  I gave -- my value was a

25    middle value that was more -- more likely than not
```



```
 1   value.
 2          Q.   Okay.  And -- but that value that you
 3   did -- your middle value was based on an estimate; is
 4   that correct?
 5               MR. BRESLER:  Form.
 6               THE WITNESS:  Yes.  It -- it's based on my
 7   best judgment as a reconstructionist.
 8   BY MR. BELLE:  (Continuing)
 9          Q.   And then you performed -- and then the next
10   thing that you -- and does this program that you used
11   have an error rate?
12          A.   Well, it wouldn't have an error rate for
13   the application of the calculations.  The -- the error
14   rate is going to come from the uncertainty with regard
15   to how evidence is interpreted.  I mean if there is
16   systematic error -- for example, Dr. Wood failed to
17   account for induced damage in his measurements.  So that
18   systematic error would produce error down the road.
19   There's nothing in the program that would do that.
20               If I -- if I did something systematically
21   wrong however, then that -- that would be a source of
22   error in the program.
23          Q.   When you're doing -- using the program, how
24   many of the inputs that you -- how many inputs do you
25   need to put in before you get the simulation to spit out
```



1    a result?

2            A.    Well, we've got to get the vehicles.  So

3    the vehicles have to be right.  We have to have the

4    right weights.  They don't have to be exact,

5    particularly when they're relatively, you know, heavy

6    weighted vehicles.  We don't have to know if a vehicle

7    is 3- or 400 or 500 pounds more even than another

8    vehicle when one is quite a bit bigger like the F-550

9    than the Hyundai.  But we need to have a -- a pretty

10   good idea of what the weight of the vehicle is and that

11   comes from specifications that are generally available

12   and typically within the program.

13           Q.    Got it.

14           A.    And so that's our Hot Wheels if you will

15   using the -- the analogy I was using before.  Then we

16   have to figure out how the vehicles were set up prior to

17   the crash.  So -- and then we have to set up what are

18   the vehicles doing when we start the crash.  So if we --

19   if we, for example, say, okay, impact speed is going to

20   be 33 that we're going to start the simulation with,

21   then that -- we line up the truck consistent with what

22   we believe the impact angle was, which we believe is --

23   in my analysis I thought it was from about a 7 o'clock

24   direction.  So somewhat coming from left to right at the

25   rear of the Hyundai.



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                              58

1          Q.   So is that -- so that -- is that a factor,

2     that you had to enter the positioning of the vehicles?

3          A.   That's correct.  That would be a pre-crash

4     position of the vehicle, set up and simulation.

5          Q.   Okay.  What empirical evidence did you have

6     in relation to the pre-crash position of the vehicles

7     besides looking at the pictures in the police report?

8          A.   Let me just make sure I'm correct.  Let's

9     see.  Yes, 7 o'clock.

10          So that has to do with the -- the damage to

11     the rear of the Hyundai, which is consistent with a

12     crash that was biased more on the left than to the

13     right, and --

14          Q.   Okay.  And --

15          A.   -- principal direction -- principal

16     direction of force is almost always determined by

17     looking at the amount and direction of crush to the

18     vehicle.

19          Q.   And how do you -- is -- is another -- do

20     you estimate how far you put the vehicle back before it

21     started braking?

22          A.   Well --

23          Q.   Being Mrs. Farley's vehicle was stopped, it

24     was struck by another vehicle.  How do you determine

25     what the input is for how far that other vehicle started



**Orange Legal**
**800-275-7991**

JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                      59

1   **to apply its brakes?**

2        A.   Well -- so I'm not trying to animate this

3   crash -- sorry -- simulate this crash to go back to some

4   time before an action by Mr. -- by Mr. Henderson.  I'm

5   trying to come up with a -- the most accurate impact

6   speed and the actions that Mr. Henderson described to be

7   taking and using his speed as well.

8             So we start at his statement of 40.  And

9   then we say, okay, if he got on the brakes, he could

10  easily take the vehicle down to 33.  And then let's use

11  33 as a starting point.  So that would -- because we

12  don't know how far he would have braked.  We don't know

13  what his vehicle was doing at -- at the time that he was

14  approaching Ms. Farley because he is quite a ways from

15  the -- the railroad tracks.  So that -- that -- that

16  doesn't help me very much.

17            But I don't need to say, okay, well, I'm

18  going to start him at 40 and then I'm going to brake him

19  until he gets to 33, and then I'm going to have the

20  impact happen.  Because then I've got to speculate about

21  how long he brakes.  So what I can say is as a

22  reconstructionist, it's reasonable if he says he's

23  braking, and there's no reason to disbelieve that, that

24  he slowed from the travel speed of 45 to his speed of 40

25  to something less than 40.



1      Q.   Wait.  Where does he ever say that he was

2  traveling at 45 miles per hour?

3      A.   Isn't -- I believe the speed limit is 45 in

4  the area.

5      Q.   Right.  But he -- if you're basing your --

6  your inputs off of the information that he provided to

7  you, the only place that it's indicated that the

8  collision speed was 45 miles per hour was in a police

9  report as far as somebody who didn't observe the crash.

10     A.   Oh, no, I didn't say -- I didn't say his

11 collision speed was 45.  The -- the -- the police report

12 stated impact speed was 45.  That's incorrect.  That's

13 too high for this crash.  So impact speed as I said was

14 almost certainly substantially less than 45.  The -- the

15 45 is the travel speed at -- at the area.  It wasn't --

16     Q.   Okay.

17     A.   Yeah.  That -- that's all I'm referring to

18 is what --

19     Q.   Okay.

20     A.   -- the speed limit was.

21     Q.   And so your -- and is it your testimony

22 that if Mr. Henderson was traveling at 40 miles per hour

23 when he started to apply the brakes, the slowest speed

24 that you could have put into the simulation for his rate

25 of travel was 27 miles per hour?

1        A.   Yeah.  Otherwise, the -- I don't think the

2   remainder of the crash is explained.  I don't think we

3   get enough damage to the front of the vehicle nor do we

4   cause the chain reaction collision to the degree that is

5   represented in the police report.  But I don't have

6   enough information on that to be able to say one way or

7   the other on that -- on the other crashes.

8        **Q.   Okay.  So -- and with regard to the impact**

9   **in this case, did you -- do you have in your records or**

10  **in your simulation what the crash would look like at 27**

11  **miles per hour?**

12       A.   It would just give me less damage, so we

13  would have less crush to the vehicle.

14       **Q.   And how do you match the crush that the**

15  **program has provided compared to the crush that**

16  **Mrs. Farley's vehicle is exhibited -- exhibiting if you**

17  **haven't had an opportunity to examine the vehicle?**

18       A.   Well, you can easily look at the

19  photographs and see that there's a lot of crush to the

20  rear of the vehicle.  I mean I think anybody can do

21  that.  If --

22       **Q.   Well, I mean observing that -- we can all**

23  **look at the rear of this vehicle and observe that there**

24  **is damage; is -- is that fair?**

25       A.   A lot of damage, yes.



**Orange Legal
800-275-7991**

1          Q.    Okay.   But -- but there's -- there's damage

2     to the vehicle.   But how do you know -- what I guess I'm

3     getting at is when you look at Mrs. Farley's vehicle and

4     you make a crush analysis it must be X amount percentage

5     of crush here, how do you -- I mean you're estimating

6     what the crush is to Mrs. Farley's vehicle and then

7     inputting that into the computer system?

8          A.    Not.   That's the output.   That's the out --

9     that's the result of the simulation.   So if the

10    simulation -- let's say that Mr. Henderson said I was

11    going 10 when I hit her and --

12         Q.    Right.

13         A.    -- but all of the other evidence is there.

14    And I'm not saying that he said that; I'm just, you

15    know, giving that as an example.   And so I say, okay,

16    let's simulate Mr. Henderson's story of 10 miles an

17    hour.   And what I get is 5 inches of crush across the

18    rear of the Hyundai, and, you know, 2 inches across the

19    front.   I would say, well, clearly 10 miles per hour is

20    not possible given the damage that we know is here.

21              So it's incremental.   I can look at the

22    rear of this vehicle and say there's more than 2 feet of

23    crush to the rear of the vehicle.   That's -- that's

24    obvious.   So any simulation that gives me substantially

25    less than 2 feet of crush is -- is not accounting for



```
 1    the severity of this crash.  That's a --

 2            Q.   Okay.  But does --

 3            A.   That's a starting point that I don't have

 4    to do a precise measurement to just say what is the

 5    general category of this crash, where does it fit.  Is

 6    it -- you know, we have 2 feet of crush to the -- the

 7    rear, and more than a foot of crush to the front, so

 8    what do we do with that.

 9            Q.   Okay.  And you keep talking about crush.

10    And I'm moving around because I've been sitting all day.

11    You're discussing crush, but the vast majority of the

12    crush in terms of how many feet of crush that you're

13    evaluating in this case is that crush -- that's crush

14    damage to the trunk; is that correct?

15            A.   Oh, no.  That's crush to the whole body.

16            MR. BRESLER:  Form.

17            THE WITNESS:  There -- as I mentioned when

18    I was talking about Dr. Woods, you have to account for

19    the induced damage that is contiguous with the damage

20    that is produced by contact.  So --

21    BY MR. BELLE:  (Continuing)

22            Q.   And when you say "the induced damage," what

23    do you mean by that?

24            A.   I mean it's damage that is -- that is

25    connected to where the vehicles made contact but it
```



1    wasn't produced by contact.  It was produced by bending

2    another part of the vehicle.  So like if I grabbed a

3    tube and I bent it by holding it on either end, the

4    damage in the middle where it bent would be induced; it

5    wouldn't be direct.

6         **Q.   Okay.  And how do you decipher between**

7    **contact -- contact that's induced and contact that's**

8    **direct?**

9         A.   Well, contact -- you're not going to have

10   contact damage, for example, to the quarter panel of the

11   Hyundai like I described in that side view picture

12   because there was no direct contact with the bumper

13   there.  So you're going to see actual contact.  It's

14   going to look crushed rather than deformed if -- if you

15   can -- you follow what the differentiation is.

16        **Q.   So you're able -- so the damage that you**

17   **observed with regard to the -- the trunk door, I guess,**

18   **the portion of the door that goes up and down, is that**

19   **crush -- is that direct damage or induced damage?**

20        A.   Is -- I -- I'm sorry.  And the -- where --

21   what was the -- the area?

22        **Q.   When you look -- when you look at the rear**

23   **of the vehicle, there's a door that -- that you would**

24   **open and close so that you could get into the trunk of**

25   **the vehicle.  Okay?**



**Orange Legal
800-275-7991**

```
 1            A.   Okay.

 2            Q.   And in your observation of the accident did

 3    that door sustain any type of damage -- or that trunk

 4    door?

 5            A.   Yes.  I think someone would have to be --

 6    have difficulty seeing the photographs to say that it

 7    didn't.  It was severely crushed.  It sustained both

 8    contact and induced crush.

 9            Q.   Okay.  But you can't identify primarily

10    which one is which; is that fair?

11            A.   Yeah, of course I can.

12            Q.   Okay.  So with regard to the trunk, you can

13    determine which one is induced and which one is direct?

14            A.   Yes.

15            Q.   Okay.  And I guess what -- I guess what I'm

16    having trouble with is I -- with regard to your

17    simulation, you have a range of as low as 27.  And

18    how -- what's the highest the range could go --

19            A.   I put 33 --

20            Q.   -- in terms of speed?

21            A.   I put 33 as the middle.  I haven't really

22    looked to see how much higher I would go.  I was

23    satisfied with 33.  It perhaps could be a few miles an

24    hour more, but I would have to look at that in a

25    simulated environment.
```



```
 1              Q.   And why aren't you satisfied with 27?

 2              A.   Well, because 33 completely satisfies the

 3     elements of the crash.  The crash would look exactly

 4     like it did with a 30 -- what did I say --

 5     32-mile-an-hour closing speed and a 33.7 mile per hour

 6     delta V.  It would look just like it does.  So I don't

 7     have a reason to drop it down.

 8                   But if somebody said, well, you know, what

 9     if we had a -- a crash -- a crash data retrieval

10     download which showed that some other vehicle -- we knew

11     what the delta V was to that vehicle and that puts your

12     whole crash back to 27 miles an hour, I would say that's

13     fine, that's within the range of -- of -- of error of

14     the methods.

15              Q.   So what is -- so what is your -- do you

16     have a typical range of error when you do these

17     estimates?

18              A.   Well, it depends on the ability that we

19     have to analyze the -- the information, but it also

20     depends on the -- it also depends on the methods used.

21     For example, crush measurements has -- even if you can

22     measure crush on the vehicle has an enormous amount of

23     scatter between various reconstructionists.  So I would

24     say most of the time if you're talking about a crash

25     which is reconstructed to a 10- to 15-mile-an-hour delta
```

```
 1   V, that could easily be plus or minus 3, 4, 5 miles an

 2   hour.  That is just the nature of the -- of the methods.

 3         Q.   And with regard to this case the delta V

 4   that you -- you elected to use was 34 miles per hour; is

 5   that correct?

 6              MR. BRESLER:  Form.

 7              THE WITNESS:  The delta V that I used or

 8   the -- the delta that resulted from the simulation in

 9   the Hyundai for just the rear impact was 33.7 miles per

10   hour.

11   BY MR. BELLE:  (Continuing)

12         Q.   Okay.  And what was the delta V you

13   determined with regard to the front impact?

14         A.   Let me see what I wrote here.  I had a

15   delta V of 21.6 miles per hour for that crash.

16         Q.   Okay.  What did -- wait.  What did you say

17   it was?

18         A.   21.6 miles per hour.

19         Q.   Okay.  And are you claim -- let's move over

20   to your injury risk associated with the 34-mile-per-hour

21   delta V rear impact collision.  Okay?

