Exhibit "C"

# In the Matter of:

Jennifer Farley

vs.

State Farm Mutual Automobile Insurance Company

## ALAN J. GRAVES, M.D.

*March 28, 2019*



www.OrangeLegal.com

800-275-7991

Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.

1                   UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
2
                  CASE NO.: 8:18-cv-00171-JSM-MAP
3
    JENNIFER FARLEY,
4
          Plaintiff,
5
    vs.
6
    STATE FARM MUTUAL
7   AUTOMOBILE INSURANCE,
    COMPANY, a foreign corporation,
8
          Defendant.
9
    _____/
10
    VIDEOTAPED
11  DEPOSITION OF:      ALAN J. GRAVES, M.D.

12  DATE:              THURSDAY, MARCH 28, 2019

13  TIME:              4:11 P.M. - 6:13 P.M.

14  PLACE:             37026 U.S. HIGHWAY 19 NORTH
                       PALM HARBOR, FLORIDA 34684
15
    STENOGRAPHICALLY
16  REPORTED BY:       VICTORIA S. FRICANO, RPR

17

18

19

20

21

22

23

24

25



**Orange Legal**
**800-275-7991**

```
 1  A P P E A R A N C E S:

 2  RYAN D. BRESLER, ESQUIRE
    OF: TANNEY, GRIFFITH & BRESLER, P.A.
 3      29605 U.S. HIGHWAY 19 NORTH
        SUITE 210
 4      CLEARWATER, FLORIDA 33761
        (727) 781-8817
 5      RYAN@TANNEYGRIFFITHLAW.COM
        APPEARING ON BEHALF OF THE PLAINTIFF
 6
    ROBERT N. BELLE, JR., ESQUIRE
 7  OF: DSK LAW
        332 NORTH MAGNOLIA AVENUE
 8      ORLANDO, FLORIDA 32801
        (407) 992-3556
 9      RBELLE@DSKLAWGROUP.COM
        APPEARING ON BEHALF OF THE DEFENDANT
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                      I N D E X

 2   TESTIMONY OF ALAN J. GRAVES, M.D.

 3        DIRECT EXAMINATION BY MR. BELLE...................5

 4        CROSS-EXAMINATION BY MR. BRESLER................86

 5   CERTIFICATE OF OATH.................................89

 6   CERTIFICATE OF DEPOSITION TRANSCRIPT................90

 7   ERRATA SHEET.......................................91

 8   NOTIFICATION LETTER................................92

 9

10                    INDEX OF EXHIBITS

11   DEFENDANT'S EXHIBITS

12   EXHIBIT  1.........................................8
     (Curriculum Vitae and Medical Records)
13
     EXHIBIT  2.........................................8
14   (Outside Medical Records)

15   EXHIBIT  3.........................................9
     (Office Notes)
16
     EXHIBIT  4.........................................9
17   (Compulsory Medical Evaluation)

18   EXHIBIT  5........................................15
     (Financial Records)
19
     EXHIBIT  6........................................49
20   (3/7/19 Office Visit Note)

21

22

23

24

25
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                      4

```
 1                         ------

 2               S T I P U L A T I O N S

 3       It is hereby stipulated and agreed by and between

 4   the counsel for the respective parties and the deponent

 5   that the reading and signing of the deposition

 6   transcript be reserved.

 7                         ------

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



**Orange Legal**
**800-275-7991**

```
 1                    P R O C E E D I N G S

 2                        * * * * * * * * *

 3          COURT REPORTER:  Do you swear or affirm that

 4      the testimony you're about to give will be the

 5      truth, the whole truth, and nothing but the truth?

 6          THE WITNESS:  I do.

 7                    ALAN J. GRAVES, M.D.,

 8  was called as a witness and, having first been duly

 9  sworn, testified as follows:

10                    DIRECT EXAMINATION

11  BY MR. BELLE:

12      Q.    Doctor, could you state your full name for the

13  record please and spell your last name?

14      A.    Sure.  Alan Joseph Graves, that's G-r-a-v-e-s.

15      Q.    And, sir, are you currently employed?

16      A.    Yes, I am.

17      Q.    What are you employed as?

18      A.    An orthopedic surgeon.

19      Q.    Okay.  And where are you employed?

20      A.    I practice out of Orthopedic Specialists in

21  Palm Harbor, Florida.

22      Q.    Okay.  And, sir, could you give me a little bit

23  of your academic background, please?

24      A.    Sure.

25            I attended University of New Orleans and
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                        6

1  received a master of science degree in 1982.  I went on

2  to attend Louisiana State University School of Medicine

3  from 1982 to 1986 and graduated with a medical doctorate

4  degree.  Following medical school, I attended

5  post-doctoral training at Alton Ochsner Medical

6  Foundation in New Orleans including two years of general

7  surgery residency from 1986 to 1988 and five years of

8  orthopedic surgery from 1988 to 1993.

9          Upon completion of my residency training, I

10  began my private practice here in Florida and received

11  my board certification from the American Board of

12  Orthopedic Surgeons in 1995.  I was recertified in 2005

13  and once again in 2015.

14      **Q.    Okay.  What are you board certified in?**

15      A.    Orthopedic surgery.

16      **Q.    Okay.  Do you have an area of the body that is**

17  **your specialty, or is it just general orthopedics?**

18      A.    I do general orthopedics, and I guess I have a

19  subspecialty interest in adult reconstruction which is

20  primarily hip, knee, and shoulder surgery.

21      **Q.    And you may have said it earlier, but where are**

22  **you employed at?**

23      A.    Orthopedic Specialists.

24      **Q.    Okay.  Is that the only place that you work**

25  **or --**



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                          7

```
 1      A.   That's where my practice location is.  Yes,
 2  sir.
 3      Q.   Okay.  Do you have any hospital privileges?
 4      A.   I do.  Currently, I just have privileges at
 5  AdventHealth in North Pinellas which is in
 6  Tarpon Springs.
 7      Q.   Okay.  I see that you have a number of pieces
 8  of paper in front of you; is that correct?
 9      A.   I do.
10      Q.   Okay.  And did you have an occasion to treat a
11  patient by the name of Jennifer Farley?
12      A.   Yes, I did.
13      Q.   Okay.  And are those records that you have in
14  front of you -- do they pertain to her medical file?
15      A.   They do, yes.
16      Q.   Okay.  If we could, could you go through the
17  stack of what you have over there --
18      A.   Sure.
19      Q.   -- and tell me what it is?  And I may stop you
20  as you're saying it just so that I can get the court
21  reporter to mark a specific thing, or I may -- I don't
22  know if it's easier to just include it as a single
23  composite item.  Why don't you start, and I'll make up
24  my mind as I go.
25      A.   Well, to begin with -- I have two packets here
```



 1  which include a copy of my CV, medical records on

 2  Jennifer Farley and radiographic records from my

 3  practice.  So --

 4      **Q.   Are they separate, or is one of them a copy?**

 5      A.   There's two separate copies.

 6      **Q.   Okay.  I just need to have one marked as an**

 7  **exhibit if we can.  That will be marked as Defense**

 8  **Composite Exhibit 1.**

 9      A.   Okay.  This is a -- if we don't need it, we'll

10  just put it aside.  I just brought one for each

11  attorney.

12      **Q.   Okay.  I'll take a copy if it's okay.**

13      A.   Sure.

14      **Q.   But I don't want to confuse the actual**

15  **evidence.**

16      A.   Okay.  I also have some outside medical records

17  here from attorneys Tanney, Griffith & Bresler which

18  includes some prior medical records from the past.

19      **Q.   Let me see that one.  We'll have this one**

20  **marked as Defense Composite Exhibit 2.  Let me just take**

21  **a look and see what these are.**

22          (Defendant's Exhibit Nos. 1 and 2 marked for

23  identification.)

24  BY MR. BELLE:

25      **Q.   Okay.**



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                      9

```
 1       A.   I have copies of all of my office notes of
 2  Mrs. Farley, and these are all the -- I'll just put them
 3  in order where I could refer to them easily -- including
 4  my operative report.
 5       Q.   Okay.  Can we mark this as, I guess, Defense
 6  Composite Exhibit 3?
 7       A.   Can I use them during --
 8       Q.   Yeah.  I'll give them back.  I just want them
 9  marked.
10       A.   And this goes with this one.
11            And then the final thing I have, Mr. Belle, is
12  a compulsory medical evaluation on Mrs. Farley and a
13  supporting document regarding that examination.
14       Q.   Okay.  I guess we'll have this marked as
15  Defense Composite Exhibit 4.
16            Before we get started on this, I just wanted to
17  ask --
18            (Defendant's Exhibit Nos. 3 and 4 marked for
19  identification.)
20  BY MR. BELLE:
21       Q.   Can I see Composite Exhibit 4?  Thank you.
22            Okay.  You indicated that -- when was the first
23  time that you met Mrs. Farley?  And I don't want to keep
24  your records from you.  So this will make it easier for
25  you.
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                    10

```
 1     A.   Yeah.  This will help us get out of here today.

 2          My first meeting with Ms. Farley was on

 3  May 9th, 2016.

 4     Q.   Okay.  And you received a compulsory medical

 5  exam; is that correct?

 6     A.   Yes, sir.

 7     Q.   When did you receive that?

 8     A.   I think I just received it in the last week.

 9     Q.   Okay.

10     A.   They may have been within the last couple

11  weeks.

12     Q.   Okay.  Did you receive that CME report with any

13  type of correspondence?

14     A.   It was along with the information that

15  Mr. Bresler's office had sent.

16     Q.   Okay.  Have you had any previous conversations

17  with Mr. Bresler's office --

18     A.   Yes, I have.

19     Q.   -- regarding this file?

20          How many times have you spoken or communicated

21  with his office?

22     A.   Probably two, maybe three.

23     Q.   Okay.  Was it with Mr. Bresler, or was it with

24  somebody else from his office?

25     A.   With Mr. Bresler.
```



**Orange Legal**
**800-275-7991**

Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                        11

```
 1       Q.    Okay.  And do you recall the substance of your

 2   first conversation with Mr. Bresler?

 3       A.    Not the first.  We just met briefly before

 4   today.  And as I said, we may have had a phone

 5   conversation, but I'm not sure on that.

 6       Q.    Was when you spoke with him the second time,

 7   when was that?  Are you counting today?

 8       A.    Today, yes, sir.

 9       Q.    Okay.  Was there any reason given to you why

10   the CME report was provided to you?

11       A.    No.

12       Q.    Okay.  Did you review that report in

13   preparation for today's deposition?

14       A.    Yes.

15       Q.    Okay.  And why did you decide to review that

16   report?

17       A.    Well, it was included with a packet of past

18   medical records.  And for completeness, I went through

19   everything.

20       Q.    Okay.  After reviewing that CME report, any of

21   your opinions changed?

22       A.    No.

23       Q.    Okay.  Do you, by any chance, have a case list

24   of cases that you've testified -- cases -- have you ever

25   given a deposition before?
```



**Orange Legal**
**800-275-7991**

Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                 12

```
 1      A.    Yes.
 2      Q.    Okay.  Do you have a list of cases that you
 3   have provided or done a deposition in, in the past?
 4      A.    No.
 5      Q.    Okay.  Is that something that you don't keep in
 6   the ordinary course of business?
 7      A.    Correct.
 8      Q.    Okay.  Have you ever testified in a trial?
 9      A.    I have.
10      Q.    Okay.  How many times?
11      A.    Maybe two or three.
12      Q.    Okay.  And in those two or three times that
13   you've testified in a trial, were you testifying on
14   behalf of a plaintiff?
15      A.    Testifying on behalf of a patient.  Yeah.
16      Q.    Okay.  Well, did that patient that -- the
17   patient that you have happen to be a plaintiff in a
18   particular case, those three instances?
19      A.    Probably.  I know at least in one or two.  Yes.
20      Q.    Okay.  Do you do any type of medical consulting
21   work?
22      A.    Such as?  Can you be more specific?
23      Q.    Do you perform any type of compulsory medical
24   exams or independent evaluations for people?
25      A.    I performed one or two independent medical
```



**Orange Legal**
**800-275-7991**

Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                                    13

```
 1   exams in the past, but that's not a typical part of my
 2   practice.
 3       Q.   Okay.  Are you typically retained as an expert
 4   witness in cases, or are you typically -- are you
 5   typically testifying as just a treater?
 6       A.   As a treating physician.
 7       Q.   Okay.  Now you've got some records here today.
 8   Did you bring your billing records today?
 9       A.   No, I didn't.
10       Q.   Okay.  And did you receive a subpoena telling
11   you what items that you were supposed to bring today?
12       A.   I'm sure I did.
13       Q.   I have a copy of some billing records.  I'll
14   have him look at them first.  I see that you have your
15   computer out in front of you.
16       A.   Yes, sir.
17       Q.   Is that something that you'd be able to access
18   on your computer?
19       A.   Billing records?
20       Q.   Yes.
21       A.   No.
22            MR. BELLE:  Do you want to take a look before I
23       show them?
24            THE WITNESS:  I'm sure they could probably be
25       accessed in here, but I don't --
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                          14

```
 1  BY MR. BELLE:
 2      Q.   I'll show them to you.
 3      A.   That's not something I typically do.
 4           MR. BRESLER:  This seems like a lot more than
 5      six pages, but it looks like it's two --
 6           MR. BELLE:  Is it two sets?
 7           MR. BRESLER:  Yeah, I think so.
 8           MR. BELLE:  I'll just flip through the last
 9      page, then.
10           Man, it's warm in here.
11           All right.  So there's just two copies in here.
12      I just wanted to make sure so that --
13           MR. BRESLER:  No.  No.  You're fine.
14  BY MR. BELLE:
15      Q.   Can you take a look at these, sir, please?
16      A.   Okay.
17      Q.   All right.  You've looked at those records, and
18  you've had an opportunity to review them.  Do you
19  recognize them?
20      A.   I'm familiar with them.  Yes, sir.
21      Q.   Okay.  What do you recognize them as?
22      A.   Basically, the charge sheet, I would say, for
23  the care that we've provided for Ms. Farley.
24      Q.   Okay.  And based upon these bills, do you know
25  what the total amount billed to Mrs. Farley was to date
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                    15

```
 1    from your facility?

 2            MR. BRESLER:  Form.

 3            MR. BELLE:  I'll rephrase.

 4    BY MR. BELLE:

 5        Q.   Do you know to date what has been billed to

 6    Mrs. Farley?

 7        A.   No.

 8        Q.   Okay.

 9        A.   And these only go up to May 25th, 2018.

10        Q.   Okay.  So there's additional billing records?

11        A.   I believe so.  Yes.

12        Q.   Okay.  But these records would encompass the

13    time frame in which she had her shoulder surgery?

14        A.   I believe her shoulder surgery was after that

15    period of time.  Let me see.  I stand corrected.  The

16    surgery -- yes, the surgery is on here.

17        Q.   Okay.

18        A.   5/25/18.  Okay.

19        Q.   Does your office or your facility -- let me

20    see.  I'll have this marked as Defense Exhibit 5.

21            (Defendant's Exhibit No. 5 marked for

22    identification.)

23    BY MR. BELLE:

24        Q.   Does your office operate under letters of

25    protection?
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                    16

```
 1     A.   Not typically.
 2     Q.   Okay.  And so, typically, how does your -- so
 3   your office collects direct payment from your payments,
 4   or do you take liens out on your patients?
 5     A.   Usually they sign a promise to pay --
 6     Q.   Okay.
 7     A.   -- I guess you'd call it.
 8     Q.   Okay.  So they sign a promissory note.  Does
 9   that promissory note indicate that if they make some
10   sort of recovery in the case that they got to pay you
11   out of that recovery?
12     A.   I don't -- I'm not that familiar with it to
13   answer that.
14     Q.   Okay.  Who in your office is familiar with how
15   you guys do your billing?
16     A.   Our office manager.
17     Q.   And what is that person's name?
18     A.   Lynette Parrish.
19     Q.   And if one of your patients doesn't pay their
20   bill, do you guys send that to collection, or do you try
21   to go to court and collect on it?
22          MR. BRESLER:  Form.
23          THE WITNESS:  I mean, it depends on a lot of
24     different things.  Some are sent to collections.
25   BY MR. BELLE:
```



 1      Q.   All right.  Now, I know that there was a --

 2  that you indicated a few minutes ago the first time that

 3  you saw the patient in the case was -- was it May --

 4  could you tell me the date again?  May 9th, I believe.

 5      A.   May 9th, 2016.

 6      Q.   Okay.  And when the patient came to see you,

 7  did she already have some diagnostic studies performed?

 8      A.   Yes.

 9      Q.   Okay.  Can we go through some of those

10  diagnostic studies?  And I'm going to ask you a couple

11  questions about it.

12           Do you have a diagnostic study dated 5/4/16

13  related to the lumbar spine?

14      A.   I don't have that in front of me, but I did

15  review that.

16      Q.   Okay.

17      A.   I think it's in one of the displays that I gave

18  you, Mr. Belle.

19      Q.   I want to give it back you to.  I don't want

20  you to be at a deficit.  I think this is the other one.

21  I don't see anything else over here.

22      A.   I do have some here too.  Yes.  Sorry.  A lot

23  of paper.

24      Q.   No.  It's fine.  I'm having the same problem as

25  you keeping them in order.



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                              18

```
 1      A.    Shuffling papers.

 2            So what I have here is --

 3      Q.    I'll just go in the order of what you have.  So

 4   what's the one you have first, besides the shoulder?  I

 5   want to do the other ones first.

 6      A.    This is emergency room records from Mease

 7   Countryside Hospital.

 8      Q.    Okay.  There's -- that's also what I'm looking

 9   at.  So it's labeled at the top "Final Report"?

10      A.    No.  That's, I think, included in here.  This

11   is the physician -- doctor notes.  It says "emergency

12   room" --

13      Q.    Got you.  Got you.

14      A.    I actually -- these were the pertinent

15   documents from the emergency room records and --

16      Q.    What did you review from the emergency room?

17      A.    Well, I looked through all the notes.  But this

18   particular stack of notes here is, you know, things like

19   instructions to the patient upon leaving and, you know,

20   that sort of thing -- don't really have any bearing on

21   what we're talking about --

22      Q.    Okay.

23      A.    -- at least I don't believe they do.

24            But the pertinent information is, you know,

25   this is when she presented to the emergency room on
```



1  May 4th, 2016, and the initial intake from the

2  physicians that evaluated her, X-rays that were

3  performed at the time of that evaluation.

4      Q.   Okay.  What was the first X-ray that -- did you

5  review the X-rays themselves or just the notes?

6      A.   Just the report.

7      Q.   Okay.  What was the first portion of her body

8  that was x-rayed that you reviewed?

9      A.   Well, according to this, the first one listed

10  is lumbar spine.

11     Q.   Okay.  And what were the clinical findings as

12  it related to her lumbar spine?

13     A.   The impression was no acute radiographic

14  abnormality of lumbar spine.

15     Q.   What does that mean?

16     A.   It generally means that they didn't see

17  anything fractured or dislocated or anything along the

18  lines of acute trauma such as that.

19     Q.   Okay.  What was the next one that you reviewed?

20     A.   The next was a cervical spine series, and that

21  included five views of the cervical spine.  The

22  impression was straightening of the cervical spine,

23  which could be secondary to pain or spasm, and no

24  evidence of fracture or dislocation.

25     Q.   Could the straightening of the cervical spine



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.

20

```
 1   also be the result of somebody's -- just normal

 2   positioning?