22         A.   Yes.

23         Q.   What was -- and so what -- can you explain

24   this opinion to me regarding your -- the -- the injury

25   estimates?
```



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                        68

```
 1              A.   Sure.  What I did was I just looked at
 2      the -- at what the risk of injury was in crashes that
 3      occurred at a more than 30-mile-per-hour delta V.  I
 4      also described the fact that a 34-mile-per-hour delta V
 5      is a very high speed rear impact collision belonging to
 6      the top 2 percent of all rear impact collisions
 7      occurring in the United States.  That's the point of
 8      that chart that you see at the bottom of page 10.
 9              Q.   Okay.  So let me ask you this:  You have a
10      34-mile-per-hour delta V -- and did the airbags engage
11      in this accident?
12              A.   Well, we're only --
13                   MR. BRESLER:  Form.
14                   THE WITNESS:  We're only talking --
15                   MR. BELLE:  I'm sorry.  Let me -- let me
16      re -- let me rephrase it.
17                   THE WITNESS:  Sure.
18      BY MR. BELLE:  (Continuing)
19              Q.   Did the airbags --
20                   MR. BRESLER:  Form.
21      BY MR. BELLE:  (Continuing)
22              Q.   Did the airbags --
23                   MR. BELLE:  Well, let me ask the question
24      first before you object.
25      BY MR. BELLE:  (Continuing)
```



```
 1            Q.   Did the airbags --

 2                 MR. BRESLER:  Robert, I was just going to

 3       say I don't -- I don't know that he finished answering

 4       your -- the initial question before you went on to the

 5       airbag question.  That was the only reason I was

 6       objecting to form.

 7                 MR. BELLE:  Okay.  I was -- could the court

 8       reporter read the last question back?

 9                 MR. BRESLER:  Sorry, Robert.

10                 MR. BELLE:  That's okay.

11                 Can you guys hear me?

12                 THE WITNESS:  Yeah.  Yeah.  You're --

13       you're coming across -- across fine.

14                 MR. BELLE:  Could -- could the court

15       reporter read the last question back please?

16                 THE COURT REPORTER:  I'm going back up to

17       it.

18                 THE WITNESS:  She's -- she's looking.

19                 MR. BELLE:  Oh, okay.  I just wasn't sure

20       if you heard me.

21                 (Reporter read back as directed.)

22                 MR. BELLE:  Okay.  I'm going to strike my

23       question regarding the injury estimates and I'll just

24       reask it.

25                 THE WITNESS:  Would you mind terribly if we
```

JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                          70

```
 1   took a very brief break?

 2               MR. BELLE:  Not at all.

 3               THE WITNESS:  Just -- just a couple of

 4   minutes?

 5               MR. BELLE:  Yeah, that's fine.  Sure.

 6               THE WITNESS:  Awesome.  Thank you.

 7               THE VIDEOGRAPHER:  And we're going off the

 8   record.  The time is 3:07 p.m.

 9                    (A recess was taken.)

10               THE VIDEOGRAPHER:  And we are back on the

11   record.  The time is 3:15 p.m.

12   BY MR. BELLE:  (Continuing)

13       Q.   All right, sir.  Can you hear me?

14       A.   I can.

15       Q.   Okay.  I -- I think we were getting ready

16   to discuss the injury risk associated with a

17   34-mile-per-hour delta V rear impact collision.  Can you

18   tell me about your opinion with regard to this?

19       A.   Yeah.  So I did an analysis of the cases at

20   the higher end of the delta V in the National Crash

21   Injury Database and just described the frequency at

22   which injuries were -- occurred that were in the --

23   of -- of -- that were of significant findings.  So

24   what's called a moderate severity injury, which would be

25   associated with like a fracture.  A fracture of the
```

 1    spine or fracture of a long bone.  That occurred in

 2    about 1 in 4 occupants.

 3              So this is a -- a very -- a very high risk

 4    rear impact collision because of the speed.  And that is

 5    not including the frontal collision at all, which would

 6    only increase the risk of injury from the 1 in 4.

 7    **Q.   Okay.  So let me ask you this:  What is**

 8    **the -- what is the -- the database that you used here?**

 9    **The US National Crash Injury Database; is that correct?**

10         A.  It's the National Automotive Sampling

11    System - Crash Worthiness Data Sample, and it's just

12    abbreviated all caps NASS-CDS.

13    **Q.   Okay.  And does this -- does -- what type**

14    **of crashes does this catalog?**

15         A.  All crashes -- it samples all crashes that

16    are reported to the police and that have at least one

17    vehicle towed from the scene.

18    **Q.   Okay.  Does it -- does it account for**

19    **underlying or overlying impacts?**

20         A.  It includes it in it.  This is not an

21    underride collision as I mentioned before.  But there

22    are certainly underride collisions, and they are

23    described in the data.  That is correct.

24    **Q.   What -- what about override?**

25         A.  Override and underride are both included in



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                    72

```
 1    the database.
 2            Q.    Okay.  But are they specifically identified
 3    or are they -- or is it just all of the crashes without
 4    any type of specification regarding the differentiation
 5    of the crashes?
 6            A.    Oh, know.  They're -- they're extensively
 7    described.  There's over 800 variables described.  The
 8    investigation of the crashes in the NASS-CDS far exceed
 9    the kind of investigation that you would see in a
10    lawsuit.
11            Q.    Okay.  So would you --
12            A.    They get the vehicles.  They go to the
13    scene.
14            Q.    Would you in your record have what the
15    variables were that you input when you performed your
16    analysis?
17            A.    Well -- well, I can tell you what they
18    were.
19            Q.    Okay.  Could you tell me what variables you
20    used please, sir?
21            A.    They were rear impact crashes.  I looked
22    at -- it's -- it's actually -- the parameters of the
23    search are described in the middle of page 10.  I said
24    all passenger vehicles exposed to a single rear impact
25    crash for which the delta V imparted to the vehicle had
```



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                          73

```
 1   been reconstructed were pulled for the 21 period --

 2   21-year period of 1995 through 2015.  Then all crashes

 3   at more than 30-mile-per-hour delta V were selectively

 4   examined for their injury status of a restrained driver.

 5              So I looked only at drivers, only at

 6   drivers wearing a three-point seatbelt, and only crashes

 7   in which there was a single rear impact collision from

 8   another vehicle.

 9        Q.   Okay.  And what are the -- were there

10   typical injuries that are listed with -- with regard to

11   what a person should sustain if they're in an impact at

12   this speed?

13        A.   Well, I described that at the top of page

14   11.  I said among the drivers there were about 1 in 4

15   who sustained a -- a what was -- what's deemed a

16   moderate or greater severity injury, which is fractures,

17   disc injuries, even bleeding of the brain to a small

18   amount and some injuries to organs and that there are

19   about 1 in 23 who sustain what are considered serious

20   injuries, which are like skull fractures and very

21   significant brain injuries and spinal cord injuries, et

22   cetera.

23        Q.   Okay.  And any of the injuries that you

24   listed here in your -- in your report that a person

25   could expect to suffer in a moderately severe crash, did
```



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH
74

1    Mrs. Farley sustain any of these injuries?

2         A.   No.  Her injuries were actually lesser.

3    She was in the 75 percent of people who sustained a less

4    than moderate injury.  Her injury would have been deemed

5    a, quote, minor injury because it wasn't life

6    threatening.

7         Q.   Okay.  Now I see that you render an opinion

8    that says:  The preceding analysis demonstrates that

9    Mrs. Farley's rear-end collision was competent enough to

10   cause all of the injuries in her shoulder and her neck

11   pain.

12        A.   Yes.  Well, her -- her -- her neck pain and

13   shoulder injury diagnoses I should say.  The diagnoses

14   associated with those.

15        Q.   Are you issuing an opinion that you're

16   suggesting that the accident did cause her to hurt her

17   neck and shoulder pain or you're saying statistically

18   it's just possible?

19        A.   In this section of the report?

20        Q.   Yes, sir.

21        A.   In this section of the report I'm only

22   saying that such injuries are consistent with the

23   subject crash and in fact more serious injuries are --

24   would be considered consistent with just the first

25   crash.



**Orange Legal**
**800-275-7991**

1        Q.    Okay.  Let's move on to the section of your

2   report -- the next section where it says cervical spine

3   load injuries.  Explain to me what your opinion is here.

4        A.    I described the kind of loads that

5   occurred -- would occur in the cervical spine as a

6   result of a very high speed rear impact collision.

7   Those forces on -- on Ms. Farley would have constituted

8   a substantially greater than 30g load on her head, which

9   would --

10       Q.    Where are your load calculations?

11       A.    Well, I'm -- I'm telling you what is known

12  from observations of crash testing.  The load

13  calculations just on the vehicle are on page 9 of this

14  report.

15       Q.    Okay.  And where on page 9 am I looking?

16       A.    In -- in the middle of the page it states

17  the delta V to the Hyundai -- and this is from the first

18  crash -- would have been 33.7 miles per hour with peak

19  acceleration of approximately 15.4g.  That would

20  translate to a substantially greater than 30g

21  acceleration on the occupant and even greater

22  acceleration at the head.

23       Q.    I remembered what I was going to ask you

24  before we took a break.  I was about to ask you about

25  the airbags in this case.  Did the airbags -- the airbag



1    in Mrs. Farley's vehicle deploy?

2            A.   No.  My understanding is they did not

3    deploy.

4            **Q.   Is there a speed at which a vehicle -- an**

5    **impact occurs where the airbags are supposed to deploy?**

6            A.   Only with a barrier.  So a barrier

7    equivalent velocity.  Generally speaking when the

8    barrier equivalent velocity is 14 miles per hour, air --

9    frontal airbags should deploy.  But that's a very loose

10   criteria, and there's no way to look at a particular

11   vehicle and determine -- determine whether the --

12   whether the -- the airbags should have deployed or not

13   or -- or -- based on delta V.

14            It's just really difficult to do because

15   the algorithm that the sensor uses is based on the shape

16   of the acceleration as it's interpreted by the sensor,

17   not just the amount of speed change of the vehicle.

18           **Q.   Okay.  But in -- so you're trying to tell**

19   **me that you could theoretically drive your car -- your**

20   **vehicle at a very, very high rate of speed, crash into**

21   **another object and the speed has no impact on whether**

22   **that airbag is going to deploy?**

23            MR. BRESLER:  Form.

24            THE WITNESS:  That would certainly be not

25   what I testified to.



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                      77

```
 1    BY MR. BELLE:  (Continuing)

 2           Q.   Well, I'm -- I'm asking.  I'm not telling

 3    you.

 4           A.   Okay.  In that case, no, that's not what I

 5    would say.  If you drove your -- your car into a bridge

 6    abutment at 14 miles an hour, the airbag should deploy.

 7           Q.   Okay.

 8           A.   If you drove it into another car that moved

 9    when you hit it at 25 miles an hour, the airbag might

10    not deploy.

11           Q.   Okay.  But there's no -- there's no --

12    there's no -- you said you looked at the vehicle --

13    Mrs. Farley's vehicle -- the specifications; is that

14    correct?

15           A.   Yeah.  You mean like the wide -- the -- the

16    weight and the dimensions and that sort of thing?

17           Q.   Yes.

18           A.   Yes.

19           Q.   And is -- and is there anywhere where you

20    could have looked to see what the -- the impact speed

21    generally is or typically is to make the airbag in a

22    vehicle deploy?

23           A.   No, that's not part of the vehicle

24    specifications.

25           Q.   Is there anywhere where you can get that
```



**Orange Legal**
**800-275-7991**

 1    information?

 2           A.   No, not -- not vehicle specific.

 3    Absolutely not.  There are -- there is literature that

 4    talks about the risk or probability of deployment for --

 5    at certain delta Vs, and most airbags will deploy when

 6    you get over 20 miles an hour delta V, but --

 7           Q.   Okay.  And --

 8           A.   But --

 9           Q.   And your -- it is your testimony that the

10    delta V in this case was over 20 miles per hour?

11           A.   It was 20 -- if the rear impact delta V was

12    33.7, then the frontal airbag delta V would be 21-ish --

13    21.6 miles per hour.  And at that speed I said this

14    frontal crash serves as an upper bound at which a

15    functioning airbag may not have deployed.

16              So you know what?  Let me revise my earlier

17    testimony.  You asked me how high this crash might go.

18    I think I would stay with the 33-mile-per-hour impact

19    speed as the maximum.  Because now that I read the

20    report I remember that I'm -- I'm putting this at -- at

21    kind of the upper -- upper bound because the airbag did

22    not deploy in the front collision.

23           Q.   But you're admitting the possibility that

24    the speed could have been lower than 33 miles per hour?

25           A.   Oh, sure.  Yeah.  I mean we discussed that