 3       A.   Not typically.

 4       Q.   Okay.  Could straightening of the cervical

 5   spine also just -- could that also result in the way the

 6   person is positioned on the X-ray machine or what type

 7   of X-ray machine is used?

 8       A.   I mean, that's one of those things like you

 9   could hold your neck straight.  Sure.

10       Q.   Okay.  But was the final -- what was the final

11   impression as it related to the X-ray of the cervical

12   spine?

13       A.   The radiologist reported there was no acute

14   radiographic abnormality of the cervical spine.

15       Q.   Okay.  So when it says "no acute radiographic

16   abnormality," does that usually mean that it's --

17   there's no abnormality found in the study related to

18   trauma?

19       A.   No.

20       Q.   Okay.  What does it mean when they say "acute"?

21       A.   What they're implying is that they don't see a

22   fracture or dislocation.  They typically will mention

23   things like soft tissue swelling in the spine that may

24   indicate a more occult injury.  Even though there's not

25   a fracture, they may see a soft tissue plane that's
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                    21

```
 1   abnormal or something.
 2       Q.   But there's nothing in here to suggest that
 3   there was a soft tissue abnormality observed on these
 4   scans?
 5       A.   They didn't report any.  Correct.
 6       Q.   Okay.  What was the next radiographic study
 7   that you reviewed?
 8       A.   The next one was the humerus, and the
 9   indication's left arm pain.  And they reported there are
10   no acute osseous abnormality which, once again, is
11   radiology talk for no broken bone or dislocation.
12       Q.   When it comes to a -- for the purpose of the
13   jury, could you tell them what part of the body the
14   humerus is?
15       A.   Sure.
16            The humerus refers to the upper arm bone
17   between your elbow and your shoulder.
18       Q.   Okay.  And there was no acute -- what is
19   osseous abnormality?
20       A.   Osseous refers to bony.  It's just another way
21   of saying bony.
22       Q.   Okay.  So there was no fundamental structure
23   issues with her arm from her -- with her left arm from
24   her elbow up to basically the shoulder?
25            MR. BRESLER:  Form.
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                22

```
 1          THE WITNESS:  You can't say no fundamental.

 2     No --

 3          MR. BELLE:  Okay.  I'll rephrase.

 4  BY MR. BELLE:

 5     Q.   So there was no -- there was nothing on the

 6  radiographic study that indicated any type of

 7  abnormality from the area of her elbow where you pointed

 8  up through the left shoulder based upon the scan that

 9  was conducted here.

10     A.   Within the limits of what you can see on an

11  X-ray, correct.

12     Q.   Right.  And I'm just talking -- and you may

13  have other opinions and diagnoses.  I'm just talking

14  about this singular scan, this study, as to what it can

15  eliminate or pick up or not pick up or what it can or

16  cannot see.  Okay?

17     A.   Okay.

18     Q.   Were there any other -- any other scans that

19  you reviewed initially from the ER --

20          MR. BRESLER:  Form.

21  BY MR. BELLE:

22     Q.   -- from the emergency room?

23          MR. BRESLER:  I don't think he actually looked

24     at the films.

25          MR. BELLE:  Let me rephrase.
```



 1   BY MR. BELLE:

 2       Q.   Were there any other reports that you reviewed

 3   from Mease Countryside Hospital Emergency Room as they

 4   related to Jennifer Farley?

 5       A.   No.

 6       Q.   Okay.  Did you have occasion to review any MRI

 7   films for the patient, Jennifer Farley, as it related to

 8   the cervical spine and the lumbar spine?

 9       A.   Yes.

10       Q.   Okay.  Do you have those reports in front of

11   you?

12       A.   I do.

13       Q.   All right.  Well, I'll start with whichever one

14   you'd like.  We can pick.

15       A.   Let me give you this back, Mr. Belle.  Keep

16   things straight.  That's an exhibit.

17       Q.   So many pieces of paper.

18       A.   So Ms. Farley had two MRIs performed on

19   May 10th, 2016.

20       Q.   Okay.

21       A.   One involved her cervical spine, and one

22   involved her lumbar spine.

23       Q.   Okay.  Let's start with the lumbar spine one

24   first because it's shorter.

25       A.   Okay.



1     Q.   Was that scan performed at your facility?

2     A.   Yes.

3     Q.   Okay.  And were you the reading physician on

4   this scan?

5     A.   No.

6     Q.   Okay.  What were the findings of the lumbar

7   spine MRI conducted on May 10th, 2016?

8     A.   The overall impression -- I'm happy to go in as

9   much detail --

10    Q.   Okay.  Let's start with the impression.

11    A.   The impression, mild lower lumbar facet

12  arthrosis, patent canal and foramina with unremarkable

13  disc signal and contours.

14    Q.   Okay.  So what is lumbar facet arthrosis?

15    A.   So the lumbar facets are the small joints on

16  either side of our back -- well, throughout our spine,

17  actually -- and it's where the actual motion occurs.  So

18  when you -- you know, when you bend, whether it's your

19  neck or your back, that motion is going through those

20  lumbar facet joints in the lower back.  There's one on

21  each side.

22         And what the radiologist is reporting is that

23  he sees some arthrosis, which is early wear, into these

24  facet joints.

25    Q.   Okay.  And when you say "wear," is wear



```
 1   equivalent to arthritis, or is it pre-arthritis, or is

 2   it --

 3       A.   Pre-arthritis.

 4       Q.   Okay.  And is facet arthrosis typically caused

 5   by trauma from an automobile accident?

 6       A.   It can be.  But, I mean, in this case, no, I

 7   wouldn't expect facet arthrosis, you know, a week later.

 8   So but -- I mean, in the case of, you know, there was

 9   something that happened in the past, yes, it could.

10       Q.   Have you treated the patient for any type of --

11   well, we'll go through it in a second.

12            And what was the second portion of the finding

13   as it related -- or the impression as it related to the

14   lumbar spine?

15       A.   So, patent canal, meaning the spinal canal

16   where the nerve roots lie; and the foramina which are

17   the openings that the nerve roots exit at each level off

18   the lower spine, they were open as well; and, overall,

19   the disc between the vertebrae in the lower back were

20   unremarkable and did not appear to be a problem.

21       Q.   Did you, in your course of treating this

22   patient, diagnose her with any type of lumbar spine

23   injury?

24       A.   Yes, I did.

25       Q.   Okay.  What was your lumbar spine diagnosis?
```



```
 1      A.    Lumbar strain.
 2      Q.    And in this patient, did -- how long does it
 3  take for a strain to heal?
 4      A.    It could be highly variable.
 5      Q.    Okay.  It can vary.  But if you were to give a
 6  generalized range, would you expect a strain to last
 7  indefinitely for a person's whole entire life?
 8      A.    No.
 9      Q.    Okay.  So even though it could vary in patients
10  from time to time -- some patients it could be three
11  months, some patients it could be six months -- when you
12  diagnose a patient with this particular injury, you, at
13  some point, expect that that injury, if it's just a
14  strain, is going to heal?
15      A.    Yes.
16      Q.    Okay.  Do you think that a strain to a patient
17  is a permanent injury within a reasonable degree of
18  medical probability?
19      A.    I'm not sure I can answer it just that
20  simply --
21      Q.    Okay.
22      A.    -- because there's, you know, high variability.
23            Let's take, like, an ankle sprain for instance.
24  Okay.  Most people have had an ankle sprain, and they
25  say, Oh, yeah, it was, you know, a problem for whatever,
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                          27

```
 1   a week, two weeks, a month.  There's also some that
 2   are -- you know, that can be life-altering.  So I'm not
 3   trying to be evasive, but --
 4       Q.   But you would agree, with regard to the example
 5   that you used, that there are degrees of ankle sprains
 6   and locations of ankle sprains, but in this instance
 7   we're talking about a specific part of the body.  Are
 8   there degrees of strains?
 9       A.   Sure.
10       Q.   Okay.  And what degree strain did you diagnose
11   Mrs. Farley with?
12       A.   Well, I mean, I couldn't quantitate it.
13            But, I mean, you know, to get back to your
14   earlier point, it's the sort of thing I would expect to
15   get better with time.
16       Q.   Okay.  Fair enough.
17            And in treating this patient, has her lumbar --
18   has the lumbar strain, from the last time that you saw
19   her, resolved itself?
20       A.   She certainly improved.
21       Q.   Okay.  So when was the first time you saw the
22   patient?  You said May of 2016?
23       A.   Yes.
24       Q.   And when was the last time that you saw her
25   that you thought she was still suffering from a lumbar
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                    28

 1  strain?

 2      A.    I'm going to say it looks like August 19th,

 3  2016.

 4      Q.    Okay.  So, on August 19th, 2016, that's the

 5  last time that you treated her for any type of lumbar

 6  strain?

 7      A.    Well, what I did was look through my diagnosis

 8  codes.

 9      Q.    Okay.

10      A.    Obviously, that was the last time that it was a

11  pertinent part of our discussion and treatment.

12      Q.    And when a patient comes in, one of the things

13  that you do -- I'm asking, I'm not telling you -- is to

14  interview them regarding their pain complaints?

15      A.    Yes.

16      Q.    Okay.  Did you see the patient again after

17  August 2016?

18      A.    Yes.

19      Q.    Okay.  And she did not bring this particular

20  pain complaint back to your attention again.

21      A.    Not that I'm aware of.

22      Q.    Okay.  Thank you, Doctor.

23            There is -- did you perform or was there at any

24  point a cervical MRI performed on this patient that you

25  reviewed or a study that you reviewed?



**Orange Legal**
**800-275-7991**

Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                          29

```
 1      A.   Yes.

 2      Q.   Okay.  And earlier you indicated that the

 3  studies that came from the hospital you reviewed them --

 4  you reviewed the reports.  In this particular instance

 5  regarding the cervical spine and the lumbar spine, did

 6  you review the films or simply the reports?

 7      A.   Both.  I looked at the films also.

 8      Q.   Okay.  And then you reviewed the cervical

 9  spine, and what -- did you generate a report, or did you

10  concur with Dr. Towers's findings?

11      A.   I just concurred.  I did not generate a

12  separate report.

13      Q.   Okay.  What were the findings as it related to

14  the cervical spine?

15      A.   So the cervical spine MRI dated May 10th,

16  2016 -- pardon me a second.

17           That's not our phones, right?

18      Q.   No.  That's not me.

19      A.   The cervical spine MRI dated 5/10/16, overall,

20  there was some loss of lordosis in the mid cervical

21  segments but reported as otherwise unremarkable

22  appearance of the cervical spine.  They made an

23  incidental notation of what's called a Chiari I

24  malformation as well.

25      Q.   Okay.  Let's start with the first part of the
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                    30

1  finding where it says mild loss of lordosis in the mid

2  cervical segments is present.  What does that mean?

3      A.   So there's a normal curvature to our spine.

4  And we're not talking about like when we're looking at

5  each other face to face, but when we're looking from

6  along the side.  So, normally, your cervical spine, your

7  neck, should curve in a little bit before it comes back

8  out --

9      Q.   Right.

10     A.   -- to your thoracic spine.  When that curvature

11 is diminished and there's straightening of the spine, we

12 refer to that as a loss of lordosis.

13     Q.   Okay.  And in this particular instance, did you

14 diagnose the mild loss of lordosis as being genetic in

15 nature or being from the result of trauma?

16     A.   It's most likely from the result of -- well,

17 it's a pain response.  I mean, it's due to spasm.

18     Q.   Okay.  And can a person develop lordosis

19 without trauma occurring?  Can it occur in regular life?

20     A.   Loss of lordosis?

21     Q.   Yes.

22     A.   Yes.

23     Q.   Okay.  And in this particular instance, are

24 you -- how long does it typically take -- does lordosis

25 go away, or is that something that stays with the



**Orange Legal**
**800-275-7991**

Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                 31

 1  patient forever?

 2      A.   Well, it's not a fixed -- I mean, in this

 3  context, it's not a fixed problem.

 4      Q.   Okay.

 5      A.   So there are context when, yes, I mean, it's

 6  lordosis, or kyphosis is the opposite, if you will, that

 7  that's never going to change.

 8           In a case like this, you would expect it to

 9  improve and return to a normal situation.

10      Q.   Okay.  And you indicated that you also found a

11  Chiari I malformation in the spine.

12      A.   They did.  I didn't find it.  Dr. Towers, the

13  radiologist, did.

14      Q.   Okay.  But did you see that when you reviewed

15  the film?

16      A.   Yes.

17      Q.   Okay.  And was that malformation -- that

18  malformation is genetic; is that correct?

19      A.   Correct.

20      Q.   Okay.  So that malformation was not caused by

21  any sort of trauma that could be related to an

22  automobile accident.

23      A.   No.

24      Q.   Okay.  Can this condition be aggravated by an

25  automobile accident?



**Orange Legal**
**800-275-7991**

Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                    32

```
 1      A.   It could be.

 2      Q.   Okay.  Were any of the pain complaints that you

 3  received from the patient consistent with aggravation of

 4  this condition?

 5      A.   No.

 6      Q.   Okay.  And do you relate this condition to the

 7  automobile accident that Mrs. Farley was involved in --

 8  let me pull the date so I don't quote it wrong -- I

 9  should know this by heart by now -- May 4th, 2016?

10      A.   No, I do not relate the Chiari malformation to

11  the motor vehicle accident.

12      Q.   And in treating this patient, did you ever come

13  to any conclusions as to whether she had sustained any

14  type of permanent injury as it related to her cervical

15  spine?

16      A.   Yes.

17      Q.   Okay.  What is that opinion today?

18      A.   That she has a permanent injury in relation to

19  her cervical spine.

20      Q.   Okay.  And what is the injury that you have

21  determined is the permanent injury related to her

22  cervical spine?

23      A.   She has facet syndrome.

24      Q.   Okay.  And when you say -- let's see.  Let's go

25  through this.
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                              33

```
 1          All right.  Doctor, let's go through your

 2   findings at each level.  Okay?

 3      A.   Sure.

 4      Q.   What were your findings as it related to the

 5   facet joints at C2-C3?

 6      A.   So the report is C2-3 as normal appearance of

 7   the disc and facet joints.

 8      Q.   Okay.

 9      A.   The canal and foramina are patent.

10      Q.   What does "the canal and foramina are patent"

11   mean?

12      A.   The canal around the spinal cord in the neck,

13   cervical spine, your spinal cord fills that canal with

14   the exception of a small amount of fluid.

15      Q.   Okay.  So, basically, "the canal and foramina

16   are patent" means that there was no abnormalities seen

17   on the film in that area of the body?

18      A.   As far as that structure is concerned, yes.

19      Q.   Right.  I'm just trying to make sure I

20   understand --

21      A.   Sure.

22      Q.   -- the lingo because this continues to repeat

23   itself --

24      A.   Correct.

25      Q.   -- and I don't want to keep asking the same
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                    34

```
 1   question.

 2           How about as to Level C3 and C4?

 3   A.   C3 was identically described as 2-3.  4-5, they

 4   mentioned a little bit of disc narrowing.

 5   Q.   Let's stop with the disc narrowing.

 6   A.   Yes.

 7   Q.   Is disc narrowing related to the automobile

 8   accident that she was involved in?

 9   A.   It could be.

10   Q.   Okay.  Do you have a conclusion today as to

11   whether it is or isn't, or you're saying it could --

12   it's a possibility?

13   A.   Well, short of having an MRI before, it's hard

14   to make that statement.

15   Q.   Okay.  So you can't date when a patient may

16   have started to develop disc narrowing?

17   A.   It can be difficult.

18   Q.   Okay.  You were going through your findings,

19   and I think I heard you stop at the canal.  Which one

20   was -- you stopped at C5-C6.  And what was your findings

21   for C6 and C7?

22   A.   Normal appearance of disc and facet joints, and

23   the canal and foramina are patent.

24   Q.   What about C7 and T1?

25   A.   They -- C7-T1 has mild facet hypertrophy.
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                    35

```
 1    Canal and foramen are patent.  Disc is unremarkable.

 2         Q.    Okay.  So -- and then I'm reading your final

 3    impression.  What does that say?

 4         A.    Once again, this is Dr. Towers's --

 5         Q.    Dr. Towers.

 6         A.    -- impression.

 7         Q.    Dr. Towers --

 8         A.    I concurred with him.

 9         Q.    Okay.  Would it be fair to say you adopted his

10    impressions?

11         A.    Yes, sir.

12         Q.    Okay.

13         A.    The impression was a Chiari I malformation,

14    which was mentioned in the very -- the second paragraph

15    of the findings, and some loss of lordosis in mid

16    cervical segments but otherwise unremarkable appearance

17    of the cervical spine.

18         Q.    Okay.  Where in this report did -- Dr. Towers's

19    report that you adopted does it say that this patient is

20    suffering from -- I believe you said facet syndrome?

21         A.    Correct.  Nowhere.  That's not a radiographic

22    diagnosis.

23         Q.    Okay.  And how is facet syndrome -- well, if

24    you saw -- so facet syndrome, if somebody's had that,

25    there's no time that it would ever show up on an X-ray
```



1  or a MRI study?

2      A.    It could show up.  So it could be a situation

3  where there's radiographic evidence on an MRI or X-ray

4  or whatever of pathology at facet joints.

5      Q.    Right.

6      A.    Or you can have what would be termed a

7  normal -- a normal radiographic study.  It's a clinical

8  diagnosis based on pain, tenderness possibly at that

9  site, response to treatment and so on.

10     **Q.    But you just said a minute ago that it isn't**

11 **something that you can see on radiographic studies.  But**

12 **if it were -- if she did -- if it was present in this**

13 **particular study, that's something that the doctor**

14 **likely would have pointed out.**

15         MR. BRESLER:  Form.

16         THE WITNESS:  I think in fairness to clarify --

17     so you could have a patient that has radiographic

18     findings and no symptoms --

19 BY MR. BELLE:

20     **Q.    Right.**

21     A.    -- or you could have a patient with negative

22 radiographic findings and significant symptoms.

23     **Q.    And is it also possible to have a patient with**

24 **significant radiographic findings, and then they would**

25 **also exhibit significant symptoms?**



```
 1      A.   Sure.

 2      Q.   Okay.  Now, could you tell the jury what facet

 3  syndrome is?

 4      A.   So, once again, the facet joints are the small

 5  joints at each vertebral level.  There's one on each

 6  side.  And that's where the motion occurs through.  So,

 7  I mean, it's a complex system.  You have the disc

 8  sitting in the forward part.  The facet joints are in

 9  the rear part of the neck.  But that's where, for the

10  most part, your motion is occurring as you straighten

11  and bend your neck.

12      Q.   Right.

13      A.   Those joints can be -- they're held together by

14  ligaments which are strong fibrous tissue that holds

15  bones together, whether it's in your neck or your knee.

16  And those ligaments can be injured, and as a result you

17  can develop pain and stiffness and other symptoms in

18  relation to that.

19      Q.   Now, it is uncommon after a person, say, were

20  to go -- maybe undergo a left shoulder surgery for there

21  to be secondary pain in the area surrounding that

22  shoulder, like somebody could have a shoulder surgery

23  and maybe present with neck pain as a symptom after that

24  surgery?