```
 1    already.  You bet.
 2            Q.   All right.  Let's go to -- so when you
 3    reviewed Mrs. Farley's deposition testimony, where did
 4    you -- where did she say her hands were on the steering
 5    wheel at the time of the impact?
 6            A.   I think she just said they both were on the
 7    steering wheel.
 8            Q.   Okay.  And when somebody is initially
 9    struck from behind, what does -- does their body move
10    forward or does it go backwards?
11            A.   Relative to the inside of the vehicle it
12    goes backwards.
13            Q.   Okay.  And if somebody -- and so at the
14    moment that Mrs. Farley is being struck from behind and
15    she starts to move backwards and she has both -- both
16    hands on the steering wheel, does -- does the
17    biomechanics of a crash typically cause the person to
18    hold onto the wheel or let go of the wheel at that
19    point?
20            A.   Very often -- depending on how much
21    preparation they have and how much their seat back
22    yields, very often their hands will come off the
23    steering wheel.
24            Q.   Okay.  And when a person's hands come off
25    the steering wheel, is -- are the load forces still the
```



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                                  80

1    same on that person?

2         A.   Well, it depends.  I mean if you're holding

3    onto the steering wheel really hard and your vehicle --

4    your body is moving away from the steering wheel at 34

5    miles per hour in a rear impact collision, that's going

6    to produce a lot of sudden traction on the shoulder.

7    There's going to be a sudden traction to get the hand

8    off the steering wheel.

9              So that traction is going to let up if

10   the -- the hand lets go of the steering wheel, and then

11   there will be a compression load when the -- the

12   secondary collision occurs and the body goes back into

13   the steering wheel.  So if the hands stay on the

14   steering wheel, there will be a -- quite a bit of -- of

15   load.

16        Q.   And do -- do you have any type of opinions

17   as to the type of injuries that a crash like this would

18   have generated for Mrs. Farley?

19        A.   Any -- any musculoskeletal injury was in

20   the realm of -- of -- of the types of injuries that

21   could occur in this crash.  Everything from fractures to

22   joint derangements to disc injuries to any kind of soft

23   tissue injury, nerve, muscle, ligament.  All of that is

24   in the realm of the kinds of injuries caused by this

25   type of a crash.



**Orange Legal**
**800-275-7991**

1        Q.    Okay.   Now, you indicated when you looked

2    at Mrs. Farley's medical records that she had bruising

3    on her left shoulder?

4        A.    That -- that that was described, that's

5    correct.

6        Q.    Okay.   And is the bruising on the

7    shoulder -- is that also consistent with just being

8    strapped into a vehicle with a seatbelt?

9        A.    It might have occurred when she went

10   backwards and away from the seatbelt, which would have

11   locked in position and then -- during the first crash.

12   And then during the second crash, then went forward and

13   made contact with the seatbelt being lower down her arm.

14   That certainly could have caused a contusion to her arm

15   at that time.

16       Q.    Is it your testimony that the contusion

17   that you observed has anything to do with any of the

18   injuries that she sustained related to her shoulder?

19       A.    It's a plausible cause of her shoulder

20   injury.  It would have resulted in a differential load

21   as her arm was being loaded with enough force to cause

22   the contusion and her torso was continuing to move

23   forward around the seatbelt, so yes.

24       Q.    And you just testified that when a person

25   is in an accident and they go back -- and they're hit



1    from behind and they go back and then their body is

2    thrown forward.  Is it -- is it -- you're saying it's

3    possible for a person to be in a seatbelt and still have

4    the front part of their shoulder or chest hit the

5    steering wheel?

6           A.   Oh, yes.  Most definitely.

7           Q.   **Even though the seatbelt is in a locked**

8    **position?**

9           A.   Yes.  Absolutely.

10          Q.   **Is that also consistent with a person not**

11   **wearing a seatbelt?**

12          A.   It could be, yeah.  I mean it would be much

13   -- it would be more consistent with someone not wearing

14   a seatbelt.  But -- but, yes, there's lot -- the -- we

15   know that people hit seat -- their -- their steering

16   wheel all of the time even when they're belted.  It's

17   just much less likely when you're -- when you're belted

18   versus not being belted.

19          Q.   **Now, you have come up with general types of**

20   **injuries that a person could sustain in a particular**

21   **crash because of a particular delta V.  But did you look**

22   **up the specific injuries that Mrs. Farley sustained and**

23   **their mathematical probability?**

24          A.   Yes.

25          Q.   **Okay.  So what is the mathematical**



1    probability with regard to suffering a -- a rotator cuff

2    tear or -- or -- or the glenoid -- or injuring the

3    glenoid labrum in an automobile accident --

4         A.   Well --

5         Q.   -- like this?

6         A.   Right.  If we're talking about -- if we're

7    talking about Ms. Farley --

8         Q.   Yes.

9         A.   -- we start with the probability that

10   Ms. Farley would have sustained all of these injuries on

11   the same day in the absence of the crash.  That's the

12   first thing we look at.  And we've already discussed

13   that.  And what I said was that that would be on the

14   order of less than 1 in 730,000.

15             So then we look at the risk of injury from

16   the crash.  Well, the risk of musculoskeletal injury of

17   a moderate level, a greater severity than what she

18   sustained from this crash, is 1 in 4.  So if we just use

19   that 1 in 4 versus the 1 in 730,000, we end up with odds

20   of nearly 200,000 to 1 in favor of the crash as the

21   cause of her shoulder injury.

22             It's pretty straightforward.  She was not

23   going to have this problem -- there is no indication

24   that she was going to have a surgical problem with her

25   shoulder in the absence of the crash and the crash is a



```
 1    fully competent cause of her injuries.  Not saying that

 2    everybody who is in a crash like this gets these

 3    injuries, but -- but that there is no stronger

 4    explanation for her injuries other than the crash.

 5          Q.   You, in your -- in your report you spent

 6    some time discussing Dr. Torke's examination of the

 7    patient.  Do you have any opinions regarding

 8    Dr. Torke -- any opinions provided -- previously

 9    provided by Dr. Torke?

10          A.   Just to the extent of the opinions that I

11    gave, which had to do with epidemiologic issues, not

12    orthopedic issues.

13          Q.   Okay.  So you're discussing the probability

14    of the injury's occurrence as opposed to making a

15    diagnostic opinion for purposes of trial?

16          A.   Right.  Dr. Torke said that he thought that

17    the source of the injury wasn't the crash because

18    injuries don't happen in crashes.  That's an

19    epidemiologic claim.  That's not a claim about a finding

20    in Ms. Farley.  So to the extent that Dr. Torke talked

21    about injury mechanisms, what happened to this lady in

22    this crash as far as injury mechanism goes, that is in

23    my area and that is the area I'm talking about.

24               If Dr. Torke is talking about how you're

25    supposed to do an arthroscopic decompression or what we
```



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                    85

```
 1    found in Ms. Farlom -- Farley, I have zero opinions

 2    about that because that would -- that would be a medical

 3    diagnostic or therapeutic opinion.

 4            Q.    But you have an opinion as to what -- do

 5    you have an opinion as to what caused -- you're

 6    saying -- you -- your -- your position is that the --

 7    the crash caused the injury based upon statistics for

 8    this type of crash?

 9            A.    No.  My opinion is that the crash was the

10    most probable cause of Ms. Farley's injuries based on

11    what we knew about Ms. Farley before the crash, what we

12    know about the crash and comparison of that knowledge to

13    what we know about other crashes like this one and other

14    people like Ms. Farley and the chance that they're going

15    to have the same problems at the same time.

16            Q.    Okay.  Now, I see in the report that

17    your -- the -- the last part of your analysis is the

18    temporal relationship between the crash and the

19    indicative of injury; is that correct?

20            A.    Yes.  That is the -- the -- the second step

21    of the three steps.

22            Q.    Okay.  And does that -- does this require

23    the help of a clinician for you to complete this step?

24            A.    I'm not sure if I follow you.  I need to

25    have information about when symptoms that are reasonably
```



 1   attributable to the injury first started.  So I mean

 2   I -- I -- I don't -- I don't actually function in this

 3   realm of medical legal assessment unless a clinician has

 4   looked at the individual and said here's what I found,

 5   you know.  I'm -- I'm not the one who is coming in and

 6   examining folks.  So there always has to be a clinician

 7   to tell me what the diagnosis is because that person has

 8   to interact with the individual.

 9            Did that -- did I misunderstand your

10   question?

11       Q.   No.  I understand.  No.  You --

12       A.   Okay.

13       Q.   You answered it.  What I'm asking is is

14   your determination as to the timing of the symptoms

15   based upon what -- the medical records that you

16   reviewed?

17       A.   Yes.  And -- and to some extent what

18   Ms. Farley said in her deposition.  But I didn't need

19   that because we had EMS records and we had emergency

20   medical assessment.

21       Q.   Okay.  I'm looking at a section of your

22   report referring to the Chiari malformation.  What is

23   that?

24       A.   Chiari malformation is a condition in which

25   essentially the brain -- the base of brain is -- is



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                      87

```
 1    protruding further down into the opening between the

 2    skull and the spinal canal than it should.  And so it

 3    makes some people very susceptible to a symptomatic

 4    Chiari malformation.

 5                THE WITNESS:  C-H-I-A-R-I.  Chiari is

 6    capitalized.

 7    BY MR. BELLE:  (Continuing)

 8          Q.   Do -- do you have any information that

 9    Mrs. Farley has a symptomatic Chiari malformation?

10          A.   I don't.

11          Q.   Okay.  Do you have any opinions as to

12    whether her Chiari malformation is related to the

13    subject automobile accident?

14          A.   Oh, that's doubtful.  Trauma can result in

15    worsening of Chiari and -- and actually occurrence of

16    Chiari if there is a dural leak, but that's the -- the

17    minority of these cases.  This is an area --

18          Q.   Okay.

19          A.   -- I've -- I've done research in for a

20    number of years.  And there's a relationship there but

21    if the patient is not symptomatic, you don't worry about

22    it.  She's like the people -- most of the people walking

23    around with this condition who don't have symptoms.

24          Q.   So based upon -- there's a whole section in

25    your report about her being asymptomatic, but you -- are
```



1    you rendering an opinion of -- regarding whether this

2    requires further clinical investigation?

3         A.   I just said that if she has persisting

4    symptoms that could be associated with the Chiari, for

5    example, headaches, and the headaches are of a

6    characteristics which were attributable to the Chiari,

7    then that may deserve or may warrant further

8    investigation.  That's as far as I've gone.  I've not

9    make any determination that Ms. Farley's headaches are

10   caused by a symptomatic Chiari.

11             THE WITNESS:  And -- and I'm -- I am going

12   to have to -- I am going to have to go in just a couple

13   of minutes, because -- I -- I know I was a bit late, but

14   I wanted to make sure I gave you your full two hours.

15             MR. BELLE:  All right.  Well, we're --

16   we're almost there.  And like I said, I reserve the

17   right to depose you because I don't have a complete copy

18   of your file, so I can't ask you certain questions about

19   that.  But we're almost there.  So if you give me five

20   minutes, I will have you out.

21             THE WITNESS:  You've got it.

22   BY MR. BELLE:  (Continuing)

23        Q.   Do you have -- do you have any opinions

24   within a reasonable degree of biomechanical certainty

25   that the -- that the Chiari malformation was aggravated



1    in any way by this accident?

2         A.   No one has made that --

3              MR. BRESLER:  Form.

4              THE WITNESS:  No one has made that

5    determination who has looked at Ms. Farley, so the --

6    the -- the concept that biomechanics can tell you

7    whether somebody had symptoms is a -- is a

8    misperception.  It cannot.  So there's nothing about --

9    biomech -- a biomechanical analysis would help explain

10   the onset of symptoms if they were temporally proximate

11   to the crash, but I don't see that anybody has

12   identified the Chiari as being related to Ms. Farley's

13   symptoms.  So I think the point essentially at the

14   present time is moot.

15        Q.   Do you have any opinion as to whether

16   Mrs. Farley more than likely sustained an injury when

17   the veh -- when she -- when the vehicle was struck from

18   behind or when it crashed into the vehicle in front of

19   it?

20        A.   Both crashes had the potential to cause the

21   injuries she sustained, and I can't answer that

22   question.  I can -- I would have to say that they are

23   inseparable with regard to which crash caused her

24   shoulder injury.

25        Q.   Okay.  So you're not going to issue an



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                    90

```
 1  opinion that says it was one over the other?

 2        A.   I have not been asked to do so, and I don't

 3  see any evidence that would allow me to do that.

 4        Q.   Do you have any other opinions that you are

 5  providing in this case that are not listed in the report

 6  that I have in front of me?

 7        A.   Well, I --

 8             MR. BRESLER:  Form.

 9             THE WITNESS:  -- I certainly have opinions

10  about Dr. Wood's methods and conclusions, yes.

11  BY MR. BELLE:  (Continuing)

12        Q.   Okay.  And what is -- and we will try to do

13  this quickly.  What -- what -- what objection do you

14  have regarding Dr. Wood's method?

15        A.   Well, Dr. Wood did the reconstruction

16  completely wrong.  He didn't -- he only counted contact

17  damage and not induced damage.  He has a systematic

18  error in his calculation sheets, which gave him wrong

19  values.  His -- his calculations are incorrect for the

20  energy of the crash.  His comments about the injury risk

21  of this crash are completely speculative and in -- in

22  conflict with all of the medical evidence.

23             So essentially there's not an -- an ounce

24  of evidence to support Dr. Wood's conclusions or claims

25  about the crash and how it related to Ms. Farley's onset
```



**Orange Legal**
**800-275-7991**

JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                    91

 1   of symptoms or the cause of any of her injuries.  And

 2   more importantly, it's -- it's at odds with -- with all

 3   of the -- the medical evidence.  I mean Dr. Woods is

 4   ostensible in this case as an expert with medical

 5   expertise.  Yet, he is ignoring the medical evidence and

 6   just drawing a conclusion that somehow this crash

 7   couldn't have caused injury to Ms. Farley because it's

 8   not enough of a crash to cause injury essentially to

 9   anybody because of a contrived and improperly performed

10   crash reconstruction.

11            So basically everything he did was -- was

12   incorrect from my perspective.

13       **Q.   And do you have any opinions regarding**

14   **Dr. Torke's opinions?**

15       A.   Outside of the opinions that are in my

16   report, no.

17       **Q.   Have you been provided any records from**

18   **our -- State Farm's reading radiologist, Dr. Stanley --**

19   **George Stanley?**

20       A.   I don't recall that I have.  It might be in

21   my records.  But if I have, I don't think my attention

22   was directed to it.

23       **Q.   When it comes to radiological records do**

24   **you defer to the reading radiologists?**

25       A.   Well, when it come -- when it comes to



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                          92

```
 1    interpreting a film, particularly something that is --
 2    is not in my normal area of interpretations like I
 3    shoulder, yeah, usually the radiologists are going to be
 4    the ones who are going to tell you about it.  That's
 5    what they do day in and day out.
 6         Q.   Besides what I just asked you with regard
 7    to Dr. Wood's analysis and your opinions related to his
 8    analysis, do you have any other opinions regarding
 9    biomechanics that are not issued in this report?
10         A.   I don't believe so, no.  I think you -- you
11    -- you got everything that I -- I've got to say in front
12    of you or in our deposition today.
13         Q.   All right.  I'm going to renew my
14    previous -- it's not an objection but previous request
15    that I be provided with a full copy of your file.  And
16    if based upon receipt of that copy of the file with your
17    actual inputs that you used for any testing, any data,
18    or any raw materials -- anything that's a part of your
19    file, that if we have to do this again, we'll be able to
20    do that because I didn't have it, which I was supposed
21    to have it prior to today.
22         A.   Yeah, of course.  I mean that's -- I will
23    let you work it out with Ryan.
24              THE WITNESS:  Ryan, would you please make
25    sure that you get the file from my office, everything
```



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH                                    93

```
 1    that you need, and then we'll go through you.  Is that

 2    all right?