25      A.   So it's always a bit challenging when you
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                    38

```
 1   you're looking at patients with neck, shoulder injuries

 2   because there is a certain amount of overlap between the

 3   two areas, and a patient with neck symptoms that go into

 4   the shoulder can complicate that and vice versa.  And

 5   then, of course, you can also have the situation where

 6   you have both.

 7       Q.   Okay.  And when a person has both neck -- were

 8   presenting as both and neck and shoulder pain, how do

 9   you differentiate between where that pain is being

10   generated from to make the diagnosis that it's facet

11   injection -- or facet -- not injection -- facet

12   syndrome?

13       A.   Syndrome.

14       Q.   Excuse me.

15       A.   So, once again, challenging.  You know, there's

16   all sorts of -- I hate to use this term, but pain

17   generators they talk about in the spine, you know,

18   whether someone is having pain in their neck because of

19   a bad disc or muscles or ligaments or nerve pain.  And

20   so, I mean, that's -- the challenge is trying to sort

21   that out and see what is the main culprit.

22           So, I mean, for instance, you'll have a patient

23   that comes in with an MRI, and maybe they have a bad

24   disc, but they have no symptoms related to that disc.

25   And maybe the disc bulge is on the right side, but their
```



```
 1   symptoms were on the left.  So, anatomically, it doesn't

 2   match up.

 3       Q.   So in this particular patient, did you at some

 4   point diagnose Mrs. Farley with a shoulder injury?

 5       A.   We did.  I did.

 6       Q.   Okay.  So how did you, in this particular case,

 7   distinguish between whether the pain that she was

 8   complaining about on the cervical spine, whether it

 9   was -- differentiate whether it was related to the

10   shoulder injury that you claim that she sustained or was

11   related to a neck injury that did not show up on any

12   radiographic studies?

13            MR. BRESLER:  Form.

14            THE WITNESS:  Well, she had diminished range of

15       motion of her shoulder.  She had pain.  She had

16       bruising of the shoulder right after the accident.

17       So those are things that I wouldn't expect your neck

18       to affect your range of motion your shoulder, per

19       se.

20   BY MR. BELLE:

21       Q.   Okay.  Now, you just said a second ago that she

22   had -- and let's finish this, and I'll come back and --

23   so we can just stick with one part of the body because

24   that's about all I can handle.

25            All right.  So it is your opinion today within
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                          40

```
 1    a reasonable degree of medical certainty that

 2    Mrs. Farley, with regard to her cervical spine, has

 3    sustained a permanent injury in the form of facet

 4    syndrome?

 5            MR. BRESLER:  Form.

 6            You may answer.

 7            THE WITNESS:  Yes.  But it's based on more than

 8        what we've discussed so far.

 9    BY MR. BELLE:

10        Q.   Okay.

11        A.   We've left out some things.

12        Q.   All right.  Well, why don't you, for purposes

13    of the record, complete your opinion as to why you think

14    that Mrs. Farley has sustained a permanent injury as it

15    relates to her cervical spine.

16        A.   Okay.  So I performed some flexion, extension

17    X-rays of her cervical spine which, basically, you're

18    having the patient flex.

19        Q.   Did you say "X-rays," or is that a physical

20    exam?

21        A.   That's X-rays.

22        Q.   Could you show me your report as it relates to

23    those X-rays?

24        A.   It would be in -- it's going to be in the

25    additional office note from that first day.  I'm trying
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                          41

```
 1   to find it for you here.

 2      Q.   I do have a question.  I received some

 3   additional office notes with some later dates.  Were

 4   they because the patient came in to see you again or

 5   because you updated your initial --

 6      A.   No.  I did not update anything.  So, I mean,

 7   they may have just been released to you later but --

 8           MR. BRESLER:  It's on page 2 of 2 of the

 9      May 9th, 2016 report, Robert.

10           MR. BELLE:  I think I have that.

11           THE WITNESS:  Did you find it?  Here we go.

12           So it's -- yes, that's the note there.

13           And by the way, the date of accident is marked

14      incorrect at the very top.

15   BY MR. BELLE:

16      Q.   Okay.

17      A.   As you already noted, it's hard to keep track

18   of sometimes.  So, yes, that was in that initial

19   evaluation, radiographic -- radiologic studies, X-rays

20   performed today that we performed here at my office

21   included AP and lateral, open-mouth and flexion and

22   extension views.  Once again, no fractures or

23   dislocations seen just as we had with the previous

24   radiographs at the emergency room.  There was, however,

25   laxity in flexion at C2-3, C3-4, and C5-6 which
```



**Orange Legal**
**800-275-7991**

Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                            42

 1   corrected on extension.

 2       Q.   What does that mean, there's laxity flexion --

 3   in flexion?

 4       A.   So, in the cervical spine in the neck there's

 5   seven vertebrae --

 6       Q.   Right.

 7       A.   -- and they all function as a unit, if you

 8   will.  So think about having these seven little blocks.

 9   I mean, this is a simple explanation.  They're all

10   stacked up.  Okay.  As you move them, they move as a

11   unit.  So everybody moves in line normally when you're

12   bending.  And, likewise, under normal circumstances when

13   you extend and you go back the other way, they should

14   all continue to move in a line.

15           What you see in a case like this when they're

16   having neck pain and you put them through a flexion,

17   extension study is, in one direction the vertebrae start

18   to move out of line a little bit.  We're talking about a

19   small amount, usually a millimeter or two.  You can

20   sometimes see asymmetric facet joint opening.  So once

21   again, as it should move together, everybody should stay

22   perfectly lined up, you start to get a little bit of

23   motion.

24           In this case, in my opinion, she had some of

25   this laxity as the spine was flexed at those levels.



**Orange Legal**
**800-275-7991**

Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                        43

```
 1   And then as she extended, everything was back in line.
 2      Q.   Okay.  So can laxity occur naturally in a
 3   patient?
 4      A.   That's a good question.  I don't have a good
 5   answer for you.
 6      Q.   Okay.  So are you -- is it your opinion today
 7   that the laxity that you observed in this patient was
 8   caused by -- let me ask it another way.
 9           Can you rule out that the laxity that you
10   observed in the X-ray study that you performed at your
11   office was caused by a just -- was caused by trauma, or
12   was it caused by just the patient's general -- it's just
13   the way the patient came in to you?
14           MR. BRESLER:  Form.
15           MR. BELLE:  I'll rephrase.
16   BY MR. BELLE:
17      Q.   Can laxity genetically occur in a person
18   without trauma having occurred first?
19      A.   I'm sure it could.
20      Q.   Okay.  So how do you, when you're doing your
21   differential diagnosis, how do you rule out laxity as it
22   relates from trauma or laxity as it just relates to the
23   general nature or genetics of a person?
24      A.   So, I mean, you look at the whole clinical
25   picture.  Are they having pain, restricted motion,
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                      44

 1    evidence of muscle spasm?  Muscle spasm is a good one to

 2    go by because, you know, we're always looking for people

 3    that may be malingering or whatever, and that's not

 4    something you can fake usually.  I don't believe you

 5    can.

 6        **Q.    Right.**

 7        A.    So, I mean, when you put the whole picture

 8    together, I mean, you can tell me you have pain; I have

 9    to take your word for it.

10        **Q.    I understand.**

11        A.    But when you see evidence of spasm and so on,

12    then you start to get a more complete picture.

13        **Q.    Have you ever seen laxity go away in a patient?**

14        A.    I can't say I've ever really looked for that.

15        **Q.    Okay.  When you do the initial study on a**

16    **person to determine whether they have laxity in their**

17    **neck or neck -- laxity in their cervical spine, did you**

18    **do any follow-up studies to determine whether it had**

19    **returned to its normal positioning?**

20        A.    No.  I did not do any other additional X-rays

21    like that.

22        **Q.    Okay.  And if you had done additional X-rays**

23    **like that, you would be able to tell us today whether**

24    **there had been any change in laxity?**

25            MR. BRESLER:  Form.



**Orange Legal**
**800-275-7991**

```
 1            MR. BELLE:  Let me re-ask it.

 2   BY MR. BELLE:

 3       Q.   Had you done a follow-up X-ray with this

 4   patient at a later period, would you be able to tell us

 5   whether there had been any change in laxity or whether

 6   it had remained the same or whether it had gotten worse

 7   based upon that X-ray?

 8       A.   You may be able to.

 9       Q.   Okay.

10       A.   And I'd also state that, I mean, in general --

11   you know, you're talking about ligamentous laxity.  And

12   if we're making an assumption, it's related to a trauma,

13   then it means ligaments were partially torn.  They

14   typically don't heal back to normal.  But, you know, I

15   mean, their symptoms may resolve.

16            Like, once again, the sprained ankle is a real

17   common example where those ligaments were torn to

18   varying degrees, but you may get back to all your

19   activities.  Sure.

20       Q.   Okay.  I mean, would it be fair to say, Doctor,

21   that when you hurt yourself there's always some sort of

22   change afterwards, whether it's good, bad, or

23   indifferent?

24            MR. BRESLER:  Form.

25            THE WITNESS:  Yeah.
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                    46

```
 1   BY MR. BELLE:

 2       Q.   Okay.  So the body gets injured, and then the

 3   body heals itself, and then there could be some change

 4   in the body as a result of that?

 5       A.   Yes.

 6       Q.   Okay.  And so it's your opinion today that

 7   based upon the fact that she underwent -- that she

 8   was -- that the patient, Jennifer Farley, was

 9   experiencing spasms and the X-ray study that you

10   performed on May 9th, 2016, concluded that she was going

11   to have facet syndrome for the remainder of her life?

12            MR. BRESLER:  Form.

13            THE WITNESS:  Not based on just that.

14   BY MR. BELLE:

15       Q.   Okay.  Was there another component that I was

16   missing?

17       A.   Well, I mean, you know, we're talking about one

18   visit here.  I mean, I'm not going to make that

19   conclusion on the first visit.

20       Q.   Okay.

21       A.   We have a couple years of treatment with her

22   and, you know --

23       Q.   When was the last time you treated her for her

24   cervical injuries?  And then we're going to move on soon

25   from this.
```



 1      A.    So I saw her March 7th, 2019, for her cervical

 2  spine.

 3      **Q.    What conclusion did you draw on that last visit**

 4  **with her?**

 5      A.    She's still having pain.  We had done several

 6  things to treat her since her accident, including

 7  treating with medications, physical therapy.  We did

 8  some facet injections which she responded to well and --

 9      **Q.    When a person responds well to facet**

10  **injections, what does that mean?**

11      A.    Usually a relief of their symptoms which is

12  typically going to be neck pain; frequently,

13  headaches --

14      **Q.    Is that -- injection is a permanent fix?**

15      A.    Not necessarily.

16      **Q.    When you saw the patient -- with regard to**

17  **facet syndrome and the treatment of her facets, is there**

18  **any type of surgical intervention that would improve**

19  **that situation?**

20      A.    Yes.  I mean, it's not really surgery in the

21  sense of, you know, like an incision or anything.  But

22  one of the things that can be done for that type of

23  problem is called a radiofrequency ablation or a

24  neurectomy.  Essentially, what you're doing is

25  denervating or destroying the sensory nerve at the facet



```
 1  joint.

 2      Q.   Have you ever recommended this procedure to

 3  this particular patient?

 4      A.   We have discussed it.  Yes.

 5      Q.   Okay.  Was that -- did you discuss it on the

 6  March 2019 visit?

 7      A.   Definitely on that visit, and I probably

 8  mentioned --

 9      Q.   Can I see that report from March '19?  I feel

10  like I got some updates, but I don't remember seeing

11  anything from March.

12          MR. BRESLER:  I don't know.  The last one --

13      the last one I have in my physical file is

14      January 14th.

15          MR. BELLE:  That's what I have, is January.

16          THE WITNESS:  And outside of that January 14th,

17      that was the only other time that I've seen her

18      since.

19  BY MR. BELLE:

20      Q.   Okay.  Was this marked as an exhibit

21  previously?

22      A.   I don't believe -- it should be included, but

23  you're welcome to mark it.

24          MR. BELLE:  Which number are we up to Madam

25      Court Reporter?
```



 1          Can we mark this?  Do you have an objection?

 2     You want to see it?

 3          MR. BRESLER:  No, I don't have an objection to

 4     you marking it.

 5          MR. BELLE:  Well, I'm marking them, and then

 6     I'm going to attach them at the end.

 7          MR. BRESLER:  Yeah.

 8          MR. BELLE:  I guess we'll try to just slide it

 9     up.  Yeah.  I didn't know that there was additional

10     treatment still going on.

11          (Defendant's Exhibit No. 6 marked for

12     identification.)

13  BY MR. BELLE:

14     **Q.   Do you have any scheduled visits for the**

15  **patient coming up?**

16     A.   I don't believe I have anything scheduled yet.

17  I think -- it looks like I said, Come see me in three

18  months or sooner if need be.

19     **Q.   So it would be later in the year if she was**

20  **scheduled to come in per your timetable?**

21     A.   Once again, nothing's scheduled.

22     **Q.   But based upon --**

23     A.   Assuming she made a three-month appointment,

24  yes.

25     **Q.   Okay.  Could you draw your attention to your --**



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                    50

```
 1    the MRI that was conducted on June 27th, 2016, of

 2    Mrs. Farley's left shoulder?

 3            MR. BRESLER:  Did you say the MRI of the left

 4       shoulder?

 5            MR. BELLE:  Yes, sir.

 6            MR. BRESLER:  Okay.  Thank you.

 7            THE WITNESS:  Yes, sir.  I have it available.

 8    BY MR. BELLE:

 9       Q.   Okay.  And did you have an opportunity to

10    review that study?

11       A.   I did.

12       Q.   Okay.  And you reviewed -- was there another

13    reading radiologist on it besides you?  Was it

14    Dr. Towers?

15       A.   Yes, Dr. Towers.

16       Q.   But you also read the study; is that correct?

17       A.   Correct.  I did, and I looked at it as well.

18       Q.   Okay.  And you didn't generate a report?

19       A.   No, I did not.

20       Q.   So would it be fair to -- based upon that, that

21    you concurred with his radiographic reading of this

22    particular patient's June 27th, 2016 study?

23       A.   Yes.

24       Q.   Okay.  Let's go through it.

25            It says -- what was the purpose of the study?
```



**Orange Legal**
**800-275-7991**

Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                    51

```
 1      A.    Rule out rotator cuff tear, radiating pain,

 2  motor vehicle accident --

 3      Q.    Okay.

 4      A.    -- 2016.

 5      Q.    I see that this patient underwent an

 6  arthrogram.

 7      A.    Yes.

 8      Q.    What kind of MRI is that?

 9      A.    So an arthrogram is when you enhance a joint

10  with some sort of contrast.  And if you combine that

11  with an MRI, it's called an MRI arthrogram.

12      Q.    Got it.

13            Can we go through your finding -- or they're

14  Dr. Towers's findings but that you concur with in the

15  report?

16      A.    Yes.  So it begins by listing the technique and

17  the comparison, and there were prior studies available

18  for comparison.

19            The findings were listed as labral maceration.

20  He described, From inferiorly from 6:00 to 4:00 with

21  labral-glenoid junction edema.

22      Q.    Okay.  Let's stop before we go too far, because

23  if I let you go too far, I'm not going to be able to get

24  an explanation.

25            So what does that mean?  What does the labral
```



 1   maceration mean?

 2       A.   So let me stop for one second and just tell you

 3   about the whole clock system because it, you know, it

 4   makes it -- so we typically will describe these labral

 5   changes.  The labrum is, of course, a fibrous structure

 6   that runs around the bony glenoid portion of the socket.

 7   And we typically will make a description just like the

 8   face of a clock, 12:00 being superior, 6:00 being

 9   inferior and so on.  So it just gives us, you know, an

10   easier means to describe something.

11           So "labral maceration" means that the labrum

12   has some tearing.  And "maceration," by definition,

13   means a shredded-type tear.

14       Q.   Okay.  So there was a labral tear, is what this

15   first part says; is that correct?

16       A.   Yes.

17       Q.   Okay.  And then it says, With labral-glenoid

18   junction edema.

19       A.   Correct.

20       Q.   What does that mean?

21       A.   So that's saying that, once again, where that

22   labrum, that fibrous tissue that is attached to the

23   bone, there's some edema at that attachment.

24       Q.   And what does "edema" mean?

25       A.   Well, "edema" typically means that there's been



1    some sort of injury to the area.

2         Q.   Okay.

3         A.   It's going to show up as, depending on the

4    study, you know, anything from fluid into a tissue to --

5    in an MRI usually fluid appears as brighter, so it may

6    have been in the bone or just at that junction where

7    there's evidence of the edema.

8         Q.   Okay.  And with regard to edema, can that be

9    caused from non-traumatic injuries to the area,

10   specifically this area?

11        A.   No, not to this area.

12        Q.   Okay.  Could you finish the rest of your -- the

13   first part of your finding?

14        A.   He goes on and describes that this is best seen

15   on Coronal Images 6 through 8 of Series 4.  No evidence

16   of a fluid-filled labral tear can be identified.  And

17   the findings would be consistent with labral capsular

18   strain primarily.

19        Q.   What does that mean?

20        A.   So he's putting these things together as, you

21   know, we're seeing some tearing of the labrum.  We're

22   seeing some edema at that labral-glenoid junction that

23   overall looks like there's been a -- you know, a strain

24   to that tissue area.

25        Q.   So.  When he says no evidence of fluid-filled



 1    labral tear, is the fluid that he's referring to the dye

 2    or the contrast that you put in the patient?

 3        A.   I would have to speculate, but, yes, that's

 4    what I'm assuming.

 5        Q.   Okay.  You've indicated that you reviewed the

 6    study.

 7        A.   Right.

 8        Q.   So in reviewing the study, if you were writing

 9    the report and were to use that term, would you be

10    referring to any other fluid besides the dye that you

11    put in there?

12        A.   No.

13        Q.   Okay.  And so usually if you see that dye in

14    that space, does that support a diagnosis that there's a

15    tear in that area?

16        A.   You know, once again, I would say that that's

17    not a typical term that I see in these reports, you

18    know.  I don't usually see evidence of fluid-filled

19    labral tear or no evidence.

20        Q.   So is it an instance where, if a person were to

21    have a complete labral tear -- and what part of the

22    body, just for the jury, does the labrum anchor inside

23    the shoulder?

24        A.   So the labrum is continuous with one of your

25    biceps tendon, the muscle in your arm here -- comes into



1  the joint, and then that tissue forms a rim around the

2  bony portion of your socket.

**3**      **Q.   Okay.**

4      A.   Now, the socket of your shoulder is part of

5  your scapula or shoulder blade, and overall it's small,

6  maybe about the size of a quarter or less.  And compared

7  to the size of the ball, it's much smaller.

8         So what the labrum does, among other things, is

9  it gives it a little more dimension, makes it a little

10  bigger, because it's like a rim.

**11**      **Q.   Okay.**

12      A.   It gives it a little more depth.  And it's also

13  where all of -- your capsule, which is the tough,

14  leathery covering that's helping hold the two bones

15  together, if you will -- is coming in and attaching to

16  the bone.

**17**      **Q.   Okay.  So --**

18      A.   It's an intersection, if you will, where things

19  are all coming together.