 3              MR. BRESLER:  Yeah, I'll do that.  And then

 4    I have just a couple quick follow-up questions.

 5    /////

 6                         EXAMINATION

 7    BY MR. BRESLER:

 8         Q.   Dr. Freeman, I don't know -- I don't know

 9    if this -- I don't know if this qualifies as a

10    communication based off of the way the questioning went

11    at the beginning.  I think it was more like what

12    communications were in the files and letters.  But you

13    and I have talked about this case before; is that

14    correct?

15         A.   Okay.  Hold on just a second because I

16    think --

17              THE WITNESS:  Robert, I think you're

18    making --

19              MR. BELLE:  Yeah.

20              THE WITNESS:  -- you're making noise which

21    is cutting off what Ryan is staying, so...

22              MR. BELLE:  All right.  I moved away, so --

23              THE WITNESS:  Okay.

24              MR. BELLE:  -- go ahead and ask your

25    question, Ryan.
```



**Orange Legal**
**800-275-7991**

1                THE WITNESS:  Okay, Ryan.  What -- now what

2    was your question then?  What -- what did you ask?

3    BY MR. BRESLER:  (Continuing)

4         Q.   Well, I was saying at the very beginning of

5    the deposition there was questions about what

6    communications you had in your file, and you were

7    looking at your laptop and I think looking at written

8    communications.  But you and I have talked about this

9    case; is that -- is that fair?

10        A.   Yeah, I wasn't asked if we had had

11   conversations.  I was asked do I have any communications

12   in my file I believe.

13        Q.   Okay.  Now, one question I have for you:  I

14   have informed you that -- that Dr. Wood has done some

15   type of analysis that -- regarding whether or not

16   Ms. Farley was wearing a seatbelt at the time of the

17   collision.  I haven't seen any reports from him yet.  I

18   don't know if the defense is going down that road or

19   not, but I found out today at Dr. Wood's depo about this

20   potential issue the seatbelt.

21             We haven't done any analysis on that yet

22   because I haven't received anything from Dr. Wood at

23   this point other than what he told me in his deposition

24   and then on that thumb drive, but I don't think there's

25   been any written report.  If that happens, would you be



  1   in a position based off of your education, training and

  2   experience to do an analysis on whether this seatbelt

  3   defense becomes an issue?

  4          A.    Most definitely.

  5                MR. BRESLER:  Okay.  And I don't have any

  6   other questions.

  7                THE WITNESS:  Okay.  All right, guys.

  8                MR. BELLE:  That's it.  Do you want to read

  9   or waive?  Read or waive?

 10                THE WITNESS:  Yeah, Ryan -- Ryan, I mean it

 11   depends on how you feel about it, but our -- our court

 12   reporter is pretty -- she's pretty comfortable with me

 13   and I think it's a waste of money.

 14                MR. BELLE:  Okay.  I would like to order.

 15   Can I have a PDF, mini and a regular please.

 16                THE COURT REPORTER:  Yes, you can.

 17                MR. BELLE:  Thank you.

 18                THE COURT REPORTER:  How about you, Ryan?

 19                MR. BRESLER:  I would like a copy as well

 20   please.

 21                Thank you, Dr. Freeman.

 22                    (Discussion off the record.)

 23                THE VIDEOGRAPHER:  And we're going off the

 24   record.  The time is 3:48 p.m.

 25                    (Deposition concluded at 3:48 p.m.)



1   STATE OF OREGON     )
                         ) ss.

2   COUNTY OF WASHINGTON )

3          I, Maureen Kelly, a Certified Shorthand

4   Reporter for Oregon and Washington, and a Registered

5   Professional Reporter, hereby certify that, pursuant to

6   rules of civil procedures, **MICHAEL D. FREEMAN, MedDr,**

7   **PhD, MPH,** personally appeared before me at the time and

8   place set forth in the caption hereof; that at said time

9   and place I reported in stenotype all testimony adduced

10  and other oral proceedings had in the foregoing matter;

11  that thereafter my notes were reduced to typewriting

12  under my direction; and the foregoing transcript, Pages

13  1 to 96, both inclusive, constitutes a full, true, and

14  correct record of such testimony adduced and oral

15  proceedings had and of the whole thereof.

16         Witness my hand and CSR seal at Beaverton,

17  Oregon, this 9th day of May, 2019.

18

19

20

21

22                                 _Maureen Kelly_

23                             MAUREEN KELLY - RPR
                              Certified Shorthand Reporter

24                             Oregon CSR No. 00-364
                              Washington CCR No. 3401

25

CERTIFIED SHORTHAND REPORTER
Oregon
CSR
00-0364
MAUREEN KELLY

JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH

Index: $14,375..affiliate

**$**

**$14,375** 9:22

**$5,000** 7:20

**$800** 8:3,6

**0**

**05** 43:3

**08** 43:4

**1**

**1** 10:1 28:25 30:20 31:3,11,12,13,14 34:15 35:13 36:2,17 37:13,16,17 38:3 39:6,8 71:2,6 73:14, 19 83:14,18,19,20

**10** 24:15 52:6 62:11, 16,19 68:8 72:23

**10,000** 37:16,18,19, 20,25

**10-** 66:25

**11** 26:14 73:14

**12** 6:5

**14** 15:16 34:6 76:8 77:6

**14,000** 10:5

**14,375** 9:24

**15** 21:22 34:6

**15-mile-an-hour** 66:25

**15.4g** 75:19

**150** 23:16

**17** 18:17 20:14

**19** 31:8 38:18

**1965** 29:12

**1990s** 15:7 16:20

**1995** 23:14 73:2

**1997** 15:12

**1999** 23:19

**19th** 7:18

**1:43** 4:1,4

**1G** 43:10

**2**

**2** 52:14 62:18,22,25 63:6 68:6

**2,000** 34:15 35:14 36:2,17,24 37:9,17 38:3 39:6

**20** 6:10 20:12 21:5 30:20 31:3,11,14 36:21 37:4,9,20 40:23 78:6,10,11

**200** 24:5,12

**200,000** 83:20

**2000s** 16:20

**2005** 23:22

**2014** 21:22

**2015** 73:2

**2017** 19:17

**2018** 7:18

**2019** 4:1,4 8:13,25

**20th** 8:13

**21** 73:1

**21-ish** 78:12

**21-year** 73:2

**21.6** 67:15,18 78:13

**23** 73:19

**23rd** 8:25

**25** 40:23 77:9

**2500** 10:5

**27** 55:17 60:25 61:10 65:17 66:1,12

**2nd** 44:4

**3**

**3** 24:17 67:1

**3,000** 24:2

**3-** 57:7

**30** 4:1 36:22,23 55:16 66:4

**30-mile-per-hour** 68:3 73:3

**300** 24:2

**30g** 75:8,20

**30th** 4:4

**32-mile-an-hour** 66:5

**33** 41:23 42:23 47:8 55:14 57:20 59:10, 11,19 65:19,21,23 66:2 78:24

**33-mile-per-hour** 78:18

**33.7** 66:5 67:9 75:18 78:12

**34** 41:24 67:4 80:4

**34-mile-per-hour** 67:20 68:4,10 70:17

**3597515** 19:17 20:14

**36** 40:20

**36-year-old** 32:14 34:11

**39** 36:22,23

**3:07** 70:8

**3:15** 70:11

**3:48** 95:24,25

**4**

**4** 67:1 71:2,6 73:14 83:18,19

**40** 42:20 59:8,18,24, 25 60:22

**400** 57:7

**4103** 4:5

**45** 42:19 46:9 59:24 60:2,3,8,11,12,14,15

**450** 45:8

**5**

**5** 49:18 52:5 62:17 67:1

**50** 30:12,22 31:15

**500** 57:7

**55** 43:8

**6**

**6** 28:25 34:21

**60** 16:24 24:4,6,8

**625** 8:1

**65** 43:1

**7**

**7** 28:12 43:8 57:23 58:9

**730,000** 39:9 83:14, 19

**75** 43:8 74:3

**750** 18:17

**8**

**8** 28:12 38:18

**8-mile-an-hour** 50:4

**80** 6:9,10 10:23 11:7

**800** 72:7

**83/15** 11:14

**8:18-cv-00171-jsm-map** 4:10

**9**

**9** 26:13 41:21 44:25 75:13,15

**96** 23:14

**97317** 4:6

**A**

**A-C-T-A-R** 23:24

**abbreviated** 71:12

**ability** 49:11 66:18

**absence** 27:18 34:15 35:12 40:2 41:2,12 83:11,25

**absent** 44:5

**absolute** 48:9

**absolutely** 14:4 55:3 78:3 82:9

**abutment** 77:6

**acceleration** 75:19, 21,22 76:16

**accident** 23:13,25 25:3,8 29:6 30:12,14 31:8 34:1 38:1,13 46:2 65:2 68:11 74:16 81:25 83:3 87:13 89:1

**accordioned** 54:18, 19

**account** 56:17 63:18 71:18

**accounting** 62:25

**accreditation** 23:23,25

**accurate** 45:24 46:22 59:5

**acknowledging** 35:9

**ACTAR** 23:23,24

**action** 59:4

**actions** 59:6

**actual** 32:24 50:18 51:24 64:13 92:17

**added** 42:21

**additional** 10:5

**admitting** 78:23

**Advancement** 18:6

**affiliate** 21:17



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH

**affiliates** 4:13

**age** 36:22,23

**aggravated** 88:25

**ahead** 34:10 35:4,18, 20 43:23 93:24

**air** 76:8

**airbag** 69:5 75:25 76:22 77:6,9,21 78:12,15,21

**airbags** 68:10,19,22 69:1 75:25 76:5,9,12 78:5

**algorithm** 76:15

**Allegheny** 21:18 22:4,8,10,11,12

**allopath** 13:12

**allowed** 18:12,13

**alternative** 40:8

**ambulance** 27:22 33:8

**amount** 14:24 41:15 43:9 47:5 51:19 58:17 62:4 66:22 73:18 76:17

**analogy** 57:15

**analysis** 5:12 6:3 27:12 32:18 34:6 40:7 43:14 46:25 48:18 57:23 62:4 70:19 72:16 74:8 85:17 89:9 92:7,8 94:15,21 95:2

**analyze** 66:19

**analyzed** 24:1

**angle** 57:22

**animate** 59:2

**animation** 49:14

**annual** 34:12

**answering** 26:3 69:3

**Antigua** 12:23 14:13

**anybody's** 23:4

**apologize** 10:4 20:9

**apparent** 19:5

**application** 42:4 56:13

**applied** 13:12,23 44:20 45:2

**applies** 38:17

**apply** 59:1 60:23

**applying** 29:9

**approach** 41:21

**approaching** 59:14

**approximately** 47:8 75:19

**April** 4:1,4 8:25

**area** 5:22 16:23 54:16,24 60:4,15 64:21 84:23 87:17 92:2

**areas** 6:6 7:10 24:14

**arena** 6:9,10,11

**arm** 27:23 81:13,14, 21

**arthroscopic** 84:25

**assess** 30:7 34:23

**assessed** 32:20

**assessing** 27:14

**assessment** 86:3,20

**association** 18:5 29:14

**assume** 8:6

**assumed** 42:11

**assumptions** 47:4

**asymptomatic** 87:25

**attempt** 25:10

**attend** 12:21,22

**attended** 16:21

**attention** 91:21

**attributable** 31:16 86:1 88:6

**authorize** 14:19

**automobile** 4:9 30:11,12 83:3 87:13

**Automotive** 18:6,7 71:10

**Automotoble** 4:8,9

**autopsy** 12:20

**averaged** 10:22

**aware** 10:18 22:11

**Awesome** 70:6

**― B ―**

**back** 12:7 20:10 23:14 39:2 44:16,21 58:20 59:3 66:12 69:8,15,16,21 70:10 79:21 80:12 81:25 82:1

**background** 11:20, 22 14:22,24 24:18

**backwards** 79:10, 12,15 81:10

**Bain** 