**20**      **Q.   Does it also kind of hold in your labrum to**

**21**  **some respect or hold your labrum to where it needs to be**

**22**  **in the shoulder?**

23      A.   So under normal circumstances, the labrum --

**24**      **Q.   Excuse me.  I'm sorry.  The rotator cuff.**

**25**  **That's what I meant.**



 1     A.    No.   The rotator cuff is attached near there,

 2  but it's not that -- just at that spot.

 3     Q.    Okay.

 4     A.    But there's a confluence of those structures

 5  all near that area.

 6     Q.    So you're not -- so would it be fair to say

 7  you're not familiar with how this term is being used in

 8  this particular report?

 9     A.    Yeah.

10     Q.    Okay.  And so it's not an instance where you

11  would expect you put the dye in the person and if you

12  see the dye in between the space where the labrum

13  connects and where it's torn, meaning -- basically, what

14  I'm saying is, if the labrum connects a portion of your

15  shoulder and it's torn and you look at the -- and you

16  look at the film and you see -- you see the dye or the

17  contrast in that space, you are looking at a complete

18  tear or a tear or a partial tear.  And if you don't

19  observe the fluid in that space, then this study

20  suggests that there may not be a tear there.

21         MR. BRESLER:  Form.

22         THE WITNESS:  So let me put it like this.  I

23     think it will be a little more clear.  So, with a

24     labrum, okay, I'll give you a practical example that

25     when I discuss this with a patient so they can



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                          57

```
 1          understand what's torn.

 2                So think about a pair of your old blue jeans,

 3          okay, and invariably the back hem is worn and

 4          frayed.

 5     BY MR. BELLE:

 6          Q.    Right.

 7          A.    They look cool like that.  So think of the

 8     little threads.  Okay.  That would represent just

 9     fraying of the labrum, maceration, whatever, shredded,

10     torn, so on.

11                Now, you might also have a pair of those jeans

12     where you have that, but in addition the hem is torn.

13     So you got that gap of tissue.  In that case, that would

14     be the labrum torn from the bone.  And, yes, sir, in a

15     situation like that, you are going to see that dye

16     fluid, you know, same thing we're talking about.  That

17     is going to fill into that, and that's the reason we put

18     the dye.

19          Q.    Okay.

20          A.    It makes for a -- you know, a more sensitive

21     study, if you will, because it is going to fill in that

22     space, and it is going to help you to identify that.

23          Q.    Okay.  But if there is a tear, that's something

24     that you -- you would expect to see the dye in that

25     space on film?
```



Orange Legal
800-275-7991

Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                          58

```
 1      A.   Yes.

 2      Q.   And there's no indication from this study that

 3   you --

 4      A.   No.

 5      Q.   -- saw the dye in that space?

 6      A.   No, there wasn't.

 7      Q.   Okay.  Could we move on to the next paragraph

 8   where it starts with "Posterior superior labrum"?

 9      A.   So he says the posterior superior labrum is

10   diminutive, which means smaller than expected, and

11   frayed at 10:00 to 11:00 on Axial Images 7 and 8 of

12   Series 2 with some deformity in the ABER images.  So

13   he's basically just kind of mapping out, you know, where

14   he's seeing these things.

15           And then he concludes, Overall, the findings

16   could be seen with a hyperabduction injury or

17   anteroinferior glenohumeral subluxation.

18      Q.   What does that mean?

19      A.   So he's talking about, basically -- with where

20   he's seeing these changes that are not normal, the

21   diminutive labrum, that doesn't necessarily mean that

22   that -- that just means that's her anatomy.  Okay.  The

23   fraying, that shouldn't be there.

24      Q.   That shouldn't be there because you didn't

25   observe fraying or because it just doesn't -- it has no
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                    59

 1  clinical value?

 2     A.   Well, I mean, I wouldn't expect fraying in a

 3  whatever, 36-, 37-year-old woman with -- you know, under

 4  normal circumstances.

 5     Q.   **Well, when would you expect to the see fraying?**

 6     A.   When you have an injury.

 7     Q.   **Right.  But what I'm saying is that you said**

 8  **you wouldn't expect to see it in a person of**

 9  **Mrs. Farley's age.  But if there was a prior injury to**

10  **that location, wouldn't you expect to see fraying?**

11           MR. BRESLER:  Form.

12           THE WITNESS:  Well, yeah, you could.  Sure.

13           So he's postulating that, you know, you could

14      see this with a hyperabduction injury which,

15      basically, abduction is this motion here with your

16      shoulder --

17  BY MR. BELLE:

18     Q.   **Okay.**

19     A.   -- where your arm is coming up like that.  Or

20  he's suggesting anterior inferior glenohumeral

21  subluxation, so where the ball and socket are being

22  driven apart.

23           Subluxation refers to a joint that's coming out

24  of socket that doesn't completely come out of socket.

25     Q.   **Were there any indications from the study that**



**Orange Legal**
**800-275-7991**

Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                     60

```
 1    the ball and the joint were out of socket or out of
 2    place?
 3         A.    No.
 4         Q.    Okay.  And do you have any -- do you have any
 5    training and experience as a -- in any type of
 6    biomechanical studies or biomechanical engineering?
 7         A.    No.
 8         Q.    Okay.  Let's move on to the next part of
 9    your -- well, not your analysis but --
10         A.    The report.
11         Q.    Yes, sir.
12         A.    Next paragraph, Middle glenohumeral ligament is
13    hypertrophied and edematous at its subscapularis
14    attachment.  The middle glenohumeral ligament is a
15    thickening of the tissue in the front portion of the
16    joint, and it attaches near where the subscapularis
17    muscle portion of the rotator cuff attaches.  He's
18    noting that it seems to be enlarged and edematous.
19         Q.    And what causes that symptom or that
20    observation?
21         A.    I can't give you any one specific thing.  I
22    mean --
23         Q.    Is it usually -- is it something that you
24    observe in patients who have sustained trauma, or is it
25    something that you observe just as naturally occurring
```



Orange Legal
800-275-7991

1   sometimes in some patients?

2       A.   So, I mean, in general, hypertrophy means

3   enlarged.  And, you know, like, for instance, if you

4   have big biceps, we say they're hypertrophied.  Okay.

5   So, I mean, that could be her natural state.

6           Once again, the edematous portion to me speaks

7   of being, you know, there's been some injury there,

8   recent injury there.

9           The anterior band of the inferior glenohumeral

10  labrum and the posterior band, these are unremarkable.

11          So he's basically just going through this whole

12  ligament complex in the front on the shoulder and noting

13  that --

14      Q.   And that doesn't get any type of a notation as

15  it relates to a clock -- a clock face?

16      A.   No.  These are all in the anterior or forward

17  part --

18      Q.   Okay.

19      A.   -- of the shoulder.

20      Q.   Okay.

21      A.   Next line, he says, The glenohumeral surfaces

22  are unremarkable.  And he's referring to the cartilage

23  over the ball and the cartilage over the socket.  The AC

24  joint is unremarkable.

25      Q.   What is the middle glenohumeral ligament?



1     A.   So the middle glenohumeral ligament is probably

2  about this level, and we're talking about it deep.  So

3  it's inside the joint.  When we look in the joint, we

4  can usually see it.  It's in the front portion.

5  Typically, the scope is in the back, and you're looking

6  straight on at it.

7     **Q.   So is that covered by the glenohumeral**

8  **surfaces?**

9     A.   No, sir.  The glenohumeral surfaces are just --

10  the glenoid is the socket.  The humerus -- the ball of

11  the shoulder.  And those two surfaces are covered with

12  the articular cartilage, you know, the nice, smooth

13  stuff that keeps us moving.

14    **Q.   Okay.  What is the middle glenohumeral covered**

15  **by, just tissue or --**

16    A.   It's not covered by anything.  So it's -- think

17  of it like a -- more or less like a thickening in the

18  capsule.  So imagine like, you know, you have this sheet

19  here, and I have a thickening in that sheet, but it's a

20  defined structure.  It's more than that.

21    **Q.   I understand.**

22    A.   Too far from the weeds with it.

23    **Q.   Okay.  Was the AC joint -- what part of the**

24  **body is that?**

25    A.   So the AC joint refers to the acromioclavicular



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                    63

```
 1   joint.  So, once again, think about a shoulder blade.
 2   It's a complex bone.  It's not like a nice, long bone.
 3   At the top portion, this bony part you can feel in your
 4   shoulder, it hooks around.
 5        Q.   Your clavicle?
 6        A.   And that's your acromion.  And then your
 7   clavicle or collarbone comes across, and they form a
 8   little joint right about here.
 9        Q.   And that was --
10        A.   That was okay.
11        Q.   That was okay.
12             Now let's go to the rotator cuff.  What was
13   the -- or not the rotator cuff.  The next paragraph.
14   What was the finding with regard to the rotator cuff?
15        A.   The next paragraph, Rotator cuff tendons have
16   mild tendinopathy, mostly at central cuff fibers of the
17   supraspinatus.  No evidence of a cuff tear could be
18   seen.
19        Q.   Okay.  What does that mean?
20        A.   So, tendinopathy is -- you know, we can see
21   some streaking in the tendon.  You know, when you look
22   at an MRI, it looks like just -- you know, they're black
23   and white and shades of gray, and you'll tend to see
24   some areas that are just, you know, some streaking in
25   that tendon that are, you know -- you could think of it
```



 1  like some fraying.  Once again, I mean, it could be

 2  very, as in this case, very mild, or it could be

 3  significant.

 4      **Q.  Now, is fraying something that -- is**

 5  **tendinopathy something that develops over time?**

 6      A.  So, tendinopathy can be an acute traumatic

 7  process.  It can also be, you know, yeah, something that

 8  develops over time.  You get out in your yard, and you

 9  work too much this weekend.

10      **Q.  And is there any way, based upon this MRI**

11  **study, to distinguish between whether the tendinopathy**

12  **that was observed was the result of trauma or just --**

13  **was acute or was present prior to the accident?**

14      A.  No.

15      **Q.  Let's keep going through.  We're almost through**

16  **this.**

17      A.  Next line, No evidence of fracture or marrow

18  edema, and they're referring to bone marrow edema.

19          So, you know, in some cases you are going to

20  see -- even if you have an X-ray that's normal, you

21  could have evidence of what we would call an occult

22  fracture or bone marrow edema, but that was negative.

23      **Q.  Okay.  Let's go to the final impression.**

24      A.  Final impression, his summary was, Inferior

25  labral maceration with edematous labral-glenoid



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                65

```
 1   scarring.

 2       Q.   Can I stop you there?

 3       A.   Yes.

 4       Q.   How long does it take for labral-glenoid

 5   scarring to develop in a patient?

 6       A.   I mean, scarring starts from the moment of an

 7   injury.  You know, you scrape your knee, and it starts

 8   to heal with a scab.  And, I mean, that's what we're

 9   talking about.  So, I don't think you can put a

10   timetable on it, per se.

11       Q.   Okay.  So you can't date whether the scarring

12   that was observed came from the accident or was there

13   prior to the accident?

14       A.   Correct.

15       Q.   Okay.  Let's go on to the next sentence.  What

16   was the remainder of the finding?

17       A.   Diminutive and frayed posterior superior labrum

18   with deformity in the ABER images.

19       Q.   Let me stop you.

20            What is -- is the deformity referring to the

21   shoulder or to the ABER images?

22       A.   So, ABER just refers to, you know, when they do

23   an MRI, they're going to do pictures with sections, this

24   direction and some with this direction and some, you

25   know, all three.  And these are some that they do on an
```



**Orange Legal**
**800-275-7991**

Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                      66

```
 1  angle that allows them to see certain things better.  So
 2  it actually stands for abduction external rotation.
 3  It's a direction.  It's not a structure, per se.
 4      Q.   Okay.
 5      A.   So it's more of a technical term with how
 6  they're doing the images.
 7           Once again, he further finds -- could be seen
 8  with hyperextension injury with tensile strain of
 9  inferior labral capsular structures or, more likely,
10  glenohumeral subluxation.
11      Q.   Okay.  So would it be fair to say that these
12  particular impressions are just opinions on how the
13  injury may have occurred?
14      A.   Yes.
15      Q.   What is your opinion as to how the injury
16  occurred?
17      A.   Well, probably from glenohumeral subluxation.
18      Q.   Okay.  But are you going to give an opinion at
19  trial as to what particular method of injury this person
20  sustained, or are you just going to give an opinion that
21  you think the person sustained an injury in the
22  accident?
23      A.   Well, I mean, obviously, I wasn't there.
24      Q.   Right.
25      A.   And as far as I know, there's no video.  So, I
```



1   mean, I --

2       **Q.   None that I've seen.**

3       A.   It doesn't serve us any purpose for me to

4   describe, you know --

5       **Q.   Mechanism of injury, would that be a fair term**

6   **beyond --**

7       A.   Specific mechanism, sure.

8       **Q.   Okay.**

9       A.   You know, I think I tend to look at it like I

10  envision a crash test dummy, and they're holding the

11  steering wheel, and their body gets thrown around

12  violently over a very short period of time.  And, you

13  know, there's going to be variations.  I don't know.

14  Did she have her hand here?  Did she have her hand

15  behind her back?  I don't know.

16      **Q.   We were speaking earlier, and you indicated**

17  **that when you're looking at the emergency room records**

18  **the patient exhibited bruising -- and when I say "the**

19  **patient," I mean Jennifer Farley -- over her -- was it**

20  **over her left breast?**

21      A.   Over her humerus and left breast.  Yeah.

22      **Q.   Okay.  When you say "her humerus," what part of**

23  **the body?**

24      A.   I'm sorry.  This portion of her shoulder, arm.

25      **Q.   Okay.  So -- and would the bruising that you**



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                          68

 1  observed on her breast have anything to do with her --

 2  any injury she may have sustained to the shoulder?

 3      A.   So, I mean, once again, you know, I try to look

 4  at these things, and I'm trying to figure out what's

 5  wrong with someone and how they might have got hurt.

 6  So, you know, she's got a seat belt on, and the shoulder

 7  harness comes across here like so.  I mean, over the

 8  years, I've seen plenty of people that come in with

 9  bruising across from the seat belt, sometimes across

10  their lap.

11      Q.   Right.  But I guess what I'm trying to ask is,

12  the bruising that was observed, that you observed in the

13  photographs, you can't rule out -- you can't say within

14  a reasonable degree of medical certainty or probability

15  that the bruising is an indication of any type of

16  shoulder injury?

17           MR. BRESLER:  Form.

18           THE WITNESS:  I would say that the bruising is

19      not a result of the labral injury.

20  BY MR. BELLE:

21      Q.   Okay.

22      A.   Okay.  So I think that's --

23      Q.   I guess that's what I'm trying to ask, and you

24  answered it better.

25      A.   Yeah -- no.  There's no labral injury that I



```
 1  could envision where you're going to have bruising,

 2  visible bruising.  I think it's more or less just a, you

 3  know, point to that area that there was some trauma

 4  there.

 5      Q.   Got it.

 6           Okay.  Let's finish the --

 7      A.   Now, I think this is important, Mr. Belle.  So,

 8  you know, we keep talking, and I just told you my

 9  opinion.  I thought it was probably a result of

10  glenohumeral subluxation.

11           And in his next line there's no evidence of

12  glenohumeral subluxation.  So that's not conflicting.

13  What that's saying is, you know, that joint probably

14  subluxed during the injury, but it's no longer subluxed.

15  Okay.  So you could have a situation where it was still

16  subluxed or even dislocated, but that was not the case

17  here.

18      Q.   There was no -- there was no evidence of --

19      A.   No persistent -- no persistent subluxation --

20      Q.   And no subluxation observed on the MRI in that

21  area?

22           MR. BRESLER:  Form.

23           THE WITNESS:  Correct.  Because that's a -- not

24      at that time.

25  BY MR. BELLE:
```



1    Q.   And what is the, I guess, the next sentence?

2    A.   The next sentence says, No evidence of a

3    Hill-Sachs lesion or frank dislocation can be seen.

4         So, in some cases when you have a dislocation

5    of a shoulder that ball actually comes out completely.

6    Okay.  Now, typically, if it comes out completely, it

7    doesn't go back in on its own.  There may be some

8    instances when it does.  But, frequently, when it

9    does -- if it pops out and pops back in on its own or,

10   you know, the patient does something to get it to go

11   back in, as it goes back in, the soft ball of the

12   shoulder impacts against the hard, bony rim of the

13   socket, and you get a hatchet-shaped or wedge-shaped

14   defect in the head.

15        And the other lesion that you see is sometimes

16   instead of the ball getting the hatchet-shaped defect,

17   you'll see a lesion where you knock a piece of the

18   corner of the glenoid off.  So that's referring to a

19   bony lesion in --

20   Q.   And none of these were present.

21   A.   No.

22   Q.   One other question, the final sentence says,

23   Minor central cuff tendinopathy.  If you look at the

24   first page, it says that -- it says the rotator cuffs

25   have mild tendinopathy.  Would you call a distinction



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                71

```
 1    between mild and minor tendinopathy?

 2        A.   No.

 3        Q.   Okay.  So to use those clinical terms mean the

 4    same thing?

 5        A.   Yes.

 6        Q.   Okay.  Let's -- we can move off of that.  We're

 7    almost there.  I just -- I needed to get through those.

 8    We can move through these studies pretty quickly.

 9             Again, the first time you saw the patient was

10    May 9th, 2016.  Can I turn your attention to that

11    report?

12        A.   Yes.

13        Q.   Okay.  What were the patient's initial pain

14    complaints as it related to her shoulder -- left

15    shoulder on that date?

16        A.   So cervical, thoracic, lumbar spine; left

17    shoulder; left breast bruise; headaches.

18        Q.   Okay.

19        A.   What would you like to know specifically on the

20    shoulder?

21        Q.   Now I just wanted to know what the initial

22    complaints were.