21:3,4

**Bain's** 21:6

**balance** 49:24 50:6

**barrier** 76:6,8

**base** 86:25

**based** 20:22 21:6 27:13 33:12 39:17 42:4,12 43:22 46:16 51:7,8,13,23 52:1 56:3,6 76:13,15 85:7,10 86:15 87:24 92:16 93:10 95:1

**basically** 12:20 31:4 39:16 49:4 91:11

**basing** 60:5

**basis** 33:13

**began** 15:12 16:23 23:19,21

**beginning** 93:11 94:4

**behalf** 4:15,16

**Belle** 4:16 5:3 16:10, 16 17:2 19:15,20,22, 25 20:7,10,12,14,16, 17 37:11 39:14 43:22 44:11,15 48:2 50:25 51:10 53:2,15 56:8 63:21 67:11 68:15,18,21,23,25 69:7,10,14,19,22 70:2,5,12 77:1 87:7 88:15,22 90:11 93:19,22,24 95:8,14, 17

**belonging** 68:5

**belongs** 35:13 36:17

**belt** 39:2,3

**belted** 82:16,17,18

**bending** 64:1

**bent** 52:23 64:3,4

**bet** 7:13 24:19 79:1

**biased** 58:12

**bigger** 57:8

**bill** 10:5,7

**bio** 22:24

**biodiag** 22:24

**Biodynamic** 20:23 21:4

**biology** 12:1

**biomech** 89:9

**biomechanic** 22:24

**biomechanical** 24:9 37:24 88:24 89:9

**biomechanics** 15:1, 4,5,6,10,15,16 16:20, 21,22,23 17:1,17,22, 23,24 18:4,4,10,14 24:7 79:17 89:6 92:9

**biostatistician** 17:4

**biostatistics** 12:8 17:9,14

**bit** 9:8 11:19 15:3,20 25:22 44:7 57:8 80:14 88:13

**bleeding** 73:17

**Board** 18:8 21:7

**bodies** 40:19

**body** 36:8 39:1 52:25 54:13 63:15 79:9 80:4,12 82:1

**bone** 71:1

**bottom** 68:8

**bound** 78:14,21

**brain** 73:17,21 86:25

**brake** 59:18

**braked** 59:12

**brakes** 44:20 45:3, 14 59:1,9,21 60:23

**braking** 26:21,23,25 27:3,5 42:22 58:21 59:23

**break** 70:1 75:24

**Bresler** 4:14 8:14,23 10:16 20:6,8,11,13, 15 37:7 38:15 44:13 47:22 50:22 51:5 52:2 53:13 56:5 63:16 67:6 68:13,20 69:2,9 76:23 89:3 90:8 93:3,7 94:3 95:5,19

**Bresler's** 7:15 8:10 9:19 10:11,13,14 26:7

**bridge** 77:5

**bring** 6:15,20,21 45:11

**broadly** 5:21

**broken** 11:13 28:2 30:25 31:2,13,19 33:17,18,20

**brought** 21:3 42:22

**bruising** 81:2,6

**bumper** 47:14,20 48:6,8,10,15,16 52:19 53:1,5,6,7,9, 10,17,18,19 54:10, 20,21,25 55:1,2,3 64:12

**bumper-to-bumper**



Orange Legal
800-275-7991

JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH

Index: bumpers..court

47:12,17

**bumpers** 48:4 54:22

**business** 11:3

**but/for** 32:20

─────────

**C**

─────────

**C-H-I-A-R-I** 87:5

**calculation** 50:9 90:18

**calculations** 56:13 75:10,13 90:19

**California** 19:9

**call** 34:25 55:4

**called** 5:12 32:18 70:24

**camera** 16:12

**canal** 87:2

**cancel** 41:10

**capacity** 26:21,23, 25

**capitalized** 87:6

**caps** 71:12

**car** 47:20 76:19 77:5, 8

**Caribbean** 12:24

**case** 4:9 6:22 9:20 18:25 19:3,8,16,19, 21 20:24 22:20 24:21 26:6 27:19 28:18 31:23 38:25 43:19 47:16 61:9 63:13 67:3 75:25 77:4 78:10 90:5 91:4 93:13 94:9

**cases** 21:23 70:19 87:17

**catalog** 71:14

**category** 30:16 63:5

**causal** 29:16 30:8

**causation** 17:17,19 27:11,13 29:7 31:15 32:19 33:14 39:21 40:7

**caused** 29:6 55:17 80:24 81:14 85:5,7 88:10 89:23 91:7

**causing** 36:5 40:16

**CD** 7:20

**cease** 20:18

**certainty** 37:23,24 88:24

**certificates** 23:4,5

**cervical** 75:2,5

**cetera** 73:22

**chain** 55:18 61:4

**challenged** 18:16

**challenges** 18:17

**chance** 27:21 30:23 31:1 32:15 33:9 36:2,11 38:3 39:6,8, 9 41:2 85:14

**change** 9:16 76:17

**characteristics** 52:11 88:6

**charge** 8:1,3

**charging** 8:4

**chart** 68:8

**check** 7:19

**chemistry** 11:25

**chest** 82:4

**Chiari** 86:22,24 87:4,5,9,12,15,16 88:4,6,10,25 89:12

**child** 22:23

**chiropractic** 12:2 13:11 14:9 32:6

**chiropractor** 11:23 12:2

**chronic** 34:13 36:25

**citation** 19:17 28:12 34:21

**Citations** 28:25

**cite** 20:8 43:12,13

**cited** 28:11 36:16

**citing** 28:5,15

**civil** 6:11 11:13

**claim** 67:19 84:19

**claims** 45:6 90:24

**Clearwater** 10:17

**clinical** 10:25 12:12, 24 13:20 88:2

**clinician** 13:15 33:3 85:23 86:3,6

**close** 31:4 38:23 64:24

**closer** 15:24 16:14 43:3 52:12

**closing** 51:7 66:5

**coefficient** 42:24 43:2,6,12

**cohort** 36:16

**collapsed** 52:19

**collision** 32:8 60:8, 11 61:4 67:21 68:5 70:17 71:4,5,21 73:7 74:9 75:6 78:22 80:5,12 94:17

**collisions** 47:12 68:6 71:22

**comfortable** 95:12

**comments** 90:20

**Commission** 23:25

**communication** 8:9 93:10

**communications** 8:17 93:12 94:6,8,11

**company** 4:9 5:12 6:4,7

**compare** 40:4

**compared** 39:11 61:15

**comparing** 32:19,20

**comparison** 33:11 34:24 85:12

**competency** 21:7

**competent** 74:9

84:1

**competing** 39:10

**complaint** 20:23 21:1,3,7,14

**complete** 12:22 44:5 54:6,19 85:23 88:17

**completely** 66:2 90:16,21

**component** 47:18 53:11

**compression** 80:11

**computer** 42:17 47:1 51:2,22 62:7

**concept** 89:6

**concluded** 95:25

**conclusion** 29:8 32:23 40:5 91:6

**conclusions** 42:3 90:10,24

**condition** 33:10 36:25 37:1,3 40:15 86:24 87:23

**conference-type** 18:9

**conferences** 16:22

**confirm** 50:16

**conflict** 90:22

**connected** 63:25

**connection** 38:12

**considered** 73:19 74:24

**consist** 7:7

**consistent** 45:21 57:21 58:11 74:22, 24 81:7 82:10,13

**constituted** 75:7

**consultation** 22:19

**consulted** 21:23

**consulting** 5:12 6:4

**consults** 6:8

**contact** 23:16 63:20, 25 64:1,7,9,10,12,13

65:8 81:13 90:16

**contiguous** 63:19

**continental** 13:8

**continuing** 17:2 19:25 20:17 37:11 39:14 44:15 48:2 50:25 51:10 53:2,15 56:8 63:21 67:11 68:18,21,25 70:12 77:1 81:22 87:7 88:22 90:11 94:3

**contrived** 91:9

**control** 42:21 45:5, 6,16 46:18

**contusion** 81:14,16, 22

**conversations** 8:23 94:11

**convert** 36:12

**copy** 7:1,11 9:4 88:17 92:15,16 95:19

**cord** 73:21

**Corporation** 20:24 21:4

**correct** 9:13,14 13:19 17:4,5,15 23:9 24:4 28:4,10,22,23 30:19 35:10 36:25 37:10 46:20 48:4 56:4 58:3,8 63:14 67:5 71:9,23 77:14 81:5 85:19 93:14

**correspondence** 7:15 8:14

**cost** 15:2

**counsel** 4:12,25

**counted** 90:16

**county** 18:11 21:18 22:4,8,10,11,12

**couple** 26:15 70:3 88:12 93:4

**courses** 15:8

**court** 4:11,18 9:9 18:24 19:19,21 25:20 69:7,14,16



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH

Index: cover..driving

95:11,16,18

**cover** 7:17 8:25 48:8 54:10

**covered** 26:13

**crash** 12:10 14:25 22:20 23:17,22 27:21,24 30:21,24 31:16,24 32:2,13,17 33:7 34:5 35:12,25 36:12,13 38:7,20,24 39:12,17,20,24,25 40:2,3 41:5,8,12,13, 20,22 42:2,5,7 43:13 45:10,20 47:13 48:24 49:19 50:11, 12 51:8 52:9,16 55:4,11,18 57:17,18 58:12 59:3 60:9,13 61:2,10 63:1,5 66:3, 9,12,24 67:15 70:20 71:9,11 72:25 73:25 74:23,25 75:12,18 76:20 78:14,17 79:17 80:17,21,25 81:11,12 82:21 83:11,16,18,20,25 84:2,4,17,22 85:7,8, 9,11,12,18 89:11,23 90:20,21,25 91:6,8, 10

**crashed** 89:18

**crashes** 24:2 34:20 47:10 54:23 61:7 68:2 71:14,15 72:3, 5,8,21 73:2,6 84:18 85:13 89:20

**credentials** 10:2

**credit** 15:6,9

**criminal** 6:9,10

**criteria** 29:9,10 30:7 76:10

**crumpling** 54:11, 12,15

**crush** 48:17 49:12, 16 50:2 52:14 58:17 61:13,14,15,19 62:4, 5,6,17,23,25 63:6,7, 9,11,12,13,15 64:19 65:8 66:21,22

**crushed** 49:18,23 54:13,24 64:14 65:7

**cuff** 33:1 83:1

**curriculum** 15:12, 14,15 16:21

**cut** 29:25 35:20

**cutting** 9:7 15:18,19 29:19 93:21

---

**D**

**dad** 12:2

**damage** 47:5,7 48:18 51:16,19 52:13,14,24 53:7,9, 19 55:1,17,19 56:17 58:10 61:3,12,24,25 62:1,20 63:14,19,22, 24 64:4,10,16,19 65:3 90:17

**data** 5:23 34:16 66:9 71:11,23 92:17

**database** 34:18 70:21 71:8,9 72:1

**date** 4:4

**dated** 7:17

**day** 35:25 36:12 39:10 40:16 63:10 83:11 92:5

**deadline** 44:3

**deal** 6:6 51:18

**Dear** 9:2

**death** 21:25 22:3,20 23:4,5

**debate** 33:21

**December** 7:18

**decipher** 33:25 64:6

**decompression** 84:25

**deemed** 73:15 74:4

**defendant** 11:14

**defendant's** 9:14

**defendants** 11:12

**defense** 9:5 94:18 95:3

**defer** 91:24

**definite** 48:9,14

**deformed** 64:14

**degeneration** 36:4, 8 40:19,21 41:1,5

**degenerative** 33:24 40:15

**degree** 11:24 12:15, 17 13:18 17:13,16, 18,24 36:4 37:23 40:21 43:8 61:4 88:24

**degreed** 17:23

**delta** 41:24 66:6,11, 25 67:3,7,8,12,15,21 68:3,4,10 70:17,20 72:25 73:3 75:17 76:13 78:5,6,10,11, 12 82:21

**demonstrates** 74:8

**depending** 79:20

**depends** 66:18,20 80:2 95:11

**deploy** 76:1,3,5,9,22 77:6,10,22 78:5,22

**deployed** 76:12 78:15

**deployment** 78:4

**depo** 94:19

**depose** 88:17

**deposition** 4:7 6:13, 16 8:5,23 44:1 79:3 86:18 92:12 94:5,23 95:25

**derangements** 80:22

**derived** 10:20 11:8 39:25 40:1

**deserve** 88:7

**designed** 47:11

**desist** 20:19

**desperate** 39:13

**destroyed** 54:20

**detailed** 7:8

**determination** 49:22 51:25 86:14 88:9 89:5

**determinations** 22:3

**determine** 26:16 30:15 58:24 65:13 76:11

**determined** 29:15 58:16 67:13

**develop** 15:12 36:24 37:1,3

**developed** 16:21

**developing** 34:13 35:14 41:6,7

**devoted** 15:14

**Dewitt** 19:16

**diag** 14:10

**diagnose** 22:2

**diagnosed** 33:3,8

**diagnoses** 74:13

**diagnosis** 32:24,25 33:6 34:25 35:1 86:7

**diagnosises** 14:6

**diagnostic** 84:15 85:3

**dial** 52:11

**dictated** 26:23

**difference** 48:1

**differential** 81:20

**differentiation** 64:15 72:4

**difficult** 53:20 76:14

**difficulty** 65:6

**digital** 7:1,7 9:12

**dimensions** 77:16

**diminishing** 39:10

**direct** 38:25 64:5,8, 12,19 65:13

**directed** 69:21 91:22

**direction** 57:24 58:15,16,17

**disbelieve** 59:23

**disc** 73:17 80:22

**discipline** 32:6

**discuss** 70:16

**discussed** 78:25 83:12

**discussing** 10:2 63:11 84:6,13

**discussion** 95:22

**disease** 29:15

**dismissed** 21:1,15

**disputed** 5:24

**distance** 47:19,24 48:1

**district** 4:10,11 18:24 19:12,13

**diverse** 31:20,23

**divided** 17:14

**doctor** 9:25 12:14,15 13:19,20 20:19

**documents** 54:1

**door** 64:17,18,23 65:3,4

**double-check** 8:19

**doubtful** 87:14

**download** 66:10

**drag** 43:9

**drawing** 91:6

**drive** 9:4 76:19 94:24

**driven** 47:21

**driver** 73:4

**drivers** 73:5,6,14

**driving** 26:18,19



**Orange Legal**
**800-275-7991**

JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH

**drop** 66:7

**drove** 77:5,8

**due** 35:17,22 38:7

**duly** 4:22

**dural** 87:16

**duty** 27:1

---

**E**

**earlier** 78:16

**easily** 59:10 61:18 67:1

**education** 95:1

**educational** 11:19, 22

**efficacy** 27:3

**elected** 67:4

**electronic** 6:24 8:9

**elements** 66:3

**email** 53:25

**emergency** 86:19

**empirical** 58:5

**employed** 5:8,10,11 23:6

**employees** 6:5

**EMS** 86:19

**enclosed** 9:2

**end** 30:4 40:24 52:15 55:10,11,22 64:3 70:20 83:19

**ended** 27:22,25

**energy** 90:20

**enforcement** 23:20

**engage** 48:10,15 68:10

**engaged** 52:20

**engagement** 7:15 53:1 54:20 55:3

**engineering** 14:23, 25 15:1

**Engineers** 18:7

**enormous** 38:20 47:5 66:22

**enter** 58:2

**entered** 51:22

**entering** 46:7

**entire** 52:18

**entirety** 54:6

**environment** 29:14 65:25

**epi** 29:4

**epidemiologic** 5:23 84:11,19

**epidemiological** 29:4,8

**epidemiology** 12:8, 9 15:13 17:14 18:14

**equivalent** 76:7,8

**error** 21:14 55:6 56:11,12,13,16,18,22 66:13,16 90:18

**essentially** 27:23 32:18 54:18 86:25 89:13 90:23 91:8

**estimate** 46:7 51:3 56:3 58:20

**estimates** 51:22 66:17 67:25 69:23

**estimating** 62:5

**evaluating** 5:24 63:13

**event** 27:15,18 38:1, 19 40:3 51:14

**events** 46:18

**evidence** 45:22 48:10,14 50:7,11,18, 23 51:9,11,23,24 56:15 58:5 62:13 90:3,22,24 91:3,5

**exact** 57:4

**examination** 5:2 23:23 84:6 93:6

**examinations** 13:13

**examine** 40:18 54:25 61:17

**examined** 4:22 30:11 33:3 73:4

**examiner** 21:17 23:20

**examiner's** 21:18 22:14

**Examiners** 21:8

**examining** 86:6

**exams** 13:14

**exceed** 31:14 40:23 72:8

**exceeded** 31:15

**exception** 8:2 28:12

**exclude** 40:17

**excluding** 40:13,15

**excuse** 6:9 45:8 52:16

**exemplars** 26:20

**exhibited** 61:16

**exhibiting** 61:16

**exist** 17:19,21

**expect** 73:25

**expected** 49:16

**experience** 17:25 18:4 23:12 95:2

**expert** 6:5,6 9:5,14 10:20 19:5 20:23 91:4

**expertise** 19:5 91:5

**expire** 44:3

**explain** 25:21 27:12 67:23 75:3 89:9

**explained** 61:2

**explaining** 38:9

**explanation** 40:8 46:17 51:14 54:14 84:4

**exposed** 31:2 32:1 72:24

**exposure** 29:14

**extensive** 14:24 17:25

**extensively** 72:6

**extent** 84:10,20 86:17

**extremely** 36:14 41:3

**extremity** 33:9

---

**F**

**F-150** 47:20

**F-550** 26:19 48:7 57:8

**F-R-E-E-M-A-N** 5:7

**fact** 36:9 40:25 48:10 68:4 74:23

**factor** 58:1

**factors** 41:10 50:7

**facts** 24:18,20

**failed** 56:16

**fair** 11:8 13:16 30:1, 17 32:24 44:8 50:17 51:1 61:24 65:10 94:9

**fall** 54:22

**falls** 30:16

**false** 21:7

**familiar** 20:25

**Farley** 4:8,15 27:20 31:24 32:11 33:7 34:12 35:9,12 36:1, 17 37:24 39:19 47:21 59:14 74:1 75:7 79:14 80:18 82:22 83:7,10 84:20 85:1,11,14 86:18 87:9 89:5,16 91:7 94:16

**Farley's** 39:1,22 40:2 44:19 50:20 51:16 53:23 58:23 61:16 62:3,6 74:9

**exposure** 76:1 77:13 79:3 81:2 85:10 88:9 89:12 90:25

**Farlom** 85:1

**Farm** 4:8,17

**Farm's** 91:18

**fatalities** 24:2

**favor** 83:20

**February** 8:13

**federal** 18:23 19:13, 19

**fee** 7:19,21

**feel** 95:11

**feet** 45:8 52:14 62:22,25 63:6,12

**fell** 54:21

**fellowship** 12:19 21:21

**field** 5:19 24:7

**figure** 10:6 50:7,10 52:8 57:16

**figures** 48:24

**file** 6:21 7:1,7,20 9:6, 12 44:6 88:18 92:15, 16,19,25 94:6,12

**files** 93:12

**filing** 21:7

**film** 92:1

**find** 7:18 20:10

**finding** 29:4 84:19

**findings** 29:9 70:23

**fine** 16:16 66:13 69:13 70:5

**finish** 12:11

**finished** 69:3

**firm** 7:16 9:20 10:12,14,15

**fit** 63:5

**fits** 50:8,11

**Florida** 4:11 10:17 14:3 18:12,21 19:1,



**Orange Legal**
**800-275-7991**

JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH

Index: focus..individual

13

**focus** 12:9 15:3

**folks** 86:6

**follow** 64:15 85:24

**follow-up** 93:4

**foot** 63:7

**footnotes** 28:3

**force** 51:18 52:16 58:16 81:21

**forces** 75:7 79:25

**Ford** 26:19 55:15

**forensic** 5:12,17,19, 20,24 6:1,2 10:20 11:8 12:18 21:21 23:6,8,10,11

**form** 18:18 37:7 38:15 47:22 50:22 51:5 52:2 53:13 56:5 63:16 67:6 68:13,20 69:6 76:23 89:3 90:8

**formal** 15:1

**Fortunately** 21:6

**forward** 36:1 79:10 81:12,23 82:2

**found** 85:1 86:4 94:19

**fraction** 40:23

**fracture** 70:25 71:1

**fractures** 73:16,20 80:21

**frame** 52:18

**fraudulent** 20:22 21:2,15

**Freeman** 4:7,21 5:6 9:2 93:8 95:21

**Freight** 19:17

**frequency** 31:10 70:21

**frequently** 22:13

**friction** 26:24 42:25 43:3,6,12

**front** 48:15 49:25

50:2,5 51:20 52:13, 15 55:19 61:3 62:19 63:7 67:13 78:22 82:4 89:18 90:6 92:11

**frontal** 50:3 71:5 76:9 78:12,14

**full** 23:6 55:3 88:14 92:15

**fully** 84:1

**function** 43:9 86:2

**functioning** 78:15

---

**G**

**gather** 24:20 42:1

**gave** 10:6 33:16 40:5 43:15 55:12,24 84:11 88:14 90:18

**general** 7:9 11:25 29:7 32:5 63:5 82:19

**generally** 11:7 29:12 33:20 57:11 76:7 77:21

**generated** 80:18

**George** 91:19

**give** 6:17 8:18 43:14 61:12 88:19

**giving** 22:23 62:15

**glenoid** 83:2,3

**good** 10:9 57:10

**grabbed** 64:2

**granted** 18:18

**great** 51:18

**greater** 73:16 75:8, 20,21 83:17

**Griffith** 10:16

**ground** 19:16 52:23 53:10

**group** 29:5 36:18,22, 23

**guess** 7:10 33:15 62:2 64:17 65:15

**guidelines** 29:13

**guys** 69:11 95:7

---

**H**

**hand** 80:7,10

**hands** 79:4,16,22,24 80:13

**hang** 53:12

**hanging** 53:10

**happen** 36:13 59:20 84:18

**happened** 33:12 34:5 40:4 45:20 84:21

**happy** 43:14,19

**hard** 53:20 80:3

**head** 34:13 75:8,22

**headaches** 88:5,9

**heads** 45:21

**health** 12:8,23 15:11

**health/ epidemiology** 17:9

**healthy** 32:14 34:7, 11 35:7

**hear** 20:12 27:8 30:4 69:11 70:13

**heard** 9:11 19:1 69:20

**hearing** 16:1

**heavy** 27:1 57:5

**heck** 50:5

**height** 48:1

**held** 53:5

**Henderson** 26:18 44:18,19 45:24 46:21 59:4,6 60:22 62:10

**Henderson's** 42:20 46:12,17 51:13 62:16

**Hey** 20:6

**high** 32:2,7 39:11 40:22 51:18 55:10 60:13 68:5 71:3 75:6 76:20 78:17

**higher** 38:6 48:7 65:22 70:20

**highest** 65:18

**Hill** 29:9,10

**hired** 20:24

**hit** 54:22 62:11 77:9 81:25 82:4,15

**hold** 9:21 34:8 53:5 79:18 93:15

**holding** 64:3 80:2

**home** 27:20

**homicide** 22:21

**hospital** 27:22 34:16,18

**hospitals** 13:22

**Hot** 49:1,4,6 57:14

**hour** 8:1,3,6 41:24 42:19,21,23 46:9 47:9 52:6 55:14,16, 17 60:2,8,22,25 61:11 62:17,19 65:24 66:5,12 67:2, 4,10,15,18 75:18 76:8 77:6,9 78:6,10, 13,24 80:5

**hourly** 7:23

**hours** 8:7 18:9 23:16 88:14

**huge** 38:20

**hundred** 31:4

**hundreds** 18:9

**hurt** 34:1 74:16

**Hyundai** 47:5,8 48:9,16 49:18 52:22 55:19,20 57:9,25 58:11 62:18 64:11 67:9 75:17

---

**I**

**idea** 57:10

**identified** 72:2 89:12

**identify** 4:12 65:9

**ignoring** 91:5

**imagine** 43:1

**immediately** 27:23 33:8

**impact** 32:7 42:11, 16,19,22 45:9 47:8, 15,16,17 48:8 49:20, 25 50:1,3,5 51:7 53:4,18 55:12,14,15 57:19,22 59:5,20 60:12,13 61:8 67:9, 13,21 68:5,6 70:17 71:4 72:21,24 73:7, 11 75:6 76:5,21 77:20 78:11,18 79:5 80:5

**impact/front** 32:7

**impacts** 71:19

**imparted** 72:25

**importantly** 91:2

**improperly** 91:9

**Inaudible** 35:2

**inches** 49:18,23 62:17,18

**included** 15:9,16 23:11 71:25

**includes** 71:20

**including** 14:12 71:5

**income** 10:19,25 11:7

**incorrect** 24:5 52:3 60:12 90:19 91:12

**increase** 71:6

**incremental** 62:21

**independent** 26:6

**indication** 46:1 83:23

**indicative** 85:19

**individual** 30:16,23 86:4,8



**induced** 56:17
63:19,22 64:4,7,19
65:8,13 90:17

**infinity** 31:4

**inflammation** 33:2

**information** 5:23
27:6 30:18,20 42:1
45:24 46:22,24 60:6
61:6 66:19 78:1
85:25 87:8

**informed** 94:14

**initial** 5:6 51:21 69:4

**initially** 79:8

**injure** 29:3

**injured** 30:17,21
38:22

**injuries** 12:10 30:24
34:20 39:23 70:22
73:10,17,18,20,21,23
74:1,2,10,22,23 75:3
80:17,20,22,24
81:18 82:20,22
83:10 84:1,3,4,18
85:10 89:21 91:1

**injuring** 83:2

**injury** 15:1,4,6,10,
13,15,16 16:25
17:17,18 18:10
22:25 24:7 27:11,13,
14,17 29:2,5,15
30:14,25 31:9,21,24
32:2,9,12 33:18,24
38:7,11,19,20 39:12,
20,21,23,25 40:7
41:16 67:20,24 68:2
69:23 70:16,21,24
71:6,9 73:4,16 74:4,
5,13 80:19,23 81:20
83:15,16,21 84:17,
21,22 85:7,19 86:1
89:16,24 90:20 91:7,
8

**injury's** 84:14

**inpatient** 34:18

**input** 42:7,9,10 44:8
47:3 50:15 58:25
72:15

**inputs** 43:15,23

55:7,10 56:24 60:6
92:17

**inputting** 62:7

**inseparable** 89:23

**inside** 55:1 79:11

**inspect** 26:24

**instances** 28:8

**Insurance** 4:9

**integral** 48:19

**intended** 14:20

**interact** 86:8

**interaction** 39:1,3

**interest** 5:22

**interested** 7:11

**interests** 11:5

**interpret** 47:25

**interpretation**
25:16 33:19

**interpretations**
92:2

**interpreted** 56:15
76:16

**interpreting** 92:1

**intersection** 5:21

**intervention** 35:8
38:2

**investigate** 24:24

**investigation** 23:18
26:6 72:8,9 88:2,8

**investigatory** 26:12

**involve** 28:19

**involved** 25:3,7
30:13

**issue** 19:4 21:24
89:25 94:20 95:3

**issued** 20:18 21:14
92:9

**issues** 5:24 6:7 27:3
84:11,12

**issuing** 74:15

**items** 6:15 28:16,18,
21

---

**J**

**Jennifer** 4:8,15

**joint** 80:22

**joints** 40:22

**Journal** 34:22

**judgment** 56:7

**jury** 19:6 38:10

---

**K**

**kid** 49:2

**kind** 7:23 22:17 30:6
32:6,14 72:9 75:4
78:21 80:22

**kinds** 80:24

**knew** 66:10 85:11

**knowledge** 6:5
19:24 85:12

---

**L**

**labrum** 83:3

**lady** 33:1 84:21

**laptop** 6:20,23 7:3
94:7

**large** 18:20 37:5

**latch** 53:11

**late** 16:20 88:13

**law** 5:22 7:16 23:20

**lawsuit** 72:10

**leak** 87:16

**left** 27:22,25 57:24
58:12 81:3

**leg** 30:25 31:2,13,19
33:17,18,20 40:7

**legal** 86:3

**lesser** 74:2

**lets** 80:10

**letter** 7:15,17 8:25
9:1

**letters** 93:12

**level** 21:8 83:17

**license** 13:7,10,14

**licensed** 13:12,25
14:2

**life** 11:23 40:20 74:5

**ligament** 80:23

**limit** 60:3,20

**limited** 19:12 41:15

**list** 6:15 7:9 8:14

**listed** 73:10,24 90:5

**literature** 16:25
28:7 34:16 78:3

**litigation** 6:7

**load** 75:3,8,10,12
79:25 80:11,15
81:20