23             And then you performed a physical

24    examination --

25        A.   Yes.
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                          72

```
 1      Q.   -- is that correct?

 2           She had -- which portions of the -- what

 3   physical examination did you perform as it relates to

 4   her shoulder, her left shoulder?

 5      A.   So, you know, we're going to look at your

 6   cervical spine as well as your shoulder, typically, with

 7   either complaint.  So I did look at her cervical spine.

 8   We'll defer that for the moment.  I looked at her left

 9   shoulder.  She had 160 degrees of forward flexion, which

10   is, you know, this forward motion, which was less than

11   normal and painful.

12      Q.   What's normal?

13      A.   Her other arm was normal which is 180 --

14      Q.   Got it.

15      A.   -- all the way up.

16           She had, similarly, about 160 degrees of

17   abduction with pain.  And, once again, the same thing.

18   Normally, you can get it completely up to 180.

19           External rotation, which is this type of motion

20   here where you're rolling out, was slightly decreased

21   over the unaffected arm.  And her internal rotation,

22   reaching behind her back, was -- was very similar.

23      Q.   Okay.

24      A.   Her neurologic exam was normal.  She didn't

25   have any numbness or tingling in that arm or hand.  And
```



**Orange Legal**
**800-275-7991**

Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                    73

```
 1   the remaining portion of that extremity was normal with

 2   the exception of the bruising we already discussed.

 3       Q.   Did you at any time give the patient any type

 4   of injections in her shoulder?

 5       A.   I did give her an injection of gadolinium for

 6   the arthrogram.

 7       Q.   Okay.

 8       A.   But as far as -- I don't believe I've given her

 9   any other injection.

10       Q.   Okay.  So all of the injections in this case

11   that you have been part of or that you've see in the

12   records were cervical.

13       A.   Yes.

14       Q.   I mean, obviously, she had surgery, so there

15   was anesthesia --

16       A.   Right.

17       Q.   -- and dye, but --

18       A.   So I did a trigger point injection in her left

19   trapezius --

20       Q.   Okay.

21       A.   -- which is this muscle here.  As I

22   mentioned --

23       Q.   What was the date of that?

24       A.   That was on April 2nd, 2018.

25       Q.   Okay.  And what is the purpose of the trigger
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                74

 1   point injection?

 2       A.   So a trigger point is if someone's having --

 3   it's usually like -- I like to think of it as a

 4   localized area of muscle spasm or not -- you know, a

 5   patient will usually come and say, Oh, I got this really

 6   painful knot.  They're common around, you know, the

 7   cervical spine and the back area and so on.  So it's not

 8   a structure, per se; it's just an area of muscle that's

 9   painful, inflamed, and in spasm.

10       Q.   What ultimately made you determine that this

11   patient -- you were going to recommend to this patient

12   that she needed surgery?

13       A.   Well, ultimately, you know, if you go back

14   through the record, I mean, I've placed her on some

15   medications.  We placed her on anti-inflammatories,

16   Mobic, probably had her take some Aleve or ibuprofen as

17   well or in addition, Celebrex, muscle relaxants, had her

18   go to physical therapy, and she just continued with the

19   pain in the shoulder.

20       Q.   Okay.  And because you thought that these

21   conservative treatments might repair the shoulder or

22   just make it manageable for her?

23       A.   Well, just to see how she would do with it.

24       Q.   Okay.

25       A.   As I recall, I don't think she was -- you know,



**Orange Legal**
**800-275-7991**

Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                      75

```
 1  she wasn't really interested in doing any surgery even

 2  when I suggested it to her.  Like most people, they

 3  would rather, you know, not.

 4      Q.   I get it.  I understand.

 5           Let's go to the date of the surgery.  Do you

 6  recall what date that was, just for ease of getting to

 7  where --

 8      A.   I have it right here.

 9      Q.   September 22nd, 2017, I believe.

10      A.   Okay.

11      Q.   That will make it faster so we could -- what

12  procedure did you perform on the patient?

13      A.   So September 22nd, 2017, I performed a left

14  shoulder arthroscopy.  I debrided her labral tear.  I

15  did a subacromial decompression.

16      Q.   So when you did the labral tear, debride the

17  labral tear, that is -- the labral -- is that a part of

18  the body that's on the clock system?

19      A.   Yes.

20      Q.   Okay.  Where, when you did the surgery, did you

21  observe the damage as it related to the clock?

22      A.   So let's see.  In my findings I listed she had

23  tearing of the labrum anterior, superior, and posterior.

24  And let me go into my -- so the debridement was along

25  those areas, anterior, superior, and posterior.
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                    76

1        Q.    Okay.   And what does a debridement mean?

2        A.    So I'm going to take you back to my easy

3    discussion before about the blue jeans.   So think about

4    those frayed -- those threads hanging.   So we want to go

5    along and trim those, trim that fray.   The hem was okay.

6    And, you know, I probed along, and there was no

7    detachment from the bony portion.   So just a matter of

8    trimming those frayed portions.

9          And we can do that with either a shaver, which

10   is a little instrument that oscillates a blade and has

11   suction attached to it that we use to do stuff like

12   debridement, and/or a radiofrequency ablation wand

13   which, basically, you could think as a type of special

14   electric cautery that just vaporizes that tissue.

15       Q.    Okay.   And once you got inside the patient, did

16   you find any -- so you -- was the debridement

17   successful?   Were there any complications with regard to

18   the procedure?

19       A.    No.

20       Q.    What else did you do once you were inside the

21   patient?

22       A.    So, typically, you're going to look at

23   everything because sometimes things are not picked up on

24   a study or they've worsened since the study, et cetera.

25   So, you know, we do a -- I should say I do a thorough



**Orange Legal**
**800-275-7991**

 1  systematic -- you know, you look at everything, inspect

 2  it, probe it, so on.  Everything else was fine in there.

 3  I felt the rotator cuff was okay.  The biceps tendon,

 4  glenohumeral articular surfaces were fine just as we had

 5  seen on the MRI.

 6          So then, essentially, we go upstairs.  So now

 7  we're going to remove the camera, and we're going to go

 8  in a little bit higher up on top of the rotator cuff.

 9  So I like to visualize it like this:  Imagine we're in

10  the joint, and this is the rotator cuff, these walls

11  around me with some other structures.  So we can look at

12  these surfaces and say, Well, they're good.  And then we

13  want to go look at the other surface and -- you know,

14  how is the other side?  So we'll insert the scope in

15  above that and then look down on to the rotator cuff.

16          Now, in that space we have a bursa which is a

17  cushion, which we usually remove that because it's --

18  number one, blocks visualization; number two, frequently

19  is inflamed in someone that's having long-standing

20  shoulder pain.  So that is removed.  And then we're able

21  to inspect the cuff as well as other structures in the

22  area.  And I did not see any evidence of any bone spur

23  or anything else that was causing any potential problems

24  going forward.

25      Q.   Okay.  And did you have any findings in the



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                    78

 1   subacromial space?

 2       A.   Let's see what we said there.  Significant

 3   bursitis.  It said, Evidence of impingement.  So I did

 4   do a subacromial decompression.

 5       Q.   What is that?

 6       A.   So that's going to be just looking at that bone

 7   that's between the -- it's the other side of that

 8   acromion, the bony surface.  And below that is the

 9   bursa, bursal cushion, and then the rotator cuff.  So

10   that little area there.  But I --

11       Q.   Is bursitis consistent with a traumatic injury,

12   or is it consistent with something that's been

13   developing over time?

14       A.   Yeah.  Bursitis can be from -- you know, you

15   could wake up with bursitis tomorrow or you can -- you

16   know, you can have an injury and then get bursitis.

17       Q.   Is bursitis a sufficient enough condition to

18   cause a patient -- if bursitis were standing alone and

19   there were no other injury in the shoulder, could it

20   cause the patient pain?

21       A.   Yes.

22       Q.   Okay.  So were you able to rule out whether the

23   patient's pain complaints that you previously identified

24   were the result of bursitis or the result of a labrum

25   tear?



**Orange Legal**
**800-275-7991**

Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                    79

```
 1      A.    I'm not sure I could separate them.
 2      Q.    Okay.  And you can't -- can you say today
 3   within a reasonable degree of medical certainly that the
 4   bursitis that was causing impingement was related to the
 5   automobile accident that Mrs. Farley was in?
 6           MR. BRESLER:  Form.
 7           THE WITNESS:  The bursitis was not a cause of
 8       impingement.  It may have been a source of pain, but
 9       that's not the source of impingement.
10   BY MR. BELLE:
11      Q.    What was the source of impingement?
12      A.    The impingement is just that the space is --
13   you have edematous bursal tissue, in some cases a bone
14   spurring out.  I don't see where we did anything -- I
15   did anything to bur down any bone spur.
16      Q.    Okay.  So is it your position that the
17   impingement was caused as a result of the accident that
18   Mrs. Farley was involved in?
19      A.    No.
20      Q.    Okay.  Would it be fair to say, kind of when
21   you do an arthroscopic surgery on somebody's shoulder,
22   you go into the shoulder, and you repair -- you may be
23   going in to repair one thing, but you observe something
24   else when you do your system check, and you sort of --
25   you fix that when you see it?
```



**Orange Legal**
**800-275-7991**

Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                    80

```
 1      A.   Yes.
 2      Q.   Okay.  So when you went into her shoulder, you
 3   were not expecting to see these issues in the
 4   subacromial space?
 5      A.   I wouldn't say I wasn't expecting.  You know, I
 6   mean, we had X-rays.  We had MRI.  We had a pretty good
 7   indication of what we were going to expect.  I wasn't
 8   expecting to see any bony impingement, you know, for a
 9   number of reasons.  I mean, had we had an MRI and so on,
10   that we were able to evaluate that.
11           But in the case where -- you know, just in
12   general, okay, you go in and you see those things, yeah,
13   you're going to address them at the same time.
14      Q.   I got you.
15      A.   You don't want to -- you know, you're not going
16   to leave a big -- like, there's a spur --
17      Q.   No.  I understand.
18      A.   -- rotator cuff and say, You got to come back.
19      Q.   Yeah.  I understand.
20      A.   But, yeah, in her case that was pretty
21   straightforward.
22      Q.   Okay.  When you visited with the patient, how
23   was the patient's recovery from the procedure?
24      A.   So the surgery went well.  There were no
25   complications, and it was outpatient.  She went home.
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                              81

```
 1   She followed up with me on -- I'll give you the exact
 2   date here -- six days later on September 28th, 2017.  We
 3   took her sutures out.  It was just sutures in each of
 4   the little pores we use for the arthroscopy.
 5       Q.   And I do have one question for you before you
 6   go on.
 7            The disc that we attached as -- I can't
 8   remember the exhibit number right now -- that was
 9   attached to your CV, does it have color photographs of
10   what -- of the surgery photographs that are attached to
11   the surgical record?
12       A.   I'm not sure.  It may.
13       Q.   If they do not, would it be possible to get
14   that from you?
15       A.   I don't see why not.  I have color photographs
16   in the computer.  And then there's a hard copy that I
17   gave to the patient --
18       Q.   Okay.
19       A.   -- which I don't know if she has them or --
20       Q.   But if we were to request them, of course, at
21   our expense --
22       A.   Yes.
23       Q.   -- would you be able to provide us color
24   copies?
25       A.   Absolutely.
```



**Orange Legal**
**800-275-7991**

Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                                    82

```
 1        Q.    Okay.  I think we'll be doing that.

 2              Okay.  Please continue explaining your

 3   postoperative visit with the patient.

 4        A.    So at that postoperative visit, we took her

 5   sutures out, and I discussed what I did and what I saw.

 6   And --

 7        Q.    Were there any complications at the surgical

 8   wound site?

 9        A.    No.

10        Q.    Okay.

11        A.    Everything was healing fine as we could tell.

12   She was complaining of a little numbness in that hand

13   off and on.  That was probably more a positional thing

14   being in a sling and, you know, not moving --

15        Q.    Did that ever resolve itself?

16        A.    To the best of my knowledge, yeah.

17        Q.    Okay.

18        A.    But I wanted to point that out because it's

19   listed on there and just, you know, due diligence for

20   her that -- that has not been a big issue, I don't

21   believe.

22              So, you know, I went through what she can do as

23   far as, you know, showering and what motions of the arm

24   would allow, which in her case we would allow her to get

25   out of the sling and start to use the shoulder pretty
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                    83

 1  quickly.

 2      **Q.   What was the estimated time for her that you**

 3  **had for her recovery that -- not that that's when she**

 4  **recovered, but when you told her to expect to see**

 5  **improvement?**

 6      A.   So, you know, with shoulder surgery, there's

 7  large variations.  So, for instance, if -- in this case,

 8  I debrided that area that was frayed.  If I would have

 9  had to go and actually sew it back to the bone, I would

10  have kept her immobile for four to six weeks.  So I just

11  wanted to add to that.

12          This case scenario, I was able to tell her at

13  roughly one week post-op to start physical therapy and

14  get it moving.

15          Now, over my experience, I've had patients

16  that, you know, four to six weeks they're, you know,

17  Hey, it's great, Doc; and some, you know, never fully --

18  and they still have problems.

19      **Q.   Has this patient come back -- since the last**

20  **time you saw this patient for her shoulder, has she come**

21  **back with any residual pain complaints as it relates to**

22  **the left shoulder or the surgery that you performed?**

23      A.   Well, as recently as December of 2018, she

24  reported that she had some pain in catching of the left

25  shoulder with motion.  I don't see where I recorded a



 1   physical exam on her at that time.

 2       Q.   And have you seen the patient since December of

 3   2018?

 4       A.   Yes.

 5       Q.   You saw her in January?

 6       A.   I saw her for her cervical.  That was more with

 7   the -- her neck issue, and we didn't really address the

 8   shoulder.

 9       Q.   Had she presented shoulder complaints, given

10   that you had done her prior surgery, would you have

11   performed a physical exam on her shoulder if she did

12   that?

13       A.   Typically, sure.

14       Q.   Okay.  And then, I guess, you said you saw the

15   patient again in March of 2019.

16       A.   Yes.

17       Q.   Okay.

18       A.   Do you have that note, or did you give it back

19   to me?

20       Q.   I don't think I --

21       A.   That was the one that we were --

22       Q.   Yeah.  Sure.

23       A.   -- all missing, so to speak, because it was

24   recent.

25            So, at that time, I did perform a physical on



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                 85

```
 1   her shoulder, and she had some slight decreased range of

 2   motion, similar to her findings in the past.

 3        Q.   Did she have pain complaints?

 4        A.   None listed with her shoulder.

 5        Q.   Okay.  And do you have any recommendations or

 6   any type of -- I know she's coming back for the

 7   cervical.  Do you think she needs any type of follow-up

 8   surgery or injections as it relates to her left

 9   shoulder?

10        A.   No surgery at this point.

11        Q.   Okay.  Do you think that she needs some sort

12   of -- have you -- have you -- when she came in, have you

13   told her that she needs to get injections at any future

14   point in the shoulder?

15        A.   I may have told her that she may.  I mean, that

16   would be just as a as-needed basis.

17        Q.   Okay.

18        A.   That wouldn't be a treatment plan like, you

19   know, you got to come in and get your shoulder --

20        Q.   Post surgery, to your knowledge, has she had

21   any type of injection therapy in the left shoulder?

22        A.   No.

23        Q.   Okay.  And is it your opinion today that within

24   a reasonable degree of medical probability that the

25   shoulder surgery that you performed on Jennifer Farley
```



**Orange Legal**
**800-275-7991**

Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                    86

```
 1   was related or caused by the automobile accident that

 2   she was involved in on May 4, 2016?

 3        A.   It's my opinion it was caused by that.

 4        Q.   Okay.  And have all the opinions that you have

 5   given today been within a reasonable degree of medical

 6   probability?

 7        A.   Yes.

 8        Q.   Okay.  I don't think I have any other questions

 9   for you.  He may have questions, but --

10                       CROSS-EXAMINATION

11   BY MR. BRESLER:

12        Q.   You mentioned at the beginning that your

13   opinions are based off of the whole clinical picture and

14   not just one single individual part.  Am I understanding

15   that correctly?

16        A.   Yes.  I mean, my opinions are formulated over,

17   you know, multiple visits of treatment with the patient.

18   Yes.

19        Q.   And you had mentioned that -- earlier that

20   bursitis is something that can be caused by trauma; it

21   can just develop at some point in time on its own.  Is

22   that -- did I understand that correctly?

23        A.   Yes.  I mean, it's not always trauma to develop

24   bursitis in a shoulder, hip, or anywhere.

25        Q.   Okay.  So just looking at just bursitis alone,
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                    87

```
 1   you told Mr. Belle you can't say that that came from

 2   trauma or not, just looking at the bursitis alone.  But

 3   if you're looking at the whole clinical picture, is

 4   there a suggestion that the bursitis came from trauma?

 5           MR. BELLE:  Objection, form.

 6           You can answer.

 7           THE WITNESS:  I may answer.

 8           MR. BELLE:  You may answer, yes.

 9           THE WITNESS:  It could be from trauma, sure.

10   BY MR. BRESLER:

11       Q.   There's one thing that was mentioned -- make it

12   clear for the record.  I think you said, when you're

13   reading off the findings on the left shoulder MRI, you

14   said about the fraying, and the fraying shouldn't be

15   there.  And that statement, as I understood it, was

16   meaning the fraying shouldn't be seen on Ms. Farley's

17   arm, in other words, that fraying is an abnormality for

18   her left shoulder.

19           MR. BELLE:  Objection, form.

20           You can answer.

21           THE WITNESS:  Correct.

22   BY MR. BRESLER:

23       Q.   As opposed to the actual words in that report

24   shouldn't be there?

25           MR. BELLE:  Objection, form.  He didn't write
```



**Orange Legal**
**800-275-7991**

Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                          88

```
 1      the report.  I'm just making my objection.  He could

 2      answer.

 3           THE WITNESS:  Right.  I wouldn't expect that in

 4      a 36-year-old.  If we would look at her other

 5      shoulder with no complaints, I wouldn't expect to

 6      see any of those things.

 7  BY MR. BRESLER:

 8      Q.   Okay.  In other words, it wasn't a mistake that

 9  the words "fraying" were in there?

10           MR. BELLE:  Objection, form.  He didn't write

11      the report.  He can answer.

12           THE WITNESS:  No.

13           MR. BRESLER:  Okay.  I don't have any other

14      questions.

15           MR. BELLE:  All right, gentlemen.

16           Do you want to read or waive?

17           THE WITNESS:  I'll read.

18           (Brief discussion off the record.)

19           COURT REPORTER:  And are you ordering, or are

20      you going to hold off?

21           MR. BELLE:  I'll order a mini and PDF, regular

22      PDF.

23           COURT REPORTER:  And do you want a copy?

24           MR. BRESLER:  Yes, please.

25           (Deposition concluded at 6:13 p.m.)
```

Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                89

```
 1                    CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA:

 4   COUNTY OF PINELLAS:

 5

 6       I, Victoria S. Fricano, Notary Public, State of

 7   Florida, do hereby certify that ALAN J. GRAVES, M.D.,

 8   personally appeared before me on March 28, 2019 and was

 9   duly sworn.

10       Signed this 5th day of April, 2019.

11

12

13

14
                  Victoria S. Fricano
15               _____
                 Victoria S. Fricano, RPR
16               Notary Public, State of Florida
                 My Commission No.:  GG 222306
17               Expires:  September 25, 2022

18

19

20

21

22

23

24

25
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                    90

```
 1                    CERTIFICATE OF REPORTER

 2   STATE OF FLORIDA:

 3   COUNTY OF PINELLAS:

 4

 5        I, Victoria S. Fricano, Notary Public, State of

 6   Florida, certify that I was authorized to and did

 7   stenographically report the deposition of

 8   ALAN J. GRAVES, M.D.; that a review of the transcript

 9   was requested; and that the foregoing transcript, pages

10   5 through 88, is a true and accurate record of my

11   stenographic notes.

12        I further certify that I am not a relative,

13   employee, or attorney, or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorneys or counsel connected with the action, nor am I

16   financially interested in the action.

17

18        DATED this 5th day of April, 2019.

19

20

21        Victoria S. Fricano
          _____
22        Victoria S. Fricano, RPR

23

24

25
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.
91

```
 1                      ERRATA SHEET

 2          DO NOT WRITE ON TRANSCRIPT-ENTER CHANGES HERE

 3              IN RE:     FARLEY VS. STATE FARM
                CASE NO:   8:18-CV-00171-JSM-MAP
 4              DATE:      MARCH 28, 2019
                DEPONENT:  ALAN J. GRAVES, M.D.
 5

 6   PAGE NO. LINE NO.  CORRECTION & REASON

 7   _____  _____  _____

 8   _____  _____  _____

 9   _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated in it
23   are true."