**loaded** 81:21

**loads** 75:4

**located** 10:16

**location** 4:5

**locked** 45:15 81:11
82:7

**long** 7:2 31:14 45:11
59:21 71:1

**longer** 53:11

**looked** 42:18 51:25
52:4 54:2 65:22 68:1
72:21 73:5 77:12,20
81:1 86:4 89:5

**loose** 76:9

**lose** 46:17

**losing** 42:21

**loss** 24:21

**lost** 45:5,6,16

**lot** 61:19,25 80:6
82:14

**lots** 36:7

**low** 41:3 49:20 52:6,
7 55:11,22 65:17

**lower** 48:7 55:17
78:24 81:13

---

**M**

**M-A-A-S-T-R-I-C-
H-T** 5:14

**M.D.** 12:11 13:17
14:10

**Maastricht** 5:13,15

**made** 41:5 51:25
63:25 81:13 89:2,4

**mainstay** 32:19

**majority** 63:11

**make** 14:6 25:6 26:2
30:15 32:3 34:24
37:4 38:12 45:9,19,
20 46:19 49:22 58:8
62:4 77:21 88:9,14
92:24

**makes** 25:13 87:3

**making** 22:3 29:4
32:22,23 84:14
93:18,20

**malformation**
86:22,24 87:4,9,12
88:25

**manner** 21:25

**margin** 55:6

**master's** 12:7 17:8

**match** 49:21 52:12
61:14

**matches** 47:7

**material** 28:10

**materials** 7:20
24:22 92:18

**math** 37:5,15

**mathematical**
82:23,25

**matter** 4:7

**maximum** 40:3
78:19



**Meaning** 42:2

**means** 21:20

**meant** 37:21

**measure** 66:22

**measurement** 63:4

**measurements**
56:17 66:21

**mechanism** 22:25
29:2 41:16 84:22

**mechanisms** 84:21

**Meddr** 4:21 13:18

**medical** 8:15 12:12,
15,17,21,22 13:4,7,
14,15,20 14:6,10,11
15:11,17 21:8,17,18
22:14 23:19 32:6,24
33:21 37:23 81:2
85:2 86:3,15,20
90:22 91:3,4,5

**medicine** 5:18,19,
20,22,25 6:1 12:14,
16 13:8,11,19 14:19
18:6 32:5,6

**mentioned** 63:17
71:21

**method** 28:6 38:17
90:14

**methodology** 27:12
28:2,16 38:9,10
41:17

**methods** 28:9 66:14,
20 67:2 90:10

**Michael** 4:7,21 5:6

**microphone** 15:20,
21 16:14

**middle** 4:11 5:6
55:25 56:3 64:4
65:21 72:23 75:16

**mile** 66:5

**miles** 41:24 42:19,
20,23 45:8 46:9 47:9
52:5,6 55:14,16,17
60:2,8,22,25 61:11
62:16,19 65:23
66:12 67:1,4,9,15,18
75:18 76:8 77:6,9

78:6,10,13,24 80:5

**million** 31:14 36:21
37:4,9,20

**mind** 69:25

**mini** 95:15

**miniscule** 36:14

**minor** 15:9 74:5

**minority** 87:17

**minus** 67:1

**minute** 6:18 9:21
33:17

**minutes** 70:4 88:13,
20

**misperception** 89:8

**missed** 10:4

**missing** 9:3

**misstated** 8:24

**misunderstand**
86:9

**model** 25:6

**moderate** 70:24
73:16 74:4 83:17

**moderately** 73:25

**moment** 79:14

**money** 95:13

**monthly** 23:21

**moot** 89:14

**move** 15:19,20 24:16
67:19 75:1 79:9,15
81:22

**moved** 39:1 77:8
93:22

**moving** 41:14 63:10
80:4

**MPH** 4:21

**multiple** 16:22 28:3

**muscle** 80:23

**musculoskeletal**
32:8 80:19 83:16

**Mutual** 4:8

**mysterious** 32:9

---

**N**

**NASS-CDS** 71:12
72:8

**national** 18:7 34:16,
18 70:20 71:9,10

**nationwide** 34:17

**nature** 24:21 27:15
33:24 67:2

**neck** 36:8 74:10,12,
17

**negligible** 34:12

**NELSON** 16:4

**nerve** 80:23

**noise** 93:20

**non-related** 11:2

**nonclinical** 12:16

**normal** 27:4 92:2

**northern** 19:12,13

**Northwestern**
23:17

**noted** 34:25

**notice** 20:25

**number** 19:17 31:12
40:20 50:9,10 51:2
55:23 87:20

**numbers** 49:19

---

**O**

**object** 68:24 76:21

**objecting** 69:6

**objection** 44:12,14
90:13 92:14

**observation** 65:2

**observations** 75:12

**observe** 31:18 60:9
61:23

**observed** 30:8 35:1
46:2 64:17 81:17

**observing** 46:23
61:22

**obvious** 62:24

**occupant** 75:21

**occupants** 71:2

**occur** 18:21 40:18
75:5 80:21

**occurred** 39:18
54:13 55:2 68:3
70:22 71:1 75:5 81:9

**occurrence** 40:8
84:14 87:15

**occurring** 27:15,17
34:20 68:7

**occurs** 76:5 80:12

**odd** 11:21

**odds** 83:19 91:2

**office** 8:10,17 21:18
22:14 26:8 92:25

**officer** 46:1,2,4,8,10,
23

**onset** 38:23 89:10
90:25

**open** 64:24

**opening** 87:1

**opinion** 31:20,23
32:1 39:16 67:24
70:18 74:7,15 75:3
84:15 85:3,4,5,9
88:1 89:15 90:1

**opinions** 9:16 18:14
80:16 84:7,8,10 85:1
87:11 88:23 90:4,9
91:13,14,15 92:7,8

**opportunity** 25:20
61:17

**opposed** 32:23
84:14

**order** 20:19 21:13
83:14 95:14

**ordinary** 27:1

**Oregon** 4:1,6 11:24
12:4 14:1 15:7,11
17:10,12 22:5,8,11

23:20

**organization** 21:22

**organs** 73:18

**orthopedic** 32:5
84:12

**Orthopedics** 34:22

**ostensible** 91:4

**ounce** 90:23

**output** 49:13,15
62:8

**outstanding** 10:7,10

**overlying** 71:19

**override** 47:14,16,
18 53:4,9 54:19,23
55:4 71:24,25

---

**P**

**P.A.** 10:16

**p.m.** 4:1,4 70:8,11
95:24,25

**paid** 9:20,22

**pain** 34:14 40:16
74:11,12,17

**panel** 54:12 64:10

**paper** 34:21

**papers** 24:13 34:19

**parameters** 72:22

**part** 11:1 14:15
15:13 42:23 48:7,19
64:2 77:23 82:4
85:17 92:18

**pass** 53:21

**passenger** 27:4,5
72:24

**past** 10:22

**pathologist** 23:9,11

**pathologists** 23:7

**pathology** 12:19
21:21 23:10

**patient** 14:7 40:14
84:7 87:21



pavement 45:15

PDF 95:15

peak 75:18

pediatric 22:19

peer 24:10,11,15

peer-reviewed 16:25

Pennsylvania 22:4, 9,12

people 20:24 28:18 30:13,16 31:8,12 33:12,25 36:7,10,18 37:6,19,25 40:24 74:3 82:15 85:14 87:3,22

percent 6:9,10 10:23 11:7 31:5,15 40:23 68:6 74:3

percentage 10:19 11:10,11 18:20 62:4

perform 13:24 14:3 25:2,5 26:5 48:17 55:21

performed 56:9 72:15 91:9

period 73:1,2

periodically 21:23

persist 27:24

persisting 88:3

person 28:9 29:3 31:21,25 33:17 34:3 35:7 38:10,11,12 40:14 73:11,24 79:17 80:1 81:24 82:3,10,20 86:7

person's 79:24

perspective 39:22 91:12

pertaining 16:25

Ph.d. 5:18 12:9 15:7 23:15

Phd 4:21

phone 15:23 29:21

photograph 49:21 54:3,5

photographs 61:19 65:6

physical 6:21 45:22 51:24

physicians 5:18

physics 11:25 49:7

pickup 27:1

picture 53:8,22 64:11

pictures 26:10 51:25 52:4 53:21 58:7

place 4:6 13:8 60:7

places 5:11

plaintiff 11:14 44:2

plaintiffs 11:11

planet 36:19,20

plausible 81:19

point 26:12 27:16,17 32:12 33:10 39:4 40:9,14,19 43:6 45:9 46:15 59:11 63:3 68:7 79:19 89:13 94:23

points 30:3

police 42:18 46:1,2, 4,8,10,23 51:12 58:7 60:8,11 61:5 71:16

population 30:13 34:4 35:13 36:19 37:6 40:2

portion 53:4 64:18

position 21:20 58:4, 6 81:11 82:8 85:6 95:1

positioning 58:2

possibility 78:23

postdoctoral 12:19

potential 29:3 32:8 89:20 94:20

pounds 57:7

power 29:24

practice 13:8,10 14:19

practiced 12:6

pre-crash 58:3,6

pre-impact 42:22

preceding 74:8

precise 63:4

precisely 28:5

prefer 29:20

premature 44:7

preparation 79:21

presence 41:13

present 16:24 19:2 36:5 89:14

pretty 8:2 31:18,25 32:14 57:9 83:22 95:12

previous 92:14

previously 34:7,11 84:8

primarily 6:6 8:15 65:9

principal 58:15

principles 28:4 29:13

prior 8:23 36:6 37:25 42:21 57:16 92:21

privileges 13:22

probabilities 39:13

probability 27:14, 16 31:15 35:10 37:20,23 38:7,11 40:18 78:4 82:23 83:1,9 84:13

probable 39:22 85:10

problem 7:5 27:24 35:15 39:9 83:23,24

problems 32:15 39:5,7 85:15

proceed 4:25

produce 50:1 56:18 80:6

produced 49:12 51:18 55:18 63:20 64:1

professor 5:17 15:10

program 5:18 10:25 12:10,12,14 15:7 17:24 42:5,7 46:7 47:6 49:14 56:10,19, 22,23 57:12 61:15

projecting 35:25

promise 26:1

protruding 87:1

provide 9:17 25:19 46:22

provided 60:6 61:15 84:8,9 91:17 92:15

providing 90:5

proximate 89:10

proximity 33:6

public 12:8 17:8

publications 16:24 18:2 24:4,6,7,9,15 28:13,15,25

published 28:6,9,10 34:21

publishing 16:23

pull 11:16

pulled 73:1

pure 54:22 55:4

purposes 42:2 44:1 84:15

purview 5:25

put 42:16 47:1 48:22 49:5 51:2 55:21 56:25 58:20 60:24 65:19,21

puts 66:11

putting 78:20

### Q

qualifies 93:9

quantified 41:20

quarter 52:22 54:11,12 64:10

question 8:12 10:9 21:10,12 22:6 25:17, 18 32:11,20 33:5,9, 14,15 36:11 37:9 38:19 39:3 68:23 69:4,5,8,15,23 86:10 89:22 93:25 94:2,13

questioning 93:10

questions 26:3 44:7 88:18 93:4 94:5 95:6

quick 93:4

quickly 90:13

quote 74:5

### R

R-A-W-S-O-N 9:5

radiological 91:23

radiologist 91:18

radiologists 91:24 92:3

railroad 45:7 59:15

ramp 49:7

range 55:9 65:17,18 66:13,16

rate 56:11,12,14 60:24 76:20

ratio 31:11

raw 92:18

Rawson 9:5

reach 40:4 42:3

reaction 55:18 61:4

read 19:15 69:8,15, 21 78:19 95:8,9

reading 45:14 91:18,24



**ready** 70:15

**realm** 80:20,24 86:3

**rear** 32:7 48:16
49:17,23,25 50:1,19
51:20 52:17,18,19,
21 53:23 54:11,12,
15 55:20 57:25
58:11 61:20,23
62:18,22,23 63:7
64:22 67:9,21 68:5,6
70:17 71:4 72:21,24
73:7 75:6 78:11 80:5

**rear-end** 74:9

**reask** 69:24

**reason** 59:23 66:7
69:5

**reasonable** 37:22
59:22 88:24

**recall** 20:3 26:17
45:14 91:20

**receipt** 92:16

**receive** 6:12,15
22:18

**received** 9:4 94:22

**receiving** 43:22

**recess** 70:9

**recognition** 32:5

**recognized** 30:3

**recollection** 19:10,
11,23 46:18

**recommendation**
36:6

**reconcile** 31:7

**reconstructed**
41:23 66:25 73:1

**reconstruction**
14:25 23:13,18,22
24:1 25:11 41:21
42:2 51:8 90:15
91:10

**reconstructionist**
52:10 56:7 59:22

**reconstructionists**
66:23

**record** 4:3 5:5 19:16
26:10 70:8,11 72:14
95:22,24

**records** 8:15 26:7,10
61:9 81:2 86:15,19
91:17,21,23

**redepose** 43:24

**reference** 34:17

**referenced** 34:19

**referring** 20:19
43:5,8 60:17 86:22

**regard** 14:17,25
45:10,19 55:7,22
56:14 61:8 64:17
65:12,16 67:3,13
70:18 73:10 83:1
89:23 92:6

**regular** 95:15

**related** 12:10 22:20
81:18 87:12 89:12
90:25 92:7

**relation** 58:6

**relationship** 30:7,9
32:10 85:18 87:20

**relative** 32:18 79:11

**reliable** 51:14

**relied** 46:12

**remainder** 10:24
28:21 61:2

**remember** 20:3
78:20

**remembered** 75:23

**render** 74:7

**rendering** 88:1

**renew** 92:13

**rephrase** 55:8 68:16

**report** 9:15 10:1
11:16,18 21:16
24:17 26:14 34:5
36:16 44:23 51:12
55:12,22 58:7 60:9,
11 61:5 73:24 74:19,
21 75:2,14 78:20
84:5 85:16 86:22
87:25 90:5 91:16

92:9 94:25

**reported** 42:18
71:16

**reporter** 4:19 9:9
69:8,15,16,21 95:12,
16,18

**reports** 21:25 94:17

**represent** 34:4

**representative** 47:6

**represented** 61:5

**request** 22:15,17
92:14

**requested** 15:12

**require** 19:4 35:8
85:22

**required** 13:14
23:15 38:1

**requires** 37:1 88:2

**rescinded** 20:21
21:1,13

**research** 5:12 6:3
20:23 21:4 87:19