24
     _____
25   DATE                        ALAN J. GRAVES, M.D.
```



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                         92

```
 1   April 11, 2019
 2
     ALAN J. GRAVES, M.D.
 3   c/o RYAN D. BRESLER, ESQUIRE
     TANNEY, GRIFFITH & BRESLER, P.A.
 4   29605 U.S. HIGHWAY 19 NORTH, SUITE 210
     CLEARWATER, FLORIDA 33761
 5   RYAN@TANNEYGRIFFITHLAW.COM
 6   In Re:  March 28, 2019, Deposition of
     ALAN J. GRAVES, M.D.
 7
     Dear ALAN J. GRAVES, M.D.:
 8
         This letter is to advise that the transcript for the
 9   above-referenced deposition has been completed and is
     available for review.  Please contact our office at
10   (800)275-7991 to make arrangements for read and sign or
     sign below to waive review of this transcript.
11
         It is suggested that the review of this transcript
12   be completed within 30 days of your receipt of this
     letter, as considered reasonable under Federal Rules*;
13   however, there is no Florida Statute to this regard.
14       The original of this transcript has been forwarded
     to the ordering party and your errata, once received,
15   will be forwarded to all ordering parties for inclusion
     in the transcript.
16
                              Sincerely,
17
18                            Victoria S. Fricano, RPR
                              Orange Legal, Inc.
19
     cc:  Robert N. Belle, Jr., Esquire
20        Ryan D. Bresler, Esquire
21   Waiver:
22   I,_____, hereby waive the reading and signing
     of my deposition transcript.
23
     _____        _____
24   Deponent Signature          Date
25   *Federal Civil Procedure Rule 30(e)/Florida Civil
     Procedure Rule 1.310(e)
```



**Orange Legal**
**800-275-7991**

Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                      Index: 1..attachment

## Exhibits

032819_A.Graves_ Exhibit 01  3:12 8:8

032819_A.Graves_ Exhibit 02  3:13 8:20

032819_A.Graves_ Exhibit 03  3:15 9:6

032819_A.Graves_ Exhibit 04  3:16 9:15,21

032819_A.Graves_ Exhibit 05  3:18 15:20,21

032819_A.Graves_ Exhibit 06  3:19 49:11

## 1

1  8:8,22
10:00  58:11
10th  23:19 24:7 29:15
11:00  58:11
12:00  52:8
14th  48:14,16
160  72:9,16
180  72:13,18
19  48:9
1982  6:1,3
1986  6:3,7
1988  6:7,8
1993  6:8
1995  6:12
19th  28:2,4

## 2

2  8:20,22 41:8 58:12
2-3  34:3

2005  6:12
2015  6:13
2016  10:3 17:5 19:1 23:19 24:7 27:22 28:3,4,17 29:16 32:9 41:9 46:10 50:1,22 51:4 71:10 86:2
2017  75:9,13 81:2
2018  15:9 73:24 83:23 84:3
2019  47:1 48:6 84:15
22nd  75:9,13
25th  15:9
27th  50:1,22
28th  81:2
2nd  73:24

## 3

3  9:6,18
36-  59:3
36-year-old  88:4
37-year-old  59:3

## 4

4  9:15,18,21 53:15 86:2
4-5  34:3
4:00  51:20
4th  19:1 32:9

## 5

5  15:20,21
5/10/16  29:19
5/25/18  15:18
5/4/16  17:12

## 6

6  49:11 53:15

6:00  51:20 52:8
6:13  88:25

## 7

7  58:11
7th  47:1

## 8

8  53:15 58:11

## 9

9th  10:3 17:4,5 41:9 46:10 71:10

## A

abduction  59:15 66:2 72:17
ABER  58:12 65:18, 21,22
ablation  47:23 76:12
abnormal  21:1
abnormalities  33:16
abnormality  19:14 20:14,16,17 21:3,10, 19 22:7 87:17
Absolutely  81:25
AC  61:23 62:23,25
academic  5:23
access  13:17
accessed  13:25
accident  25:5 31:22, 25 32:7,11 34:8 39:16 41:13 47:6 51:2 64:13 65:12,13 66:22 79:5,17 86:1
acromioclavicular  62:25
acromion  63:6 78:8

activities  45:19
actual  8:14 24:17 87:23
acute  19:13,18 20:13,15,20 21:10, 18 64:6,13
add  83:11
addition  57:12 74:17
additional  15:10 40:25 41:3 44:20,22 49:9
address  80:13 84:7
adopted  35:9,19
adult  6:19
Adventhealth  7:5
affect  39:18
affirm  5:3
age  59:9
aggravated  31:24
aggravation  32:3
agree  27:4
Alan  5:7,14
Aleve  74:16
Alton  6:5
American  6:11
amount  14:25 33:14 38:2 42:19
analysis  60:9
anatomically  39:1
anatomy  58:22
anchor  54:22
and/or  76:12
anesthesia  73:15
angle  66:1
ankle  26:23,24 27:5, 6 45:16
anterior  59:20 61:9, 16 75:23,25
anteroinferior

58:17
anti-inflammatories  74:15
AP  41:21
appearance  29:22 33:6 34:22 35:16
appears  53:5
appointment  49:23
April  73:24
area  6:16 22:7 33:17 37:21 53:1,9,10,11, 24 54:15 56:5 69:3, 21 74:4,7,8 77:22 78:10 83:8
areas  38:3 63:24 75:25
arm  21:9,16,23 54:25 59:19 67:24 72:13,21,25 82:23 87:17
arthritis  25:1
arthrogram  51:6,9, 11 73:6
arthroscopic  79:21
arthroscopy  75:14 81:4
arthrosis  24:12,14, 23 25:4,7
articular  62:12 77:4
as-needed  85:16
assuming  49:23 54:4
assumption  45:12
asymmetric  42:20
attach  49:6
attached  52:22 56:1 76:11 81:7,9,10
attaches  60:16,17
attaching  55:15
attachment  52:23 60:14


**Orange Legal**
**800-275-7991**

Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.

**attend** 6:2

**attended** 5:25 6:4

**attention** 28:20
49:25 71:10

**attorney** 8:11

**attorneys** 8:17

**August** 28:2,4,17

**automobile** 25:5
31:22,25 32:7 34:7
79:5 86:1

**aware** 28:21

**Axial** 58:11

---

**B**

**back** 9:8 17:19 23:15
24:16,19,20 25:19
27:13 28:20 30:7
39:22 42:13 43:1
45:14,18 57:3 62:5
67:15 70:7,9,11
72:22 74:7,13 76:2
80:18 83:9,19,21
84:18 85:6

**background** 5:23

**bad** 38:19,23 45:22

**ball** 55:7 59:21 60:1
61:23 62:10 70:5,11,
16

**band** 61:9,10

**based** 14:24 22:8
36:8 40:7 45:7 46:7,
13 49:22 50:20
64:10 86:13

**basically** 14:22
21:24 33:15 40:17
56:13 58:13,19
59:15 61:1 76:13

**basis** 85:16

**bearing** 18:20

**began** 6:10

**begin** 7:25

**beginning** 86:12

**begins** 51:16

**behalf** 12:14,15

**Belle** 5:11 8:24 9:11,
20 13:22 14:1,6,8,14
15:3,4,23 16:25
17:18 22:3,4,21,25
23:1,15 36:19 39:20
40:9 41:10,15 43:15,
16 45:1,2 46:1,14
48:15,19,24 49:5,8,
13 50:5,8 57:5 59:17
68:20 69:7,25 79:10
87:1,5,8,19,25
88:10,15,21

**belt** 68:6,9

**bend** 24:18 37:11

**bending** 42:12

**biceps** 54:25 61:4
77:3

**big** 61:4 80:16 82:20

**bigger** 55:10

**bill** 16:20

**billed** 14:25 15:5

**billing** 13:8,13,19
15:10 16:15

**bills** 14:24

**biomechanical** 60:6

**bit** 5:22 30:7 34:4
37:25 42:18,22 77:8

**black** 63:22

**blade** 55:5 63:1
76:10

**blocks** 42:8 77:18

**blue** 57:2 76:3

**board** 6:11,14

**body** 6:16 19:7
21:13 27:7 33:17
39:23 46:2,3,4 54:22
62:24 67:11,23
75:18

**bone** 21:11,16 52:23
53:6 55:16 57:14
63:2 64:18,22 77:22
78:6 79:13,15 83:9

**bones** 37:15 55:14

**bony** 21:20,21 52:6
55:2 63:3 70:12,19
76:7 78:8 80:8

**breast** 67:20,21 68:1
71:17

**Bresler** 8:17 10:23,
25 11:2 14:4,7,13
15:2 16:22 21:25
22:20,23 36:15
39:13 40:5 41:8
43:14 44:25 45:24
46:12 48:12 49:3,7
50:3,6 56:21 59:11
68:17 69:22 79:6
86:11 87:10,22 88:7,
13,24

**Bresler's** 10:15,17

**briefly** 11:3

**brighter** 53:5

**bring** 13:8,11 28:19

**broken** 21:11

**brought** 8:10

**bruise** 71:17

**bruising** 39:16
67:18,25 68:9,12,15,
18 69:1,2 73:2

**bulge** 38:25

**bur** 79:15

**bursa** 77:16 78:9

**bursal** 78:9 79:13

**bursitis** 78:3,11,14,
15,16,17,18,24 79:4,
7 86:20,24,25 87:2,4

**business** 12:6

---

**C**

**C2-3** 33:6 41:25

**C2-c3** 33:5

**C3** 34:2,3

**C3-4** 41:25

**C4** 34:2

**C5-6** 41:25

**C5-c6** 34:20

**C6** 34:21

**C7** 34:21,24

**C7-t1** 34:25

**call** 16:7 64:21 70:25

**called** 5:8 29:23
47:23 51:11

**camera** 77:7

**canal** 24:12 25:15
33:9,10,12,13,15
34:19,23 35:1

**capsular** 53:17 66:9

**capsule** 55:13 62:18

**care** 14:23

**cartilage** 61:22,23
62:12

**case** 11:23 12:18
16:10 17:3 25:6,8
31:8 39:6 42:15,24
57:13 64:2 69:16
73:10 80:11,20
82:24 83:7,12

**cases** 11:24 12:2
13:4 64:19 70:4
79:13

**catching** 83:24

**caused** 25:4 31:20
43:8,11,12 53:9
79:17 86:1,3,20

**causing** 77:23 79:4

**cautery** 76:14

**Celebrex** 74:17

**central** 63:16 70:23

**certainty** 40:1 68:14

**certification** 6:11

**certified** 6:14

**cervical** 19:20,21,
22,25 20:4,11,14
23:8,21 28:24 29:5,
8,14,15,19,20,22
30:2,6 32:14,19,22
33:13 35:16,17 39:8
40:2,15,17 42:4
44:17 46:24 47:1

**C5-c6** 34:20

**C6** 34:21

**C7** 34:21,24

**C7-t1** 34:25

**call** 16:7 64:21 70:25

**called** 5:8 29:23
47:23 51:11

**camera** 77:7

**canal** 24:12 25:15
33:9,10,12,13,15
34:19,23 35:1

**capsular** 53:17 66:9

**capsule** 55:13 62:18

**care** 14:23

**cartilage** 61:22,23
62:12

**case** 11:23 12:18
16:10 17:3 25:6,8
31:8 39:6 42:15,24
57:13 64:2 69:16
73:10 80:11,20
82:24 83:7,12

**cases** 11:24 12:2
13:4 64:19 70:4
79:13

**catching** 83:24

**caused** 25:4 31:20
43:8,11,12 53:9
79:17 86:1,3,20

**causing** 77:23 79:4

**cautery** 76:14

**Celebrex** 74:17

**central** 63:16 70:23

**certainty** 40:1 68:14

**certification** 6:11

**certified** 6:14

**cervical** 19:20,21,
22,25 20:4,11,14
23:8,21 28:24 29:5,
8,14,15,19,20,22
30:2,6 32:14,19,22
33:13 35:16,17 39:8
40:2,15,17 42:4
44:17 46:24 47:1

71:16 72:6,7 73:12
74:7 84:6 85:7

**cetera** 76:24

**challenge** 38:20

**challenging** 37:25
38:15

**chance** 11:23

**change** 31:7 44:24
45:5,22 46:3

**changed** 11:21

**charge** 14:22

**check** 79:24

**Chiari** 29:23 31:11
32:10 35:13

**circumstances**
42:12 55:23 59:4

**claim** 39:10

**clarify** 36:16

**clavicle** 63:5,7

**clear** 56:23 87:12

**clinical** 19:11 36:7
43:24 59:1 71:3
86:13 87:3

**clock** 52:3,8 61:15
75:18,21

**CME** 10:12 11:10,20

**codes** 28:8

**collarbone** 63:7

**collect** 16:21

**collection** 16:20

**collections** 16:24

**collects** 16:3

**color** 81:9,15,23

**combine** 51:10

**common** 45:17 74:6

**communicated**
10:20

**compared** 55:6

**comparison** 51:17,
18



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.

Index: complaining..documents

**complaining** 39:8 82:12

**complaint** 28:20 72:7

**complaints** 28:14 32:2 71:14,22 78:23 83:21 84:9 85:3 88:5

**complete** 40:13 44:12 54:21 56:17

**completely** 59:24 70:5,6 72:18

**completeness** 11:18

**completion** 6:9

**complex** 37:7 61:12 63:2

**complicate** 38:4

**complications** 76:17 80:25 82:7

**component** 46:15

**composite** 7:23 8:8, 20 9:6,15,21

**compulsory** 9:12 10:4 12:23

**computer** 13:15,18 81:16

**concerned** 33:18

**concluded** 46:10 88:25

**concludes** 58:15

**conclusion** 34:10 46:19 47:3

**conclusions** 32:13

**concur** 29:10 51:14

**concurred** 29:11 35:8 50:21

**condition** 31:24 32:4,6 78:17

**conducted** 22:9 24:7 50:1

**conflicting** 69:12

**confluence** 56:4

**confuse** 8:14

**connects** 56:13,14

**conservative** 74:21

**consistent** 32:3 53:17 78:11,12

**consulting** 12:20

**context** 31:3,5

**continue** 42:14 82:2

**continued** 74:18

**continues** 33:22

**continuous** 54:24

**contours** 24:13

**contrast** 51:10 54:2 56:17

**conversation** 11:2,5

**conversations** 10:16

**cool** 57:7

**copies** 8:5 9:1 14:11 81:24

**copy** 8:1,4,12 13:13 81:16 88:23

**cord** 33:12,13

**corner** 70:18

**Coronal** 53:15

**correct** 7:8 10:5 12:7 21:5 22:11 31:18,19 33:24 35:21 50:16,17 52:15,19 65:14 69:23 72:1 87:21

**corrected** 15:15 42:1

**correctly** 86:15,22

**correspondence** 10:13

**counting** 11:7

**Countryside** 18:7 23:3

**couple** 10:10 17:10 46:21

**court** 5:3 7:20 16:21 48:25 88:19,23

**covered** 62:7,11,14, 16

**covering** 55:14

**crash** 67:10

**CROSS-EXAMINATION** 86:10

**cuff** 51:1 55:24 56:1 60:17 63:12,13,14, 15,16,17 70:23 77:3, 8,10,15,21 78:9 80:18

**cuffs** 70:24

**culprit** 38:21

**curvature** 30:3,10

**curve** 30:7

**cushion** 77:17 78:9

**CV** 8:1 81:9

---

**D**

**damage** 75:21

**date** 14:25 15:5 17:4 32:8 34:15 41:13 65:11 71:15 73:23 75:5,6 81:2

**dated** 17:12 29:15, 19

**dates** 41:3

**day** 40:25

**days** 81:2

**debride** 75:16

**debrided** 75:14 83:8

**debridement** 75:24 76:1,12,16

**December** 83:23 84:2

**decide** 11:15

**decompression** 75:15 78:4

**decreased** 72:20 85:1

**deep** 62:2

**defect** 70:14,16

**defendant's** 8:22 9:18 15:21 49:11

**Defense** 8:7,20 9:5, 15 15:20

**defer** 72:8

**deficit** 17:20

**defined** 62:20

**definition** 52:12

**deformity** 58:12 65:18,20

**degree** 6:1,4 26:17 27:10 40:1 68:14 79:3 85:24 86:5

**degrees** 27:5,8 45:18 72:9,16

**denervating** 47:25

**depending** 53:3

**depends** 16:23

**deposition** 11:13,25 12:3 88:25

**depth** 55:12

**describe** 52:4,10 67:4

**describes** 53:14

**description** 52:7

**destroying** 47:25

**detachment** 76:7

**detail** 24:9

**determine** 44:16,18 74:10

**determined** 32:21

**develop** 30:18 34:16 37:17 65:5 86:21,23

**developing** 78:13

**develops** 64:5,8

**diagnose** 25:22 26:12 27:10 30:14 39:4

**diagnoses** 22:13

**diagnosis** 25:25

**28:7 35:22 36:8 38:10 43:21 54:14

**diagnostic** 17:7,10, 12

**differential** 43:21

**differentiate** 38:9 39:9

**difficult** 34:17

**diligence** 82:19

**dimension** 55:9

**diminished** 30:11 39:14

**diminutive** 58:10,21 65:17

**direct** 5:10 16:3

**direction** 42:17 65:24 66:3

**disc** 24:13 25:19 33:7 34:4,5,7,16,22 35:1 37:7 38:19,24, 25 81:7

**discuss** 48:5 56:25

**discussed** 40:8 48:4 73:2 82:5

**discussion** 28:11 76:3 88:18

**dislocated** 19:17 69:16

**dislocation** 19:24 20:22 21:11 70:3,4

**dislocations** 41:23

**displays** 17:17

**distinction** 70:25

**distinguish** 39:7 64:11

**Doc** 83:17

**doctor** 5:12 18:11 28:22 33:1 36:13 45:20

**doctorate** 6:3

**document** 9:13

**documents** 18:15



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.

**draw** 47:3 49:25

**driven** 59:22

**due** 30:17 82:19

**duly** 5:8

**dummy** 67:10

**dye** 54:1,10,13 56:11,12,16 57:15, 18,24 58:5 73:17

---