**reservation** 44:12

**reserve** 43:23 88:16

**restrained** 73:4

**restricted** 19:12

**result** 38:19 41:8
47:4 57:1 62:9 75:6
87:14

**resulted** 67:8 81:20

**retainer** 7:19

**retrieval** 66:9

**review** 26:20

**reviewed** 24:10,11,
15,22 79:3 86:16

**reviewing** 9:15

**revise** 78:16

**risk** 30:21 32:18
33:11 34:12,24
35:14 36:14 38:20
39:11,24,25 40:1
67:20 68:2 70:16

71:3,6 78:4 83:15,16
90:20

**risks** 32:21

**road** 56:18 94:18

**roadway** 26:24 43:7

**Robert** 4:16 20:6
69:2,9 93:17

**rotations** 12:24

**rotator** 33:1 83:1

**roughly** 47:7

**run** 5:18 25:23

**Ryan** 4:14 44:10,11
92:23,24 93:21,25
94:1 95:10,18

_____

**S**

**Safety** 18:8

**Salem** 4:1,5

**sample** 34:18 71:11

**samples** 71:15

**Sampling** 71:10

**satisfied** 65:23 66:1

**satisfies** 66:2

**scatter** 66:23

**scene** 24:25 71:17
72:13

**schedule** 7:19,22

**scheduled** 8:7

**school** 12:2,7,22,24
13:2,5 15:11,17
23:18

**science** 11:25 15:11

**scientific** 12:15
24:4,6,12

**scientist** 13:15

**screen** 16:9,12

**search** 72:23

**seat** 79:21 82:15

**seatbelt** 73:6 81:8,
10,13,23 82:3,7,11,

14 94:16,20 95:2

**secondary** 80:12

**section** 24:17 74:19,
21 75:1,2 86:21
87:24

**seek** 36:6

**selectively** 73:3

**semi-tractor** 27:2

**sense** 32:3 45:10,19
46:19

**sensor** 76:15,16

**serves** 78:14

**Services** 12:23

**set** 4:6 12:25 29:11,
12 57:16,17 58:4

**severe** 73:25

**severely** 65:7

**severity** 41:20,22
63:1 70:24 73:16
83:17

**shaken** 22:23

**shape** 76:15

**sheets** 90:18

**shoulder** 27:23,25
32:2,15,16 34:13,14,
20 35:14 36:3,5,25
37:2 39:23 40:22
74:10,13,17 80:6
81:3,7,18,19 82:4
83:21,25 89:24 92:3

**shoulders** 36:9

**showed** 45:22 66:10

**showing** 38:11

**shows** 49:21

**sic** 14:6

**side** 54:3,7 64:11

**signed** 7:19

**significant** 53:18,19
54:15 70:23 73:21

**signing** 23:3

**similar** 25:6



**simulate** 47:11,13 59:3 62:16

**simulated** 65:25

**simulation** 48:20, 21,22 49:13 55:13 56:25 57:20 58:4 60:24 61:10 62:9,10, 24 65:17 67:8

**simulator** 42:5,7 47:3 49:11

**simulators** 47:11

**single** 72:24 73:7

**sir** 5:4,8 6:12 7:22,25 11:16 15:19 19:22 20:18 25:15 37:12 41:17 48:5 70:13 72:20 74:20

**sitting** 27:20 63:10

**sizable** 50:3

**size** 36:16

**skull** 73:20 87:2

**slap** 33:23

**sliding** 45:15

**slow** 26:2

**slowed** 59:24

**slowest** 60:23

**small** 32:17 73:17

**smash** 50:5

**Society** 18:6

**sofa** 27:20

**soft** 80:22

**somebody's** 33:20

**sort** 12:1 32:9 33:23 38:2 42:11 77:16

**sound** 25:13

**source** 56:21 84:17

**Southeast** 4:5

**spattering** 12:1

**speaking** 76:7

**specific** 17:16 78:2 82:22

**specifically** 5:22 72:2

**specification** 72:4

**specifications** 57:11 77:13,24

**speculate** 59:20

**speculative** 90:21

**speed** 26:16 32:2,7 42:3,7,11,16,19,22 45:24 46:8,13,24,25 47:3,8 48:22,23 49:20 50:18 51:7,15, 18 52:1,5,6 55:7,9, 12,14,15 57:19 59:6, 7,24 60:3,8,11,12,13, 15,20,23 65:20 66:5 68:5 71:4 73:12 75:6 76:4,17,20,21 77:20 78:13,19,24

**spell** 5:5

**spent** 12:13 84:5

**spinal** 73:21 87:2

**spine** 34:13 40:21 71:1 75:2,5

**spit** 56:25

**spontaneously** 31:13 34:13 35:14 41:6

**spurious** 30:9

**standard** 7:21 16:5 27:6

**standpoint** 14:9 34:2 36:19 39:17,19

**stands** 23:24

**Stanley** 91:18,19

**start** 10:1 42:11 51:7 57:18,20 59:8,18 83:9

**started** 11:22 12:3 15:10 46:17 58:21, 25 60:23 86:1

**starting** 26:13 46:15 52:5,6 59:11 63:3

**starts** 79:15

**state** 4:8,16 5:4

13:25 14:2 15:7 17:10,12 18:12 20:20 23:20 39:24 91:18

**stated** 28:17 45:8 60:12

**statement** 42:20 46:12 59:8

**states** 4:10 12:5,25 13:9 14:19 17:8 36:21 37:6 68:7 75:16

**statistic** 31:7

**statistical** 32:23 34:1 35:10 39:17,19, 24

**statistically** 35:7 39:25 40:1 74:17

**statistics** 85:7

**status** 73:4

**stay** 78:18 80:13

**staying** 93:21

**steering** 79:4,7,16, 23,25 80:3,4,8,10,13, 14 82:5,15

**step** 85:20,23

**steps** 85:21

**stop** 45:11

**stopped** 58:23

**story** 62:16

**straightforward** 83:22

**strapped** 81:8

**Street** 4:5

**stricken** 18:23 21:5, 9

**strike** 69:22

**stronger** 84:3

**struck** 51:17 58:24 79:9,14 89:17

**studying** 5:19

**stuff** 23:7 44:6

**subfolders** 8:12

**subject** 25:16 33:7, 18 74:23 87:13

**subpoena** 6:12

**subscapularis** 33:2

**substantially** 38:22 60:14 62:24 75:8,20

**sudden** 80:6,7

**suffer** 73:25

**suffered** 39:20

**suffering** 83:1

**suggesting** 74:16

**supply** 43:20

**support** 28:15 90:24

**supported** 29:8

**supposed** 76:5 84:25 92:20

**surgeries** 13:24

**surgery** 14:3 27:25 32:16 34:14 36:3,7,9 37:2 40:24

**surgical** 38:2 41:3 83:24

**surprised** 31:22

**susceptible** 41:6,7 87:3

**sustain** 30:14 31:9 65:3 73:11,19 74:1 82:20

**sustained** 31:21,24 32:16 33:23 53:7 65:7 73:15 74:3 81:18 82:22 83:10, 18 89:16,21

**swear** 4:19

**Sweden** 12:14,16 14:12,18

**sworn** 4:22

**Sylvia** 4:5

**symptomatic** 87:3, 9,21 88:10

**symptoms** 27:23

38:24 40:9 41:1,6,8, 11 85:25 86:14 87:23 88:4 89:7,10, 13 91:1

**system** 47:1 51:2,22 53:22 62:7 71:11

**systematic** 56:16,18 90:17

**systematically** 56:20

---

**T**

**tails** 45:21

**takes** 6:7

**taking** 23:21 52:10 59:7

**talk** 20:2 29:2 36:20 41:16

**talked** 84:20 93:13 94:8

**talking** 27:8 39:12 48:11 63:9,18 66:24 68:14 83:6,7 84:23, 24

**talks** 78:4

**Tanney** 10:15

**taught** 15:16

**teaching** 10:25 11:1

**tear** 33:23 83:2

**Ted** 21:3

**teeny** 16:9,11 40:23

**telling** 19:18 30:3 75:11 77:2

**tells** 49:15 52:15 54:17

**temporal** 33:6 85:18

**temporally** 89:10

**tendon** 33:23

**tenured** 5:17

**terms** 53:18 63:12 65:20

**terribly** 69:25



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH

Index: testified..Wood's

**testified** 4:22 76:25 81:24

**testify** 18:13,23

**testifying** 19:11

**testimony** 8:2 18:16,22 19:3,11 21:5,6,8 22:24 23:2 44:22 51:13 53:7 60:21 78:9,17 79:3 81:16

**testing** 25:2,6 75:12 92:17

**Texas** 20:20

**theoretically** 76:19

**therapeutic** 85:3

**thing** 7:24 16:2,6,8 17:18 41:19 49:10 54:17 56:10 77:16 83:12

**things** 25:21 26:16 43:25

**thinking** 43:19

**thought** 44:3 57:23 84:16

**thousand** 30:13,22 37:13

**threatening** 74:6

**three-point** 73:6

**thrown** 82:2

**thumb** 94:24

**time** 4:4,6 7:5 12:13 16:24 21:24 23:6,19 24:1 25:22,23 27:16, 17,20 32:12 33:11 39:4 40:9 41:15 59:4,13 66:24 70:8, 11 79:5 81:15 82:16 84:6 85:15 89:14 94:16 95:24

**times** 18:17 21:6

**timing** 86:14

**tiny** 16:11 40:23

**tissue** 80:23

**today** 6:21 7:4 8:5

9:17 92:12,21 94:19

**today's** 4:4 6:13

**told** 18:11,23 19:3 94:23

**top** 10:5 53:9 68:6 73:13

**topic** 34:16

**tore** 54:21

**Torke** 84:8,9,16,20, 24

**Torke's** 84:6 91:14

**torn** 33:1,22

**torso** 81:22

**total** 6:4 9:19,22 14:11

**touching** 52:23

**towed** 71:17

**tracks** 45:7 59:15

**traction** 80:6,7,9

**traffic** 12:10 22:20 23:17,25 34:20

**trailer** 27:2

**trained** 14:6 23:10

**training** 11:23 12:11,20 14:11,12, 13,17,22 15:5 16:22 18:2,4,5,8,9,10 23:12,16,21,22 95:1

**translate** 75:20

**Transportation** 18:7

**trauma** 15:13 31:2, 18 32:16 33:8 34:15 35:17,22 38:25 41:2 87:14

**traumas** 31:20

**travel** 48:24 59:24 60:15,25

**traveling** 42:8 45:25 50:20 51:15 60:2,22

**treated** 33:4

**treatment** 36:6

**tremendous** 51:19 52:24

**trial** 84:15

**trouble** 65:16

**truck** 26:19 27:1 57:21

**trunk** 54:16 63:14 64:17,24 65:3,12

**tube** 64:3

**TUESDAY** 4:1

**turned** 20:22 43:25

**type** 7:14 23:12 25:2, 5 26:5,17 35:8 39:17 48:17 65:3 71:13 72:4 80:16,17,25 85:8 94:15

**types** 42:10 43:3 80:20 82:19

**typical** 66:16 73:10

**typically** 11:11,12 14:16 22:19,22 43:7 49:13 57:12 77:21 79:17

---

## U

**unable** 25:13

**uncertainty** 56:14

**undergo** 15:4

**underlying** 71:19

**underride** 47:14,16 71:21,22,25

**understand** 18:16 25:15,18,19 39:15 45:18 86:11

**understanding** 19:6,24 46:6 76:2

**underwent** 14:18

**United** 4:10 12:25 13:8 14:19 36:21 37:6 68:7

**University** 5:13,16 11:24 12:4,23 15:8, 11 17:7,10,11 23:17

**unnecessary** 25:10

**unpaid** 21:20

**upper** 33:9 78:14,21

**UPS** 19:16

**USB** 9:4

**utilized** 55:14

---

## V

**values** 43:12 90:19

**variables** 50:14 72:7,15,19

**vast** 63:11

**veh** 89:17

**vehicle** 26:17,22,25 27:4,5 42:21 43:3 44:19 45:5,7,11,13, 17 46:18,22,24 48:23 49:5,6,18 50:6,18,19,20 51:15, 17,19 52:14,15,17, 18,22,25 53:4,5,8,12, 23 54:3,6,7,10 57:6, 8,10 58:4,18,20,23, 24,25 59:10,13 61:3, 13,16,17,20,23 62:2, 3,6,22,23 64:2,23,25 66:10,11,22 71:17 72:25 73:8 75:13 76:1,4,11,17,20 77:12,13,22,23 78:2 79:11 80:3 81:8 89:17,18

**vehicle's** 49:23

**vehicles** 25:3,6,7 27:7 42:8,10 48:23 52:11 57:2,3,6,16,18 58:2,6,6 63:25 72:12, 24

**velocity** 76:7,8

**versus** 27:16 31:3 82:18 83:19

**video** 4:7 15:22 16:7

**view** 64:11

**viewpoints** 29:11 30:6

**virtual** 42:5,6 43:13 47:13

**virtually** 31:3

**visit** 24:25

---

## W

**wait** 37:17 49:19 60:1 67:16

**waive** 95:9

**Walk** 26:11

**walking** 36:7 87:22

**wanted** 88:14

**warrant** 88:7

**waste** 95:13

**ways** 59:14

**wearing** 73:6 82:11, 13 94:16

**weight** 26:21 57:10 77:16

**weighted** 57:6

**weights** 27:5,6 57:4

**weird** 16:7 38:21

**Western** 12:4 17:8

**wet** 43:7

**wheel** 79:5,7,16,18, 23,25 80:3,4,8,10,13, 14 82:5,16

**Wheels** 49:1,4,6 57:14

**wide** 77:15

**wild** 32:1

**WL** 19:17 20:9,14

**woman** 32:14 34:12

**women** 36:21,24 40:20

**Wood** 9:5,12 31:25 56:16 90:15 94:14, 22

**Wood's** 90:10,14,24 92:7 94:19



JENNIFER FARLEY vs STATE FARM
MICHAEL FREEMAN, MEDDR, PH.D., MPH

**Woods** 63:18 91:3

**word** 9:3

**work** 6:8 8:2 9:20
10:21 11:8,10,11,13
12:13 26:15 48:25
92:23

**worked** 10:11

**working** 22:13
23:19 44:2

**works** 47:3

**worry** 87:21

**worsening** 87:15

**Worthiness** 71:11

**write** 21:16

**written** 7:14 8:8,9
28:13,16,18,21 94:7,
25

**wrong** 32:25 55:4
56:21 90:16,18

**wrote** 15:15 67:14

---
**Y**
---

**year** 22:16 25:7
35:15 36:1 39:8

**years** 10:22 11:23
12:7,18,20 13:1,3,4,
6 14:11 15:17 87:20

**yields** 79:22



**Orange Legal**
**800-275-7991**