**E**

**earlier** 6:21 27:14 29:2 67:16 86:19

**early** 24:23

**ease** 75:6

**easier** 7:22 9:24 52:10

**easily** 9:3

**easy** 76:2

**edema** 51:21 52:18, 23,24,25 53:7,8,22 64:18,22

**edematous** 60:13,18 61:6 64:25 79:13

**elbow** 21:17,24 22:7

**electric** 76:14

**eliminate** 22:15

**emergency** 18:6,11, 15,16,25 22:22 23:3 41:24 67:17

**employed** 5:15,17, 19 6:22

**encompass** 15:12

**end** 49:6

**engineering** 60:6

**enhance** 51:9

**enlarged** 60:18 61:3

**entire** 26:7

**envision** 67:10 69:1

**equivalent** 25:1

**ER** 22:19

**essentially** 47:24 77:6

**estimated** 83:2

**evaluate** 80:10

**evaluated** 19:2

**evaluation** 9:12 19:3 41:19

**evaluations** 12:24

**evasive** 27:3

**evidence** 8:15 19:24 36:3 44:1,11 53:7, 15,25 54:18,19 63:17 64:17,21 69:11,18 70:2 77:22 78:3

**exact** 81:1

**exam** 10:5 40:20 72:24 84:1,11

**examination** 5:10 9:13 71:24 72:3

**exams** 12:24 13:1

**exception** 33:14 73:2

**Excuse** 38:14 55:24

**exhibit** 8:7,8,20,22 9:6,15,18,21 15:20, 21 23:16 36:25 48:20 49:11 81:8

**exhibited** 67:18

**exit** 25:17

**expect** 25:7 26:6,13 27:14 31:8 39:17 56:11 57:24 59:2,5, 8,10 80:7 83:4 88:3, 5

**expected** 58:10

**expecting** 80:3,5,8

**expense** 81:21

**experience** 60:5 83:15

**experiencing** 46:9

**expert** 13:3

**explaining** 82:2

**explanation** 42:9 51:24

**extend** 42:13

**extended** 43:1

**extension** 40:16 41:22 42:1,17

**external** 66:2 72:19

**extremity** 73:1

---

**F**

**face** 30:5 52:8 61:15

**facet** 24:11,14,20,24 25:4,7 32:23 33:5,7 34:22,25 35:20,23, 24 36:4 37:2,4,8 38:10,11 40:3 42:20 46:11 47:8,9,17,25

**facets** 24:15 47:17

**facility** 15:1,19 24:1

**fact** 46:7

**fair** 27:16 35:9 45:20 50:20 56:6 66:11 67:5 79:20

**fairness** 36:16

**fake** 44:4

**familiar** 14:20 16:12,14 56:7

**Farley** 7:11 8:2 9:2, 12,23 10:2 14:23,25 15:6 23:4,7,18 27:11 32:7 39:4 40:2,14 46:8 67:19 79:5,18 85:25

**Farley's** 50:2 59:9 87:16

**faster** 75:11

**feel** 48:9 63:3

**felt** 77:3

**fibers** 63:16

**fibrous** 37:14 52:5, 22

**figure** 68:4

**file** 7:14 10:19 48:13

**fill** 57:17,21

**fills** 33:13

**film** 31:15 33:17 56:16 57:25

**films** 22:24 23:7 29:6,7

**final** 9:11 18:9 20:10 35:2 64:23,24 70:22

**find** 31:12 41:1,11 76:16

**finding** 25:12 30:1 51:13 53:13 63:14 65:16

**findings** 19:11 24:6 29:10,13 33:2,4 34:18,20 35:15 36:18,22,24 51:14, 19 53:17 58:15 75:22 77:25 85:2 87:13

**finds** 66:7

**fine** 14:13 17:24 77:2,4 82:11

**finish** 39:22 53:12 69:6

**fix** 47:14 79:25

**fixed** 31:2,3

**flex** 40:18

**flexed** 42:25

**flexion** 40:16 41:21, 25 42:2,3,16 72:9

**flip** 14:8

**Florida** 5:21 6:10

**fluid** 33:14 53:4,5 54:1,10 56:19 57:16

**fluid-filled** 53:16,25 54:18

**follow-up** 44:18 45:3 85:7

**foramen** 35:1

**foramina** 24:12 25:16 33:9,10,15 34:23

**forever** 31:1

**form** 15:2 16:22 21:25 22:20 36:15 39:13 40:3,5 43:14 44:25 45:24 46:12 56:21 59:11 63:7 68:17 69:22 79:6 87:5,19,25 88:10

**forms** 55:1

**formulated** 86:16

**forward** 37:8 61:16 72:9,10 77:24

**found** 20:17 31:10

**Foundation** 6:6

**fracture** 19:24 20:22,25 64:17,22

**fractured** 19:17

**fractures** 41:22

**frame** 15:13

**frank** 70:3

**fray** 76:5

**frayed** 57:4 58:11 65:17 76:4,8 83:8

**fraying** 57:9 58:23, 25 59:2,5,10 64:1,4 87:14,16,17 88:9

**frequently** 47:12 70:8 77:18

**front** 7:8,14 13:15 17:14 23:10 60:15 61:12 62:4

**full** 5:12

**fully** 83:17

**function** 42:7

**fundamental** 21:22 22:1

**future** 85:13

---

**G**

**G-R-A-V-E-S** 5:14

**gadolinium** 73:5

**gap** 57:13



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                                                      Index: gave..jury

**gave** 17:17 81:17

**general** 6:6,17,18 43:12,23 45:10 61:2 80:12

**generalized** 26:6

**generally** 19:16

**generate** 29:9,11 50:18

**generated** 38:10

**generators** 38:17

**genetic** 30:14 31:18

**genetically** 43:17

**genetics** 43:23

**gentlemen** 88:15

**give** 5:4,22 9:8 17:19 23:15 26:5 56:24 60:21 66:18,20 73:3, 5 81:1 84:18

**glenohumeral** 58:17 59:20 60:12, 14 61:9,21,25 62:1, 7,9,14 66:10,17 69:10,12 77:4

**glenoid** 52:6 62:10 70:18

**good** 43:4 44:1 45:22 77:12 80:6

**graduated** 6:3

**Graves** 5:7,14

**gray** 63:23

**great** 83:17

**Griffith** 8:17

**guess** 6:18 9:5,14 16:7 49:8 68:11,23 70:1 84:14

**guys** 16:15,20

---

**H**

**hand** 67:14 72:25 82:12

**handle** 39:24

**hanging** 76:4

**happen** 12:17

**happened** 25:9

**happy** 24:8

**Harbor** 5:21

**hard** 34:13 41:17 70:12 81:16

**harness** 68:7

**hatchet-shaped** 70:13,16

**hate** 38:16

**head** 70:14

**headaches** 47:13 71:17

**heal** 26:3,14 45:14 65:8

**healing** 82:11

**heals** 46:3

**heard** 34:19

**heart** 32:9

**held** 37:13

**helping** 55:14

**hem** 57:3,12 76:5

**Hey** 83:17

**high** 26:22

**higher** 77:8

**highly** 26:4

**Hill-sachs** 70:3

**hip** 6:20 86:24

**hold** 20:9 55:14,20, 21 88:20

**holding** 67:10

**holds** 37:14

**home** 80:25

**hooks** 63:4

**hospital** 7:3 18:7 23:3 29:3

**humerus** 21:8,14,16 62:10 67:21,22

**hurt** 45:21 68:5

**hyperabduction** 58:16 59:14

**hyperextension** 66:8

**hypertrophied** 60:13 61:4

**hypertrophy** 34:25 61:2

---

**I**

**ibuprofen** 74:16

**identically** 34:3

**identification** 8:23 9:19 15:22 49:12

**identified** 53:16 78:23

**identify** 57:22

**images** 53:15 58:11, 12 65:18,21 66:6

**imagine** 62:18 77:9

**immobile** 83:10

**impacts** 70:12

**impingement** 78:3 79:4,8,9,11,12,17 80:8

**implying** 20:21

**important** 69:7

**impression** 19:13, 22 20:11 24:8,10,11 25:13 35:3,6,13 64:23,24

**impressions** 35:10 66:12

**improve** 31:9 47:18

**improved** 27:20

**improvement** 83:5

**incidental** 29:23

**incision** 47:21

**include** 7:22 8:1

**included** 11:17 18:10 19:21 41:21 48:22

**includes** 8:18

**including** 6:6 9:3 47:6

**incorrect** 41:14

**indefinitely** 26:7

**independent** 12:24, 25

**indication** 58:2 68:15 80:7

**indication's** 21:9

**indications** 59:25

**indifferent** 45:23

**individual** 86:14

**inferior** 52:9 59:20 61:9 64:24 66:9

**inferiorly** 51:20

**inflamed** 74:9 77:19

**information** 10:14 18:24

**initial** 19:1 41:5,18 44:15 71:13,21

**initially** 22:19

**injection** 38:11 47:14 73:5,9,18 74:1 85:21

**injections** 47:8,10 73:4,10 85:8,13

**injured** 37:16 46:2

**injuries** 38:1 46:24 53:9

**injury** 20:24 25:23 26:12,13,17 32:14, 18,20,21 39:4,10,11 40:3,14 53:1 58:16 59:6,9,14 61:7,8 65:7 66:8,13,15,19, 21 67:5 68:2,16,19, 25 69:14 78:11,16, 19

**insert** 77:14

**inside** 54:22 62:3 76:15,20

**inspect** 77:1,21

**instance** 26:23 27:6 29:4 30:13,23 38:22 54:20 56:10 61:3 83:7

**instances** 12:18 70:8

**instructions** 18:19

**instrument** 76:10

**intake** 19:1

**interest** 6:19

**interested** 75:1

**internal** 72:21

**intersection** 55:18

**intervention** 47:18

**interview** 28:14

**invariably** 57:3

**involved** 23:21,22 32:7 34:8 79:18 86:2

**issue** 82:20 84:7

**issues** 21:23 80:3

**item** 7:23

**items** 13:11

---

**J**

**January** 48:14,15, 16 84:5

**jeans** 57:2,11 76:3

**Jennifer** 7:11 8:2 23:4,7 46:8 67:19 85:25

**joint** 42:20 48:1 51:9 55:1 59:23 60:1,16 61:24 62:3,23,25 63:1,8 69:13 77:10

**joints** 24:15,20,24 33:5,7 34:22 36:4 37:4,5,8,13

**Joseph** 5:14

**junction** 51:21 52:18 53:6,22

**June** 50:1,22

**jury** 21:13 37:2 54:22

---



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.

**K**

keeping 17:25

kind 51:8 55:20
58:13 79:20

knee 6:20 37:15 65:7

knock 70:17

knot 74:6

knowledge 82:16
85:20

kyphosis 31:6

**L**

labeled 18:9

labral 51:19,25 52:4,
11,14 53:16,17 54:1,
19,21 64:25 66:9
68:19,25 75:14,16,
17

labral-glenoid
51:21 52:17 53:22
64:25 65:4

labrum 52:5,11,22
53:21 54:22,24 55:8,
20,21,23 56:12,14,24
57:9,14 58:8,9,21
61:10 65:17 75:23
78:24

lap 68:10

large 83:7

lateral 41:21

laxity 41:25 42:2,25
43:2,7,9,17,21,22
44:13,16,17,24 45:5,
11

leathery 55:14

leave 80:16

leaving 18:19

left 21:9,23 22:8
37:20 39:1 40:11
50:2,3 67:20,21
71:14,16,17 72:4,8
73:18 75:13 83:22,
24 85:8,21 87:13,18

lesion 70:3,15,17,19

letters 15:24

level 25:17 33:2 34:2
37:5 62:2

levels 42:25

lie 25:16

liens 16:4

life 26:7 30:19 46:11

life-altering 27:2

ligament 60:12,14
61:12,25 62:1

ligamentous 45:11

ligaments 37:14,16
38:19 45:13,17

likewise 42:12

limits 22:10

lined 42:22

lines 19:18

lingo 33:22

list 11:23 12:2

listed 19:9 51:19
75:22 82:19 85:4

listing 51:16

localized 74:4

location 7:1 59:10

locations 27:6

long 26:2 30:24 63:2
65:4

long-standing
77:19

longer 69:14

looked 14:17 18:17
22:23 29:7 44:14
50:17 72:8

lordosis 29:20 30:1,
12,14,18,20,24 31:6
35:15

loss 29:20 30:1,12,
14,20 35:15

lot 14:4 16:23 17:22

Louisiana 6:2

lower 24:11,20
25:18,19

lumbar 17:13 19:10,
12,14 23:8,22,23
24:6,11,14,15,20
25:14,22,25 26:1
27:17,18,25 28:5
29:5 71:16

Lynette 16:18

**M**

M.D. 5:7

maceration 51:19
52:1,11,12 57:9
64:25

machine 20:6,7

Madam 48:24

made 29:22 49:23
74:10

main 38:21

make 7:23 9:24
14:12 16:9 33:19
34:14 38:10 46:18
52:7 74:22 75:11
87:11

makes 52:4 55:9
57:20

making 45:12 88:1

malformation
29:24 31:11,17,18,
20 32:10 35:13

malingering 44:3

Man 14:10

manageable 74:22

manager 16:16

mapping 58:13

March 47:1 48:6,9,
11 84:15

mark 7:21 9:5 48:23
49:1

marked 8:6,7,20,22
9:9,14,18 15:20,21
41:13 48:20 49:11

marking 49:4,5

marrow 64:17,18,22

master 6:1

match 39:2

matter 76:7

meaning 25:15
56:13 87:16

means 19:16 33:16
45:13 52:10,11,13,
25 58:10,22 61:2

meant 55:25

Mease 18:6 23:3

mechanism 67:5,7

medical 6:3,4,5 7:14
8:1,16,18 9:12 10:4
11:18 12:20,23,25
26:18 40:1 68:14
79:3 85:24 86:5

medications 47:7
74:15

Medicine 6:2

meeting 10:2

mention 20:22

mentioned 34:4
35:14 48:8 73:22
86:12,19 87:11

met 9:23 11:3

method 66:19

mid 29:20 30:1
35:15

middle 60:12,14
61:25 62:1,14

mild 24:11 30:1,14
34:25 63:16 64:2
70:25 71:1

millimeter 42:19

mind 7:24

mini 88:21

minor 70:23 71:1

minute 36:10

minutes 17:2

marking 49:4,5

missing 46:16 84:23

mistake 88:8

Mobic 74:16

moment 65:6 72:8

month 27:1

months 26:11 49:18

motion 24:17,19
37:6,10 39:15,18
42:23 43:25 59:15
72:10,19 83:25 85:2

motions 82:23

motor 32:11 51:2

move 42:10,14,18,21
46:24 58:7 60:8
71:6,8

moves 42:11

moving 62:13 82:14
83:14

MRI 23:6 24:7 28:24
29:15,19 34:13 36:1,
3 38:23 50:1,3 51:8,
11 53:5 63:22 64:10
65:23 69:20 77:5
80:6,9 87:13

MRIS 23:18

multiple 86:17

muscle 44:1 54:25
60:17 73:21 74:4,8,
17

muscles 38:19

**N**

narrowing 34:4,5,7,
16

natural 61:5

naturally 43:2
60:25

nature 30:15 43:23

necessarily 47:15
58:21

neck 20:9 24:19 30:7
33:12 37:9,11,15,23
38:1,3,7,8,18 39:11,



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.

17 42:4,16 44:17
47:12 84:7

**needed** 71:7 74:12

**negative** 36:21
64:22

**nerve** 25:16,17
38:19 47:25

**neurectomy** 47:24

**neurologic** 72:24

**nice** 62:12 63:2

**non-traumatic** 53:9

**normal** 20:1 30:3
31:9 33:6 34:22 36:7
42:12 44:19 45:14
55:23 58:20 59:4
64:20 72:11,12,13,
24 73:1

**North** 7:5

**Nos** 8:22 9:18

**notation** 29:23
61:14

**note** 16:8,9 40:25
41:12 84:18

**noted** 41:17

**notes** 9:1 18:11,17,
18 19:5 41:3

**nothing's** 49:21

**noting** 60:18 61:12

**number** 7:7 48:24
77:18 80:9 81:8

**numbness** 72:25
82:12

───────────

**O**

**objection** 49:1,3
87:5,19,25 88:1,10

**observation** 60:20

**observe** 56:19 58:25
60:24,25 75:21
79:23

**observed** 21:3 43:7,
10 64:12 65:12 68:1,
12 69:20

**occasion** 7:10 23:6

**occult** 20:24 64:21

**occur** 30:19 43:2,17

**occurred** 43:18
66:13,16

**occurring** 30:19
37:10 60:25

**occurs** 24:17 37:6

**Ochsner** 6:5

**office** 9:1 10:15,17,
21,24 15:19,24 16:3,
14,16 40:25 41:3,20
43:11

**open** 25:18

**open-mouth** 41:21

**opening** 42:20

**openings** 25:17

**operate** 15:24

**operative** 9:4

**opinion** 32:17 39:25
40:13 42:24 43:6
46:6 66:15,18,20
69:9 85:23 86:3

**opinions** 11:21
22:13 66:12 86:4,13,
16

**opportunity** 14:18
50:9

**opposed** 87:23

**opposite** 31:6

**order** 9:3 17:25 18:3
88:21

**ordering** 88:19

**ordinary** 12:6

**Orleans** 5:25 6:6

**orthopedic** 5:18,20
6:8,12,15,23

**orthopedics** 6:17,18

**oscillates** 76:10

**osseous** 21:10,19,20

**outpatient** 80:25

**overlap** 38:2

───────────

**P**

**p.m.** 88:25

**packet** 11:17

**packets** 7:25

**pages** 14:5

**pain** 19:23 21:9
28:14,20 30:17 32:2
36:8 37:17,21,23
38:8,9,16,18,19
39:7,15 42:16 43:25
44:8 47:5,12 51:1
71:13 72:17 74:19
77:20 78:20,23 79:8
83:21,24 85:3

**painful** 72:11 74:6,9

**pair** 57:2,11

**Palm** 5:21

**paper** 7:8 17:23
23:17

**papers** 18:1

**paragraph** 35:14
58:7 60:12 63:13,15

**pardon** 29:16

**Parrish** 16:18

**part** 13:1 21:13 27:7
28:11 29:25 37:8,9,
10 39:23 52:15
53:13 54:21 55:4
60:8 61:17 62:23
63:3 67:22 73:11
75:17 86:14

**partial** 56:18

**partially** 45:13

**past** 8:18 11:17 12:3
13:1 25:9 85:2

**patent** 24:12 25:15
33:9,10,16 34:23
35:1

**pathology** 36:4

**patient** 7:11 12:15,
16,17 17:3,6 18:19
23:7 25:10,22 26:2,

12,16 27:17,22
28:12,16,24 31:1
32:3,12 34:15 35:19
36:17,21,23 38:3,22
39:3 40:18 41:4
43:3,7,13 44:13 45:4
46:8 47:16 48:3
49:15 51:5 54:2
56:25 65:5 67:18,19
70:10 71:9 73:3
74:5,11 75:12 76:15,
21 78:18,20 80:22
81:17 82:3 83:19,20
84:2,15 86:17

**patient's** 43:12
50:22 71:13 78:23
80:23

**patients** 16:4,19
26:9,10,11 38:1
60:24 61:1 83:15

**pay** 16:5,10,19

**payment** 16:3

**payments** 16:3

**PDF** 88:21,22

**people** 12:24 26:24
44:2 68:8 75:2

**perfectly** 42:22

**perform** 12:23
28:23 72:3 75:12
84:25

**performed** 12:25
17:7 19:3 23:18 24:1
28:24 40:16 41:20
43:10 46:10 71:23
75:13 83:22 84:11
85:25

**period** 15:15 45:4
67:12

**permanent** 26:17
32:14,18,21 40:3,14
47:14

**persistent** 69:19

**person** 20:6 30:18
37:19 38:7 43:17,23
44:16 47:9 54:20
56:11 59:8 66:19,21

**person's** 16:17 26:7

**pertain** 7:14

**pertinent** 18:14,24
28:11

**phone** 11:4

**phones** 29:17

**photographs** 68:13
81:9,10,15

**physical** 40:19 47:7
48:13 71:23 72:3
74:18 83:13 84:1,11,
25

**physician** 13:6
18:11 24:3

**physicians** 19:2

**pick** 22:15 23:14

**picked** 76:23

**picture** 43:25 44:7,
12 86:13 87:3

**pictures** 65:23

**piece** 70:17

**pieces** 7:7 23:17

**Pinellas** 7:5

**place** 6:24 60:2

**plaintiff** 12:14,17

**plan** 85:18

**plane** 20:25

**plenty** 68:8

**point** 26:13 27:14
28:24 39:4 69:3
73:18 74:1,2 82:18
85:10,14 86:21

**pointed** 22:7 36:14

**pops** 70:9

**pores** 81:4

**portion** 19:7 25:12
52:6 55:2 56:14
60:15,17 61:6 62:4
63:3 67:24 73:1 76:7

**portions** 72:2 76:8

**position** 79:16

**positional** 82:13



**positioned** 20:6

**positioning** 20:2 44:19

**possibility** 34:12

**possibly** 36:8

**Post** 85:20

**post-doctoral** 6:5

**post-op** 83:13

**posterior** 58:8,9 61:10 65:17 75:23, 25

**postoperative** 82:3, 4

**postulating** 59:13

**potential** 77:23

**practical** 56:24

**practice** 5:20 6:10 7:1 8:3 13:2

**pre-arthritis** 25:1,3

**preparation** 11:13

**present** 30:2 36:12 37:23 64:13 70:20

**presented** 18:25 84:9

**presenting** 38:8

**pretty** 71:8 80:6,20 82:25

**previous** 10:16 41:23

**previously** 48:21 78:23

**primarily** 6:20 53:18

**prior** 8:18 51:17 59:9 64:13 65:13 84:10

**private** 6:10

**privileges** 7:3,4

**probability** 26:18 68:14 85:24 86:6

**probe** 77:2

**probed** 76:6

**problem** 17:24 25:20 26:25 31:3 47:23

**problems** 77:23 83:18

**procedure** 48:2 75:12 76:18 80:23

**process** 64:7

**promise** 16:5

**promissory** 16:8,9

**protection** 15:25

**provide** 81:23

**provided** 11:10 12:3 14:23

**pull** 32:8

**purpose** 21:12 50:25 67:3 73:25

**purposes** 40:12

**put** 8:10 9:2 42:16 44:7 54:2,11 56:11, 22 57:17 65:9

**putting** 53:20

### Q

**quantitate** 27:12

**quarter** 55:6

**question** 34:1 41:2 43:4 70:22 81:5

**questions** 17:11 86:8,9 88:14

**quickly** 71:8 83:1

**quote** 32:8

### R

**radiating** 51:1

**radiofrequency** 47:23 76:12

**radiographic** 8:2 19:13 20:14,15 21:6 22:6 35:21 36:3,7,

11,17,22,24 39:12 41:19 50:21

**radiographs** 41:24

**radiologic** 41:19

**radiologist** 20:13 24:22 31:13 50:13

**radiology** 21:11

**range** 26:6 39:14,18 85:1

**re-ask** 45:1

**reaching** 72:22

**read** 50:16 88:16,17

**reading** 24:3 35:2 50:13,21 87:13

**real** 45:16

**rear** 37:9

**reason** 11:9 57:17

**reasonable** 26:17 40:1 68:14 79:3 85:24 86:5

**reasons** 80:9

**recall** 11:1 74:25 75:6

**receive** 10:7,12 13:10

**received** 6:1,10 10:4,8 32:3 41:2

**recent** 61:8 84:24

**recently** 83:23

**recertified** 6:12

**recognize** 14:19,21

**recommend** 74:11

**recommendations** 85:5

**recommended** 48:2

**reconstruction** 6:19

**record** 5:13 40:13 74:14 81:11 87:12 88:18

**recorded** 83:25

**records** 7:13 8:1,2, 16,18 9:24 11:18 13:7,8,13,19 14:17 15:10,12 18:6,15 67:17 73:12

**recovered** 83:4

**recovery** 16:10,11 80:23 83:3

**refer** 9:3 30:12

**referring** 54:1,10 61:22 64:18 65:20 70:18

**refers** 21:16,20 59:23 62:25 65:22

**regard** 27:4 40:2 47:16 53:8 63:14 76:17

**regular** 30:19 88:21

**relate** 32:6,10

**related** 17:13 19:12 20:11,17 23:4,7 25:13 29:13 31:21 32:14,21 33:4 34:7 38:24 39:9,11 45:12 71:14 75:21 79:4 86:1

**relates** 40:15,22 43:22 61:15 72:3 83:21 85:8

**relation** 32:18 37:18

**relaxants** 74:17

**released** 41:7

**relief** 47:11

**remainder** 46:11 65:16

**remained** 45:6

**remaining** 73:1

**remember** 48:10 81:8

**remove** 77:7,17

**removed** 77:20

**repair** 74:21 79:22, 23

**repeat** 33:22

**rephrase** 15:3 22:3, 25 43:15

**report** 9:4 10:12 11:10,12,16,20 18:9 19:6 21:5 29:9,12 33:6 35:18,19 40:22 41:9 48:9 50:18 51:15 54:9 56:8 60:10 71:11 87:23 88:1,11

**reported** 20:13 21:9 29:21 83:24

**reporter** 5:3 7:21 48:25 88:19,23

**reporting** 24:22

**reports** 23:2,10 29:4,6 54:17

**represent** 57:8

**request** 81:20

**residency** 6:7,9

**residual** 83:21

**resolve** 45:15 82:15

**resolved** 27:19

**respect** 55:21

**responded** 47:8

**responds** 47:9

**response** 30:17 36:9

**rest** 53:12

**restricted** 43:25

**result** 20:1,5 30:15, 16 37:16 46:4 64:12 68:19 69:9 78:24 79:17

**retained** 13:3

**return** 31:9

**returned** 44:19

**review** 11:12,15 14:18 17:15 18:16 19:5 23:6 29:6 50:10

**reviewed** 19:8,19 21:7 22:19 23:2 28:25 29:3,4,8 31:14 50:12 54:5



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.                                                      Index: reviewing..strong

**reviewing** 11:20 54:8

**rim** 55:1,10 70:12

**Robert** 41:9

**rolling** 72:20

**room** 18:6,12,15,16, 25 22:22 23:3 41:24 67:17

**roots** 25:16,17

**rotation** 66:2 72:19, 21

**rotator** 51:1 55:24 56:1 60:17 63:12,13, 14,15 70:24 77:3,8, 10,15 78:9 80:18

**roughly** 83:13

**rule** 43:9,21 51:1 68:13 78:22

**runs** 52:6

**S**

**scab** 65:8

**scan** 22:8,14 24:1,4

**scans** 21:4 22:18

**scapula** 55:5

**scarring** 65:1,5,6,11

**scenario** 83:12

**scheduled** 49:14,16, 20,21

**school** 6:2,4

**science** 6:1

**scope** 62:5 77:14

**scrape** 65:7

**seat** 68:6,9

**secondary** 19:23 37:21

**sections** 65:23

**sees** 24:23

**segments** 29:21 30:2 35:16

**send** 16:20

**sense** 47:21

**sensitive** 57:20

**sensory** 47:25

**sentence** 65:15 70:1, 2,22

**separate** 8:4,5 29:12 79:1

**September** 75:9,13 81:2

**series** 19:20 53:15 58:12

**serve** 67:3

**sets** 14:6

**sew** 83:9

**shades** 63:23

**shaver** 76:9

**sheet** 14:22 62:18,19

**short** 34:13 67:12

**shorter** 23:24

**shoulder** 6:20 15:13,14 18:4 21:17, 24 22:8 37:20,22 38:1,4,8 39:4,10,15, 16,18 50:2,4 54:23 55:4,5,22 56:15 59:16 61:12,19 62:11 63:1,4 65:21 67:24 68:2,6,16 70:5,12 71:14,15,17, 20 72:4,6,9 73:4 74:19,21 75:14 77:20 78:19 79:21, 22 80:2 82:25 83:6, 20,22,25 84:8,9,11 85:1,4,9,14,19,21,25 86:24 87:13,18 88:5

**show** 13:23 14:2 35:25 36:2 39:11 40:22 53:3

**showering** 82:23

**shredded** 57:9

**shredded-type** 52:13

**Shuffling** 18:1

**side** 24:16,21 30:6 37:6 38:25 77:14 78:7

**sign** 16:5,8

**signal** 24:13

**significant** 36:22, 24,25 64:3 78:2

**similar** 72:22 85:2

**similarly** 72:16

**simple** 42:9

**simply** 26:20 29:6

**single** 7:22 86:14

**singular** 22:14

**sir** 5:15,22 7:2 10:6 11:8 13:16 14:15,20 35:11 50:5,7 57:14 60:11 62:9

**site** 36:9 82:8

**sitting** 37:8

**situation** 31:9 36:2 38:5 47:19 57:15 69:15

**size** 55:6,7

**slide** 49:8

**slight** 85:1

**slightly** 72:20

**sling** 82:14,25

**small** 24:15 33:14 37:4 42:19 55:5

**smaller** 55:7 58:10

**smooth** 62:12

**socket** 52:6 55:2,4 59:21,24 60:1 61:23 62:10 70:13

**soft** 20:23,25 21:3 70:11

**somebody's** 20:1 35:24 79:21

**someone's** 74:2

**sooner** 49:18

**sort** 16:10 18:20 27:14 31:21 38:20

45:21 51:10 53:1 79:24 85:11

**sorts** 38:16

**source** 79:8,9,11

**space** 54:14 56:12, 17,19 57:22,25 58:5 77:16 78:1 79:12 80:4

**spasm** 19:23 30:17 44:1,11 74:4,9

**spasms** 46:9

**speak** 84:23

**speaking** 67:16

**speaks** 61:6

**special** 76:13

**Specialists** 5:20 6:23

**specialty** 6:17

**specific** 7:21 12:22 27:7 60:21 67:7

**specifically** 53:10 71:19

**speculate** 54:3

**spell** 5:13

**spinal** 25:15 33:12, 13

**spine** 17:13 19:10, 12,14,20,21,22,25 20:5,12,14,23 23:8, 21,22,23 24:7,16 25:14,18,22,25 29:5, 9,14,15,19,22 30:3,6, 10,11 31:11 32:15, 19,22 33:13 35:17 38:17 39:8 40:2,15, 17 42:4,25 44:17 47:2 71:16 72:6,7 74:7

**spoke** 11:6

**spoken** 10:20

**spot** 56:2

**sprain** 26:23,24

**sprained** 45:16

**sprains** 27:5,6

**Springs** 7:6

**spur** 77:22 79:15 80:16

**spurring** 79:14

**stack** 7:17 18:18

**stacked** 42:10

**stand** 15:15

**standing** 78:18

**stands** 66:2

**start** 7:23 23:13,23 24:10 29:25 42:17, 22 44:12 82:25 83:13

**started** 9:16 34:16

**starts** 58:8 65:6,7

**state** 5:12 6:2 45:10 61:5

**statement** 34:14 87:15

**stay** 42:21

**stays** 30:25

**steering** 67:11

**stick** 39:23

**stiffness** 37:17

**stop** 7:19 34:5,19 51:22 52:2 65:2,19

**stopped** 34:20

**straight** 20:9 23:16 62:6

**straighten** 37:10

**straightening** 19:22,25 20:4 30:11

**straightforward** 80:21

**strain** 26:1,3,6,14,16 27:10,18 28:1,6 53:18,23 66:8

**strains** 27:8

**streaking** 63:21,24

**strong** 37:14



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.

**structure** 21:22
33:18 52:5 62:20
66:3 74:8

**structures** 56:4 66:9
77:11,21

**studies** 17:7,10 29:3
36:11 39:12 41:19
44:18 51:17 60:6
71:8

**study** 17:12 20:17
21:6 22:6,14 28:25
36:1,7,13 42:17
43:10 44:15 46:9
50:10,16,22,25 53:4
54:6,8 56:19 57:21
58:2 59:25 64:11
76:24

**stuff** 62:13 76:11

**subacromial** 75:15
78:1,4 80:4

**subluxation** 58:17
59:21,23 66:10,17
69:10,12,19,20

**subluxed** 69:14,16

**subpoena** 13:10

**subscapularis**
60:13,16

**subspecialty** 6:19

**substance** 11:1

**successful** 76:17

**suction** 76:11

**suffering** 27:25
35:20

**sufficient** 78:17

**suggest** 21:2

**suggested** 75:2

**suggesting** 59:20

**suggestion** 87:4

**suggests** 56:20

**summary** 64:24

**superior** 52:8 58:8,9
65:17 75:23,25

**support** 54:14

**supporting** 9:13

**supposed** 13:11

**supraspinatus**
63:17

**surface** 77:13 78:8

**surfaces** 61:21 62:8,
9,11 77:4,12

**surgeon** 5:18

**Surgeons** 6:12

**surgery** 6:7,8,15,20
15:13,14,16 37:20,
22,24 47:20 73:14
74:12 75:1,5,20
79:21 80:24 81:10
83:6,22 84:10 85:8,
10,20,25

**surgical** 47:18 81:11
82:7

**surrounding** 37:21

**sustained** 32:13
39:10 40:3,14 60:24
66:20,21 68:2

**sutures** 81:3 82:5

**swear** 5:3

**swelling** 20:23

**sworn** 5:9

**symptom** 37:23
60:19

**symptoms** 36:18,22,
25 37:17 38:3,24
39:1 45:15 47:11

**syndrome** 32:23
35:20,23,24 37:3
38:12,13 40:4 46:11
47:17

**system** 37:7 52:3
75:18 79:24

**systematic** 77:1

---

**T**

**T1** 34:24

**talk** 21:11 38:17

**talking** 18:21 22:12,

13 27:7 30:4 42:18
45:11 46:17 57:16
58:19 62:2 65:9 69:8

**Tanney** 8:17

**Tarpon** 7:6

**tear** 51:1 52:13,14
53:16 54:1,15,19,21
56:18,20 57:23
63:17 75:14,16,17
78:25

**tearing** 52:12 53:21
75:23

**technical** 66:5

**technique** 51:16

**telling** 13:10 28:13

**tend** 63:23 67:9

**tenderness** 36:8

**tendinopathy**
63:16,20 64:5,6,11
70:23,25 71:1

**tendon** 54:25 63:21,
25 77:3

**tendons** 63:15

**tensile** 66:8

**term** 38:16 54:9,17
56:7 66:5 67:5

**termed** 36:6

**terms** 71:3

**test** 67:10

**testified** 5:9 11:24
12:8,13

**testifying** 12:13,15
13:5

**testimony** 5:4

**therapy** 47:7 74:18
83:13 85:21

**thickening** 60:15
62:17,19

**thing** 7:21 9:11
18:20 27:14 57:16
60:21 71:4 72:17
79:23 82:13 87:11

**things** 16:24 18:18

20:8,23 23:16 28:12
39:17 40:11 47:6,22
53:20 55:8,18 58:14
66:1 68:4 76:23
80:12 88:6

**thoracic** 30:10
71:16

**thought** 27:25 69:9
74:20

**threads** 57:8 76:4

**three-month** 49:23

**thrown** 67:11

**time** 9:23 11:6
15:13,15 17:2 19:3
26:10 27:15,18,21,
24 28:5,10 35:25
46:23 48:17 64:5,8
67:12 69:24 71:9
73:3 78:13 80:13
83:2,20 84:1,25
86:21

**times** 10:20 12:10,12

**timetable** 49:20
65:10

**tingling** 72:25

**tissue** 20:23,25 21:3
37:14 52:22 53:4,24
55:1 57:13 60:15
62:15 76:14 79:13

**today** 10:1 11:4,7,8
13:7,8,11 32:17
34:10 39:25 41:20
43:6 44:23 46:6 79:2
85:23 86:5

**today's** 11:13

**told** 69:8 83:4 85:13,
15 87:1

**tomorrow** 78:15

**top** 18:9 41:14 63:3
77:8

**torn** 45:13,17 56:13,
15 57:1,10,12,14

**total** 14:25

**tough** 55:13

**Towers** 31:12 35:5,7
50:14,15

**Towers's** 29:10
35:4,18 51:14

**track** 41:17

**training** 6:5,9 60:5

**trapezius** 73:19

**trauma** 19:18 20:18
25:5 30:15,19 31:21
43:11,18,22 45:12
60:24 64:12 69:3
86:20,23 87:2,4,9

**traumatic** 64:6
78:11

**treat** 7:10 47:6

**treated** 25:10 28:5
46:23

**treater** 13:5

**treating** 13:6 25:21
27:17 32:12 47:7

**treatment** 28:11
36:9 46:21 47:17
49:10 85:18 86:17

**treatments** 74:21

**trial** 12:8,13 66:19

**trigger** 73:18,25
74:2

**trim** 76:5

**trimming** 76:8

**truth** 5:5

**turn** 71:10

**type** 10:13 12:20,23
20:6 22:6 25:10,22
28:5 32:14 47:18,22
60:5 61:14 68:15
72:19 73:3 76:13
85:6,7,21

**typical** 13:1 54:17

**typically** 13:3,4,5
14:3 16:1,2 20:3,22
25:4 30:24 45:14
47:12 52:4,7,25 62:5
70:6 72:6 76:22
84:13



Jennifer Farley vs State Farm Mutual Automobile Insurance Company
ALAN J. GRAVES, M.D.

**U**

ultimately 74:10,13

unaffected 72:21

uncommon 37:19

undergo 37:20

understand 33:20 44:10 57:1 62:21 75:4 80:17,19 86:22

understanding 86:14

understood 87:15

underwent 46:7 51:5

unit 42:7,11

University 5:25 6:2

unremarkable 24:12 25:20 29:21 35:1,16 61:10,22,24

update 41:6

updated 41:5

updates 48:10

upper 21:16

upstairs 77:6

**V**

vaporizes 76:14

variability 26:22

variable 26:4

variations 67:13 83:7

vary 26:5,9

varying 45:18

vehicle 32:11 51:2

versa 38:4

vertebrae 25:19 42:5,17

vertebral 37:5

vice 38:4

video 66:25

views 19:21 41:22

violently 67:12

visible 69:2

visit 46:18,19 47:3 48:6,7 82:3,4

visited 80:22

visits 49:14 86:17

visualization 77:18

visualize 77:9

**W**

waive 88:16

wake 78:15

walls 77:10

wand 76:12

wanted 9:16 14:12 71:21 82:18 83:11

warm 14:10

wear 24:23,25

wedge-shaped 70:13

weeds 62:22

week 10:8 25:7 27:1 83:13

weekend 64:9

weeks 10:11 27:1 83:10,16

wheel 67:11

whichever 23:13

white 63:23

woman 59:3

word 44:9

words 87:17,23 88:8,9

work 6:24 12:21 64:9

worn 57:3

worse 45:6

worsened 76:24

wound 82:8

write 87:25 88:10

writing 54:8

wrong 32:8 68:5

**X**

X-RAY 19:4 20:6,7, 11 22:11 35:25 36:3 43:10 45:3,7 46:9 64:20

x-rayed 19:8

X-RAYS 19:2,5 40:17,19,21,23 41:19 44:20,22 80:6

**Y**

yard 64:8

year 49:19

years 6:6,7 46:21 68:8



**Orange Legal**
**800-275-7991**